1

2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

3                                                                  VOL. IV

4    UNITED STATES OF AMERICA,          )
                                        ) Case No. 1:15-CR-00033
5                                       )          (RJA)(HBS)
                      Plaintiff,        )
6                                       )
     vs.                                ) April 24th, 2018
7                                       )
     AARON HICKS,                       )
8                                       )
                      Defendant.        )
9

10

11          **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
         **BEFORE THE HONORABLE RICHARD J. ARCARA**
12            **SENIOR UNITED STATES DISTRICT JUDGE**

13
     APPEARANCES:

14
     For the Plaintiff:   JAMES P. KENNEDY, JR.
15                         UNITED STATES ATTORNEY
                           BY:  PAUL PARISI, ESQ.
16                              WEI XIANG, ESQ.
                           ASSISTANT UNITED STATES ATTORNEYS
17                         138 Delaware Avenue
                           Buffalo, NY 14202
18
     For the Defendant:   ROBERT ROSS FOGG, ESQ.
19                         69 Delaware Avenue, Suite 600
                           Buffalo, NY 14202
20
     Court Reporter:      MEGAN E. PELKA, RPR
21                         Robert H. Jackson Courthouse
                           2 Niagara Square
22                         Buffalo, NY 14202

23

24

25

1                          **I N D E X**

2    WITNESSES                                            PAGE

3    GOVERNMENT

4    JEROME GRANT
         Direct Examination by Mr. Xiang                  555
5        Cross-examination by Mr. Fogg                    590
         Redirect Examination by Mr. Xiang               657
6        Recross-examination by Mr. Fogg                  663
     JEREMY PETERSON
7        Direct Examination by Mr. Parisi                 666

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:25AM | 1 | (The jury entered the room at 10:00 a.m.) |
| 10:01AM | 2 | THE CLERK:  All rise.  Criminal action 2015-33A. |
| 10:01AM | 3 | United States v. Aaron Hicks.  Jury trial.  Counsel, please |
| 10:01AM | 4 | state your name and the party you represent for the record. |
| 10:01AM | 5 | MR. PARISI:  Good morning.  Paul Parisi and Wei Xiang |
| 10:01AM | 6 | for the United States. |
| 10:01AM | 7 | MR. FOGG:  Good morning, Your Honor, ladies and |
| 10:01AM | 8 | gentlemen.  Robert Ross Fogg for Aaron Hicks, who is present |
| 10:01AM | 9 | in court. |
| 10:01AM | 10 | THE COURT:  Good morning, everyone. |
| 10:01AM | 11 | (An off-the-record discussion was held.) |
| 10:02AM | 12 | THE COURT:  Okay, folks.  We're ready to continue. |
| 10:02AM | 13 | MR. XIANG:  Your Honor, the government calls Jerome |
| 10:02AM | 14 | Grant, witness number 34. |
| 10:02AM | 15 | THE CLERK:  Please state your full name and spell |
| 10:02AM | 16 | your last name for the record. |
| 10:02AM | 17 | THE WITNESS:  Jerome Nathan Grant, G-R-A-N-T. |
| 10:02AM | 18 | (The witness was sworn at 10:02 a.m.) |
| 10:02AM | 19 | |
| 10:02AM | 20 | DIRECT EXAMINATION |
| 10:02AM | 21 | |
| 10:02AM | 22 | BY MR. XIANG: |
| 10:02AM | 23 | Q.  Mr. Grant, how old are you? |
| 10:02AM | 24 | A.  Thirty-seven. |
| 10:02AM | 25 | Q.  Where are you from? |

10:03AM    1    A.  Buffalo.

10:03AM    2    Q.  Were you born here?

10:03AM    3    A.  Yeah.

10:03AM    4    Q.  Are you currently in jail?

10:03AM    5    A.  Yeah.

10:03AM    6    Q.  Pull the mic closer to you, please.

10:03AM    7    A.  Yes.

10:03AM    8    Q.  Since when have you been in jail on this stint?

10:03AM    9    A.  July 24th, 2014.

10:03AM   10    Q.  So, for almost the past four years?

10:03AM   11    A.  Yes.

10:03AM   12    Q.  Had you ever been incarcerated before 2014, before July

10:03AM   13    of 2014?

10:03AM   14    A.  Yes.

10:03AM   15    Q.  What years?

10:03AM   16    A.  2003, 2004, 2006.  2006 to 2011, I got out on pre-release

10:03AM   17    and then, went back from 2011 to -- March 2011 to October

10:03AM   18    2012.

10:03AM   19    Q.  All right.  When you say pre-release, you were on --

10:04AM   20    A.  Technically, I was still incarcerated, but I was in a

10:04AM   21    halfway house.

10:04AM   22    Q.  And just to clarify, what time period was this that you

10:04AM   23    were at the halfway house?

10:04AM   24    A.  From August of 2011, August 15th, 2011 until March 2012.

10:04AM   25    I took too long to get back to work and they sent me back to

GRANT  --  BY MR. XIANG  --  4/24/18

10:04AM    1    Albion and I got on parole October 9th, 2012.

10:04AM    2    Q.  When you were released on -- to the halfway house, the

10:04AM    3    pre-release you're talking about August 15th, 2011, what

10:04AM    4    facility were you released from?

10:04AM    5    A.  SCI Albion.

10:04AM    6    Q.  And what state is that in?

10:04AM    7    A.  Pennsylvania.

10:04AM    8    Q.  SCI, being State Correctional Institution?

10:04AM    9    A.  Yeah.

10:04AM   10    Q.  And how long had you been in custody in the

10:05AM   11    Pennsylvania -- Commonwealth of Pennsylvania Department of

10:05AM   12    Corrections before this halfway house release on August 15,

10:05AM   13    2011?  How long before that?

10:05AM   14    A.  2004 to 2006.  I got paroled in 2006 from SCI Houtzdale.

10:05AM   15    Q.  And then when did you go back in?

10:05AM   16    A.  July 2006.

10:05AM   17    Q.  And when did you get released from that stint?

10:05AM   18    A.  Well, I got released from federal jail September 2010,

10:05AM   19    but I had a warrant for Pennsylvania for parole violation, so

10:05AM   20    they came and got me and took me to SCI Albion.  Then I got

10:05AM   21    released on pre-release August 15th, 2011.

10:05AM   22    Q.  Both the Pennsylvania -- well, what was the -- the

10:05AM   23    underlying conviction for which you served time in

10:06AM   24    Pennsylvania?

10:06AM   25    A.  Possession of marijuana.

GRANT  --  BY MR. XIANG  --  4/24/18

10:06AM    1    Q.  And then, the federal sentence?

10:06AM    2    A.  Possession of a firearm.  Criminal in possession of a

10:06AM    3    firearm.

10:06AM    4    Q.  When you were in Pennsylvania prison, did you have access

10:06AM    5    to telephone contact with people on the outside?

10:06AM    6    A.  Yes.

10:06AM    7    Q.  How were you able to do that?

10:06AM    8    A.  Get a phone list, fill it out, put the numbers on there.

10:06AM    9    Don't nobody else have a number, they approve it for you and

10:06AM   10    you call them.

10:06AM   11    Q.  The phone list, who did you submit that to?

10:06AM   12    A.  The counselor on the unit.  The unit counselor.

10:06AM   13    Q.  At the prison?

10:06AM   14    A.  Yes.

10:06AM   15    Q.  Did you give them, the Pennsylvania facility, a list of

10:06AM   16    people for your phone list?

10:06AM   17    A.  Yes, I did.

10:06AM   18    Q.  Who was at the top of your list?

10:06AM   19    A.  Aaron Hicks.

10:06AM   20    Q.  Is the Aaron Hicks that you're talking about, is he in

10:06AM   21    the courtroom with us today?

10:07AM   22    A.  Yes.

10:07AM   23    Q.  Can you identify him by a unique article of clothing he's

10:07AM   24    wearing?

10:07AM   25    A.  A blue jacket, suit jacket and glasses.

10:07AM    1            MR. XIANG:  The record will reflect the witness has

10:07AM    2    identified the defendant.  Can you stop swinging?  It's

10:07AM    3    squeaking.

10:07AM    4    BY MR. XIANG:

10:07AM    5    Q.  Why did you put Aaron Hicks on the top of your telephone

10:07AM    6    list?

10:07AM    7    A.  At that time, he was somebody that I was talking to

10:07AM    8    pretty much the most.  So, when I filled out the list, that

10:07AM    9    was the first person to pop up in my mind.

10:07AM   10    Q.  How did you know him?

10:07AM   11    A.  From Schuele Street, around that area.

10:07AM   12    Q.  Since when?

10:07AM   13    A.  Since about -- I want to say about maybe 2000, early

10:07AM   14    2000, late 90's, early 2000's.

10:07AM   15    Q.  How old would that have made you at the time?

10:08AM   16    A.  Like probably 2000, I was 19, about to be 20.  About 20,

10:08AM   17    21, around that area.

10:08AM   18    Q.  And what street -- on what street were you living at that

10:08AM   19    time?

10:08AM   20    A.  I was staying on Schuele.

10:08AM   21    Q.  And where was Aaron Hicks?

10:08AM   22    A.  He was staying on Northland.

10:08AM   23    Q.  How did you first meet him?

10:08AM   24    A.  Just seen him around over there in the neighborhood.

10:08AM   25    Q.  Did you go to school with him?

GRANT  --  BY MR. XIANG  --  4/24/18

560

| | | |
|---|---|---|
| 10:08AM | 1 | A.  No. |
| 10:08AM | 2 | Q.  In terms of age, are you older, younger? |
| 10:08AM | 3 | A.  Older. |
| 10:08AM | 4 | Q.  How did your relationship with him develop from the early |
| 10:08AM | 5 | 2000's? |
| 10:08AM | 6 | A.  When I first got released from Houtzdale -- excuse me. |
| 10:08AM | 7 | When I first got released from Houtzdale, I was in the |
| 10:08AM | 8 | halfway house in Pennsylvania.  I think it was called Gateway |
| 10:09AM | 9 | and -- |
| 10:09AM | 10 | Q.  What year is this? |
| 10:09AM | 11 | A.  This was 2006.  Then, I talked to Stacks. |
| 10:09AM | 12 | Q.  Who is Stacks? |
| 10:09AM | 13 | A.  Antwon Steward.  And he told me that Boogy was going to |
| 10:09AM | 14 | Edinboro down there. |
| 10:09AM | 15 | Q.  Who is Boogy? |
| 10:09AM | 16 | A.  Aaron Hicks. |
| 10:09AM | 17 | Q.  How did you know Stacks or Antwon Steward? |
| 10:09AM | 18 | A.  I have known him for a while, from around the Schuele |
| 10:09AM | 19 | area. |
| 10:09AM | 20 | Q.  In 2006, after you learned that Boogy was going to school |
| 10:09AM | 21 | in Edinboro, what happened next? |
| 10:09AM | 22 | A.  I called him.  He came down.  I was in Erie.  He came |
| 10:09AM | 23 | down to pick me up from the halfway house. |
| 10:09AM | 24 | Q.  Erie, Pennsylvania? |
| 10:09AM | 25 | A.  Yeah.  Then, we went back out to his school.  Stayed out |

GRANT  --  BY MR. XIANG  --  4/24/18

| 10:09AM | 1 | there for a little while 'til it was time for me to go back |
|10:09AM | 2 | to the halfway house.  And then I went back to the halfway |
|10:10AM | 3 | house and that's when we started hanging around each other. |
|10:10AM | 4 | Q.  What did you guys do together? |
|10:10AM | 5 | A.  Well, at that time, we really wasn't doing too much, a |
|10:10AM | 6 | little bit of weed. |
|10:10AM | 7 | Q.  What do you mean a little bit of weed? |
|10:10AM | 8 | A.  Like, nickle bags. |
|10:10AM | 9 | Q.  Using? |
|10:10AM | 10 | A.  Selling.  I couldn't smoke at that time because I was in |
|10:10AM | 11 | the halfway house and they was giving me urines.  So, I would |
|10:10AM | 12 | just sell. |
|10:10AM | 13 | Q.  What do you mean by we? |
|10:10AM | 14 | A.  Well, I got the weed from him. |
|10:10AM | 15 | Q.  Where were you selling? |
|10:10AM | 16 | A.  In Erie, Pennsylvania, to various people. |
|10:10AM | 17 | Q.  How much were you getting from Boogy? |
|10:10AM | 18 | A.  At that time, it was probably like an ounce, two ounces. |
|10:10AM | 19 | Q.  So, how many -- you said nickel bags? |
|10:10AM | 20 | A.  Yeah. |
|10:10AM | 21 | Q.  Give us an idea of quantity-wise, price-ise, what that |
|10:11AM | 22 | is? |
|10:11AM | 23 | A.  You take an ounce, you probably make maybe 20 nickle bags |
|10:11AM | 24 | out of it, if I'm not mistaken. |
|10:11AM | 25 | Q.  A nickel bag; what's a nickle bag? |

GRANT  --  BY MR. XIANG  --  4/24/18

562

10:11AM   1   A.  It's a $5 bag of weed.

10:11AM   2   Q.  You say you would get an ounce or so from Boogy every

10:11AM   3   time?

10:11AM   4   A.  Yeah.  At that time, yes.

10:11AM   5   Q.  And how much was an ounce?

10:11AM   6   A.  At that time, it was kind of cheap, it was $50, $75 an

10:11AM   7   ounce.

10:11AM   8   Q.  How often were you doing this with Boogy?  And I'll ask

10:11AM   9   you again; we're talking about 2006?

10:11AM  10   A.  I don't know.  Just pretty much if I needed it or if I

10:11AM  11   knew somebody who needed it, I would call.  So, whenever I

10:11AM  12   needed it or somebody else needed it.

10:11AM  13   Q.  Was there anyone else -- you mentioned Stacks earlier.

10:12AM  14   Was there anyone else you knew from Schuele involved in your

10:12AM  15   drug dealing with Hicks in the Edinboro/Erie area at this

10:12AM  16   time?

10:12AM  17   A.  Barkley was going there, too.

10:12AM  18   Q.  Who?

10:12AM  19   A.  Barkley, Anthony.  I think his name is Anthony Barkley.

10:12AM  20   Q.  What was he doing?

10:12AM  21   A.  He was selling weed.

10:12AM  22   Q.  Where was he from?

10:12AM  23   A.  Schuele.

10:12AM  24   Q.  Did you know him before?

10:12AM  25   A.  Yeah.

10:12AM    1    Q.  I think earlier you said that in 2006 you went back to

10:12AM    2    prison?

10:12AM    3    A.  Yeah.

10:12AM    4    Q.  When -- and when you went back in, in 2006, when was the

10:12AM    5    next time you got out?

10:12AM    6    A.  2011.

10:12AM    7    Q.  And you said from -- is that the August 15, 2011?

10:12AM    8    A.  Yes.  That's when I was on pre-release -- or post-

10:13AM    9    release.  It's called -- it's actually called -- they have

10:13AM   10    pre-release if it's before your sentence; post-release if

10:13AM   11    it's after your sentence.

10:13AM   12    Q.  What you got out August 15, 2011, how did you get to the

10:13AM   13    halfway house?

10:13AM   14    A.  Boogy took me.

10:13AM   15    Q.  Where was this halfway house?

10:13AM   16    A.  On West 2nd Street in Erie.

10:13AM   17    Q.  Erie, Pennsylvania?

10:13AM   18    A.  Yes.

10:13AM   19    Q.  How long were you at this halfway house?

10:13AM   20    A.  Seven months before I went back to jail for taking too

10:13AM   21    long to get home from work.

10:13AM   22    Q.  During this seven-month period, starting August 15th,

10:13AM   23    2011, did you continue to sell drugs in the Erie area?

10:13AM   24    A.  Yeah.

10:13AM   25    Q.  What?

GRANT  --  BY MR. XIANG  --  4/24/18

564

| | | |
|---|---|---|
| 10:13AM | 1 | A.  Marijuana, cocaine. |
| 10:13AM | 2 | Q.  How did you get it? |
| 10:14AM | 3 | A.  From Boogy. |
| 10:14AM | 4 | Q.  How? |
| 10:14AM | 5 | A.  He would come up there and see me.  One time, I went to |
| 10:14AM | 6 | Buffalo to get some weed from him. |
| 10:14AM | 7 | Q.  Was there anyone else from the Schuele area who was also |
| 10:14AM | 8 | involved in your drug dealing in Erie during this period? |
| 10:14AM | 9 | A.  Yeah.  It was Hottie. |
| 10:14AM | 10 | Q.  How did you know Hottie? |
| 10:14AM | 11 | A.  I really met him when I first came home, because he |
| 10:14AM | 12 | wasn't around before then.  But when I first came home, I |
| 10:14AM | 13 | been -- |
| 10:14AM | 14 | Q.  When you first came home was when? |
| 10:14AM | 15 | A.  Well, 2011.  That was when I first met him. |
| 10:14AM | 16 | Q.  How did you get to meet Hottie? |
| 10:14AM | 17 | A.  I met him through -- well, Boogy didn't introduce us.  He |
| 10:14AM | 18 | was there when we like, met face to face, but he told me that |
| 10:14AM | 19 | that was his peoples. |
| 10:14AM | 20 | Q.  Where did you meet Hottie? |
| 10:14AM | 21 | A.  First time I met him was at a Walmart.  He had came up |
| 10:15AM | 22 | and brought me some CDs. |
| 10:15AM | 23 | Q.  And what city was this? |
| 10:15AM | 24 | A.  This was in Erie, Pennsylvania. |
| 10:15AM | 25 | Q.  When you say that he went -- he came up or you went up, |

GRANT  --  BY MR. XIANG  --  4/24/18

565

| | | |
|---|---|---|
| 10:15AM | 1 | Buffalo is north of Erie, correct? |
| 10:15AM | 2 | A.  Yeah. |
| 10:15AM | 3 | Q.  But are you referring to you met him in Pennsylvania? |
| 10:15AM | 4 | A.  Yeah.  I met him at a Walmart in Pennsylvania. |
| 10:15AM | 5 | Q.  Why did you meet Hottie then? |
| 10:15AM | 6 | A.  Well, at that time, he was -- he had some CDs for me to |
| 10:15AM | 7 | pass around Erie. |
| 10:15AM | 8 | Q.  What kind of CDs? |
| 10:15AM | 9 | A.  Rap CDs. |
| 10:15AM | 10 | Q.  What relation did the rap CDs have with Hottie? |
| 10:15AM | 11 | A.  Well, he was Black. |
| 10:15AM | 12 | Q.  Who is Black? |
| 10:15AM | 13 | A.  Sirius Black, Sandy Jones. |
| 10:15AM | 14 | Q.  Did you know who Sirius Black or Sandy Jones was? |
| 10:15AM | 15 | A.  Yeah. |
| 10:15AM | 16 | Q.  Before Hottie passed you these CDs? |
| 10:15AM | 17 | A.  Yes. |
| 10:15AM | 18 | Q.  How did you know Sirius Black? |
| 10:16AM | 19 | A.  From Schuele Street. |
| 10:16AM | 20 | Q.  What time period?  As in, when did you first meet him? |
| 10:16AM | 21 | A.  About late 90's, early 2000's. |
| 10:16AM | 22 | Q.  And how did you meet Sirius Black? |
| 10:16AM | 23 | A.  Being in the neighborhood.  At that time, he was selling |
| 10:16AM | 24 | weed. |
| 10:16AM | 25 | Q.  When Hottie gave you the Sirius Black CDs, did you ever |

GRANT  --  BY MR. XIANG  --  4/24/18

566

| | | |
|---|---|---|
| 10:16AM | 1 | view any music videos with -- of Sirius Black? |
| 10:16AM | 2 | A.  Yes. |
| 10:16AM | 3 | Q.  When you were at the halfway house in Erie, Pennsylvania, |
| 10:16AM | 4 | from August 2011 to March of 2012, were you invited to be in |
| 10:16AM | 5 | a music video with Sirius Black? |
| 10:16AM | 6 | A.  Yes. |
| 10:16AM | 7 | Q.  Who invited you? |
| 10:16AM | 8 | A.  Boogy. |
| 10:16AM | 9 | Q.  How? |
| 10:16AM | 10 | A.  Phone.  I was talking to him on the phone.  He was |
| 10:17AM | 11 | telling me that they was bringing Cheddar DVD down to Buffalo |
| 10:17AM | 12 | and see if I can come to the video shoot.  And the reason why |
| 10:17AM | 13 | he was asking is because I guess he wanted me to get fitted |
| 10:17AM | 14 | for a tux. |
| 10:17AM | 15 | Q.  How did you know he wanted to get you fitted for a tux? |
| 10:17AM | 16 | A.  Because that's what he told me. |
| 10:17AM | 17 | Q.  Were you able -- |
| 10:17AM | 18 | A.  If I can come. |
| 10:17AM | 19 | Q.  Were you able to attend? |
| 10:17AM | 20 | A.  No. |
| 10:17AM | 21 | Q.  Why not? |
| 10:17AM | 22 | A.  Because by me being on pre-release, I was technically |
| 10:17AM | 23 | still in jail, so I wasn't allowed to leave the state. |
| 10:17AM | 24 | Q.  You just said pre-release? |
| 10:17AM | 25 | A.  Well, post-release.  It's the same. |

| | | |
|---|---|---|
| 10:17AM | 1 | Q.  The particular video that you were supposed to -- that |
| 10:17AM | 2 | you were invited to be in with the tux, did you learn about |
| 10:17AM | 3 | the finished video? |
| 10:17AM | 4 | A.  Yes, I did. |
| 10:17AM | 5 | Q.  How did you learn about the finished video? |
| 10:17AM | 6 | A.  Boogy told me that it was on YouTube.  He called me and |
| 10:17AM | 7 | told me it was on YouTube, or maybe I called him.  We was |
| 10:18AM | 8 | talking on the phone. |
| 10:18AM | 9 | Q.  Did you see the video afterwards after he told you about |
| 10:18AM | 10 | it? |
| 10:18AM | 11 | A.  Yes. |
| 10:18AM | 12 | Q.  And is Hottie in that video? |
| 10:18AM | 13 | A.  Yes. |
| 10:18AM | 14 | Q.  Do you remember the scene or a scene where he's in? |
| 10:18AM | 15 | A.  Yeah.  I remember a scene where he's in. |
| 10:18AM | 16 | Q.  When? |
| 10:18AM | 17 | A.  He was sitting at the table.  He had an unlit cigar in |
| 10:18AM | 18 | his mouth and he was talking. |
| 10:18AM | 19 | Q.  Did you recognize anyone else in that video? |
| 10:18AM | 20 | A.  Yeah. |
| 10:18AM | 21 | MR. XIANG:  Can we pull up 24 -- what's in evidence |
| 10:18AM | 22 | as Government Exhibit 24H, please? |
| 10:18AM | 23 | BY MR. XIANG: |
| 10:19AM | 24 | Q.  Mr. Grant, do you see what's on the screen as |
| 10:19AM | 25 | Exhibit 24H? |

GRANT  --  BY MR. XIANG  --  4/24/18

568

| | | |
|---|---|---|
| 10:19AM | 1 | A.  Yes. |
| 10:19AM | 2 | Q.  Is this still a lot of the video that we've been talking |
| 10:19AM | 3 | about? |
| 10:19AM | 4 | A.  Yes. |
| 10:19AM | 5 | Q.  Do you recognize any persons shown in this still shot? |
| 10:19AM | 6 | A.  Yes.  Yeah. |
| 10:19AM | 7 | Q.  Why don't we start on the right-hand side?  Fair to say |
| 10:19AM | 8 | that there's four people seated and then a number of people |
| 10:19AM | 9 | standing in the back? |
| 10:19AM | 10 | A.  Yes. |
| 10:19AM | 11 | Q.  All right.  Let's start on the right-hand side with the |
| 10:19AM | 12 | back row.  The first person on the right, do you recognize |
| 10:19AM | 13 | that person? |
| 10:19AM | 14 | A.  That's standing? |
| 10:19AM | 15 | Q.  Yes. |
| 10:19AM | 16 | A.  Holding the drink?  What are you talking about? |
| 10:19AM | 17 | Q.  Just to be clear, on the back row.  The first person on |
| 10:20AM | 18 | the right. |
| 10:20AM | 19 | A.  Oh, yeah, yeah.  That's Dre. |
| 10:20AM | 20 | Q.  How did you know him? |
| 10:20AM | 21 | A.  From the Schuele Avenue. |
| 10:20AM | 22 | Q.  What was your relationship to him? |
| 10:20AM | 23 | A.  He was all right, cordial. |
| 10:20AM | 24 | Q.  Let's move one over.  Second person on the right, back |
| 10:20AM | 25 | row? |

10:20AM   1   A.  Yeah, I know him.

10:20AM   2   Q.  Who is that?

10:20AM   3   A.  Torrance.

10:20AM   4   Q.  Do you know him by -- is that a first name, last name,

10:20AM   5   nickname?

10:20AM   6   A.  First name is Letorrance, last name Travis.

10:20AM   7   Q.  How did you know him?

10:20AM   8   A.  Well, I knew him before Schuele area.  His mom was one of

10:20AM   9   my teachers at the school, so I knew them by the Schuele

10:21AM  10   Avenue.  His grandmother stayed on Stevens.

10:21AM  11   Q.  Moving one left, still on the back row.

10:21AM  12   A.  The girl?

10:21AM  13   Q.  Yes.

10:21AM  14   A.  No, I'm not familiar with her.

10:21AM  15   Q.  Moving one over from her?

10:21AM  16   A.  That's Tory, Torrance's older brother.

10:21AM  17   Q.  Do you know Tory's full name?

10:21AM  18   A.  I think it's Shawntorrian Travis.

10:21AM  19   Q.  Moving one over from Tory?

10:21AM  20   A.  That's Mike.  Mikey Bird.

10:21AM  21   Q.  How did you know Mikey Bird?

10:21AM  22   A.  From the Schuele area.

10:21AM  23   Q.  Do you remember one over, the one in the White Sox hat?

10:21AM  24   A.  I can't really see his face, to be honest with you.

10:22AM  25   Q.  One over from the White Sox hat, individual holding up

GRANT  --  BY MR. XIANG  --  4/24/18

570

10:22AM   1    the bottle with the gold chain?

10:22AM   2    A.   That's DJ Shay.

10:22AM   3    Q.   How did you know him?

10:22AM   4    A.   From being in the studio, his studio.

10:22AM   5    Q.   Do you see the person one over from him, the person on

10:22AM   6    the left-most side?

10:22AM   7    A.   Yeah.  It look like it could be Joe.

10:22AM   8    Q.   But you can't see his face?

10:22AM   9    A.   No, I can't see his whole face, but just from -- like,

10:22AM   10   what I assume he would look like.

10:22AM   11   Q.   I'm not asking you to assume anything.

10:22AM   12   A.   All right.

10:22AM   13   Q.   So, now let's go to the seated row.  Again, on the right-

10:22AM   14   hand side.  Starting on the right.

10:22AM   15   A.   Ra Ra.

10:22AM   16   Q.   Who?

10:22AM   17   A.   Ra Ra.

10:22AM   18   Q.   Do you know his -- is that a first name, last name,

10:23AM   19   nickname?

10:23AM   20   A.   No.  That's his nickname.  His first name is Roderick.

10:23AM   21   His last name is Arrington.

10:23AM   22   Q.   How did you know Roderick Arrington?

10:23AM   23   A.   I went to school with him and from around Schuele area.

10:23AM   24   Q.   Moving one left from Roderick Arrington?

10:23AM   25   A.   Boogy.

GRANT  --  BY MR. XIANG  --  4/24/18

571

| 10:23AM | 1 | Q.  One left from Boogy? |
|---|---|---|

10:23AM   1   Q.  One left from Boogy?

10:23AM   2   A.  Black.

10:23AM   3   Q.  Do you remember from the video, at least one left from

10:23AM   4   Black, who has his head down?

10:23AM   5   A.  That's Breeze.

10:23AM   6   Q.  Who?

10:23AM   7   A.  OP, Breeze.

10:23AM   8   Q.  How did you know OP/Breeze?

10:23AM   9   A.  Schuele Street.

10:23AM   10   Q.  Do you remember the layout of the rest of this table?  I

10:23AM   11   mean, who was seated to OP's right?  Who is off the screen on

10:23AM   12   the left-hand side?

10:23AM   13   A.  I'm thinking.  If I can remember correctly, it would be

10:24AM   14   Brill and Dan, maybe Hottie.

10:24AM   15   Q.  Was there any video that you were present for?

10:24AM   16   A.  Yeah.

10:24AM   17   Q.  Which one or which ones?

10:24AM   18   A.  The All White video.

10:24AM   19   Q.  When was that?

10:24AM   20   A.  That was in 2013.

10:24AM   21   Q.  2013?

10:24AM   22   A.  Yeah.

10:24AM   23   Q.  Now, you had previously said that you went back to

10:24AM   24   Pennsylvania's prison in March of 2012?

10:24AM   25   A.  Yes.

10:24AM   1   Q.  So, when did you get released, after March of 2012?

10:24AM   2   A.  I got released to the halfway house.  They paroled me to

10:24AM   3   the halfway house on October 9th, 2012.  And then, I maxed

10:24AM   4   out from the halfway house, January 18th, 2013.

10:24AM   5   Q.  Can you explain what it meant for you to have maxed out

10:25AM   6   from the halfway house?

10:25AM   7   A.  I was finished with my Pennsylvania state sentence.

10:25AM   8   Q.  So, in January of 2013, were you under any criminal

10:25AM   9   sentence?  Let me rephrase.  By February of 2013, were you

10:25AM  10   under any criminal sentence?

10:25AM  11   A.  I was on probation for my previous federal charge that I

10:25AM  12   had.

10:25AM  13   Q.  Did that mean that you were in or out of custody?

10:25AM  14   A.  Well, I was out of custody, but I had to just report to

10:25AM  15   probation.

10:25AM  16   Q.  Is it -- after you were released or you maxed out of your

10:25AM  17   Pennsylvania sentence, in January of 2013, where did you go?

10:25AM  18   A.  Came back to Buffalo.

10:25AM  19   Q.  The All White video that you mentioned being produced in

10:25AM  20   2013, where was that?

10:25AM  21   A.  It was in Buffalo.

10:25AM  22   Q.  And how is it that you were present for its making?

10:26AM  23   A.  Because I was in Buffalo.

10:26AM  24   Q.  How did you know that it was being made?

10:26AM  25   A.  Oh, because Boogy had told me that they were about to do

GRANT -- BY MR. XIANG -- 4/24/18

10:26AM    1    a video.  I was hanging around pretty much almost every day

10:26AM    2    around this time.

10:26AM    3    Q.  Do you know how the All White video was funded?

10:26AM    4    A.  Yeah, we had some marijuana that came in.

10:26AM    5    Q.  How do you know that?

10:26AM    6    A.  Because I was there.

10:26AM    7    Q.  Explain what you meant by you had marijuana come in?

10:26AM    8    A.  I think it was 33 pounds, if I'm not mistaken.  And

10:26AM    9    picked it up from one of his relative's houses and we took it

10:26AM   10    to Brill house and we broke it down.  It was all in like,

10:26AM   11    little bags.  And like, you had to open the bags up and break

10:26AM   12    the weed down because it was compressed.

10:26AM   13    Q.  Start from the beginning.  How did you learn that there

10:27AM   14    was a shipment coming in?

10:27AM   15    A.  I was with Boogy.  He told me.

10:27AM   16    Q.  You said that it was brought to Brill's house?

10:27AM   17    A.  Yes.  We picked it up and then took it to Brill's house.

10:27AM   18    Q.  Who is we?  When you say we picked up?

10:27AM   19    A.  It was me, Boogy and Black was with us.

10:27AM   20    Q.  And where did you say you went to pick this up?

10:27AM   21    A.  It was one of his relative's houses, off like Camp

10:27AM   22    Street.

10:27AM   23    Q.  Whose relative?

10:27AM   24    A.  Boogy's.

10:27AM   25    Q.  When was the first time you saw the package?

574

10:27AM | 1 | A.  When the UPS man dropped it off.

10:27AM | 2 | Q.  And give us an idea of what you saw, the package, before

10:27AM | 3 | it was opened.

10:27AM | 4 | A.  It was in a brown box.  The UPS man dropped it off.

10:28AM | 5 | Boogy got out the -- we was in a truck, I think at the time.

10:28AM | 6 | Boogy got out of the truck, he grabbed it, put it in the

10:28AM | 7 | truck and we pulled of.

10:28AM | 8 | Q.  Why were you there?

10:28AM | 9 | A.  Because I was with him all the time at that time.

10:28AM | 10 | Q.  Was Brill with you when you picked it up?

10:28AM | 11 | A.  No.  No.

10:28AM | 12 | Q.  And you know why it was taken to Brill's house to be

10:28AM | 13 | broken down?

10:28AM | 14 | A.  I really don't know.  Nobody said why we was taking it

10:28AM | 15 | over or nothing.  Just that's where we went to.  So, that's

10:28AM | 16 | when I got out of the car.

10:28AM | 17 | Q.  Can you explain what it means or what you meant by

10:28AM | 18 | breaking it down?

10:28AM | 19 | A.  It comes in, it's compressed.  You got to break it down,

10:28AM | 20 | take it out of its form and then, put it into pounds and

10:28AM | 21 | then, put them in a Ziplock bag.

10:28AM | 22 | Q.  What do you mean that it came compressed?

10:29AM | 23 | A.  Like, it would be -- sometimes it would be -- sometimes

10:29AM | 24 | it come in big -- it would be like, a -- just a big,

10:29AM | 25 | compressed like, bale.  Sometimes, it would come and it would

10:29AM    1    be compressed, but they would be about this big (indicating).

10:29AM    2    You got to take it, it's wrapped up.  You got to take it from

10:29AM    3    out of its wrapper and break it down.

10:29AM    4    Q.   And what do you mean by putting it in pounds?

10:29AM    5    A.   Weigh it up to a pound, then put it in a Ziplock bag

10:29AM    6    because you sell it in pounds, you sell it by the pound.

10:29AM    7    Q.   Is that a common denomination for sale, pounds for

10:29AM    8    marijuana?

10:29AM    9    A.   Yeah.

10:29AM    10   Q.   And so, what happened to this parcel that you're talking

10:29AM    11   about that you took to Brill's house?

10:29AM    12   A.   It got broke down and it got sold.

10:29AM    13   Q.   Who broke it down?

10:29AM    14   A.   Boogy was breaking it down.  I'm not sure if I touched

10:29AM    15   that one, but I know Boogy was breaking it down.

10:30AM    16   Q.   How do you know it got sold?

10:30AM    17   A.   Because I was there when they got it and I was there when

10:30AM    18   it was gone.

10:30AM    19   Q.   What did that have to do with the All White video that we

10:30AM    20   were talking about?

10:30AM    21   A.   Well, it was pretty much dependent on that, on the weed

10:30AM    22   making it through, because nobody had no money at that time

10:30AM    23   to finance the videos.  So, the weed, like if it would have

10:30AM    24   never gotten through, then we wouldn't have been able to do

10:30AM    25   the video.

GRANT  --  BY MR. XIANG  --  4/24/18
576

10:30AM  1  Q.  The Brill that you're talking about, how did you know

10:30AM  2  Brill?

10:30AM  3  A.  I met him before.  I met him like, in the early 2000's,

10:30AM  4  briefly, but I really wasn't hanging around him then.  A

10:30AM  5  couple times I'd be around with Boogy.  And when I came home,

10:30AM  6  Boogy had introduced me to him.

10:30AM  7  Q.  When you first met Brill in the early 2000's, where did

10:30AM  8  you meet him?

10:30AM  9  A.  I met him -- at that time, I met him, he was coming

10:31AM  10  around Schuele neighborhood with Black Wheeze.  Black Wheeze

10:31AM  11  was on Lombard around that time.  So, I guess that's where he

10:31AM  12  was dealing on Lombard.  So, he would come around Schuele

10:31AM  13  from time to time, Brill would be with him.

10:31AM  14  Q.  You said that you didn't know him too well in the

10:31AM  15  beginning?

10:31AM  16  A.  No.  Just seeing him in passing.  I knew Black Wheeze.  I

10:31AM  17  didn't really know Brill.

10:31AM  18  Q.  Was there a time when you got to know Brill better?

10:31AM  19  A.  Yeah.  I got to know Brill better.

10:31AM  20  Q.  When?

10:31AM  21  A.  When I came home in 2013.

10:31AM  22  Q.  And how did you get to know him better then?

10:31AM  23  A.  From Boogy.

10:31AM  24  Q.  How?

10:31AM  25  A.  They was always together.

10:31AM   1   Q.  Doing what?

10:31AM   2   A.  Well, at that time, they really wasn't doing too much;

10:31AM   3   still getting some weed sent there.

10:31AM   4        MR. XIANG:  Can we pull up what's in evidence as

10:31AM   5   Government Exhibit 24B?

10:31AM   6   BY MR. XIANG:

10:31AM   7   Q.  Do you recognize what's on here?

10:32AM   8   A.  Yeah.

10:32AM   9   Q.  And how do you recognize it?

10:32AM  10   A.  That's the cover of the CD that I was passing out in

10:32AM  11   Erie.

10:32AM  12   Q.  The one that you had said Hottie gave you?

10:32AM  13   A.  Yeah.

10:32AM  14   Q.  Do you recognize any of the -- well, first, fair to say

10:32AM  15   that there are eight people or eight faces shown on here?

10:32AM  16   A.  Yeah.

10:32AM  17   Q.  Do you recognize any of them?

10:32AM  18   A.  Yeah.

10:32AM  19   Q.  How many?

10:32AM  20   A.  All of them.

10:32AM  21   Q.  Let's do what we did with the other one.  Start on the

10:32AM  22   right-hand side and go left.

10:32AM  23   A.  The -- the dark-skinned, bald-headed man, that's Black

10:32AM  24   dad.

10:32AM  25   Q.  That's whose dad?

GRANT  --  BY MR. XIANG  --  4/24/18

578

```
10:32AM    1   A.  Sirius Black dad.

10:32AM    2   Q.  One over on?

10:32AM    3   A.  Torrance.

10:32AM    4   Q.  One over?

10:32AM    5   A.  Boogy.

10:32AM    6   Q.  One over?

10:32AM    7   A.  That's Cheese little brother, Wheeze.

10:32AM    8   Q.  One over?

10:32AM    9   A.  Black.

10:32AM   10   Q.  One over?

10:33AM   11   A.  Cheese.

10:33AM   12   Q.  One over?

10:33AM   13   A.  Brill.

10:33AM   14   Q.  And then the last person on the --

10:33AM   15   A.  Ra Ra.

10:33AM   16   Q.  Just let the question be finished.  The last person on

10:33AM   17   the left side?

10:33AM   18   A.  That's Ra Ra.

10:33AM   19   Q.  The All White video, did you ever learn why it was made?

10:33AM   20   A.  Yeah.  We had went to see --

10:33AM   21   Q.  Wait, wait, wait.  Just yes or no.  Did you ever learn --

10:33AM   22   A.  Yes.

10:33AM   23   Q.  How did you learn it?

10:33AM   24   A.  Well, we had went to see Black when he was in jail.

10:33AM   25   Q.  Who is we?
```

10:33AM   1   A.   Me and Boogy.

10:33AM   2   Q.   Okay.

10:33AM   3   A.   We went to see him.  He was like, saying some of the rap,

10:33AM   4   some of the songs that he had.  Then, we talking about pretty

10:33AM   5   much the situation that was revolving around Torrance.

10:34AM   6   Q.   Explain for us what that was about.

10:34AM   7   A.   He --

10:34AM   8   Q.   And by that, I mean what you, Boogy and Sirius Black were

10:34AM   9   discussing about Torrance.

10:34AM  10   A.   Just about how he was cooperating with the Feds.

10:34AM  11   Q.   When was that?

10:34AM  12   A.   That was in 2013.

10:34AM  13   Q.   And the cooperation -- or the perceived cooperation with

10:34AM  14   the Feds, when was that from?

10:34AM  15   A.   2011.

10:34AM  16   Q.   To be clear, were you in Buffalo for any arrest of

10:34AM  17   Letorrance Travis in 2011?

10:34AM  18   A.   No.

10:34AM  19   Q.   Where were you at the time?

10:34AM  20   A.   I was in Erie, Pennsylvania.

10:34AM  21   Q.   And what did you, Boogy and Sirius Black talk about in

10:34AM  22   2013, about Torrance cooperating?

10:34AM  23   A.   The -- well, at the jail, when we went to see him, he was

10:34AM  24   saying like, how he ain't messing with him.  Torrance, he

10:35AM  25   about to mess up his rap name.  And that's why he was making

10:35AM    1   some of the songs.

10:35AM    2   Q.  What does that have to do with All White?

10:35AM    3   A.  All White, that's like a formal -- it's like a slang word

10:35AM    4   for -- to represent cocaine.

10:35AM    5   Q.  And what did it have to do with Letorrance Travis?

10:35AM    6   A.  Well, of course it was All White.  That's -- well,

10:35AM    7   Torrance was selling cocaine, but that phrase wasn't

10:35AM    8   necessarily directed towards him.  Telling other niggas that

10:35AM    9   was bitch nigga shit was more of the phrase that was directed

10:35AM   10   towards him.

10:35AM   11   Q.  So, you're saying that there were lines in the song about

10:35AM   12   Letorrance?

10:35AM   13   A.  Yes.

10:35AM   14   Q.  What lines?

10:35AM   15   A.  Telling on niggas, that's bitch nigga shit.  That was

10:35AM   16   directed towards Torrance.

10:35AM   17   Q.  Was cooperating or providing information to the

10:36AM   18   government encouraged?

10:36AM   19   A.  Pardon?

10:36AM   20   Q.  Where you're from?

10:36AM   21   A.  No.

10:36AM   22   Q.  Were you present for picking up any other marijuana boxes

10:36AM   23   with Boogy?

10:36AM   24   A.  Yes.

10:36AM   25   Q.  How many?

GRANT  --  BY MR. XIANG  --  4/24/18

581

10:36AM   1   A.  A few times, couple times, various times.

10:36AM   2   Q.  And what time period are we talking about?

10:36AM   3   A.  2013, 2014.

10:36AM   4   Q.  Was there anybody else present during those times that

10:36AM   5   you were?

10:36AM   6   A.  Yeah.  It was me and Black a couple times.

10:36AM   7   Q.  And Black, you're referring to whom?

10:36AM   8   A.  Sirius Black.  He was present one time when we picked it

10:36AM   9   up.  Then, he was present at the other time when we took it

10:36AM  10   down to Girard Street.

10:36AM  11   Q.  Girard?

10:37AM  12   A.  Yeah.

10:37AM  13   Q.  Who else was at Girard, if anybody?

10:37AM  14   A.  Ra Ra had came over there.  That was his mother house.

10:37AM  15   Q.  Why were you and Sirius Black with Boogy for picking up

10:37AM  16   these other parcels?

10:37AM  17   A.  He told us that he had it coming in.  We went with him

10:37AM  18   and got it, took it over there.

10:37AM  19   Q.  Did you have anything to do with the marijuana that he

10:37AM  20   received?

10:37AM  21   A.  Yeah.  I was -- sometimes, I would pick it up.  I would

10:37AM  22   be by myself and pick it up and take it to him or I would

10:37AM  23   sell some of it.

10:37AM  24   Q.  The time that you were talking about with Sirius Black,

10:37AM  25   how much did you, Boogy and Black pick up then?

GRANT  --  BY MR. XIANG  --  4/24/18

582

| | | |
|---|---|---|
| 10:37AM | 1 | A.  At that time, it was 40 pounds. |
| 10:37AM | 2 | Q.  And what did you all do with the 40 pounds? |
| 10:37AM | 3 | A.  Took it to Girard to Ra Ra's mother house and broke it |
| 10:38AM | 4 | down. |
| 10:38AM | 5 | Q.  Was Ra Ra's mother there? |
| 10:38AM | 6 | A.  No, she wasn't there. |
| 10:38AM | 7 | Q.  So, who else was there? |
| 10:38AM | 8 | A.  Me, Black and Ra Ra. |
| 10:38AM | 9 | Q.  You, Black, Ra Ra.  Anyone else? |
| 10:38AM | 10 | A.  Oh, Boogy. |
| 10:38AM | 11 | Q.  And what did the four of you -- each of the four of you |
| 10:38AM | 12 | do when -- with those 40 pounds? |
| 10:38AM | 13 | A.  I was breaking it down.  Boogy was putting it in pounds, |
| 10:38AM | 14 | weighing it up in pounds and putting it in a bag.  Black and |
| 10:38AM | 15 | Ra Ra really wasn't doing too much. |
| 10:38AM | 16 | Q.  Did you ever know of an individual by the name of Matt? |
| 10:38AM | 17 | A.  Yeah.  I heard of him.  I did.  I never met him, though, |
| 10:38AM | 18 | but I heard of him. |
| 10:38AM | 19 | Q.  Did you ever talk to him? |
| 10:39AM | 20 | A.  Yeah.  I talked to him before. |
| 10:39AM | 21 | Q.  How? |
| 10:39AM | 22 | A.  I was locked up one time and he was with Boogy and I had |
| 10:39AM | 23 | called Boogy. |
| 10:39AM | 24 | Q.  What time period of your incarceration are we talking |
| 10:39AM | 25 | about here? |

10:39AM  1   A.  This was when I was in FCI Petersburg, so that had to be

10:39AM  2   like, 2009, I want to say it was, maybe 2009, 2010, around

10:39AM  3   that time, before I got released from FCI Petersburg.

10:39AM  4   Q.  How is it that you were on the phone with Boogy and got

10:39AM  5   introduced to Matt?

10:39AM  6   A.  Because I had called him.  And Matt is from Cleveland.

10:39AM  7   And so, Stacks and all them, they from Cleveland, so he

10:39AM  8   was -- asked me did I know him, because he my cousin.

10:39AM  9   Q.  Who was asking you?

10:39AM  10  A.  Boogy.

10:39AM  11  Q.  Did you -- well, I think you answered that.  So, but you

10:39AM  12  said that you never met Matt in person?

10:39AM  13  A.  No, I never met him in person.

10:39AM  14  Q.  Did you ever learn of what happened to Matt?

10:40AM  15  A.  Yes, I did.

10:40AM  16  Q.  After you came home, did -- to Buffalo, did Boogy ever

10:40AM  17  talk to you about Matt?

10:40AM  18  A.  Yeah.

10:40AM  19  Q.  Under what circumstances?

10:40AM  20  A.  I had -- I was at -- he picked me up from --

10:40AM  21  Q.  Who is he?

10:40AM  22  A.  Boogy.  Boogy picked me up from the -- downtown mall.  We

10:40AM  23  went to his girlfriend house in the Town Gardens and he was

10:40AM  24  just pretty much like, filling me in on things that was

10:40AM  25  happening since I was gone, because that was like, one of the

GRANT -- BY MR. XIANG -- 4/24/18

584

10:40AM   1   main times that we got a chance to really sit down and talk.

10:40AM   2   And he was telling me about how I would have liked him.  How

10:40AM   3   he, you know, he got on his nerves sometimes, but he had love

10:40AM   4   for him.

10:40AM   5   Q.  He had what?

10:40AM   6   A.  He had love for him.

10:40AM   7   Q.  Did Boogy say anything to you about Matt's death?

10:40AM   8   A.  Yeah.  He said that it hurt him.  And he was talking

10:40AM   9   about how Matt's uncle asked him and welcomed him into the

10:41AM  10   church, about how it was really hurting him and he couldn't

10:41AM  11   let it go.

10:41AM  12   Q.  Were you in Buffalo on August 26th, 2012?

10:41AM  13   A.  No.

10:41AM  14   Q.  Where were you then?

10:41AM  15   A.  August 26th, 2012, I was in SCI Albion.

10:41AM  16   Q.  What about four days later, on August 30th, 2012?

10:41AM  17   A.  No, I wasn't there.

10:41AM  18   Q.  Still in prison?

10:41AM  19   A.  Yeah.

10:41AM  20   Q.  Did Ra Ra ever -- Roderick Arrington ever show you

10:41AM  21   anything regarding August 30th, 2012?

10:41AM  22   A.  Yes.

10:41AM  23   Q.  What?

10:41AM  24   A.  He showed me a letter from Dame.

10:41AM  25   Q.  Where were you and Ra Ra when Ra Ra showed you this

GRANT  --  BY MR. XIANG  --  4/24/18

10:41AM   1   letter?

10:41AM   2   A.   The Erie County Holding Center.

10:41AM   3   Q.   And around when was that?

10:41AM   4   A.   That was in -- I want to say maybe like, the early part

10:42AM   5   of 2015.  Yeah, it was about the early part of 2015.  I want

10:42AM   6   to say like, around January 2015.

10:42AM   7   Q.   Explain for us how it is that you saw Ra Ra at the

10:42AM   8   holding center at that time.

10:42AM   9   A.   I was in Allegany County on this charge I'm on now.  And

10:42AM  10   I had a city case in Buffalo that I had to go to court for.

10:42AM  11   So that they do it -- the sheriffs from Buffalo come and take

10:42AM  12   me to the holding center.  So, when they took me to the

10:42AM  13   holding center, I went to the -- they moved me to the block

10:42AM  14   that Roderick was on.

10:42AM  15   Q.   Explain for us the layout of the block where Ra Ra was on

10:42AM  16   at this time.

10:42AM  17   A.   It's just like, a big room with a bunch of cells on the

10:42AM  18   side, a shower, a TV area, a microwave area, CO's desk.

10:42AM  19   Q.   Did inmates in this block have their own sleeping

10:43AM  20   quarters?

10:43AM  21   A.   Yes.

10:43AM  22   Q.   Like, individual beds?

10:43AM  23   A.   Yes.  They're all single cells, all individual rooms.

10:43AM  24   All single cells.

10:43AM  25   Q.   By single cell, you mean there's only one person who is

10:43AM  1    in the cell?

10:43AM  2    A.  Yes.

10:43AM  3    Q.  Or one person who is assigned to a cell?

10:43AM  4    A.  Yes.

10:43AM  5    Q.  So, explain for us how Ra Ra showed you a letter from

10:43AM  6    Dame.

10:43AM  7    A.  When I came up, he was playing chess.  I said, what's up?

10:43AM  8    And he asked me what I was doing there.  When I told him I

10:43AM  9    had a city case that I had to go to court for, because I had

10:43AM  10   to go to court the next day for it, Dame, he got to asking me

10:43AM  11   about were you guys questioning me about him.

10:43AM  12   Q.  Were the Feds asking you about Arrington?

10:43AM  13   A.  Yeah.  Somebody had -- I think somebody had told him that

10:43AM  14   he was on our criminal compliant.  So, he was -- kept asking

10:43AM  15   me about that.  Did you guys -- did the Feds say anything

10:43AM  16   about me?  I pretty much telling him, no and he kept asking

10:43AM  17   me and I kept telling him no.

10:43AM  18   Q.  You told him that we hadn't -- that the Feds were not

10:44AM  19   asking about Ra Ra?

10:44AM  20   A.  Yeah.  That he wasn't on --

10:44AM  21   Q.  Was that true?

10:44AM  22   A.  No.

10:44AM  23   Q.  Why did you lie to Ra Ra?

10:44AM  24   A.  Because if I would have told him that you was asking

10:44AM  25   about me and that I was cooperating, it would have been a

GRANT  --  BY MR. XIANG  --  4/24/18

10:44AM   1   different situation.

10:44AM   2   Q.  Like what?

10:44AM   3   A.  It would turn around, pretty sure.

10:44AM   4   Q.  So, after you told him no, what happened next?

10:44AM   5   A.  He got to telling me about how Dame not telling on him.

10:44AM   6   And then that's when I asked him if Dame not telling on you

10:44AM   7   about what.  And he said, Dame about shooting Shooter.  And

10:44AM   8   then, he took me to his cell because at that time, we was at

10:44AM   9   my cell and he took me to his cell and he showed me the

10:44AM  10   letter.

10:44AM  11   Q.  Did you read the letter?

10:44AM  12   A.  Yeah.  I read it.

10:44AM  13   Q.  I'm handing to you what's in evidence as Government

10:45AM  14   Exhibit 41 and 41A.  Do you recognize those two exhibits?

10:45AM  15   A.  Yes.

10:45AM  16   Q.  How do you recognize them?

10:45AM  17   A.  Well, I recognize the letter from -- this is the letter

10:45AM  18   that I read from Dame -- or that he told me it was from Dame.

10:45AM  19   Q.  That Ra Ra showed to you?

10:45AM  20   A.  Yeah.

10:45AM  21   Q.  And what, if any, reaction did Ra Ra have to that letter?

10:45AM  22   A.  He seemed like he was relieved that Dame -- he was

10:45AM  23   convinced that Dame wasn't telling on him.

10:45AM  24   Q.  Do you see where Ra Ra had the letter stored?

10:45AM  25   A.  He just had it in an envelope.  I didn't see exactly

GRANT  --  BY MR. XIANG  --  4/24/18
588

10:46AM  1   what -- I mean, I think he pulled it out of the envelope,

10:46AM  2   because his back was towards me when he was pulling it out.

10:46AM  3   Q.  What I was referring to was in the cell itself?

10:46AM  4   A.  Oh, yeah.  He was in his cell.  He had like, a desk and

10:46AM  5   he had like, some mail and it was like, a little cubby hole.

10:46AM  6   He had mail sitting down there and that's what he reached and

10:46AM  7   grabbed it from.

10:46AM  8   Q.  Was he showing it to everybody on the block that you saw?

10:46AM  9   A.  Not that I seen, no.

10:46AM  10  Q.  What happened after you read the letter in Ra Ra's cell?

10:46AM  11  A.  I gave it back to him.

10:46AM  12  Q.  Did you do anything with your knowledge of the letter?

10:46AM  13  A.  Yeah.  I wrote a letter to George Burgasser.

10:46AM  14  Q.  Who is that?

10:46AM  15  A.  He was the prosecutor on the case that I was on.

10:46AM  16  Q.  You told the prosecutor on your case about Ra Ra's

10:47AM  17  letter?

10:47AM  18  A.  Yes.

10:47AM  19  Q.  You mentioned your current charge a little bit.

10:47AM  20  You're currently convicted on a 2014 cocaine charge here in

10:47AM  21  Federal Court?

10:47AM  22  A.  Yes.

10:47AM  23  Q.  And after your arrest, continuing to today, are you

10:47AM  24  cooperating with the investigation and prosecution of

10:47AM  25  criminal conduct?

10:47AM  1   A.  Yes.

10:47AM  2   Q.  Have you already been sentenced?

10:47AM  3   A.  Yes.

10:47AM  4   Q.  To what?

10:47AM  5   A.  188 months.

10:47AM  6   Q.  In years' terms, what is that?

10:47AM  7   A.  Fifteen and a half.

10:47AM  8   Q.  By whom?

10:47AM  9   A.  By the Judge.  You're talking about who sentenced me?

10:47AM  10  Q.  Correct.

10:47AM  11  A.  The Judge.

10:47AM  12  Q.  And who is that?

10:47AM  13  A.  Judge Arcara.

10:48AM  14  Q.  Are you hoping for a sentencing reduction?

10:48AM  15  A.  Yes.

10:48AM  16  Q.  Did you receive -- as far as you knew, any credit at the

10:48AM  17  time of your sentence?

10:48AM  18  A.  No.

10:48AM  19  Q.  Let me rephrase.  Did you receive any credit at the time

10:48AM  20  of your sentence?

10:48AM  21  A.  For cooperating?

10:48AM  22  Q.  Correct.

10:48AM  23  A.  No.  I got 188 months.  That was my low end of my

10:48AM  24  sentencing guidelines.

10:48AM  25  Q.  In terms of any sentencing reduction, had anyone made any

10:48AM  1   promises to you about a specific reduction or a specific

10:48AM  2   sentence?

10:48AM  3   A.  No.

10:48AM  4   Q.  Who makes the final determination?

10:48AM  5   A.  The Judge.

10:48AM  6   Q.  Judge Arcara?

10:48AM  7   A.  Yes.

10:48AM  8        MR. XIANG:  No other questions, Judge.

10:48AM  9

10:49AM  10                  CROSS-EXAMINATION

10:49AM  11

10:49AM  12  BY MR. FOGG:

10:49AM  13  Q.  Mr. Grant, you had testified that you wrote George

10:50AM  14  Burgasser a letter.

10:50AM  15  A.  Yes.

10:50AM  16  Q.  In fact, you wrote George Burgasser several letters,

10:50AM  17  right?

10:50AM  18  A.  Yes.

10:50AM  19  Q.  How many letters, all together, would you say?

10:50AM  20  A.  I don't know a specific number.

10:50AM  21  Q.  Well, the one letter, did you -- do you recall writing a

10:50AM  22  letter to George Burgasser, I guess that would be 12/12/2016

10:50AM  23  and that would be a Christmas card?

10:50AM  24  A.  Where -- do you know where it was sent from?

10:51AM  25  Q.  Do you recall?

GRANT  --  BY MR. FOGG  --  4/24/18

591

10:51AM    1    A.  It's possible.

10:51AM    2    Q.  Let me show you what's been marked as Government's

10:51AM    3    Exhibit -- well, excuse me -- Defendant's Exhibit 9 for

10:51AM    4    identification.  Look through that.

10:51AM    5    A.  Oh, yeah.  All right.

10:51AM    6    Q.  Do you recognize that?

10:51AM    7    A.  Yes, sir.

10:51AM    8    Q.  And that's your Christmas card, right?

10:51AM    9    A.  Well, they was giving them away in Allegany County, so --

10:51AM   10    Q.  That's a Christmas card you prepared, right?

10:51AM   11    A.  Well, prepared?  Did I prepare?  What do you mean?

10:51AM   12    Q.  Did you sent this Christmas card to Mr. Burgasser?

10:51AM   13    A.  Oh, yeah.

10:51AM   14    Q.  Yeah.  Okay.  And that consists of the card, what's

10:52AM   15    inside the card, correct?

10:52AM   16    A.  Yes.

10:52AM   17    Q.  And then, there was a letter attached, right?

10:52AM   18    A.  Yes.

10:52AM   19    Q.  And then, of course, the envelope, right?

10:52AM   20    A.  Yes.

10:52AM   21    Q.  And the back of the envelope, right?

10:52AM   22    A.  Yes.

10:52AM   23    Q.  Okay.  And does Government -- excuse me.  Does Defense 9

10:52AM   24    fairly and accurately represent what you sent?

10:52AM   25    A.  Pardon me?

10:52AM    1    Q.  Does it -- is it accurate?  Does this represent what you

10:52AM    2    sent?

10:52AM    3    A.  Oh, yes.

10:52AM    4    Q.  It does?

10:52AM    5         MR. FOGG:  Defendant moves Defendant's 9 into

10:52AM    6    evidence, Judge.

10:52AM    7         MR. XIANG:  Objection.  Hearsay.

10:52AM    8         THE COURT:  Ladies and gentlemen, would you step in

10:52AM    9    the jury room?

10:52AM   10    (The jury left the room at 10:52 a.m.)

10:53AM   11         THE COURT:  Marshal, would you have the witness step

10:53AM   12    out of the courtroom for a minute?

10:53AM   13    (The witness left the stand at 10:53 a.m.)

10:53AM   14         THE COURT:  What's the objection?

10:53AM   15         MR. XIANG:  Hearsay objection.  There's no purpose to

10:53AM   16    the exhibit, other than the statements that are contained

10:53AM   17    therein, which are statements -- out-of-court statements.  And

10:54AM   18    unless there was some -- I don't hear any impeachment.  I

10:54AM   19    don't hear anything that would say that it's not for the truth

10:54AM   20    of any matter asserted, which would make it hearsay.

10:54AM   21         THE COURT:  Mr. Fogg?

10:54AM   22         MR. FOGG:  Judge, this is some documents -- he had

10:54AM   23    mentioned that he wrote George Burgasser.  There are several

10:54AM   24    letters that I have that basically state certain things.  And

10:54AM   25    what he says to George Burgasser --

| | | |
|---|---|---|
| 10:54AM | 1 | THE COURT:  So what? |
| 10:54AM | 2 | MR. FOGG:  It established a relationship with George |
| 10:54AM | 3 | Burgasser and the office and also his attempts to curry favor |
| 10:54AM | 4 | and also to somehow work out deals. |
| 10:54AM | 5 | THE COURT:  I'm not sure I fully understand the |
| 10:54AM | 6 | relevance of this. |
| 10:54AM | 7 | MR. FOGG:  Well -- |
| 10:54AM | 8 | THE COURT:  I want you to give me some authority on |
| 10:54AM | 9 | this.  We'll take a 10-minute recess.  I want some authority |
| 10:54AM | 10 | on this. |
| 10:55AM | 11 | MR. FOGG:  Your Honor, I don't have access to -- |
| 10:55AM | 12 | THE COURT:  It's not my problem. |
| 10:55AM | 13 | (Brief recess) |
| 11:08AM | 14 | THE CLERK:  All rise.  You may be seated. |
| 11:08AM | 15 | THE COURT:  Now, as I see it, there's like 29 letters |
| 11:08AM | 16 | here?  Where is Mr. Fogg? |
| 11:08AM | 17 | MR. FOGG:  Yeah, Judge. |
| 11:08AM | 18 | THE COURT:  What do you intend to use in the |
| 11:08AM | 19 | 29 letters? |
| 11:08AM | 20 | MR. FOGG:  I'm probably not going to be using all |
| 11:08AM | 21 | these letters, Judge. |
| 11:08AM | 22 | THE COURT:  Well, I want to know which ones you |
| 11:08AM | 23 | intend to use.  What is -- the purpose of it is.  I had no |
| 11:08AM | 24 | notice on any of this and I'm trying to make a fair decision |
| 11:08AM | 25 | here, on evidentiary grounds, of whether any of this is |

11:08AM  1  admissible or not admissible and I am not shooting from the

11:08AM  2  hip.

11:08AM  3          MR. FOGG:  I understand, Judge.

11:08AM  4          THE COURT:  So -- and the government should have been

11:08AM  5  aware of these letters and briefed these points, as well as

11:09AM  6  the defense.

11:09AM  7          MR. XIANG:  Judge, we got the binder yesterday.

11:09AM  8          MR. FOGG:  Judge, the -- some of the letters are

11:09AM  9  actually handed in the last trial.  They were actually in the

11:09AM  10  last trial.  A lot of these letters were.

11:09AM  11          THE COURT:  Well, I don't know which ones were.  I

11:09AM  12  don't remember which ones were and which ones were not and

11:09AM  13  there's 29 letters here.  And I don't know what these letters

11:09AM  14  say.  I never read these letters.  And they're not that easy

11:09AM  15  to read right now.  So, I don't know what you want to do about

11:09AM  16  this.

11:09AM  17          MR. FOGG:  Well --

11:09AM  18          THE COURT:  You can do this, you can call him as your

11:09AM  19  own witness, if you want, But I'm not -- but I got 29 letters

11:09AM  20  here.  I don't know which ones you want to use, which ones --

11:09AM  21  how you identify them, which ones may be hearsay.  Which ones

11:09AM  22  may be -- I saw two letters here that may have to raise

11:09AM  23  concern of mine as to whether or not it may be a privileged

11:09AM  24  communication between you and your client, in that quick 15

11:10AM  25  minutes that I had a recess.  So, I don't know what's in here.

11:10AM   1          MR. FOGG:  Which one was that?

11:10AM   2          THE COURT:  Well, I don't remember exactly which one,

11:10AM   3   but I was looking at them.  I said, listen, some of this stuff

11:10AM   4   may be confidential communication you had with Mr. Hicks.  I

11:10AM   5   don't know.

11:10AM   6          MR. FOGG:  Well, this --

11:10AM   7          THE COURT:  I think you got to step back here a

11:10AM   8   little bit --

11:10AM   9          MR. FOGG:  Okay.

11:10AM  10          THE COURT:  -- and figure out where you want to go

11:10AM  11   with these things.  I think you can take a look at these

11:10AM  12   things.  I don't know how long you're going to be on cross-

11:10AM  13   examination, but it may be a point that -- we'll break at

11:10AM  14   lunch time and you want to take a look at these things more

11:10AM  15   precisely, tell the government exactly which ones you intend

11:10AM  16   to use.  I want to know what the purpose of it is and I want

11:10AM  17   to hear some argument on these things.  You gave this to the

11:10AM  18   government yesterday?

11:10AM  19          MR. FOGG:  I -- they've had most of them.  They've

11:10AM  20   had quite a few from the last trial.

11:10AM  21          THE COURT:  We didn't -- none of these -- were any of

11:10AM  22   these used in evidence at the last trial?  None of them were

11:11AM  23   in evidence at the last trial.

11:11AM  24          MR. XIANG:  No.

11:11AM  25          MR. FOGG:  They weren't in evidence, Judge, but they

11:11AM     1     were provided.

11:11AM     2              THE COURT:  How am I supposed to know?  I can't just

11:11AM     3     sit here and you know --

11:11AM     4              MR. FOGG:  Well, Jerome Grant didn't testify last

11:11AM     5     time.

11:11AM     6              THE COURT:  Pardon me?

11:11AM     7              MR. FOGG:  I'm sorry, Judge.

11:11AM     8              THE COURT:  Stay on one microphone.

11:11AM     9              MR. FOGG:  Jerome Grant didn't testify last time, so

11:11AM    10     there was no need to present them, but they were there and

11:11AM    11     ready to go.  At the last moment, only because my secretary's

11:11AM    12     husband died, I wasn't able to package it all and I was trying

11:11AM    13     to get it all together.  And I don't really mean for that to

11:11AM    14     be on the record, but we've had a little problem in the

11:11AM    15     office.

11:11AM    16              And this is something I let counsel know from the

11:11AM    17     very beginning, that I was trying to get some documents

11:11AM    18     together.  I'm not saying that they have any obligation to me.

11:11AM    19     I'm not saying that they had -- well, even consented, but I

11:11AM    20     did notify them I was having trouble getting some of the

11:12AM    21     documents together.  Now, Judge, this is --

11:12AM    22              THE COURT:  Well, I'll tell you what we'll do, we'll

11:12AM    23     just put this aside for now --

11:12AM    24              MR. FOGG:  This is a major part of the cross-exam,

11:12AM    25     Judge.  That's basically the letters.  And I know it's too

11:12AM    1   early for a lunch break, but it is the major part of the exam.

11:12AM    2   What I can do is go through each one and see -- definitely

11:12AM    3   pull up the ones we had before, because those are the ones we

11:12AM    4   should be using.  And anything extra, I'll notify both the

11:12AM    5   Court and counsel with regard to what's greater than it was

11:12AM    6   before.

11:12AM    7          But some of these things I wanted to step through,

11:12AM    8   they actually say quite a few things.  This gentleman actually

11:13AM    9   wrote me and you know, I'm not his attorney.  He wrote me a

11:13AM   10   letter.  He wrote Wei a letter.

11:13AM   11          THE COURT:  Well, what is the government's position

11:13AM   12   on this?

11:13AM   13          MR. XIANG:  Judge, regarding the timing, I mean, I

11:13AM   14   think there's -- if counsel wants to use them for impeachment,

11:13AM   15   there are ways to do that, but we --

11:13AM   16          THE COURT:  He can ask him questions about that to

11:13AM   17   refresh his memory without getting the letters in evidence.

11:13AM   18          MR. XIANG:  Right.  Same thing that was done with the

11:13AM   19   transcripts.  These are no different.  They're prior

11:13AM   20   statements made outside of the courtroom -- outside of here,

11:13AM   21   so, I don't know what --

11:13AM   22          MR. FOGG:  But they're not hearsay.  They can't be

11:13AM   23   considered hearsay.

11:13AM   24          THE COURT:  Well, then, what are they being offered

11:13AM   25   for?

11:13AM  1        MR. FOGG:  Well, it wouldn't be inadmissible, because

11:13AM  2   it's being offered for the truth of the matter asserted.  That

11:13AM  3   would be the wrong basis --

11:13AM  4        THE COURT:  I think it's being offered for the truth

11:13AM  5   of the matter asserted, that he wants to move from one prison

11:13AM  6   to another?

11:13AM  7        MR. FOGG:  Yes.

11:13AM  8        THE COURT:  I mean, what is it being offered for?

11:13AM  9        MR. FOGG:  Well, he's looking -- he's trying to curry

11:14AM  10  favor.  He's trying to bury his own dirt and actually increase

11:14AM  11  someone else's liability and get favors from the government.

11:14AM  12  Now, I'm not saying that the government actually did it, But

11:14AM  13  you can see the steps.  Burgasser is a very honorable man.

11:14AM  14  So, I'm not saying that the government is complicit in some

11:14AM  15  illegal activity.  I'm pretty sure they were stalwart, but the

11:14AM  16  fact is that this gentleman is trying to manipulate people.

11:14AM  17  He comes up with a plan.  It's all contrived.

11:14AM  18        THE COURT:  What's contrived?

11:14AM  19        MR. FOGG:  He's got a plan and the plan is to

11:14AM  20  manipulate, to keep sending letters and keep requesting this.

11:14AM  21  He wants to get out of jail.  He wants to get home.  And he's

11:14AM  22  trying his best to offer things so he can get things in

11:14AM  23  return.

11:14AM  24        THE COURT:  Well, if you want to ask him questions

11:14AM  25  about some of the information that's in these letters

| | | |
|---|---|---|
| 11:14AM | 1 | without -- and you can use the letters to maybe refresh his |
| 11:15AM | 2 | memory.  If it's proper cross-examination, we'll consider it. |
| 11:15AM | 3 | But the letters themselves, right now, I'm not |
| 11:15AM | 4 | inclined to allow them in, because I don't -- there's |
| 11:15AM | 5 | 29 letters here.  I haven't read them.  I have no idea what |
| 11:15AM | 6 | these letters say and I'm not about to bring all these letters |
| 11:15AM | 7 | in evidence and start reading them to the jury.  First of all, |
| 11:15AM | 8 | they're very confusing.  We're going to have a like, |
| 11:15AM | 9 | mini-trial here and I'm not going to do that.  So, think about |
| 11:15AM | 10 | what you want to do before we go any further.  We'll take a |
| 11:15AM | 11 | five-minute recess. |
| 11:15AM | 12 | THE CLERK:  All rise. |
| 11:15AM | 13 | (Brief recess) |
| 11:27AM | 14 | (The jury entered the room at 11:27 a.m.) |
| 11:28AM | 15 | THE CLERK:  All rise.  You may be seated. |
| 11:28AM | 16 | THE COURT:  Ladies and gentlemen, in trials sometimes |
| 11:29AM | 17 | issues come up and it takes time to try to resolve them.  It's |
| 11:29AM | 18 | not the attorneys' fault.  It's basically mine, I guess, But I |
| 11:29AM | 19 | don't like to have you just sitting around, waiting around. |
| 11:29AM | 20 | So, what I'm going to do is -- I don't know what you want to |
| 11:29AM | 21 | call it, breakfast, brunch or lunch.  I'm going to send you |
| 11:29AM | 22 | out at 11:30.  I don't want you to sit there, waiting around. |
| 11:29AM | 23 | So, let's see if we can try to start back about 1 o'clock, |
| 11:29AM | 24 | Okay?  I'm sorry for the delay.  It happens in trials. |
| 11:29AM | 25 | And certainly, I don't mean to ignore you at all. |

11:29AM   1   Just sitting around, waiting around is kind of -- can be

11:29AM   2   irritating.  I know that when I'm on an airplane and there's a

11:29AM   3   delay and they don't tell you what's going on and you sit

11:29AM   4   there for a while and you get -- will someone tell me the

11:30AM   5   truth, what's really going on?  So, that's the truth.  I've

11:30AM   6   got to work out some issues.

11:30AM   7        So, see if we can come back here at 1 o'clock.  I

11:30AM   8   can't guarantee 1 o'clock, but we're going to try for it,

11:30AM   9   okay?  Thank you.  Enjoy your lunch, folks.

11:30AM  10   (The jury left the room at 11:30 a.m.)

11:30AM  11        THE COURT:  I have three other matters on at

11:30AM  12   1 o'clock.  I'm going to just put them off until later in the

11:30AM  13   day.  It's probably the government and the one public

11:30AM  14   defenders office and one private practice lawyer.  So, I'd

11:31AM  15   like you back here at quarter to one and see where we're going

11:31AM  16   to go from there.

11:31AM  17        MR. FOGG:  Thank you, Judge.

11:31AM  18        THE CLERK:  All rise.

11:31AM  19        THE COURT:  And the government, I want the

11:31AM  20   government's position a little bit more carefully articulated

11:31AM  21   to what it is as to what's in these letters.

11:31AM  22   (Lunch recess at 11:31 a.m.)

01:51PM  23   (The jury entered the room at 1:51 p.m.)

01:43PM  24        THE CLERK:  All rise.

01:53PM  25        THE COURT:  Sorry for the delay, folks.  We're

01:53PM   1    trying.  I hope you enjoyed your lunch.  All right, Mr. Fogg.

01:53PM   2              MR. FOGG:  Thank you, Judge.

01:53PM   3    (An off-the-record discussion was held.)

01:53PM   4    BY MR. FOGG:

01:54PM   5    Q.  Mr. Grant, previously, I showed you a document that was

01:54PM   6    marked as Exhibit 8 -- excuse me -- as Exhibit 9 and that was

01:54PM   7    your card.  Do you recall that?

01:54PM   8    A.  Yes.

01:54PM   9    Q.  All right.  You'll have to excuse me.

01:54PM  10              MR. FOGG:  It's now marked as Exhibit 8, for the

01:54PM  11    record, Judge.  Defendant's Exhibit 8.

01:54PM  12    BY MR. FOGG:

01:54PM  13    Q.  And I'll show you what's been marked as Defense

01:54PM  14    Exhibit 8.  Now, that Exhibit 8 is the same exhibit that was

01:55PM  15    produced to you as Exhibit 9; am I correct?

01:55PM  16    A.  Yes.

01:55PM  17    Q.  All right.  You had a chance to look it over?

01:55PM  18    A.  Yes.

01:55PM  19    Q.  Now, when did you write that card?

01:55PM  20    A.  When did I write the card?

01:55PM  21    Q.  Mm-hmm.  Was that December 12th?

01:55PM  22    A.  I never wrote the card.  I sent the card.

01:55PM  23    Q.  Okay.  When did you send the card and write the letter?

01:55PM  24    A.  I don't know the exact date.

01:56PM  25    Q.  12/12/2016 sound familiar?

01:56PM    1    A.  Yeah.  It was before Christmas.

01:56PM    2    Q.  Okay.  And at that time, you were looking to come home;

01:56PM    3    am I right?

01:56PM    4    A.  Is that what it says in the letter?

01:56PM    5    Q.  Sorry?

01:56PM    6    A.  Is that what it says in the letter?

01:56PM    7    Q.  Well, what you were looking to do was actually be

01:56PM    8    relocated from Youngstown, Ohio or at least being located in

01:56PM    9    Youngstown, Ohio, right?

01:56PM   10    A.  I was looking to be relocated somewhere.

01:56PM   11    Q.  Okay.  Where were you housed at that time?

01:56PM   12    A.  Allegany.

01:56PM   13    Q.  In Allegany.  And at that time, you just simply wrote

01:56PM   14    him -- and not your attorney -- but you wrote the prosecutor

01:56PM   15    to ask him to relocate you to Youngstown, correct?

01:56PM   16    A.  Be relocated somewhere, yeah.

01:56PM   17    Q.  Okay.  Do you recall where?

01:56PM   18    A.  I don't.

01:56PM   19    Q.  No?  All right.

01:56PM   20    A.  Be relocated numerous places.

01:57PM   21    Q.  I'll show you, again, Exhibit 8.  And you can turn to the

01:57PM   22    page with your letter on it.  And if you would read that to

01:57PM   23    yourself, the first one and two lines.  Do you see that?

01:57PM   24    A.  Oh, yeah.

01:57PM   25    Q.  Okay.  I'll take that back.  Does that refresh your

01:57PM   1   recollection?

01:57PM   2   A.   Yeah.

01:57PM   3   Q.   And you wished him a merry Christmas, too; am I right?

01:57PM   4   A.   Yeah, I think so.

01:57PM   5   Q.   Now, you also wrote a letter to -- I guess that would be

01:58PM   6   Judge -- excuse me -- you also wrote a letter to

01:58PM   7   Mr. Burgasser again and that would be 7/25/2006.  Do you

01:58PM   8   recall that?

01:58PM   9   A.   7/25/2006?

01:58PM  10   Q.   Excuse me.  2016.  Sorry about that.

01:58PM  11   A.   No.  You probably have to show me the letter.

01:58PM  12   Q.   Okay.

01:58PM  13   A.   I wrote a lot of letters.

01:58PM  14   Q.   I'll show you what's been marked as Defendant's 10.  Look

01:58PM  15   that over to yourself.  At the bottom of Defendant's 10,

01:58PM  16   that's your signature?

01:58PM  17   A.   Yeah.

01:58PM  18   Q.   Okay.  And it's dated 7/20/2016, right?

01:59PM  19   A.   There's a little tape in the way, but I see a 7.  I see a

01:59PM  20   2.  It looks like a 0.  I think that's the date.

01:59PM  21   Q.   20 slash and then a large 1 and a 6, right?

01:59PM  22   A.   That thing right there is in the way of those numbers.

01:59PM  23   It looks like a 2, though.

01:59PM  24   Q.   How about I give you the original?

01:59PM  25   A.   That will work.

01:59PM    1    Q.  I'll show you what's been marked as also 10, but it's the

01:59PM    2    original in the plastic container.

01:59PM    3    A.  Oh, yeah.  That's the date.

01:59PM    4    Q.  Okay.

01:59PM    5    A.  Do you need this back?

01:59PM    6    Q.  Now, you were again asking Mr. Burgasser to move you; am

01:59PM    7    I correct?

01:59PM    8    A.  Yes.

01:59PM    9    Q.  All right.  And you were asking that -- you were

01:59PM   10    informing him that if you were to become a CI, you would have

02:00PM   11    to be moved; am I correct?  Let me take that from you.  You

02:00PM   12    shouldn't be reading it at this time.

02:00PM   13    A.  Oh, I shouldn't?

02:00PM   14    Q.  No.

02:00PM   15    A.  I'm not sure.

02:00PM   16    Q.  Oh, you're not sure?

02:00PM   17    A.  I needed it -- I need it.

02:00PM   18    Q.  Then, you can review it to -- Have you had an opportunity

02:00PM   19    to look it over?

02:00PM   20    A.  Yeah.

02:00PM   21    Q.  Okay.  Now, this was around July, there was some sort of

02:01PM   22    affidavit going around in the jail; am I correct?

02:01PM   23    A.  Well, I had asked for the affidavit before July.  I think

02:01PM   24    I was in Warsaw, Virginia when I had got the affidavit sent

02:01PM   25    to me.

02:01PM    1    Q.  And that was an affidavit for, what, people, inmates to

02:01PM    2    sign, to say that there was no RICO conspiracy in this case;

02:01PM    3    am I right?

02:01PM    4    A.  Well, the one that I got was from -- well, it had

02:01PM    5    Roderick's name on it and Boogy's name on it, saying that we

02:01PM    6    never talked about things or nothing like that.

02:01PM    7    Q.  All right.  So, you've got something from Roderick

02:01PM    8    Arrington?

02:01PM    9    A.  Well, it was all in one letter.

02:01PM   10    Q.  All right.  So, you received the letter.  Do you know

02:01PM   11    where you got the letter from?

02:01PM   12    A.  Yeah.

02:01PM   13    Q.  Where did you get the affidavit from?

02:01PM   14    A.  Aaron.

02:01PM   15    Q.  How did you get the affidavit from Aaron?

02:01PM   16    A.  He mailed it to me.

02:01PM   17    Q.  And do you have that address?  Do you have that mail?

02:01PM   18    A.  No, I don't.

02:01PM   19    Q.  And when did he mail that?

02:01PM   20    A.  When I was in Warsaw, Virginia.

02:02PM   21    Q.  And it came from where?

02:02PM   22    A.  Niagara County.

02:02PM   23    Q.  And it had his name on it?

02:02PM   24    A.  Yeah.

02:02PM   25    Q.  So, you wrote to George to tell him that you didn't want

02:02PM    1    to sign the affidavit, correct?

02:02PM    2    A.  It's possible.  I didn't sign it, so --

02:02PM    3    Q.  And that's because you didn't want to lose your credit as

02:02PM    4    far as cooperation; am I correct?

02:02PM    5    A.  Well, the reason I couldn't -- didn't want to sign it is

02:02PM    6    because I didn't want to -- that would be lying and I would

02:02PM    7    perjure myself.

02:02PM    8    Q.  I understand, but you actually told them that you didn't

02:02PM    9    want to lose your credit with the U.S. Attorney's Office.  Do

02:02PM   10    you recall stating that?

02:02PM   11    A.  Is that in this letter?

02:02PM   12    Q.  If you would go up to at least fifth from the bottom.

02:02PM   13    A.  So, I can read it now?

02:02PM   14    Q.  You can.  To yourself, please.

02:02PM   15    A.  Fifth from the bottom.  Yeah, that's what it say.

02:02PM   16    Q.  Okay.  Now, in that letter, you were stating that you

02:03PM   17    wanted to go home to your kids; am I correct?

02:03PM   18    A.  I would have to read that.  What line is that?

02:03PM   19    Q.  Is that what you said?

02:03PM   20    A.  I don't remember, but if you said it's in here, can you

02:03PM   21    show me?

02:03PM   22    Q.  Now, you also wrote a letter to Mr. Burgasser.  And that

02:04PM   23    would have been 12 -- let's see, 12/24 -- let's see.  That

02:04PM   24    would be 12/19/2014, it looks like.  Do you recall writing

02:04PM   25    Mr. Burgasser then?

02:04PM    1    A.  It's possible.

02:04PM    2    Q.  All right.  And do you recall a letter where you were

02:04PM    3    asking for your release from custody, so that you can see

02:04PM    4    your kids?

02:04PM    5    A.  That's possible.

02:04PM    6    Q.  And that -- well, do you recall doing that?  Yes or no?

02:04PM    7    A.  You would have to show me a letter.

02:04PM    8    Q.  All right.  Now, you have what's been marked as

02:05PM    9    Defendant's 12.  Have you had an opportunity to read that?

02:05PM   10    A.  Yeah.

02:05PM   11    Q.  I'm sorry?

02:05PM   12    A.  Yes, I did.

02:05PM   13    Q.  Okay.  So, this letter was written on what date?

02:05PM   14    A.  12/19/2014.

02:05PM   15    Q.  2014.  And where were you there, at that time?  Where

02:06PM   16    were you housed in?

02:06PM   17    A.  I think Monroe County.  Yeah, Monroe County.

02:06PM   18    Q.  Monroe County?

02:06PM   19    A.  Yeah.

02:06PM   20    Q.  And you were writing this letter to express to

02:06PM   21    Mr. Burgasser that you wanted to go home to see your babies

02:06PM   22    and your girlfriend, right?

02:06PM   23    A.  Well, that was part of the reason.  I was expressing to

02:06PM   24    him why I wouldn't -- why I probably can't read this right

02:06PM   25    here because you said I ain't supposed to read it, read it to

02:06PM    1   myself, but I was expressing that I wouldn't lie to him.

02:06PM    2   Q.  And where did you express that in that letter?

02:06PM    3   A.  I didn't say it, but I said bullshit.

02:06PM    4   Q.  And where did you express that?

02:06PM    5   A.  You want me to read it?

02:06PM    6   Q.  No, I don't.

02:06PM    7   A.  On the same letter, 12/19/14.

02:06PM    8   Q.  You never stated that you wouldn't bullshit him -- you

02:06PM    9   weren't bullshitting him; am I right?  You were serious about

02:06PM   10   a plan?

02:06PM   11   A.  No.  I was serious about telling the truth.  I wasn't

02:06PM   12   going to lie or anything like that.  I mean, if I could read

02:06PM   13   it, I could read what it says.

02:07PM   14   Q.  And you were asking Mr. Burgasser to bring you home on

02:07PM   15   certain dates; am I correct?

02:07PM   16   A.  Bring me home?

02:07PM   17   Q.  Yeah.  On 12/24 and 12/06, those are important dates for

02:07PM   18   you, right?

02:07PM   19   A.  Am I asking him to bring me home in this letter?

02:07PM   20   Q.  Yes.

02:07PM   21   A.  12/24.

02:07PM   22   Q.  Sixth line down.  Not bring you home.  You wanted to come

02:07PM   23   into the office, is that what it was and speak to him?

02:07PM   24   A.  Oh, yeah, yeah, yeah.  I see it now.

02:07PM   25   Q.  I apologize.

02:07PM   1   A.  No problem.

02:07PM   2   Q.  Right.  So, you just wanted to offer your information to

02:07PM   3   him; is that what it was?

02:07PM   4   A.  Yeah.  I guess if that's what you want to say.

02:08PM   5   Q.  Now, you also wrote Mr. Burgasser on 10/22/2014.  Do you

02:08PM   6   recall that at all?

02:08PM   7   A.  Again, you got to show me the letter.

02:08PM   8   Q.  Showing you what's been marked as Defendant's 11.

02:08PM   9   A.  Okay.

02:08PM   10  Q.  What is the date on that?

02:08PM   11  A.  I don't see anything on this one.

02:08PM   12  Q.  Is that your letter?  Is that your handwriting?

02:08PM   13  A.  Yeah, that's my handwriting.

02:08PM   14  Q.  And that's your signature at the bottom?

02:08PM   15  A.  Yes.

02:08PM   16  Q.  And if you flip through the next two pages, you'll see an

02:09PM   17  envelope, right?

02:09PM   18  A.  Yeah.

02:09PM   19  Q.  And that's your writing?

02:09PM   20  A.  Yeah.  That's my handwriting.

02:09PM   21  Q.  And there's a postmark October 20th, 2014, correct?

02:09PM   22  A.  October 27th.

02:09PM   23  Q.  Postmark, the postal mark?

02:09PM   24  A.  Yeah.  It says received October 27th, 2014, U.S.

02:09PM   25  Attorneys Office.

02:09PM   1   Q.  That's received, true.  And the stamp shows October 20th,

02:09PM   2   correct?

02:09PM   3   A.  Oh, yeah.  Okay.

02:09PM   4   Q.  All right.  Now, in that letter you actually mentioned an

02:09PM   5   agent by first name Shawn, right?  You meant Sean Hill,

02:09PM   6   correct?

02:09PM   7   A.  Yeah, that was my -- the lawyer that I had at the time.

02:09PM   8   Q.  Sean Hill was a lawyer?

02:09PM   9   A.  Yeah, that's the one I was -- mentioned.

02:09PM  10   Q.  Okay.  And so, you were talking about your lawyer?

02:09PM  11   A.  I would have to read it to be sure.

02:09PM  12   Q.  Okay.  And you were asking Mr. Burgasser that -- what you

02:09PM  13   wanted to do is you wanted to give up some murders in

02:10PM  14   exchange for bail; am I correct?

02:10PM  15   A.  Yeah.

02:10PM  16   Q.  And you had stated to him that you felt the murder is

02:10PM  17   worth a signature bond; isn't that correct?

02:10PM  18   A.  Let's see.  Yeah.  I said -- yeah, that's what I said.

02:10PM  19   Q.  And you also told Mr. Burgasser one good deed deserves

02:10PM  20   another, sir; am I correct?

02:10PM  21   A.  Yeah, that's what it says.

02:10PM  22   Q.  All right.  Now, you wrote Mr. Burgasser again on

02:11PM  23   September 19th, 2016.  Do you recall that at all?

02:11PM  24   A.  Yeah.  I wrote a lot of letters.  You're going to need to

02:11PM  25   show me.

GRANT  --  BY MR. FOGG  --  4/24/18

02:11PM  1   Q.  I'll show you what's been marked as Defendant's 13.  Is

02:11PM  2   that your letter that you wrote?  Is that your handwriting?

02:11PM  3   A.  Yeah, looks like my handwriting.

02:11PM  4   Q.  And you wrote that letter; am I correct?

02:11PM  5   A.  Yeah.

02:11PM  6   Q.  And you wrote that letter to George?  It says, dear

02:12PM  7   George?

02:12PM  8   A.  Yeah.

02:12PM  9   Q.  Now, do you remember informing George that you needed a

02:12PM  10  root canal and you were hoping that he can get you out on

02:12PM  11  bail, correct?

02:12PM  12  A.  Yes, I do, actually.

02:12PM  13  Q.  And you actually proposed bail conditions to George; am I

02:12PM  14  right?

02:12PM  15  A.  Yeah.

02:12PM  16  Q.  Now, this George is George Burgasser, who is an Assistant

02:12PM  17  U.S. Attorney, just like the gentlemen behind me here for the

02:12PM  18  government, correct?

02:12PM  19  A.  Yeah.

02:12PM  20  Q.  Now, on 8/10/2015, you wrote George Burgasser a letter as

02:12PM  21  well.  Do you recall that or should I --

02:13PM  22  A.  Yeah.  You would be better off just showing me the

02:13PM  23  letters.

02:13PM  24  Q.  I'll show you what's marked as Defendant's 14.  Is that

02:13PM  25  your letter?

02:13PM  1  A.  Yes, it is.

02:13PM  2  Q.  Okay.  And that's the letter that you wrote to George --

02:13PM  3  or Mr. Burgasser -- excuse me; am I correct?

02:13PM  4  A.  Yes, sir.

02:13PM  5  Q.  All right.  And what's the date on that one?

02:13PM  6  A.  I don't see no date on this first page.  Well, it says

02:13PM  7  received May 8th, 2015 on the second page.  Is that the date

02:13PM  8  you're talking about?

02:13PM  9  Q.  That's when it was received.  And the date postmarked?

02:14PM  10  A.  Oh, May 5th, 2015.

02:14PM  11  Q.  May 5th, okay.  So, this is a May 5th letter; is that

02:14PM  12  what this is?

02:14PM  13  A.  Yeah.

02:14PM  14  Q.  And then do you recall writing to George and still

02:14PM  15  looking for some sort of decrease in your time; is that

02:14PM  16  correct?

02:14PM  17  A.  Well, I think this letter was concerning my relevant

02:14PM  18  conduct, as far as the phone conversations that -- that they

02:14PM  19  had that I heard and that they had, like in the criminal

02:14PM  20  complaints so --

02:14PM  21  Q.  So, this is a phone conversation as far as a wiretap; am

02:14PM  22  I correct?

02:14PM  23  A.  Correct.

02:14PM  24  Q.  All right.  So, they wiretapped your phone?

02:14PM  25  A.  Not my phone.

613

02:14PM   1   Q.  Someone else's phone?

02:14PM   2   A.  Yes.

02:14PM   3   Q.  And in that wiretap of that other individual, it was a

02:14PM   4   co-defendant on your case?

02:14PM   5   A.  Yes.

02:14PM   6   Q.  All right.  And in that wiretap, there was discussions

02:14PM   7   about drug transactions?

02:14PM   8   A.  Yes.

02:15PM   9   Q.  And they actually had you on the wiretap; am I correct?

02:15PM  10   A.  Yes.

02:15PM  11   Q.  And you were discussing drug transactions with those --

02:15PM  12   with that person, right?

02:15PM  13   A.  Yes.

02:15PM  14   Q.  All right.  And you were trying to explain to George that

02:15PM  15   this should not have an effect on your relevant conduct; is

02:15PM  16   that what it is?

02:15PM  17   A.  No.  I think my relevant conduct -- well, I felt like it

02:15PM  18   was wrong at the time, based off of those phone

02:15PM  19   conversations.  So, I was trying to clear that up.

02:15PM  20   Q.  But you were also talking to George about -- to take you

02:15PM  21   off of probation for some reason.  Were you trying to work

02:15PM  22   out a deal with George to get you off of your violation of

02:16PM  23   probation?  First page.

02:16PM  24   A.  First page?

02:16PM  25   Q.  Bottom, lower half.

GRANT  --  BY MR. FOGG  --  4/24/18                    614

02:16PM    1    A.  I don't see nothing on the first page.  Oh, I think I was

02:16PM    2    talking about what you questioned about being on probation,

02:16PM    3    as far as the guidelines.  When you get guidelines -- and I'm

02:16PM    4    pretty sure you know how the guidelines work.  So, that's the

02:16PM    5    only thing I can see on the first page pertaining to

02:16PM    6    probation.

02:16PM    7    Q.  So, what you're trying to explain to George Burgasser is

02:16PM    8    the point system in which you would fall under; am I correct?

02:16PM    9    A.  As far -- from the way I see it, yeah.

02:16PM   10    Q.  Okay.  Now, you have also written, I guess, Judge

02:17PM   11    Skretny; is that correct?

02:17PM   12    A.  It's possible.

02:17PM   13    Q.  And what would be the purpose of writing Judge Skretny;

02:17PM   14    do you recall?

02:17PM   15    A.  Skretny was the Judge that I had on my first federal

02:17PM   16    charge.

02:17PM   17    Q.  And you wrote to him for what purpose?

02:17PM   18    A.  If I'm not mistaken, I'm pretty sure -- you got the

02:17PM   19    letter, just so I'm not mistaken.

02:17PM   20    Q.  Sure.

02:17PM   21    A.  All right.  I appreciate that.

02:17PM   22    Q.  I'll show you what's been marked Defendant's 9.  And

02:18PM   23    Defendant's 9 is a letter that you wrote.  That's your

02:18PM   24    handwriting; am I correct?

02:18PM   25    A.  Yes.

02:18PM    1    Q.  All right.  And it says, Dear Judge Skretny and

02:18PM    2    2/23/2015, correct, at the top?

02:18PM    3    A.  Yes.

02:18PM    4    Q.  Okay.  So, this is not to be confused with prior

02:18PM    5    testimony with regard to Exhibit 9, which has been changed.

02:18PM    6    So, this is your letter to Judge Skretny, correct?

02:18PM    7    A.  Yes.

02:18PM    8    Q.  Now, you were hoping that the Judge would plead you out

02:18PM    9    to time served; am I correct?  And you were trying to get a

02:18PM   10    bail on your other charge; isn't that correct?

02:18PM   11    A.  It's possible.  I haven't read that far yet, to tell you

02:18PM   12    if it's correct or not.  Yeah.  Yeah.  It was time served.

02:18PM   13    Yeah.

02:18PM   14    Q.  Time served on your probation and you were trying to get

02:18PM   15    bail on the other charge?

02:19PM   16    A.  Yes.

02:19PM   17    Q.  And that was the federal charge that you were on, right?

02:19PM   18    A.  Yes.

02:19PM   19    Q.  All right.  So, you were hoping, because they didn't

02:19PM   20    release you on your federal charge, you were hoping that if

02:19PM   21    you could negotiate with the Judge to get time served, they

02:19PM   22    would release you on your federal charge, correct?

02:19PM   23    A.  Well, I was hoping that if I could get time served from

02:19PM   24    him, that they wouldn't be able to use the fact that I was on

02:19PM   25    probation as a reason not to give me bail.

02:19PM    1    Q.  And you were asking for, at least, maybe home confinement

02:19PM    2    or something like that; am I correct?

02:19PM    3    A.  Yes.

02:19PM    4    Q.  And you actually informed the Judge that the agents on

02:19PM    5    your case didn't mind you getting bail; am I correct?

02:19PM    6    A.  Yes, that's what it says.

02:19PM    7    Q.  And that was the Agent Vanessa M. Paris, right?

02:19PM    8    A.  Yes.

02:19PM    9    Q.  She's the agent that investigated your case?

02:19PM   10    A.  Yes.

02:19PM   11    Q.  And she's the agent that investigated this case -- well,

02:19PM   12    the case that you were indicted on, right?

02:20PM   13    A.  Yes.

02:20PM   14    Q.  Now, on January 31st, 2017, you wrote a letter to

02:20PM   15    Mr. Hicks; am I correct?

02:20PM   16    A.  Again, I wrote plenty of letters.  You going to have to

02:20PM   17    show me.  I've been in jail four years.  I ain't done nothing

02:20PM   18    but write letters.

02:20PM   19    Q.  I'll show you what's been marked as Defendant's 5.

02:20PM   20    A.  Okay.

02:20PM   21    Q.  Now, in that letter -- that is your letter that you

02:20PM   22    wrote, right?  That's your handwriting?

02:20PM   23    A.  Yeah.  It looks like it.

02:21PM   24    Q.  Okay.  Now, in the letter, you're explaining to Mr. Hicks

02:21PM   25    how you were going to discuss, with his attorney, how you

02:21PM   1   were going to help his attorney; am I right?

02:21PM   2   A.  I have to read this letter to be sure.  Yeah.  I know

02:22PM   3   this letter.

02:22PM   4   Q.  You remember?  Okay.  So, in that letter you were talking

02:22PM   5   about Bones.  Who's Bones?

02:22PM   6   A.  He's one of my co-defendants.

02:22PM   7   Q.  And what's his real name; do you know?

02:22PM   8   A.  Yeah.  Michael Robertson.

02:22PM   9   Q.  Michael Robertson?

02:22PM  10   A.  Yeah.

02:22PM  11   Q.  So, you were explaining to Mr. Hicks how Michael

02:22PM  12   Robertson was selling drugs; am I correct?

02:22PM  13   A.  Yes.

02:22PM  14   Q.  And you were explaining how Michael Robertson was getting

02:22PM  15   drugs from Spence; am I correct?

02:22PM  16   A.  No.  I don't think you correct with that one.  You going

02:22PM  17   to have to show me where it says that.

02:22PM  18   Q.  Well, if you look lower on the second page.

02:22PM  19   A.  I said Bones was getting drugs from Spence?

02:23PM  20   Q.  If you look at the second page.

02:23PM  21   A.  I'm on the second page.

02:23PM  22   Q.  All right.  Halfway down.

02:23PM  23   A.  Halfway down.

02:23PM  24   Q.  Things that you can say to your lawyer is what you said.

02:23PM  25   A.  Oh, okay.  I see what you're saying.  It's towards the

02:23PM    1    end, right?

02:23PM    2    Q.   Yes.

02:23PM    3    A.   All right.  Yeah.  I see that it did say that.

02:23PM    4    Q.   Right.  Okay.  And you wanted Mr. Hicks to let me know --

02:24PM    5    let his lawyer know; am I correct?

02:24PM    6    A.   Do you want me to -- how do you want me to answer this?

02:24PM    7    Q.   Well, is it correct that you wanted Hicks to inform me of

02:24PM    8    the information that you had, so it can help Mr. Hicks?

02:24PM    9    A.   Well, sort of, but it was a letter that I had received

02:24PM   10    from Mr. Hicks before.  This was me answering him.

02:24PM   11    Q.   Well, hold on a second.  Is that what you're saying in

02:24PM   12    that letter, though?

02:24PM   13    A.   No.  What I -- do you want to read what I said in the

02:24PM   14    letter?

02:24PM   15    Q.   No.  Did you advise him that you believed they were lying

02:24PM   16    on Mr. Hicks and that you wanted Mr. Hicks to have the

02:24PM   17    information from you?

02:24PM   18    A.   Well, I advised that if Spence was talking about drugs,

02:25PM   19    as far as he go, then I had no knowledge of it.  And as far

02:25PM   20    as I know Spence was lying but --

02:25PM   21    Q.   All right.  And you wanted to reach out and talk to his

02:25PM   22    lawyer, correct?

02:25PM   23    A.   Well, actually, that is what he wanted me to tell his

02:25PM   24    lawyer.

02:25PM   25    Q.   And this is a letter that you addressed to Mr. Hicks; am

GRANT -- BY MR. FOGG -- 4/24/18
619

02:25PM   1   I right?

02:25PM   2   A.  I don't see --

02:25PM   3   Q.  That's the letter you sent to Mr. Hicks?

02:25PM   4   A.  Yeah.  Yeah.

02:25PM   5   Q.  And did you eventually write me?

02:25PM   6   A.  Yes.

02:25PM   7   Q.  And why did you reach out to me?

02:25PM   8   A.  Because he asked me to.

02:25PM   9   Q.  Now, you reached out to me and sent me a letter.  And you

02:25PM  10   knew that I was his attorney, correct?

02:26PM  11   A.  Correct.

02:26PM  12   Q.  And you stated that you were the driver for Michael

02:26PM  13   Robertson, correct?

02:26PM  14   A.  I would have to see the letter.

02:26PM  15   Q.  Were you the driver for Michael Robertson?

02:26PM  16   A.  I mean, I drove him places.

02:26PM  17   Q.  So, then that was a correct statement, right?

02:26PM  18   A.  Like, to an extent, yeah.

02:26PM  19   Q.  I'll show you what's been marked as Defendant's

02:26PM  20   Exhibit 6.  Now, that's a letter you wrote, correct?

02:26PM  21   A.  Yes.

02:26PM  22   Q.  And you wrote that to me; am I right?

02:26PM  23   A.  Yes.

02:26PM  24   Q.  And that's your signature, correct?

02:26PM  25   A.  Yes, it is.

GRANT  --  BY MR. FOGG  --  4/24/18
620

02:26PM  1   Q.  And you were explaining how Michael Robertson was dealing

02:26PM  2   drugs, at least and he never bought it from Spence.  And you

02:26PM  3   were a driver for Michael Robertson, correct?

02:26PM  4   A.  Yeah.

02:27PM  5   Q.  Now, this is because -- that would -- Spence would be

02:27PM  6   who; Spencer Rogers?

02:27PM  7   A.  Yes.

02:27PM  8   Q.  Now, at that time, just as people were thinking that you

02:27PM  9   were a CI, people were also thinking that Spencer Rogers was

02:27PM  10  a CI, correct?

02:27PM  11  A.  Correct.

02:27PM  12  Q.  And that he was talking to the government, correct?

02:27PM  13  A.  Correct.

02:27PM  14  Q.  And what you were trying to do, is you were trying to at

02:27PM  15  least set the record straight; am I right?

02:27PM  16  A.  Pertaining to as far as I knew, from Spencer getting

02:27PM  17  drugs from Boogy, yes.

02:27PM  18  Q.  All right.  Now, you're saying that you were willing to

02:27PM  19  be a witness for Aaron; am I correct?

02:27PM  20  A.  Yes, I did.  Pertaining to that.

02:27PM  21  Q.  And that's -- excuse me?

02:27PM  22  A.  Pertaining to Spencer Rogers.

02:27PM  23  Q.  Now, you've written Aaron quite a few times; am I right?

02:28PM  24  A.  Yeah.  We write each other.  Well, we did.

02:28PM  25  Q.  How many times would Aaron write you?

| | | |
|---|---|---|
| 02:28PM | 1 | A.  I can't keep count.  I don't know.  A lot, though. |
| 02:28PM | 2 | Q.  Did you ever save the letters? |
| 02:28PM | 3 | A.  Yes.  I saved some. |
| 02:28PM | 4 | Q.  Did you provide the government with those letters? |
| 02:28PM | 5 | A.  I gave them to my lawyer. |
| 02:29PM | 6 | Q.  And did you instruct your lawyer to give it to the |
| 02:29PM | 7 | government? |
| 02:29PM | 8 | MR. XIANG:  Objection.  Privilege.  Not to be |
| 02:29PM | 9 | asserted by the government, but by the witness. |
| 02:29PM | 10 | THE COURT:  Overruled.  Go ahead.  You may answer the |
| 02:29PM | 11 | question, sir. |
| 02:29PM | 12 | THE WITNESS:  Can you repeat that for me? |
| 02:29PM | 13 | BY MR. FOGG: |
| 02:29PM | 14 | Q.  Did you advise your attorney to give it to the |
| 02:29PM | 15 | government? |
| 02:29PM | 16 | A.  I don't remember advising him to give it to them, but it |
| 02:29PM | 17 | is a possibility.  I'm pretty sure that's why I sent it to |
| 02:29PM | 18 | him. |
| 02:29PM | 19 | Q.  I'm going to show you what's been marked -- well, you |
| 02:30PM | 20 | wrote George Burgasser and you explained to George -- |
| 02:30PM | 21 | Mr. George Burgasser, the Assistant U.S. Attorney, you |
| 02:30PM | 22 | explained your daughter's first birthday was January 30, |
| 02:30PM | 23 | 2015, correct?  Do you remember telling him that? |
| 02:30PM | 24 | A.  Well, yeah.  At that time I thought that it -- |
| 02:30PM | 25 | Q.  Okay. |

| | | |
|---|---|---|
| 02:30PM | 1 | A.  -- was my daughter.  But, yeah -- |
| 02:30PM | 2 | Q.  Okay.  All right. |
| 02:30PM | 3 | A.  -- I remember saying that. |
| 02:30PM | 4 | Q.  All right.  And you also explained that your grandmother |
| 02:30PM | 5 | may pass that year; am I correct? |
| 02:30PM | 6 | A.  You would have to show me where I said that at. |
| 02:30PM | 7 | Q.  All right.  I'll show you Government's Exhibit 3506Y. |
| 02:30PM | 8 | Now, this is a typed letter; am I correct? |
| 02:30PM | 9 | A.  Mm-hmm. |
| 02:30PM | 10 | Q.  All right.  So, where were you when you typed that |
| 02:30PM | 11 | letter? |
| 02:30PM | 12 | A.  I assume at Allegany County.  That's the only place I |
| 02:30PM | 13 | remember having a typewriter. |
| 02:31PM | 14 | Q.  Now, in this letter, you were explaining how your |
| 02:31PM | 15 | grandmother was going to pass within the year and you're |
| 02:31PM | 16 | explaining how your daughter was having a birthday and you |
| 02:31PM | 17 | were asking Mr. Burgasser, again, if you could get out on |
| 02:31PM | 18 | bail; am I correct? |
| 02:31PM | 19 | A.  I don't see where it says my grandmother is going to pass |
| 02:31PM | 20 | in a year.  Can you show me that? |
| 02:31PM | 21 | Q.  Can you read one, two, three, four, fifth one down. |
| 02:31PM | 22 | Fifth sentence down where it says, sir, my grandmother is. |
| 02:31PM | 23 | A.  Not doing the best.  Want me to keep going? |
| 02:31PM | 24 | Q.  No.  You don't -- just read it to yourself. |
| 02:31PM | 25 | A.  Yeah.  I never said that she was going to pass in a year. |

GRANT  --  BY MR. FOGG  --  4/24/18                          623

02:31PM   1   Q.  Well, you said she will not -- you know, you can't say if

02:31PM   2   she will make it past this year, Lord willing; am I right?

02:31PM   3   Do you remember that?

02:31PM   4   A.  Oh, yeah.  Okay.

02:31PM   5   Q.  All right.  And then you went on to say that she will not

02:31PM   6   be alive if I do some years, sir.  Do you remember that?

02:32PM   7   A.  Yes.

02:32PM   8   Q.  All right.  And you wrote Mr. Burgasser again?

02:32PM   9   A.  Yeah.

02:32PM  10   Q.  And that would be, what, December 10th, 2014?  Do you

02:33PM  11   recall that or should I show you?

02:33PM  12   A.  Yeah.  It probably would be better for you to show it to

02:33PM  13   me.

02:33PM  14   Q.  All right.  All right.  I'm going to show you what's been

02:33PM  15   marked as Government Exhibit 3506AA.  Do you remember writing

02:33PM  16   that letter?

02:33PM  17   A.  I don't really necessarily remember writing it, because I

02:34PM  18   didn't finish reading it yet, but it's my handwriting.

02:34PM  19   Q.  And do you remember telling Mr. Burgasser that you wanted

02:34PM  20   to go home and that you -- you had a plan that will work so

02:34PM  21   that you can get Mr. Hicks convicted?  Do you remember that?

02:34PM  22   A.  I don't see the plan part.

02:34PM  23   Q.  Take your time.

02:34PM  24   A.  I will.  You have to let me know where the plan part at.

02:34PM  25   Q.  Do you see it?

02:35PM   1   A.  I seen I had no plans on running.  I see I didn't have no

02:35PM   2   plans on harming anyone.  I see that.

02:35PM   3   Q.  Do you see where it says that you know that the U.S.

02:35PM   4   Attorneys are -- they want Hicks?

02:35PM   5          MR. XIANG:  Objection.  Speculation.

02:35PM   6   BY MR. FOGG:

02:35PM   7   Q.  Do you see that?

02:35PM   8   A.  Yeah.

02:35PM   9          THE COURT:  Overruled.

02:35PM  10   BY MR. FOGG:

02:35PM  11   Q.  Do you see it?

02:35PM  12   A.  Do I see that the U.S. Attorneys want Hicks?

02:35PM  13   Q.  Yeah.  I know you guys want Hicks, Aaron Hicks?

02:35PM  14   A.  Yes.  I see that.

02:35PM  15   Q.  All right.  And you were telling them that you -- you're

02:35PM  16   sure that you can be a big help; am I right?

02:35PM  17   A.  Yes.

02:35PM  18   Q.  All right.  And then you're advising them that you could

02:36PM  19   have been in the same line of business as they were, right?

02:36PM  20   A.  I think I remember something like that.  Pretty much

02:36PM  21   saying if I was -- chose a different path, I could have been.

02:36PM  22   Q.  And then later on, at the end, you were saying that you

02:36PM  23   have a plan that will work; am I right?

02:36PM  24   A.  Yeah.  I see that.

02:36PM  25   Q.  Okay.  Then you wished him happy holidays; am I correct?

02:36PM    1    A.   Yeah.

02:36PM    2    Q.   All right.  I'll take that back.

02:36PM    3    A.   Okay.

02:36PM    4    Q.   Now, as you stated, you wrote many letters, right?

02:37PM    5    A.   Yeah.

02:37PM    6    Q.   You wrote letters to the Judge Magistrate Scott for your

02:37PM    7    release; am I correct?

02:37PM    8    A.   Yeah.

02:37PM    9    Q.   Right.  And you wrote letters to Judge Magistrate Scott

02:37PM   10    with regard to complaints about your attorney, correct?

02:37PM   11    A.   Yes.

02:37PM   12    Q.   And you did that about three times, didn't you?

02:37PM   13    A.   Yes.

02:37PM   14    Q.   And that was after each time the Court admonished you and

02:37PM   15    told you not to write letters and you continued to do so,

02:37PM   16    correct?

02:37PM   17    A.   Yeah.  I didn't know who I was supposed to write to if it

02:37PM   18    wasn't the Courts.

02:37PM   19    Q.   But you were in court when the Judge told you not to

02:37PM   20    write him letters; am I correct?

02:37PM   21    A.   Yeah.  Yeah.  I was there.

02:37PM   22    Q.   But even though he told you not to write letters the

02:37PM   23    first time, you wrote him three -- two or three successive

02:38PM   24    times?

02:38PM   25    A.   Yeah.  I was having a lot of problems with my lawyer.

| | | |
|---|---|---|
| 02:38PM | 1 | Q.  Okay. |
| 02:38PM | 2 | A.  I didn't know who else to write. |
| 02:38PM | 3 | Q.  Now, you have an arrest -- a criminal history, correct? |
| 02:39PM | 4 | A.  Yeah. |
| 02:39PM | 5 | Q.  And you had stated, on the record a couple times, as far |
| 02:39PM | 6 | as your charges were, right? |
| 02:39PM | 7 | A.  Right now? |
| 02:39PM | 8 | Q.  Well, you had previously testified to your charges, |
| 02:39PM | 9 | correct? |
| 02:39PM | 10 | A.  Previously testified of my charges? |
| 02:39PM | 11 | Q.  Yeah. |
| 02:39PM | 12 | A.  Right now, you're talking about?  I had plenty of charges |
| 02:39PM | 13 | before. |
| 02:39PM | 14 | Q.  You had plenty of charges? |
| 02:39PM | 15 | A.  Yes.  Before this one, I have. |
| 02:39PM | 16 | Q.  All right.  And you went back as far as what, 2003?  Or |
| 02:39PM | 17 | it goes further? |
| 02:39PM | 18 | A.  First time I was arrested, I think I was like, 16.  I got |
| 02:40PM | 19 | an ACD, so it goes further -- a little further than 2003. |
| 02:40PM | 20 | Q.  When was that? |
| 02:40PM | 21 | A.  That was '97. |
| 02:40PM | 22 | MR. XIANG:  Objection.  Improper impeachment. |
| 02:40PM | 23 | THE COURT:  Sustained. |
| 02:40PM | 24 | BY MR. FOGG: |
| 02:40PM | 25 | Q.  And you were arrested -- well, did you get a conviction |

02:40PM    1    in 2003?

02:40PM    2    A.  2003, no.  I think I got convicted in 2004.

02:40PM    3    Q.  It was 2004.  And that was for an arrest in 2003?

02:40PM    4    A.  Yeah.  Which one?  I got arrested twice in 2003.

02:40PM    5    Q.  You tell me.  What happened in 2003?

02:40PM    6    A.  You want to know about them both?

02:40PM    7    Q.  Sure.

02:40PM    8    A.  All right.  The first one I was on Bissell Street.  I

02:40PM    9    got -- I had like, a half a gram of crack on me and a

02:40PM   10    firearm.

02:40PM   11    Q.  So, there was a firearm possession, right?

02:40PM   12    A.  Yes.

02:40PM   13    Q.  Okay.

02:40PM   14    A.  Then I got caught with -- I had 55 grams of weed on me in

02:41PM   15    Erie, Pennsylvania.

02:41PM   16    Q.  And those were in two different locations?

02:41PM   17    A.  Yes.

02:41PM   18    Q.  So, you had a firearms possession and you had a

02:41PM   19    controlled substance possession, right?

02:41PM   20    A.  Yes.

02:41PM   21    Q.  All right.  And you were convicted on both?

02:41PM   22    A.  Yes.

02:41PM   23    Q.  And one was up here in Buffalo and one was in Erie,

02:41PM   24    Pennsylvania?

02:41PM   25    A.  Yes.

02:41PM  1    Q.  Which one were you convicted on first?

02:41PM  2    A.  Buffalo.

02:41PM  3    Q.  In Buffalo.  And you received a sentence?

02:41PM  4    A.  Of eight months.

02:41PM  5    Q.  Eight months?

02:41PM  6    A.  One year.

02:41PM  7    Q.  One year.

02:41PM  8    A.  Yeah.

02:41PM  9    Q.  And were you transferred down to Erie?

02:41PM  10   A.  Yeah.  When I finished my county year, Erie, Pennsylvania

02:41PM  11   came and got me.

02:41PM  12   Q.  All right.  So, they were waiting for you to do that

02:41PM  13   year.  So, you were sitting in jail until you got to Erie,

02:41PM  14   Pennsylvania, right?

02:41PM  15   A.  Yeah.  They came and got me in like, two days or

02:42PM  16   something.

02:42PM  17   Q.  All right.  And that was on a criminal possession of a

02:42PM  18   controlled substance.  And you were convicted on that one?

02:42PM  19   A.  Yes.

02:42PM  20   Q.  And that was a felony conviction, correct?

02:42PM  21   A.  Well, it got dropped to a misdemeanor 1.

02:42PM  22   Q.  Okay.  And were you sentenced on that?

02:42PM  23   A.  Yes.

02:42PM  24   Q.  What was your sentence on that?

02:42PM  25   A.  One to four.

02:42PM   1   Q.  So, that was one to four years?

02:42PM   2   A.  Yes.

02:42PM   3   Q.  On a misdemeanor?

02:42PM   4   A.  Yeah.

02:42PM   5   Q.  And you did state time?

02:42PM   6   A.  Yeah.

02:42PM   7   Q.  And you got out on post-release supervision; is that what

02:42PM   8   it was?

02:42PM   9   A.  No.  At that time I got paroled in 2006 to a halfway

02:42PM   10   house.  I think it was Gateway, Erie, Pennsylvania.

02:42PM   11   Q.  Okay.  So, you got out early; is that what it is?

02:42PM   12   A.  No.  Actually, I got out late because by the time I

02:42PM   13   was -- I did 20 months instead of one year.

02:42PM   14   Q.  So, after you were doing your time, you were on post-

02:42PM   15   release supervision or parole; is that what is?

02:42PM   16   A.  Yeah.  One to four, you do a minimum of one year, that

02:43PM   17   you can get paroled, but I didn't get paroled until

02:43PM   18   20 months, based off of the time that I had in Buffalo,

02:43PM   19   county.  So, I already had my year in when I got sentenced,

02:43PM   20   so I had to go see the parole board.

02:43PM   21   Q.  So, parole is basically court supervision where you're

02:43PM   22   supervised after you do your time; am I right?

02:43PM   23   A.  Yeah.

02:43PM   24   Q.  Okay.  And that's sort of like post-release supervision

02:43PM   25   in Federal Court, where you're just supervised after you do

| | | |
|---|---|---|
| 02:43PM | 1 | your time? |
| 02:43PM | 2 | A.  No.  It's counted differently. |
| 02:43PM | 3 | Q.  How so? |
| 02:43PM | 4 | A.  Because parole like, you -- you have a sentence.  I had a |
| 02:43PM | 5 | one to four.  After the four years, my time is up. |
| 02:43PM | 6 | Corrections, you know, parole -- I mean, supervision, they |
| 02:43PM | 7 | can reinstate you.  They can keep you a year, they can |
| 02:43PM | 8 | reinstate you on three years probation.  They can't do that |
| 02:43PM | 9 | on parole. |
| 02:43PM | 10 | Q.  So, you're saying with federal post-release supervision, |
| 02:44PM | 11 | you do your time and that's it or are you saying -- |
| 02:44PM | 12 | A.  No.  What I'm saying with federal post-supervisory -- |
| 02:44PM | 13 | supervised release, if you violate, you can do whatever you |
| 02:44PM | 14 | fall at in the guidelines, but I think it's up to the Judge |
| 02:44PM | 15 | to cancel your probation or extend it all over again. |
| 02:44PM | 16 | Q.  Okay.  But at least with the state, or at least with |
| 02:44PM | 17 | parole, time is the time and it can't end early; is that what |
| 02:44PM | 18 | you're saying? |
| 02:44PM | 19 | A.  I've never seen nobody get off it early. |
| 02:44PM | 20 | Q.  I'm sorry? |
| 02:44PM | 21 | A.  I ain't never seen nobody get off early. |
| 02:44PM | 22 | Q.  Well, then, they don't extend it as much as, I guess, the |
| 02:44PM | 23 | federal post-release; is that what it is? |
| 02:44PM | 24 | A.  Well, yeah.  They extended mine. |
| 02:44PM | 25 | Q.  And they extended it for how long? |

02:44PM    1    A.  I was supposed to max out from parole in 2008, but they

02:44PM    2    extended it all the way back to 2013, based off of my arrests

02:44PM    3    in 2006.

02:44PM    4    Q.  All right.  So, now you got a rearrest in 2006?

02:45PM    5    A.  Yeah.

02:45PM    6    Q.  And that rearrest was for what?

02:45PM    7    A.  Felon in possession of a firearm.

02:45PM    8    Q.  And where was that?

02:45PM    9    A.  On Carl Street in Buffalo.

02:45PM   10    Q.  In Buffalo?

02:45PM   11    A.  Yes, sir.

02:45PM   12    Q.  And because of that, you violated the -- your --

02:45PM   13    A.  Parole.

02:45PM   14    Q.  Parole.  Which you were at Gateway at the time.  I guess

02:45PM   15    you were let out of Gateway?

02:45PM   16    A.  Yes.  I was finished with Gateway.

02:45PM   17    Q.  And then, you decided to possess a weapon.  And you also

02:45PM   18    were charged with drug charges then, too; am I correct?

02:45PM   19    A.  No.  You're not correct.

02:45PM   20    Q.  So, no drug charges at that time, just the weapon?

02:45PM   21    A.  Yeah, just the weapon.

02:45PM   22    Q.  They didn't dismiss the drug charge?

02:45PM   23    A.  No drug charge.

02:45PM   24    Q.  It was just the weapon?

02:45PM   25    A.  Yes.

GRANT  --  BY MR. FOGG  --  4/24/18

02:45PM  1   Q.  And did you do time on that one?

02:45PM  2   A.  On the weapon charge?

02:45PM  3   Q.  Yeah.  2006.

02:45PM  4   A.  Yeah.

02:45PM  5   Q.  And that was in what year?

02:45PM  6   A.  What year did I do time?

02:45PM  7   Q.  Yeah.  When were you sentenced on that one?

02:45PM  8   A.  Well, I was sentenced in 2007, if I'm not mistaken, maybe

02:46PM  9   2008.

02:46PM  10  Q.  And you were sentenced to what?

02:46PM  11  A.  Fifty-seven months.

02:46PM  12  Q.  And that was 57 months federal time or is that --

02:46PM  13  A.  Federal.

02:46PM  14  Q.  Okay.  So, this was -- in 2006, this was a federal case;

02:46PM  15  am I right?

02:46PM  16  A.  Yeah.  It started off a city case, but I guess, due to

02:46PM  17  all the violence that was going to at that time --

02:46PM  18  Q.  They transferred it over?

02:46PM  19  A.  Yeah.

02:46PM  20  Q.  All right.  And this is the case that you were before

02:46PM  21  Judge Skretny on?

02:46PM  22  A.  Yes.

02:46PM  23  Q.  All right.  And that's when you wrote the letter to --

02:46PM  24  well, not when -- but that's the same Judge you wrote the

02:46PM  25  letter to; am I right?

02:46PM  1    A.  The letter talking about my probation situation?

02:46PM  2    Q.  Yes.

02:46PM  3    A.  Yeah.  Not at the same time, though, of course.

02:46PM  4    Q.  So, now, you were found to be a felon in possession of a

02:46PM  5    firearm; am I right?

02:46PM  6    A.  Yes.

02:47PM  7    Q.  Because you have a prior felony and you were possessing a

02:47PM  8    firearm, correct?

02:47PM  9    A.  Yes.

02:47PM  10   Q.  And that's how you were charged with federal charges,

02:47PM  11   correct?

02:47PM  12   A.  Yes.

02:47PM  13   Q.  All right.  You did -- you were sentenced to 57 months by

02:47PM  14   Judge Skretny, correct?

02:47PM  15   A.  Correct.

02:47PM  16   Q.  How much time on post-super -- excuse me -- post-release

02:47PM  17   supervision?

02:47PM  18   A.  Three years.

02:47PM  19   Q.  Hmm?

02:47PM  20   A.  Three years.

02:47PM  21   Q.  Three years.  And did you do all your time on the 57?

02:47PM  22   A.  Well, no.  I had good time.

02:47PM  23   Q.  Okay.  So, you got out a little earlier, right?

02:47PM  24   A.  Yeah.

02:47PM  25   Q.  And then, you were placed on post-release supervision for

02:47PM    1   three years, correct?

02:47PM    2   A.  Well, no.  Correct, to an extent.  But no, because when I

02:47PM    3   finished, Pennsylvania came and got me from Virginia and I

02:47PM    4   had to answer to my parole.

02:47PM    5   Q.  All right.  So, the 2006 criminal possession of a

02:47PM    6   weapon --

02:47PM    7   A.  Felon in possession.

02:47PM    8   Q.  It's a -- yes.  Felony possession violated the Erie,

02:47PM    9   Pennsylvania --

02:47PM   10   A.  Parole.

02:48PM   11   Q.  -- parole?

02:48PM   12   A.  Yes.

02:48PM   13   Q.  So, you did 57 months on federal time, correct?

02:48PM   14   A.  Correct.

02:48PM   15   Q.  And then, when you were about to be released, or

02:48PM   16   released, you were sent back to Erie, Pennsylvania?

02:48PM   17   A.  No.  I was sent back -- yeah, Albion.

02:48PM   18   Q.  So, you were sent back to Pennsylvania, though?

02:48PM   19   A.  Oh, yeah.

02:48PM   20   Q.  Right.  So, you were sent back to Pennsylvania to answer

02:48PM   21   for the VOP, right?

02:48PM   22   A.  Yes.

02:48PM   23   Q.  All right.  And you got sentenced on that?

02:48PM   24   A.  Yeah.  They gave me 18 months.

02:48PM   25   Q.  And did you get out early on 18 months?

02:48PM   1   A.  Yeah.  I got out, I want to say maybe seven months.  It

02:48PM   2   was I think, maybe nine.  One of the two.  I got out earlier,

02:48PM   3   though.

02:48PM   4   Q.  All right.  And what year that would be?

02:48PM   5   A.  That would be 2011.  That's when I got home.  Well,

02:48PM   6   technically, I wasn't released, because it was post-release.

02:48PM   7   I was still under the Department of Corrections custody, but

02:48PM   8   I was in a halfway house.

02:49PM   9   Q.  And what year was that?  Did you say 2011?

02:49PM  10   A.  Yes, sir.

02:49PM  11   Q.  So, 2011, were you on post-release still or that ended

02:49PM  12   that?

02:49PM  13   A.  No.  Post-release didn't start at that time because,

02:49PM  14   technically, I was still incarcerated.  You talking about as

02:49PM  15   far as the federal go, right?

02:49PM  16   Q.  Mm-hmm.

02:49PM  17   A.  Yeah.

02:49PM  18   Q.  So, now, with the federal case, 2006 criminal possession

02:49PM  19   of a weapon, the felony case, you pled guilty?  You entered a

02:49PM  20   plea; am I right?

02:49PM  21   A.  Of guilty?

02:49PM  22   Q.  Mm-hmm.

02:49PM  23   A.  Yeah.

02:49PM  24   Q.  And you actually had a plea agreement, correct?

02:49PM  25   A.  Yes.

02:49PM    1    Q.  All right.  Now, in that plea agreement, you agreed not

02:50PM    2    to violate the conditions of your post-release; am I right?

02:50PM    3    A.  I don't know.  You got a copy of my plea agreement?  I

02:50PM    4    don't want to answer a question that I am not 100 percent

02:50PM    5    sure.

02:51PM    6    Q.  Sure.  Sure.

02:51PM    7          MR. FOGG:  Can I have this marked?

02:51PM    8    BY MR. FOGG:

02:51PM    9    Q.  I'm going to show you what's been marked as Defendant's

02:52PM   10    Exhibit 15.  It's a pink label, but it's Defendant's 15.

02:52PM   11    A.  What page would it be that I agree not to -- what you

02:52PM   12    say?

02:52PM   13    Q.  May I?  Your plea agreement specifies that -- talks about

02:52PM   14    supervised release; am I correct?  Do you recall that at all?

02:52PM   15    A.  It's possible.

02:52PM   16    Q.  All right.  And do you recall that if you violate those

02:52PM   17    conditions, that you can be resentenced?  Do you recall that?

02:52PM   18    A.  I would need to --

02:52PM   19    Q.  All right.  Turn to page 2, paragraph 2.  Read it to

02:52PM   20    yourself.  Did you read that paragraph?

02:54PM   21    A.  Mm-hmm.

02:54PM   22    Q.  You're supposed to let me know.  So, you agree with that;

02:54PM   23    am I right?

02:54PM   24    A.  What was your question again?

02:54PM   25    Q.  So, in your plea agreement, you had agreed to -- that if

02:54PM   1   you violated your -- you wouldn't violate your supervised

02:54PM   2   release.  And if you did, you could be resentenced; am I

02:54PM   3   right?

02:54PM   4   A.  Well, it says to the defendant's understanding, so --

02:54PM   5   Q.  So, right?  That's correct?

02:54PM   6   A.  Yeah, I guess.

02:54PM   7   Q.  Okay.  And your plea agreement also spoke to you

02:54PM   8   cooperating with the government and providing truthful

02:54PM   9   information, right?

02:54PM   10  A.  Yes.

02:54PM   11  Q.  And helping in the prosecution of other people; am I

02:54PM   12  correct?

02:54PM   13  A.  I would need to see it again.

02:55PM   14  Q.  Start at page 10.

02:55PM   15  A.  Okay.  And where to stop?

02:55PM   16  Q.  That one paragraph will do it, the one section.

02:55PM   17  A.  Okay.

02:55PM   18  Q.  But you can go up to page -- I mean paragraph 25.

02:55PM   19  A.  It starts on page 10?  It's on 11, that's why I'm not

02:55PM   20  seeing it.

02:55PM   21  Q.  Yes.  Page 10, where the cooperation starts.

02:55PM   22  A.  Okay.  I got you.

02:56PM   23  Q.  Are you finished?

02:56PM   24  A.  All you wanted me to read was this right here, right?

02:56PM   25  Q.  Did you -- do you recall actually agreeing to provide

02:57PM  1    substantial assistance in the prosecution of others?  Do you

02:57PM  2    recall that?

02:57PM  3    A.  Yeah.  I can recall that.

02:57PM  4    Q.  Huh?

02:57PM  5    A.  Yes.

02:57PM  6    Q.  You do?  Now, 2011 is when you came out of Pennsylvania

02:57PM  7    off of time; am I correct?

02:57PM  8    A.  Well, 2011 is when I was released on post-release.  So,

02:57PM  9    technically, I was still doing time.

02:57PM  10   Q.  You were on post-release in 2011, right?

02:57PM  11   A.  Yes.

02:57PM  12   Q.  And your next arrest was?

02:57PM  13   A.  2014, if I'm not mistaken.  Oh, no.  No.  No.  No.  2013.

02:57PM  14   Q.  And that was for what?

02:58PM  15   A.  They said I had possession, but I never was charged with

02:58PM  16   that.

02:58PM  17   Q.  Right.  And then after that came?

02:58PM  18   A.  2014.

02:58PM  19   Q.  2014; am I correct?

02:58PM  20   A.  Yeah.

02:58PM  21   Q.  Now, the 2014 arrest, you were arrested.  Do you recall

02:58PM  22   the month?

02:58PM  23   A.  In 2014?

02:58PM  24   Q.  Mm-hmm.

02:58PM  25   A.  Hold up.  I think Buffalo times was in 2014.  I think one

02:58PM   1   of them was April, I want to say maybe 24th.  And was that

02:58PM   2   April 24th, 2013 or '14?  I think it was '14, though.

02:58PM   3   Q.  So, May 2014?

02:58PM   4   A.  No.  I said April.

02:58PM   5   Q.  I'm sorry.  April?

02:58PM   6   A.  Yeah.  I said April.  The charges had gotten dismissed.

02:59PM   7   That was in April.

02:59PM   8   Q.  That was in April?

02:59PM   9   A.  Yes.

02:59PM   10  Q.  Okay.  And then, you were arrested in July, right, of

02:59PM   11  2014?

02:59PM   12  A.  I turned myself in in July.

02:59PM   13  Q.  All right.  You turned yourself in in July?

02:59PM   14  A.  Yeah.

02:59PM   15  Q.  And that was to federal agents?

02:59PM   16  A.  Well, not necessarily to the agent, but to the court

02:59PM   17  building.

02:59PM   18  Q.  To the court building?  All right.

02:59PM   19  A.  Yeah.

02:59PM   20  Q.  And that was July 24th, 2014?

02:59PM   21  A.  Yes, sir.

02:59PM   22  Q.  Now, before that, April 29th, 2014, you actually met with

02:59PM   23  federal agents, didn't you?

02:59PM   24  A.  April 29th, 2014?

02:59PM   25  Q.  Mm-hmm.

02:59PM    1    A.  You would have to show me that.

02:59PM    2    Q.  Well, do you recall being interviewed by the agents at

02:59PM    3    the Buffalo Central Booking Department?

02:59PM    4    A.  April 29th, 2014?

02:59PM    5    Q.  Well, excuse me.  That would probably be the 25th.

02:59PM    6    Sorry.  April 25th, 2014.

02:59PM    7    A.  And they interviewed me?

02:59PM    8    Q.  Yes.

03:00PM    9    A.  Can you show me that?

03:00PM    10    Q.  I'll show you what's been marked as Government

03:00PM    11    Exhibit 3506B.

03:00PM    12    A.  Yeah.  I think this might be the false document.  Oh, you

03:00PM    13    mean did they come and try to talk to me?

03:00PM    14    Q.  Where were you located at that time?

03:00PM    15    A.  I think it was in central booking, if I'm not mistaken.

03:00PM    16    Yeah, central booking.

03:00PM    17    Q.  And you were on some other arrest?

03:00PM    18    A.  That's the charge that got submitted.

03:00PM    19    Q.  So, while you were being held on that charge, they came

03:00PM    20    to visit you?

03:00PM    21    A.  Yeah.  That next morning, before I went to court,

03:00PM    22    actually I thought I had court, but when I got around the

03:00PM    23    corner, the lady was telling me that there was some people

03:00PM    24    that wanted to speak to me.  They asked to speak to me.  Once

03:01PM    25    he showed me his badge, that's when I said I had nothing to

03:01PM  1   say to them.

03:01PM  2   Q.  All right.  Now, that was the FBI, correct?

03:01PM  3   A.  Yeah.  FBI.

03:01PM  4   Q.  Sorry?

03:01PM  5   A.  Yeah.  He had a FBI badge.

03:01PM  6   Q.  Now, you also filed a petition in the Western District of

03:01PM  7   New York -- well, excuse me.  You were under supervision, am

03:01PM  8   I correct?  And they violated you in, what, April?  I mean --

03:01PM  9   excuse me -- in May 2014; is that what it was?

03:01PM  10  A.  You would have to show me.  It's possible.  What was the

03:01PM  11  violation for?

03:01PM  12  Q.  Well, 4/24, Buffalo Police pulled you over and found

03:02PM  13  criminal possession of drugs.

03:02PM  14  A.  Oh, yeah, that's --

03:02PM  15  Q.  4/24 they pulled you over and said you were tampering

03:02PM  16  with physical evidence, driving without a license, possession

03:02PM  17  of marijuana.  You tested positive for marijuana?

03:02PM  18  A.  Okay.

03:02PM  19  Q.  They actually issued a violation; am I right?

03:02PM  20  A.  Yeah, yeah, yeah.

03:02PM  21  Q.  All right.  And that was before Judge Skretny?

03:02PM  22  A.  Yes.

03:02PM  23  Q.  All right.  So, you were violated again before Judge

03:02PM  24  Skretny; am I right?

03:02PM  25  A.  That was the first time, if I am not mistaken.

03:02PM   1   Q.  Well, this is now, actually, May of 2005 -- I mean,

03:02PM   2   excuse me, 2014.

03:02PM   3   A.  So, you -- I'm confused.

03:02PM   4   Q.  Okay.  Well, you were arrested -- well, you were placed

03:02PM   5   on post-release supervision by Pennsylvania while you were

03:02PM   6   still on post-release supervision in the Federal Court; am I

03:03PM   7   right?  So, in 2006, you had three-years post-release

03:03PM   8   supervision, right?

03:03PM   9   A.  For who?

03:03PM   10  Q.  Was that for the federal court?

03:03PM   11  A.  No.

03:03PM   12  Q.  So, this new post-release supervision --

03:03PM   13  A.  New?  No.  It's probably old, 2006, 2014.  It's 2018

03:03PM   14  right now, right?

03:04PM   15  Q.  I'll show you what's been marked as Defendant's 16 for

03:04PM   16  identification.

03:04PM   17  A.  Okay.  And you said I violated my federal probation in

03:04PM   18  2006?

03:04PM   19  Q.  That's a violation petition, right?

03:04PM   20  A.  Yes, it is.

03:04PM   21  Q.  And that's with Judge Skretny?

03:04PM   22  A.  Yes, it is.

03:04PM   23  Q.  It's got the same docket on it as the original docket; am

03:04PM   24  I correct?

03:04PM   25  A.  Yes, it does.

03:04PM   1   Q.  Flip the page and it shows the conditions relating to

03:04PM   2   April 24th, right?

03:04PM   3   A.  Of 2014, right.

03:04PM   4   Q.  2014?

03:04PM   5   A.  Okay.

03:04PM   6   Q.  Correct?

03:04PM   7   A.  Yeah.

03:04PM   8   Q.  So, you were violated at that time?

03:04PM   9   A.  Yeah.  He sent -- my probation officer sent -- yeah, he

03:04PM  10   sent the violation paperwork to the Judge.  Yes, if I'm not

03:04PM  11   mistaken.

03:04PM  12   Q.  And that was on the federal case?

03:04PM  13   A.  Yes.

03:04PM  14   Q.  All right.

03:04PM  15   A.  But this was after 2006.  When you first was talking, you

03:04PM  16   mentioned 2006.

03:05PM  17   Q.  I'll show you again Defendant's 16.  And the date on that

03:05PM  18   filing is what day?

03:05PM  19   A.  This date right here (indicating)?

03:05PM  20   Q.  Yes.  What is the date?

03:05PM  21   A.  5/4/14.

03:05PM  22   Q.  And the date of the filing of the document is what date?

03:05PM  23   A.  5/5/14.

03:05PM  24   Q.  '14.  So, on 5/5 --

03:05PM  25   A.  I was done with Pennsylvania.

03:05PM    1    Q.  On 5/5/14, the Federal Court actually pled -- you were

03:05PM    2    done with Pennsylvania, right?

03:05PM    3    A.  Yes.

03:05PM    4    Q.  All right.  And the Federal Court placed a violation on

03:05PM    5    you, correct?

03:05PM    6    A.  Yes.  My probation officer did --

03:05PM    7    Q.  Your probation officer --

03:05PM    8    A.  -- advise the court.

03:05PM    9    Q.  Right.  And that's because you got rearrested, even

03:05PM   10    though those cases were dismissed, right?  Now, you were

03:05PM   11    placed in custody at that time?

03:05PM   12    A.  Yeah.

03:05PM   13    Q.  All right.

03:05PM   14    A.  On the 24th of April, yeah.

03:05PM   15    Q.  Right.  And did you get out of custody or your probation

03:06PM   16    officer filed it and you remained in custody, in federal

03:06PM   17    custody?

03:06PM   18    A.  No, I bailed out.

03:06PM   19    Q.  You bailed out?

03:06PM   20    A.  Yeah.

03:06PM   21    Q.  When your federal probation officer placed the violation

03:06PM   22    petition, were you placed in custody?

03:06PM   23    A.  No.

03:06PM   24    Q.  So, Judge Skretny allowed you to come in and out of

03:06PM   25    court; am I right?

03:06PM   1    A.  Yes.

03:06PM   2    Q.  All right.  And you had to make an appearance before the

03:06PM   3    Court, so they can see what happens in Buffalo City Court,

03:06PM   4    right?

03:06PM   5    A.  Yes.

03:06PM   6    Q.  To determine if they're going to consider it a violation;

03:06PM   7    am I right?

03:06PM   8    A.  Yes.

03:06PM   9    Q.  And that was May 5th, 2014, right?

03:06PM  10    A.  That's when the paper got put in, yes.

03:06PM  11    Q.  When the paperwork got in.  Now, it just turns out that

03:06PM  12    on July 24th is when you turned yourself in?

03:06PM  13    A.  Yeah.

03:06PM  14    Q.  And that's 2014, correct?

03:06PM  15    A.  Yes.

03:06PM  16    Q.  Now, you turned yourself in because you found that FBI

03:06PM  17    agents were actually inquiring about you and looking for you,

03:07PM  18    correct?

03:07PM  19    A.  Well, yeah, because they had my picture all over the

03:07PM  20    news.

03:07PM  21    Q.  Right.  Okay.  So, you decided just to walk on in; am I

03:07PM  22    right?

03:07PM  23    A.  Yeah, turn myself in, yeah.

03:07PM  24    Q.  All right.  Now -- and that would be on this case, but at

03:07PM  25    the time, your case number was a little different, 14-2082,

03:07PM    1    right?  Do you remember?

03:07PM    2    A.  You would have to show me the criminal complaint.

03:07PM    3    Q.  All right.  I'll show you what's been marked as

03:08PM    4    Defendant's 17.  Can you see that?

03:08PM    5    A.  Mm-hmm.

03:08PM    6    Q.  That's the cover sheet to the complaint you made; am I

03:08PM    7    right?

03:08PM    8    A.  Yes.

03:08PM    9    Q.  Okay.  And at the top, it has a docket number up there;

03:08PM   10    am I right?

03:08PM   11    A.  Yes.

03:08PM   12    Q.  And you recognize that docket number as 14-M-2082, right?

03:08PM   13    A.  I didn't memorize it by heart, but I am assuming.

03:08PM   14    Q.  But this is the case; am I right?  And --

03:08PM   15    A.  Yeah.  That's what my criminal complaint looked like.

03:08PM   16    But as far the numbers, I don't remember was that the exact

03:08PM   17    numbers or not.

03:08PM   18    Q.  All right.  And your -- a criminal complaint was filed

03:08PM   19    consisting of 17 co-defendants, right?

03:08PM   20    A.  Yeah.  I think it was 17.

03:08PM   21    Q.  And each one considered to be conspiring with each other,

03:09PM   22    correct?  So, you had 17 co-conspirators all together.  And

03:09PM   23    you were one of them, right?  So, that was 16 co-

03:09PM   24    conspirators, right?

03:09PM   25    A.  Yeah, plus me, which makes 17.

03:09PM   1   Q.  Which makes 17.

03:09PM   2   A.  Yeah.

03:09PM   3   Q.  All right.  Now, the people that are on this, on the case

03:09PM   4   with you and that was July, you knew those people; am I

03:09PM   5   right?

03:09PM   6          THE COURT:  Would you mind telling me what the

03:09PM   7   relevance of this is?

03:09PM   8          MR. FOGG:  Judge, we're getting --

03:09PM   9          THE COURT:  I think we better get into a different

03:09PM  10   area.

03:09PM  11          MR. FOGG:  Well, this is the --

03:09PM  12          THE COURT:  I think we've heard enough.

03:09PM  13          MR. FOGG:  Yes, Judge.

03:09PM  14          THE COURT:  Go on to some other area.

03:09PM  15          MR. FOGG:  All right.

03:09PM  16   BY MR. FOGG:

03:09PM  17   Q.  Now, you had testified about dealing, what, 33 pounds of

03:10PM  18   marijuana?  When did that transpire?

03:10PM  19   A.  I didn't testify to dealing 33 pounds of marijuana.  Are

03:10PM  20   you talking today?

03:10PM  21   Q.  Yes.

03:10PM  22   A.  I never said that I dealt 33 pounds of marijuana.

03:10PM  23   Q.  Well, did you deal in marijuana?

03:10PM  24   A.  Yeah.

03:10PM  25   Q.  All right.  And when did you do that, in 2014?

| | | |
|---|---|---|
| 03:10PM | 1 | A.  When didn't I. |
| 03:10PM | 2 | Q.  I'm sorry? |
| 03:10PM | 3 | A.  I said, when didn't I. |
| 03:10PM | 4 | Q.  And where were you getting your marijuana from? |
| 03:10PM | 5 | A.  Aaron.  Boogy. |
| 03:10PM | 6 | Q.  All right.  And you believed that the people in the |
| 03:10PM | 7 | neighborhood, or at least Aaron, had a Mexican connection? |
| 03:10PM | 8 | MR. XIANG:  Objection to speculation and relevance. |
| 03:10PM | 9 | THE COURT:  Sustained. |
| 03:10PM | 10 | BY MR. FOGG: |
| 03:10PM | 11 | Q.  Where did you believe Aaron was getting it from? |
| 03:10PM | 12 | MR. XIANG:  Objection.  Relevance and speculation. |
| 03:10PM | 13 | THE COURT:  Well, it's a perception of the witness. |
| 03:10PM | 14 | If you know, sir. |
| 03:10PM | 15 | MR. FOGG:  Well, I'll -- |
| 03:10PM | 16 | THE COURT:  It's all right.  He can answer it. |
| 03:10PM | 17 | THE WITNESS:  Where I do believe that he was getting |
| 03:10PM | 18 | it from? |
| 03:10PM | 19 | BY MR. FOGG: |
| 03:10PM | 20 | Q.  Mm-hmm. |
| 03:10PM | 21 | A.  Texas. |
| 03:10PM | 22 | Q.  Texas.  But you didn't know that? |
| 03:10PM | 23 | A.  I mean, I did pick up a couple boxes before. |
| 03:11PM | 24 | Q.  And you picked up a couple of boxes from where? |
| 03:11PM | 25 | A.  Texas. |

03:11PM  1   Q.  You drove down to Texas and went down to Texas?

03:11PM  2   A.  No.  They were mailed.

03:11PM  3   Q.  How do you --

03:11PM  4   A.  You know, like the letters that I had, on the envelope,

03:11PM  5   my name was like, on the return address and where I was

03:11PM  6   sending the letter to.  Same thing with the UPS service.

03:11PM  7   Q.  And it was marijuana?

03:11PM  8   A.  Yeah.

03:11PM  9   Q.  You saw what was in the box?

03:11PM  10  A.  Yeah.

03:11PM  11  Q.  When did that happen?

03:11PM  12  A.  Couple times.

03:11PM  13  Q.  How many times is a couple?

03:11PM  14  A.  Well, all right.  Let me rephrase that, because I think a

03:11PM  15  couple is two.  Numerous times.

03:11PM  16  Q.  All right.  How many times?

03:11PM  17  A.  I don't know how many times, to be exact.

03:11PM  18  Q.  Okay.

03:11PM  19  A.  Whenever he called me.

03:11PM  20  Q.  All right.  So, what year?

03:11PM  21  A.  2013.  As far as me, per se, picking them up, 2013, 2014.

03:11PM  22  Q.  All right.  So, in two-years' time.  And do you know when

03:11PM  23  in 2013?

03:11PM  24  A.  No.

03:11PM  25  Q.  Do you know how many times in 2013?

03:11PM    1    A.   However many times he called me and told me he needed me.

03:12PM    2    Q.   So, you don't know?

03:12PM    3    A.   No.

03:12PM    4    Q.   And in 2014, do you know how many times in 2014?

03:12PM    5    A.   Like, you asking for an exact number?

03:12PM    6    Q.   I'm asking how many times.  You said numerous times.  How

03:12PM    7    many times in 2014?

03:12PM    8    A.   If I give you an exact number, it's a possibility that I

03:12PM    9    could be --

03:12PM   10    Q.   I'm not asking for possibility --

03:12PM   11         THE REPORTER:  Wait.  Wait.  One at a time.

03:12PM   12         MR. FOGG:  I'm sorry.

03:12PM   13    BY MR. FOGG:

03:12PM   14    Q.   I'm not asking for possibilities.  I just want to know,

03:12PM   15    do you know how many times in 2014?  Do you know?

03:12PM   16         THE COURT:  Approximately, sir.

03:12PM   17         THE WITNESS:  No.

03:12PM   18         THE COURT:  Approximately?

03:12PM   19         THE WITNESS:  Approximately, I don't have an

03:12PM   20    approximate.

03:12PM   21         THE COURT:  Would it be more than five?

03:12PM   22         THE WITNESS:  Yes.

03:12PM   23         THE COURT:  More than 10?

03:12PM   24         THE WITNESS:  I'd say about 10.  I'd say maybe 10 to

03:12PM   25    15, at the most.

03:12PM    1              THE COURT:  All right.

03:12PM    2    BY MR. FOGG:

03:12PM    3    Q.  All right.  And do you know what months they may have

03:12PM    4    been?

03:12PM    5    A.  No.

03:12PM    6    Q.  Summertime, wintertime?

03:12PM    7    A.  I mean, summertime, wintertime, spring.

03:12PM    8    Q.  Okay.  And do you know what houses they were delivered

03:13PM    9    at?

03:13PM   10    A.  Different houses.  One time, he got it sent to me.

03:13PM   11    Q.  And what address is that?

03:13PM   12    A.  The address that's in the criminal complaint, 2 West

03:13PM   13    Cleveland Drive.  Actually, two times.

03:13PM   14    Q.  And when was that?

03:13PM   15    A.  That was in 2014.

03:13PM   16    Q.  They were both in 2014?

03:13PM   17    A.  Yes.  A couple days apart from each other, actually.

03:13PM   18    Q.  Now, how do you know they were coming from Aaron or

03:13PM   19    purposed for Aaron?

03:13PM   20    A.  Because I took it to him.

03:13PM   21    Q.  All right.

03:13PM   22    A.  One time, he came to the house.  The second time, I took

03:13PM   23    it to him.

03:13PM   24    Q.  All right.  Have you ever dealt with Letorrance Travis?

03:13PM   25    A.  What do you mean?

03:13PM     1    Q.  Drug dealing?

03:13PM     2    A.  No.

03:13PM     3    Q.  Have you ever purchased from him?  Have you ever -- ever

03:13PM     4    sell to him?

03:13PM     5    A.  No.

03:13PM     6    Q.  You described this one particular time where there was

03:14PM     7    33 pounds.  You made reference to 33 pounds?

03:14PM     8    A.  Yes.

03:14PM     9    Q.  And where did that occur?

03:14PM    10    A.  I want to say it was at his grandfather's house, maybe on

03:14PM    11    Camp Street, one of them streets over there.  We picked it up

03:14PM    12    from there.  His aunt dropped -- she grabbed it -- she

03:14PM    13    dropped it on the floor.  He grabbed it, picked it up on the

03:14PM    14    concrete.  He grabbed it, picked it up, put it in the back of

03:14PM    15    the truck.  We took it to Brill house.

03:14PM    16    Q.  And who's Brill?

03:14PM    17    A.  I don't know his first name.

03:14PM    18    Q.  All right.  And was this in a vehicle?  Did he pick you

03:14PM    19    up in his vehicle or your vehicle?

03:14PM    20    A.  Did who pick me up?

03:14PM    21    Q.  Well, how did you get to the house to pick up the

03:14PM    22    package?

03:14PM    23    A.  How did I get to the house?

03:14PM    24    Q.  Yes.

03:14PM    25    A.  Boogy.  I didn't -- what is you saying?  Can you be a

03:15PM   1   little more -- so I can understand you?

03:15PM   2   Q.  Well, I'm asking --

03:15PM   3   A.  I don't want to answer it wrong.

03:15PM   4   Q.  No.  No.  I don't want you to answer it wrong.  You said

03:15PM   5   you picked up 33 pounds in a box, right?  It was at Camp?

03:15PM   6   A.  Well, I didn't pick him up.  I was there.

03:15PM   7   Q.  Okay.  And how did you get there?  Were you driven there?

03:15PM   8   Were you -- did you walk there?  How did you get to that

03:15PM   9   location to see that?  Does that make sense to you?

03:15PM  10   A.  Yes.  Boogy.  Boogy's.

03:15PM  11   Q.  And how did he get you there?

03:15PM  12   A.  He had a rental from somebody.

03:15PM  13   Q.  Somebody?

03:15PM  14   A.  Yeah, I don't know who, one of his girlfriends.

03:15PM  15   Q.  Now, the white video -- All White video, did you

03:16PM  16   participate in that?

03:16PM  17   A.  Yeah, I was there.

03:16PM  18   Q.  Okay.  Were you in the video itself?

03:16PM  19   A.  No.

03:16PM  20   Q.  All right.

03:16PM  21   A.  Well, there was two makes of it.  I might have been in

03:16PM  22   the second one.

03:17PM  23   Q.  Now, you went to -- you testified that you went to a

03:17PM  24   relative's house on Camp Street to deliver the 33 pounds?

03:17PM  25   A.  To deliver?

GRANT  --  BY MR. FOGG  --  4/24/18

654

03:17PM  1   Q.  Well, to pick up the 33 pounds, right?

03:17PM  2   A.  You saying that I did it?  Because you just said that I

03:17PM  3   took it, but I got it.

03:17PM  4   Q.  Well, you said you went there; am I right?

03:17PM  5   A.  Oh, yeah.

03:17PM  6   Q.  Am I right?

03:17PM  7   A.  Yeah, you right.  I was there.

03:17PM  8   Q.  All right.  And you recall the address, right?

03:17PM  9   A.  No, I don't recall the address.

03:17PM  10  Q.  No?  Now, you testified at a prior proceeding on

03:17PM  11  September 18, 2017; do you recall?

03:18PM  12  A.  That's sounds about correct.  I'm not sure on the date,

03:18PM  13  but --

03:18PM  14  Q.  And at that time you swore, under oath, to tell the

03:18PM  15  truth, right?

03:18PM  16  A.  Mm-hmm.

03:18PM  17  Q.  And you did -- and to tell the whole truth, right?

03:18PM  18  A.  Mm-hmm.

03:18PM  19  Q.  And you did, didn't you?

03:18PM  20  A.  Yeah.

03:18PM  21  Q.  Do you recall being asked questions about the 33 pounds

03:18PM  22  then?

03:18PM  23  A.  No.  It was 40 pounds that time.

03:18PM  24  Q.  So, you recall it wasn't 33 pounds; it was 40 pounds?

03:18PM  25  A.  Two different incidents.

03:18PM    1    Q.  Two different incidents?

03:18PM    2    A.  Yeah.

03:18PM    3    Q.  But you didn't know where the 40 pounds was delivered; is

03:18PM    4    that what it is?

03:18PM    5    A.  I didn't know where it was delivered?

03:18PM    6    Q.  Right.

03:18PM    7    A.  Yeah, I knew where it was delivered.

03:18PM    8    Q.  Where was the 40 pounds delivered?

03:18PM    9    A.  On Girard Street.

03:18PM   10    Q.  On Girard?

03:18PM   11    A.  Yeah.

03:19PM   12    Q.  But it was not 33 pounds; am I right?

03:19PM   13    A.  At that time, no.

03:19PM   14          THE COURT:  This was a different time?

03:19PM   15          THE WITNESS:  Yes.

03:19PM   16          MR. FOGG:  A different time?

03:19PM   17          THE COURT:  One time it was 33 pounds.  One time it

03:19PM   18    was 40 pounds?

03:19PM   19          THE WITNESS:  The 33 pound was, I think that was

03:19PM   20    2013, if I am not mistaken.  The 40 was in 2014.

03:19PM   21          THE COURT:  We'll take a 15-minute recess, ladies and

03:19PM   22    gentlemen.  Court will be in recess.

03:19PM   23          THE CLERK:  All rise.

03:19PM   24    (The jury left the room at 3:19 p.m.)

03:19PM   25    (Brief recess)

| | | |
|---|---|---|
| 03:35PM | 1 | (The jury entered the room at 3:36 p.m.) |
| 03:36PM | 2 | THE CLERK:  All rise.  You may be seated. |
| 03:36PM | 3 | THE COURT:  All right. |
| 03:36PM | 4 | BY MR. FOGG: |
| 03:37PM | 5 | Q.  Mr. Grant, do you recall also writing letters to George |
| 03:37PM | 6 | Burgasser with regard to -- excuse me.  Have you also -- do |
| 03:37PM | 7 | you recall writing a letter to Mr. Wei Xiang, here, on |
| 03:37PM | 8 | September 15th, 2017? |
| 03:37PM | 9 | A.  You have to show me the letter, man. |
| 03:37PM | 10 | Q.  I'll show you what's been marked as Government's |
| 03:37PM | 11 | Exhibit 3506DD.  Do you recognize that? |
| 03:37PM | 12 | A.  Yeah. |
| 03:37PM | 13 | Q.  You recognize that, right? |
| 03:38PM | 14 | A.  Yeah. |
| 03:38PM | 15 | Q.  And you were advising him -- or letting him know that |
| 03:38PM | 16 | you're ready to get prepped for trial; am I right? |
| 03:38PM | 17 | A.  What line is that? |
| 03:38PM | 18 | Q.  Is that what you were doing on that date?  Do you recall |
| 03:38PM | 19 | writing that letter? |
| 03:38PM | 20 | A.  Yeah.  I recall writing the letter. |
| 03:38PM | 21 | Q.  All right.  And the purpose to write him was to inform |
| 03:38PM | 22 | him that you're ready to get prepped for trial?  Is that the |
| 03:38PM | 23 | purpose? |
| 03:38PM | 24 | A.  I think my purpose here was -- yeah.  I would think I was |
| 03:38PM | 25 | being threatened.  So, I think that was my purpose for |

03:38PM  1  writing him, but you can show me the line that you're talking

03:38PM  2  about?

03:38PM  3  Q.  Well, look at the bottom.

03:38PM  4  A.  Oh, okay.  Yeah.

03:38PM  5  Q.  Yeah?

03:38PM  6  A.  Yeah.

03:38PM  7         MR. FOGG:  No further questions.

03:38PM  8

03:38PM  9                    REDIRECT EXAMINATION

03:38PM  10

03:39PM  11  BY MR. XIANG:

03:39PM  12  Q.  Mr. Grant, let's start with where defense counsel left

03:39PM  13  off, the letter that you wrote to me.  What did you say your

03:39PM  14  purpose for writing that letter was?

03:39PM  15  A.  Well, my purpose was, I was being threatened.  I had

03:39PM  16  actually -- was told to check into the SHU, protective

03:39PM  17  custody.

03:39PM  18  Q.  In fact, lines 3 to 4 of that letter:  I was threatened

03:40PM  19  by a guy at the jail due to me cooperating against Roderick

03:40PM  20  Arrington.  Is that right?

03:40PM  21  A.  Yes.

03:40PM  22  Q.  What do you mean by the SHU, you just said?

03:40PM  23  A.  It's -- like I said, it's a segregated housing unit where

03:40PM  24  they put people for either administrative -- I was placed

03:40PM  25  under administrative -- due to me checking myself -- solitary

03:40PM   1   confinement.

03:40PM   2   Q.  Can you explain what checking yourself in means?

03:40PM   3   A.  It's like when you be threatened.  Somebody tell you get

03:40PM   4   out the compound.  You got to check yourself in for coop --

03:40PM   5   there's many people who check their selves as people who

03:40PM   6   cooperate.

03:40PM   7   Q.  What did you mean by the term compound you just used?

03:40PM   8   A.  Oh, that's what they call the jail, as a whole, the

03:40PM   9   different units.  There's a chow hall, the library, medical

03:40PM  10   units.  So, I'm assuming that that's why they call it a

03:40PM  11   compound.

03:40PM  12   Q.  Now, putting yourself in solitary confinement, what was

03:41PM  13   the purpose?

03:41PM  14   A.  Protection.  To be protected.

03:41PM  15   Q.  Defense counsel had asked you during cross-

03:41PM  16   examination -- actually, he started with a couple of letters

03:41PM  17   about you asking George Burgasser about being relocated.  Do

03:41PM  18   you recall that line of questioning?

03:41PM  19   A.  Yes.

03:41PM  20   Q.  Relocated from Allegany County?

03:41PM  21   A.  Yeah.

03:41PM  22   Q.  And relocated to Youngstown?

03:41PM  23   A.  Yeah.

03:41PM  24   Q.  And relocated -- or being housed at Monroe County.  Do

03:41PM  25   you remember there's a letter he asked you about that you

GRANT -- BY MR. XIANG -- 4/24/18

659

03:41PM  1   were housed at Monroe County?

03:41PM  2   A.   Yeah.

03:41PM  3   Q.   And you also mentioned in one of the letters you got it

03:41PM  4   at Warsaw, Virginia?

03:41PM  5   A.   Yes.

03:41PM  6   Q.   Can you just explain for the jury here, how is it that

03:41PM  7   you were at these county jails in the past four years?

03:41PM  8   A.   What do you mean?  Like, how was I -- like, why I was

03:42PM  9   getting moved?

03:42PM  10  Q.   Yes.

03:42PM  11  A.   Well, my cooperation.  I was being -- I was cooperating

03:42PM  12  and everybody knew about it.  So, they, you know, I was

03:42PM  13  getting threatened from time to time.

03:42PM  14  Q.   First off, is there a federal detention center here in

03:42PM  15  the Western District of New York?

03:42PM  16  A.   No, not in the Western District of New York, no.

03:42PM  17  Q.   So, are federal inmates located -- farmed out to local

03:42PM  18  facilities?

03:42PM  19  A.   Yes.

03:42PM  20  Q.   Including, you said, as far down south as Warsaw,

03:42PM  21  Virginia?

03:42PM  22  A.   Yes.

03:42PM  23  Q.   So, when you wrote to George Burgasser asking to be

03:42PM  24  relocated from Allegany County, that was Defendant's

03:42PM  25  Exhibit 8, being relocated in that letter, Defendant's

GRANT  --  BY MR. XIANG  --  4/24/18

660

03:43PM    1  Exhibit 10, why were you asking to be relocated from where

03:43PM    2  you were housed?

03:43PM    3  A.  Because I was having problems there due to my

03:43PM    4  cooperation.

03:43PM    5  Q.  What kind of problems?

03:43PM    6  A.  People was threatening me.  Ra Ra, he was sending threats

03:43PM    7  to me through people.

03:43PM    8  Q.  Defense counsel also asked you about letters that you

03:43PM    9  wrote to the defendant while you were in jail.

03:43PM   10  A.  Yeah.

03:43PM   11  Q.  Do you remember that?

03:43PM   12  A.  Yeah.

03:43PM   13  Q.  I mean, him asking you those questions?

03:43PM   14  A.  Yeah.

03:43PM   15  Q.  Why were you exchanging letters with Aaron Hicks when you

03:43PM   16  were in jail?

03:43PM   17  A.  Well, I felt like that if I write him and maybe try to

03:44PM   18  persuade him that I am not going to cooperate with you guys,

03:44PM   19  I'm not going to follow complete all the way through with it,

03:44PM   20  that like, as far as all of the threats that I was getting

03:44PM   21  might cease.

03:44PM   22  Q.  Might cease?

03:44PM   23  A.  Yeah, stop.

03:44PM   24  Q.  Similar to when you told Roderick Arrington to his face

03:44PM   25  that you weren't -- that the government didn't ask about him?

03:44PM  1    A.  Yeah.

03:44PM  2    Q.  Defense counsel also asked you about writing to George

03:44PM  3    Burgasser, trying to get credit.  Do you remember he used

03:44PM  4    that term, to get credit?

03:44PM  5    A.  Yeah.  I remember that term.

03:44PM  6    Q.  Under the terms of your plea agreement, do you get credit

03:44PM  7    if you falsely accuse anyone of a crime?

03:44PM  8    A.  No.

03:44PM  9    Q.  Why not?

03:45PM  10   A.  That's perjury.  If you perjure, you get extra charges

03:45PM  11   against you.

03:45PM  12   Q.  Is it in your interest or against your interest to be

03:45PM  13   truthful in your testimony right now?

03:45PM  14   A.  In my interest.

03:45PM  15   Q.  Why is that?

03:45PM  16   A.  I won't -- would not get charged with perjury.

03:45PM  17   Q.  And then, defense counsel also asked you about -- well,

03:45PM  18   first off, let's clarify.  Am I George Burgasser?

03:45PM  19   A.  No.

03:45PM  20   Q.  Is my counsel here George Burgasser?

03:45PM  21   A.  No.

03:45PM  22   Q.  Is it a different United States Attorney than the two of

03:45PM  23   us who are here today?

03:45PM  24   A.  As far as George Burgasser?

03:45PM  25   Q.  Correct.

03:45PM   1   A.  Yeah.

03:45PM   2   Q.  And all of the -- what defense counselor went over, your

03:46PM   3   request for bail, for the root canal, whatnot, did the U.S.

03:46PM   4   Attorney's Office agree to any of it?

03:46PM   5   A.  No.

03:46PM   6   Q.  Defense counsel asked you about your 2006 firearm

03:46PM   7   possession.  Do you remember that line of questioning?

03:46PM   8   A.  Yeah.

03:46PM   9   Q.  You said it was on Carl Street?

03:46PM  10   A.  Yes.

03:46PM  11   Q.  Why did you have a gun on Carl Street in 2006?

03:46PM  12   A.  At that time, it was a lot of shooting going back and

03:46PM  13   forth.  Yeah, a lot going on.

03:46PM  14   Q.  Well, with you having a gun, what did that do for you?

03:46PM  15   A.  Got me arrested.

03:46PM  16   Q.  Well, if you weren't arrested, what was your purpose in

03:47PM  17   having the gun?

03:47PM  18   A.  To protect myself.

03:47PM  19   Q.  Is that a common tool of the trade in the drug trade?

03:47PM  20   A.  Yeah.

03:47PM  21   Q.  Then, defense counsel asked you about the 33 pounds of

03:47PM  22   marijuana with Brill.  Do you remember that line of

03:47PM  23   questioning?

03:47PM  24   A.  Yeah.

03:47PM  25   Q.  And he asked you how you got there or got to the Camp

| | | |
|---|---|---|
| 03:47PM | 1 | Street -- |
| 03:47PM | 2 | A.  Yes. |
| 03:47PM | 3 | Q.  -- address.  You said rental? |
| 03:47PM | 4 | A.  Yeah. |
| 03:47PM | 5 | Q.  Was using rentals common? |
| 03:47PM | 6 | A.  Yeah. |
| 03:47PM | 7 | Q.  Why? |
| 03:47PM | 8 | A.  Keeps it -- keeps you off the radar.  Like, one minute, |
| 03:47PM | 9 | people might hear you in this and then, you would switch to |
| 03:47PM | 10 | something else. |
| 03:47PM | 11 | THE COURT:  You say rental, you mean a rental car? |
| 03:48PM | 12 | THE WITNESS:  Yeah. |
| 03:48PM | 13 | BY MR. XIANG: |
| 03:48PM | 14 | Q.  Was that also a common tactic in the drug trade? |
| 03:48PM | 15 | A.  Yes. |
| 03:48PM | 16 | MR. XIANG:  No other questions, Judge. |
| 03:48PM | 17 | MR. FOGG:  Judge, may I ask three questions? |
| 03:48PM | 18 | THE COURT:  All right. |
| 03:48PM | 19 | MR. FOGG:  Thank you, Judge.  Maybe four. |
| 03:48PM | 20 | |
| 03:48PM | 21 | RECROSS-EXAMINATION |
| 03:48PM | 22 | |
| 03:48PM | 23 | BY MR. FOGG: |
| 03:48PM | 24 | Q.  Counsel for the government asked, is it in your best |
| 03:48PM | 25 | interest to lie; am I right?  Do you remember that? |

GRANT  --  BY MR. FOGG  --  4/24/18

664

| | | |
|---|---|---|
| 03:48PM | 1 | A.  In my best interest to lie? |
| 03:48PM | 2 | Q.  Do you remember that? |
| 03:48PM | 3 | A.  I was never asked if it -- |
| 03:48PM | 4 | Q.  Okay. |
| 03:48PM | 5 | A.  -- was in my -- |
| 03:48PM | 6 | Q.  Okay. |
| 03:48PM | 7 | A.  -- best interest to lie. |
| 03:48PM | 8 | Q.  Right. |
| 03:48PM | 9 | A.  I said tell the truth. |
| 03:48PM | 10 | Q.  You're serving a sentence of 188 months? |
| 03:48PM | 11 | A.  Correct. |
| 03:48PM | 12 | Q.  And that's a little over 15 years, correct? |
| 03:48PM | 13 | A.  Yes. |
| 03:49PM | 14 | Q.  Will you get a reduction in sentencing if you cooperate |
| 03:49PM | 15 | here today? |
| 03:49PM | 16 | A.  If I'm truthful, I assume. |
| 03:49PM | 17 | Q.  So, you're hopeful that this -- so, it is in your best |
| 03:49PM | 18 | interest to actually talk -- to testify today, at least; am I |
| 03:49PM | 19 | correct, because you're hoping to get a sentence reduction, |
| 03:49PM | 20 | correct? |
| 03:49PM | 21 | A.  I mean, like give me what you -- I need an example. |
| 03:49PM | 22 | Q.  Your testimony here would help you get a reduction in |
| 03:49PM | 23 | your sentence, correct? |
| 03:49PM | 24 | A.  If I'm telling the truth. |
| 03:49PM | 25 | Q.  Right.  When you were in the hold today, did you -- |

03:49PM   1   yesterday, did you refer to someone else, saying that you're

03:49PM   2   going to lie against Aaron in the hold?

03:49PM   3   A.   Hmm?

03:49PM   4   Q.   Did you say, in the hold yesterday, that you were looking

03:49PM   5   to come home a lot earlier than 15 years and you're going to

03:49PM   6   say whatever you have to say, to lie against Aaron today?

03:50PM   7   Did you say something like that in the hold?

03:50PM   8   A.   What?  No.  I was in the hold -- it was probably one

03:50PM   9   other person in the hold with me.  No.  So, if you have --

03:50PM  10   Q.   You didn't --

03:50PM  11   A.   -- somebody that heard that.

03:50PM  12   Q.   Did you say that; yes or no?

03:50PM  13   A.   No.

03:50PM  14        MR. FOGG:  No further questions, Judge.

03:50PM  15   (The witness was excused at 3:50 p.m.)

03:50PM  16        THE COURT:  All right.  Ladies and gentlemen, we'll

03:50PM  17   take a five-minute recess.  Court will be in recess.

03:50PM  18        THE CLERK:  All rise.

03:50PM  19   (The jury left the room at 3:50 p.m.)

03:50PM  20   (Brief recess)

03:56PM  21   (The jury entered the room at 3:56 p.m.)

03:57PM  22        THE CLERK:  All rise.  You may be seated.

03:57PM  23        THE COURT:  All right.  Mr. Parisi?

03:57PM  24        MR. PARISI:  The government calls Jeremy Peterson,

03:57PM  25   witness number 24.

PETERSON -- BY MR. PARISI -- 4/24/18

03:58PM  1  (The witness was sworn at 3:58 p.m.)

03:58PM  2         THE CLERK:  State your full name and spell your last

03:58PM  3  name for the record.

03:58PM  4         THE WITNESS:  Jeremy Peterson, P-E-T-E-R-S-O-N.

03:58PM  5

03:58PM  6                    DIRECT EXAMINATION

03:58PM  7

03:58PM  8  BY MR. PARISI:

03:58PM  9  Q.  Good afternoon.

03:58PM  10  A.  Good afternoon.

03:58PM  11  Q.  What do you do for a living?

03:58PM  12  A.  I am an investigator with the New York State Police.

03:58PM  13  Q.  How long have you worked for the New York State Police

03:58PM  14  Department?

03:58PM  15  A.  Almost 20 years.

03:58PM  16  Q.  How long have you been an investigator?

03:58PM  17  A.  2014 I was promoted, so 14 years.

03:58PM  18  Q.  Are you assigned to any special unit within the New York

03:58PM  19  State Police?

03:58PM  20  A.  Yes.  The Community Narcotics Enforcement Team.

03:58PM  21  Q.  And do you have any specialty within the Community

03:58PM  22  Narcotics Enforcement Team?

03:58PM  23  A.  My specialty is interdiction work with shipping

03:59PM  24  companies.

03:59PM  25  Q.  Can you tell the jury a little bit about what you do as

03:59PM   1   an investigator in the interdiction unit?

03:59PM   2   A.  I go to shipping companies and target packages, look for

03:59PM   3   packages that contain narcotics, marijuana or proceeds from

03:59PM   4   those.

03:59PM   5   Q.  How long have you been doing that as part of the

03:59PM   6   interdiction unit?

03:59PM   7   A.  Since February 2011.

03:59PM   8   Q.  Do you have training in the recognition of controlled

03:59PM   9   substances, including marijuana?

03:59PM  10   A.  Yes, I do.

03:59PM  11   Q.  What kind of training do you have?

03:59PM  12   A.  We trained at the New York State Police Academy on the

03:59PM  13   identification of different drugs and then of -- being in the

03:59PM  14   unit that I'm in, when we go out and do operations or buys,

03:59PM  15   we -- everybody usually takes a look at it.  And then,

03:59PM  16   there's a test kit that is involved and that gives a positive

04:00PM  17   yes or no that -- if the substance is what we think it is.

04:00PM  18   Q.  And with respect to marijuana, if you can, approximate

04:00PM  19   how many investigations have you been involved in that have

04:00PM  20   concerned marijuana?

04:00PM  21   A.  A hundred and fifty.

04:00PM  22   Q.  I'd like to discuss with you February 18th of 2014.  Were

04:00PM  23   you working with the New York State Police on that day?

04:00PM  24   A.  Yes, I was.

04:00PM  25   Q.  In the early morning hours of February 18, 2017, were you

PETERSON -- BY MR. PARISI -- 4/24/18

| | | |
|---|---|---|
| 04:00PM | 1 | on the interdiction unit? |
| 04:00PM | 2 | A.  Yes, I was. |
| 04:00PM | 3 | Q.  As part of your assignment, did you become involved in |
| 04:00PM | 4 | the investigation of a suspicious package that was |
| 04:00PM | 5 | intercepted by UPS? |
| 04:00PM | 6 | A.  Yes, I did. |
| 04:00PM | 7 | Q.  How did you become involved in that? |
| 04:00PM | 8 | A.  I received a phone call from a task force in Louisville |
| 04:00PM | 9 | that targets and looks for packages containing narcotics. |
| 04:00PM | 10 | They called me and said they had a suspicious package coming |
| 04:00PM | 11 | to Buffalo and asked me if I was interested in working the |
| 04:01PM | 12 | package.  If they would send it through, if I would work the |
| 04:01PM | 13 | package. |
| 04:01PM | 14 | Q.  Prior to that phone call, did you have any knowledge that |
| 04:01PM | 15 | a package was going to be shipped? |
| 04:01PM | 16 | A.  No, not prior to the phone call. |
| 04:01PM | 17 | Q.  And did you indicate that you were interested in |
| 04:01PM | 18 | investigating that package? |
| 04:01PM | 19 | A.  Yes, I did. |
| 04:01PM | 20 | Q.  What did you direct them to do? |
| 04:01PM | 21 | A.  I directed them to send the package on and that once it |
| 04:01PM | 22 | was in Buffalo, that I would intercept the package and go |
| 04:01PM | 23 | from there and conduct an investigation. |
| 04:01PM | 24 | Q.  Did you, in fact, intercept the package in Buffalo on |
| 04:01PM | 25 | February 18th, 2014? |

PETERSON  --  BY MR. PARISI  --  4/24/18

669

04:01PM    1    A.  Yes, I did.

04:01PM    2    Q.  How did you do that?

04:01PM    3    A.  I responded to UPS.  Louisville had given me the tracking

04:01PM    4    number of the package.  So, I contacted UPS security and

04:01PM    5    asked them to hold the package when it comes and I responded

04:01PM    6    to UPS with a narcotics K-9 and did a drug search with the

04:01PM    7    K-9 and then we seized the package.

04:02PM    8    Q.  Where is the UPS facility that you went to?

04:02PM    9    A.  1907 Casey Boulevard -- James Casey Boulevard, in

04:02PM   10    Buffalo.

04:02PM   11    Q.  And when you went there, where was the package?

04:02PM   12    A.  The package was in the hold area of UPS.

04:02PM   13    Q.  And can you just describe what the package would look

04:02PM   14    like?

04:02PM   15    A.  This one, in particular, was a brown cardboard box that

04:02PM   16    was -- had a shipping label on it and then it was taped

04:02PM   17    closed.

04:02PM   18    Q.  With respect to the shipping label, did it indicate a

04:02PM   19    sender?

04:02PM   20    A.  Yes, it did.

04:02PM   21    Q.  Did it indicate a person that it was being sent to?

04:02PM   22    A.  Yes, it did.

04:02PM   23    Q.  Do you recall those individuals?

04:02PM   24    A.  I recall who it was shipped to, but I would have to look

04:02PM   25    at the report or the search warrant for the name of the

670

04:02PM  1  shipper.

04:02PM  2  Q.  I'm going to hand you what's marked for identification as

04:03PM  3  Government Exhibit 3531A and ask you to look through that

04:03PM  4  document -- and first of all, with respect to the shipper,

04:03PM  5  does that refresh your recollection as to the name of the

04:03PM  6  person that shipped it?

04:03PM  7  A.  Yes, it does.

04:03PM  8  Q.  And what was the name of the person that shipped it?

04:03PM  9  A.  Cory Billings.

04:03PM  10  Q.  Was there an address associated with the person that

04:03PM  11  shipped it?

04:03PM  12  A.  Yes, there was.

04:03PM  13  Q.  What was the address?

04:03PM  14  A.  615 East Schreiner Street, Kerrville, Texas.

04:03PM  15  Q.  How do you spell Kerrville, just so we're clear?

04:03PM  16  A.  K-E-R-R-V-I-L-L-E.

04:03PM  17  Q.  Thank you.  And you said there was also the receiver, the

04:03PM  18  person it was being shipped to?

04:03PM  19  A.  Yes, there was.

04:03PM  20  Q.  And do you recall -- and you said you do recall who the

04:03PM  21  receiver was?

04:03PM  22  A.  Yes.

04:03PM  23  Q.  What was the name of the person receiving it?

04:03PM  24  A.  Marcus Gibson.

04:04PM  25  Q.  What was the address that the package was supposed to go

PETERSON  --  BY MR. PARISI  --  4/24/18

04:04PM  1   to?

04:04PM  2   A.  204 Stevens Street -- I'm sorry -- Ave.

04:04PM  3   Q.  In what city?

04:04PM  4   A.  In Buffalo, New York.

04:04PM  5   Q.  With respect to the sender, did you do any investigation

04:04PM  6   into the sender, particularly the name and the address?

04:04PM  7   A.  Yes.

04:04PM  8   Q.  Tell us about that.

04:04PM  9   A.  I checked the white pages through the internet to see if

04:04PM  10  I could locate the name in Buffalo or in Kerrville, Texas.

04:04PM  11  And then, I checked New York State DMV and Texas DMV to see

04:04PM  12  if that name was associated with either of those locations.

04:04PM  13  Q.  Start with the sender.  Was the name associated with the

04:04PM  14  address?

04:04PM  15  A.  No.

04:04PM  16  Q.  And what about the receiver, the Gibbons name, was that

04:04PM  17  associated with the address on Stevens Street?

04:04PM  18  A.  Not with that address, no.

04:04PM  19  Q.  What made you suspicious of this package?

04:05PM  20  A.  The way it was packaged, where it was coming from is a

04:05PM  21  source area for narcotics to be shipped from.  The names did

04:05PM  22  not match the address of the shipper or recipient location.

04:05PM  23  The phone number for the shipper was not associated with a

04:05PM  24  person, but a business and then, it was shipped from a third-

04:05PM  25  party shipper, a UPS store, instead of from a business or a

672

04:05PM   1   person's address.

04:05PM   2   Q.  And you said you went with a K-9 dog?

04:05PM   3   A.  Yes, I did.

04:05PM   4   Q.  Did you have the K-9 dog perform any tests on the

04:05PM   5   package?

04:05PM   6   A.  It ran a drug search.  What I do is I put out five to ten

04:05PM   7   packages and then the dog is introduced to all of them and

04:05PM   8   the dog works from there.

04:05PM   9   Q.  So, is it five to ten packages that all contain suspected

04:05PM   10  controlled substances?

04:05PM   11  A.  No.  There's five to ten packages from the shipping

04:05PM   12  company with the one package that we've identified as

04:06PM   13  suspicious and we do not know what the contents of the other

04:06PM   14  packages are.

04:06PM   15  Q.  So, kind of like a package lineup?

04:06PM   16  A.  Yes.

04:06PM   17  Q.  Did the K-9 indicate on the package, the suspected

04:06PM   18  package?

04:06PM   19  A.  Yes, he did.

04:06PM   20  Q.  What did you do with the package after your investigation

04:06PM   21  and after the K-9 ran its test?

04:06PM   22  A.  After the K-9 indicated that there was narcotics, the

04:06PM   23  odor of narcotics or marijuana, I seized it at that point in

04:06PM   24  time and took it from UPS to the State Police office here in

04:06PM   25  Buffalo.

673

04:06PM   1   Q.  And with -- did you open it?  From the time that you

04:06PM   2   brought it from the UPS office until the time you brought it

04:06PM   3   to the State Police office, did you open the package?

04:06PM   4   A.  No, it remained closed.

04:06PM   5   Q.  And was it sealed?

04:06PM   6   A.  Yes, it was.

04:06PM   7   Q.  At the State Police office, did you notify any other law

04:06PM   8   enforcement of what you were investigating?

04:06PM   9   A.  Yes.  I requested assistance from other people in my

04:07PM   10  office that usually work in Buffalo and they requested

04:07PM   11  assistance from Buffalo PD.  So, Buffalo PD and some other

04:07PM   12  people in my office assisted.

04:07PM   13  Q.  Did you eventually go with -- to the Buffalo Police

04:07PM   14  Department -- to the Buffalo Police Department Narcotics

04:07PM   15  offices?

04:07PM   16  A.  Yes, we did.

04:07PM   17  Q.  And did you take the package with you?

04:07PM   18  A.  Yes, I did.

04:07PM   19  Q.  Was the package in your custody from the time you brought

04:07PM   20  it into UPS until the time you went to the Buffalo Police

04:07PM   21  Department Narcotics office?

04:07PM   22  A.  Yes, I had possession of it.

04:07PM   23  Q.  And up until that point in time, was it opened?

04:07PM   24  A.  No, it was not.

04:07PM   25  Q.  Did you take any steps then to open the package before

PETERSON -- BY MR. PARISI -- 4/24/18

04:07PM   1   you opened the package?

04:07PM   2   A.   Yes.  We did some -- we did the checking of the internet

04:07PM   3   and the locale to see if there were any association with the

04:07PM   4   name and the address that were on the package.  Somebody

04:07PM   5   drove by the address where the package was going to and then,

04:07PM   6   I wrote up a search warrant to request permission to open the

04:08PM   7   package.

04:08PM   8   Q.   Did you or another member of the New York State Police go

04:08PM   9   in front of a judge --

04:08PM  10   A.   Yes, I did.

04:08PM  11   Q.   -- with the search warrant?

04:08PM  12   A.   Yes, I did.

04:08PM  13   Q.   And did the judge authorize the search of that package?

04:08PM  14   A.   Yes.

04:08PM  15   Q.   Was that package still in a sealed condition when you

04:08PM  16   left it to go sign the search warrant?

04:08PM  17   A.   Yes, it was.

04:08PM  18   Q.   When you returned and went back to the package, was it in

04:08PM  19   the same condition as it was when you left it?

04:08PM  20   A.   Yes.

04:08PM  21   Q.   Had it been opened at all?

04:08PM  22   A.   No.  It was not opened.

04:08PM  23   Q.   After the judge signed the search warrant to open the

04:08PM  24   package, was the package opened?

04:08PM  25   A.   After the judge signed the search warrant, yes, we opened

PETERSON  --  BY MR. PARISI  --  4/24/18

04:08PM    1   it.

04:08PM    2   Q.  What was the weight of the package?

04:08PM    3   A.  I believe it was approximately 36 pounds.

04:08PM    4   Q.  That's the entire package?

04:08PM    5   A.  The entire package, yes.

04:08PM    6   Q.  And did you look inside the package?

04:08PM    7   A.  Yes, we did.

04:08PM    8   Q.  What was inside the package?

04:08PM    9   A.  Three bundles of green vegetation, wrapped in cellophane.

04:09PM   10   Q.  Based on your training and experience, could you tell

04:09PM   11   what those green bundles were?

04:09PM   12   A.  Marijuana.

04:09PM   13   Q.  I'm going to show you what's been marked for

04:09PM   14   identification as Government Exhibit 36A.  Do you recognize

04:09PM   15   what that is?

04:09PM   16   A.  Yes.  That is a bundle of marijuana with cellophane

04:09PM   17   inside of it.

04:09PM   18   Q.  Is that -- well, is that related to what you opened on

04:09PM   19   February 18th of 2014?

04:09PM   20   A.  Yes.  It is how the bundles came, just like this.  And

04:10PM   21   then the cellophane was wrapped -- the plastic bag that it's

04:10PM   22   currently in was not on it.  The cellophane inside the bag

04:10PM   23   was wrapped around the marijuana in the bundle.

04:10PM   24   Q.  So, the cellophane that it was wrapped around is

04:10PM   25   currently in that bag?

PETERSON  --  BY MR. PARISI  --  4/24/18

676

04:10PM  1   A.  Yes.

04:10PM  2   Q.  And you said there were three of those?

04:10PM  3   A.  Yes.

04:10PM  4   Q.  Handing you Government Exhibit 36B and 36D for

04:10PM  5   identification.  I'm handing you scissors.  Start with 36B.

04:11PM  6   First of all, the brown packaging, was it in the brown

04:11PM  7   packaging when you observed those materials in the bag?

04:11PM  8   A.  No, it was not.

04:11PM  9   Q.  Can you cut open 36B, please and just look to see if you

04:11PM  10  recognize what's inside of there?

04:11PM  11  A.  Yes.  It's a bundle of marijuana wrapped in cellophane.

04:12PM  12  Q.  And is that consistent with how the marijuana was that

04:12PM  13  you observed on February 18th, 2014?

04:12PM  14  A.  Yes.

04:12PM  15  Q.  And just so the record is clear, on Government

04:12PM  16  Exhibit 36B, you used scissors to open the package and open

04:12PM  17  the seal, correct?

04:12PM  18  A.  Correct.

04:12PM  19  Q.  And three packages, all the same size and it was all

04:12PM  20  those similar sizes that we see in front of you, 36A, 36B and

04:12PM  21  36D?

04:12PM  22  A.  Correct.  Yes.

04:12PM  23  Q.  Did you keep possession of the package from UPS then, you

04:12PM  24  personally?

04:12PM  25  A.  Once we opened it, it was turned over to Buffalo Police

PETERSON  --  BY MR. PARISI  --  4/24/18

04:12PM   1   Department.

04:12PM   2   Q.  And was it put back in the UPS package that it came in?

04:12PM   3   A.  Yes.  The marijuana was resealed back in the package so

04:12PM   4   that we could attempt a delivery.

04:12PM   5   Q.  And did you see it put back in the sealed package?

04:12PM   6   A.  Yes.

04:12PM   7   Q.  Investigator, were you the one that attempted the

04:13PM   8   delivery?

04:13PM   9   A.  No.  A Buffalo PD officer did.

04:13PM  10   Q.  Investigator, if I could have you reseal the package in

04:13PM  11   front of us.  Nothing like 20 people watching you do that,

04:15PM  12   right?

04:15PM  13   A.  The tape is very sensitive.  I'm sorry.

04:15PM  14          MR. PARISI:  No further questions.

04:16PM  15          MR. FOGG:  No questions, Judge.

04:16PM  16          THE COURT:  All right.  Thank you, sir.

04:16PM  17          THE WITNESS:  Thank you, sir.

04:16PM  18   (Witness excused at 4:16 p.m.)

04:16PM  19          THE COURT:  Ladies and gentlemen, we're going to

04:16PM  20   conclude for the day.  I think we had enough witness and we'll

04:16PM  21   resume again tomorrow.  I've got some matters on.  We better

04:16PM  22   make it 10:30 tomorrow.  I don't want to have you waiting in

04:16PM  23   there.  So, we'll resume the trial tomorrow at 10:30.

04:16PM  24          During the recess, please do not discuss the case

04:16PM  25   with anyone.  Do not discuss the case among yourselves.  Do

PETERSON -- BY MR. PARISI -- 4/24/18
678

04:16PM   1   not read anything about the case.  Do not do any research or

04:16PM   2   conduct any investigation.  You're reminded not to talk to any

04:16PM   3   of the witnesses or the lawyers or the parties.  Keep an open

04:16PM   4   mind, ladies and gentlemen.  Do not form any opinion or

04:16PM   5   judgment.  Wait until you have heard all the evidence.

04:16PM   6        Enjoy the evening, folks and we'll see you tomorrow

04:16PM   7   morning.  I hate to start at 10:30, but I don't want to keep

04:16PM   8   you waiting.  So, we'll start at 10:30.  Okay?  Have a nice

04:17PM   9   evening.

04:17PM   10  (The jury left the room at 4:17 p.m.)

04:17PM   11       THE COURT:  Mr. Parisi, who is the next three or four

04:17PM   12  witnesses you're calling?

04:17PM   13       MR. PARISI:  Your Honor, I think we're going to call

04:17PM   14  State Police and Buffalo Police officers related to this Joel

04:17PM   15  Catuzza, Lauren Nash from the District Attorney's office,

04:17PM   16  Kaitlin Drollette from the Central Police Services Laboratory.

04:17PM   17  I think that's the next few witnesses.

04:17PM   18       THE COURT:  All right.  All right.  We'll see you

04:17PM   19  tomorrow morning.  Court will be in recess.

04:17PM   20       THE CLERK:  All rise.

         21  (Proceedings concluded at 4:17 p.m.)

         22

         23

         24

         25

1               *    *    *    *    *    *    *

2

3          I certify that the foregoing is a

4      correct transcription of the proceedings

5      recorded by me in this matter.

6

7

8

9                          s/ Megan E. Pelka, RPR

10                         Court Reporter,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25