1           **UNITED STATES DISTRICT COURT**
            **WESTERN DISTRICT OF NEW YORK**
2

UNITED STATES OF AMERICA,          )
3                                   ) Case No. 1:15-CR-00033-3
                                    )          (RJA)(HBS)
4                  Plaintiff,       )
                                    )
5      vs.                          ) September 12th, 2022
                                    ) 11:33 a.m.
6      RODERICK ARRINGTON,          )
                                    )
7                  Defendant.       )

8        **TRANSCRIPT OF JURY TRIAL TESTIMONY OF DAMARIO JAMES**
            **BEFORE THE HONORABLE RICHARD J. ARCARA**
9             **SENIOR UNITED STATES DISTRICT JUDGE**

10

<u>APPEARANCES:</u>
11

For the Plaintiff:    TRINI E. ROSS, ESQ.
12                    UNITED STATES ATTORNEY
                      BY:  JEREMIAH LENIHAN, ESQ.
13                    ASSISTANT UNITED STATES ATTORNEY
                      138 Delaware Avenue
14                    Buffalo, NY 14202

15                    U.S. DEPARTMENT OF JUSTICE
                      ORGANIZED CRIME SECTION
16                    BY:  JULIE ANN FINOCCHIARO, ESQ.
                      1301 New York Avenue, NW
17                    Suite 7th Floor
                      Washington, DC 20530
18
For the Defendant:    RODERICK ARRINGTON, PRO SE
19
Stand-by counsel:     MARK A. FOTI, ESQ.
20                    16 W. Main Street, Suite 100
                      Rochester, NY 14614
21
Court Reporter:       MEGAN E. PELKA, RPR
22                    Robert H. Jackson US Courthouse
                      2 Niagara Square
23                    Buffalo, NY 14202
                      (716) 364-6449
24

25

| | | |
|---|---|---|
| 11:33AM | 1 | THE COURT:  All right.  Mr. Lenihan? |
| 11:33AM | 2 | MR. LENIHAN:  Thank you, Your Honor.  The Government |
| 11:33AM | 3 | calls Damario James. |
| 11:33AM | 4 | THE COURT:  What number is he? |
| 11:33AM | 5 | MR. LENIHAN:  The number?  Number eight. |
| 11:34AM | 6 | (The witness was sworn at 11:34 a.m.) |
| 11:34AM | 7 | THE CLERK:  Can you please state your name and spell |
| 11:34AM | 8 | it for the record? |
| 11:34AM | 9 | THE WITNESS:  Damario James; D-A-M-A-R-I-O, last name |
| 11:34AM | 10 | James, J-A-M-E-S. |
| 11:35AM | 11 | MR. LENIHAN:  Permission to proceed? |
| 11:35AM | 12 | THE COURT:  Yes. |
| 11:35AM | 13 | |
| 11:35AM | 14 | DIRECT EXAMINATION |
| 11:35AM | 15 | |
| 11:35AM | 16 | BY MR. LENIHAN: |
| 11:35AM | 17 | Q.  Good morning, sir. |
| 11:35AM | 18 | A.  Good morning. |
| 11:35AM | 19 | Q.  Mr. James, did you grow up in Buffalo? |
| 11:35AM | 20 | A.  Yes. |
| 11:35AM | 21 | Q.  Where did you grow up in Buffalo? |
| 11:35AM | 22 | A.  Central Park area, like Fillmore, Kensington, Jewett, |
| 11:35AM | 23 | Main Street area. |
| 11:35AM | 24 | Q.  Can you describe to the jury where the Central Park area |
| 11:35AM | 25 | is in Buffalo? |

| | | |
|---|---|---|
| 11:35AM | 1 | A.   It's on the East Side.  It's, like, by Canisius College, |
| 11:35AM | | Main Street and Fillmore area. |
| 11:35AM | 3 | Q.   And that's where you grew up? |
| 11:35AM | 4 | A.   Yes. |
| 11:35AM | 5 | Q.   Did you go to high school in Buffalo? |
| 11:35AM | 6 | A.   Yes. |
| 11:35AM | 7 | Q.   Did you ever spend time -- are you familiar with the |
| 11:36AM | | Schuele neighborhood? |
| 11:36AM | 9 | A.   Yes. |
| 11:36AM | 10 | Q.   How are you familiar with the Schuele neighborhood? |
| 11:36AM | 11 | A.   It was my grandmother's neighborhood or area.  I grew up |
| 11:36AM | | around there, too.  I used to be over there a lot.  My |
| 11:36AM | | grandmother used to watch me and my cousins. |
| 11:36AM | 14 | Q.   Where was your grandma living? |
| 11:36AM | 15 | A.   On Stevens. |
| 11:36AM | 16 | Q.   Where is Stevens? |
| 11:36AM | 17 | A.   It's right around the corner from Schuele. |
| 11:36AM | 18 | Q.   You mentioned that your grandma would watch you a lot? |
| 11:36AM | 19 | A.   Mm-hmm. |
| 11:36AM | 20 | Q.   Along with your cousins? |
| 11:36AM | 21 | A.   Yes. |
| 11:36AM | 22 | Q.   What cousins? |
| 11:36AM | 23 | A.   Shawntorrian Travis and Letorrance Travis. |
| 11:36AM | 24 | Q.   Would you spend a lot of time in the Schuele area? |
| 11:36AM | 25 | A.   Yes. |

11:36AM   1   Q.  Are you familiar with the Schuele Boys?

11:36AM   2   A.  Yes.

11:36AM   3   Q.  Did you get involved in any drug dealing?

11:36AM   4   A.  Yes.

11:36AM   5   Q.  Can you describe how you got involved in drug dealing?

11:36AM   6   A.  I started selling drugs around the age of 12, 13,

11:37AM   7   marijuana, and started selling crack.  Then, you know, as I

11:37AM   8   got older, being around family members and friends, started

11:37AM   9   selling more, you know, different weight-wise.

11:37AM  10   Q.  What do you mean by different weight?

11:37AM  11   A.  I'd say when I was younger, it was in smaller quantities

11:37AM  12   of drugs and, as I got older, it was a larger quantity.

11:37AM  13   Q.  As you got older, what were some of these larger

11:37AM  14   quantities that you were selling?

11:37AM  15   A.  I would say a big, which is 125 grams, a half a key or --

11:37AM  16   to a whole kilogram, a whole.

11:37AM  17   Q.  And you mentioned a big is what?

11:37AM  18   A.  A hundred twenty-five grams.

11:37AM  19   Q.  How much is -- 125 grams of what?

11:37AM  20   A.  Cocaine.

11:37AM  21   Q.  How much is that worth?

11:37AM  22   A.  At the time, 5,500.  Could be anywhere from five,

11:38AM  23   fifty-five.

11:38AM  24   Q.  So, 5,000 to 5,500?

11:38AM  25   A.  Mm-hmm.

11:38AM  1   Q.  And then you mentioned you would sell a half a key?

11:38AM  2   A.  Yes.

11:38AM  3   Q.  What is a half a key?

11:38AM  4   A.  Grams or --

11:38AM  5   Q.  Grams of what?

11:38AM  6   A.  Cocaine.

11:38AM  7   Q.  How many grams?

11:38AM  8   A.  It was 500.

11:38AM  9   Q.  And then a key is what?

11:38AM  10  A.  A thousand.

11:38AM  11  Q.  And then that -- of cocaine?

11:38AM  12  A.  Yes.

11:38AM  13  Q.  Okay.  As part of dealing drugs -- were you dealing drugs

11:38AM  14  in the Schuele neighborhood?

11:38AM  15  A.  Yes.

11:38AM  16  Q.  Who were you dealing drugs with in the Schuele

11:38AM  17  neighborhood?

11:38AM  18  A.  It was my cousins, Hicks, Robertson.

11:38AM  19  Q.  Which cousin were you dealing with?

11:38AM  20  A.  I'm sorry.  Letorrance Travis.

11:38AM  21  Q.  How about Shawntorrian?

11:38AM  22  A.  Shawntorrian?

11:38AM  23  Q.  Yeah.

11:38AM  24  A.  Yes.  We -- in the past with my other cousin, too, as

11:39AM  25  well.

| 11:39AM | 1 | Q.  You mentioned Hicks? |
| 11:39AM | 2 | A.  Yes. |
| 11:39AM | 3 | Q.  Who is Hicks? |
| 11:39AM | 4 | THE COURT:  Do you know his first name? |
| 11:39AM | 5 | THE WITNESS:  Aaron.  Aaron Hicks.  I'm sorry. |
| 11:39AM | 6 | Aaron Hicks. |
| 11:39AM | 7 | BY MR. LENIHAN: |
| 11:39AM | 8 | Q.  Did Aaron Hicks have a nickname? |
| 11:39AM | 9 | A.  Boog or Boogy. |
| 11:39AM | 10 | MR. LENIHAN:  Permission to approach the witness with |
| 11:39AM | 11 | what has been premarked as Government Exhibit 24B? |
| 11:39AM | 12 | THE COURT:  All right. |
| 11:39AM | 13 | BY MR. LENIHAN: |
| 11:39AM | 14 | Q.  Do you recognize Government Exhibit 24B? |
| 11:39AM | 15 | A.  Yes. |
| 11:39AM | 16 | Q.  What is Government Exhibit 24B? |
| 11:39AM | 17 | A.  This is a picture of an album cover. |
| 11:40AM | 18 | Q.  Of what?  I'm sorry? |
| 11:40AM | 19 | A.  An album cover. |
| 11:40AM | 20 | Q.  And are there individuals that you recognize on the album |
| 11:40AM | 21 | cover? |
| 11:40AM | 22 | A.  Yes. |
| 11:40AM | 23 | Q.  Do the people that you recognize, does this picture |
| 11:40AM | 24 | accurately depict the people that you recognize? |
| 11:40AM | 25 | A.  Yes.  It's the people I recognize. |

11:40AM  1          MR. LENIHAN:  The government would move to admit

11:40AM  2  Government Exhibit 24B into evidence.

11:40AM  3          MR. ARRINGTON:  Objection, Your Honor.  It doesn't

11:40AM  4  say who the people are, foundation of it.  And it's also

11:40AM  5  hearsay, written on the bottom of this photo, album cover.

11:40AM  6          THE COURT:  Overruled.  It will be admitted.

11:41AM  7  (Government Exhibit 24B was received in evidence.)

11:41AM  8

11:41AM  9          MR. LENIHAN:  Permission to publish, Your Honor.

11:41AM  10          THE COURT:  Yes, you may.

11:41AM  11  BY MR. LENIHAN:

11:41AM  12  Q.  All right.  Do you see the individuals on this

11:41AM  13  photograph, sir?

11:41AM  14  A.  Yes.

11:41AM  15  Q.  So, starting from left to right, can you identify the

11:41AM  16  people in the photographs?

11:41AM  17  A.  Yes.  Left you have Arrington, Brell.

11:41AM  18  Q.  So, the second person is Brell?

11:41AM  19  A.  Yes.

11:41AM  20  Q.  Do you know Brell's real name?

11:41AM  21  A.  No.  Then you got Worthy, Marcel Worthy.

11:41AM  22  Q.  What is Worthy wearing?

11:41AM  23  A.  He's got a blue hat on.

11:41AM  24          THE COURT:  I'll tell you what; when you identify a

11:41AM  25  person, can you just hit the screen so we know what person

11:41AM  1    we're talking about?

11:41AM  2            THE WITNESS:  Oh, okay.

11:41AM  3            THE COURT:  Now, who is the first one you mentioned?

11:41AM  4            THE WITNESS:  First one is Arrington.

11:41AM  5            THE COURT:  Where is that?

11:41AM  6            THE WITNESS:  In the courtroom.

11:41AM  7            THE COURT:  What's that?

11:41AM  8            THE WITNESS:  He's in the courtroom.  Oh, where?

11:41AM  9            THE COURT:  Yeah.  On the far left?

11:42AM  10           THE WITNESS:  Mm-hmm.

11:42AM  11           THE COURT:  All right.  He has a black hat on?

11:42AM  12           THE WITNESS:  Yes.  Black hat.

11:42AM  13           THE COURT:  The next one?

11:42AM  14           THE WITNESS:  The next one, next is Brell with a

11:42AM  15   white T-shirt.

11:42AM  16           THE COURT:  Okay.

11:42AM  17           THE WITNESS:  And then we got Worthy, which is

11:42AM  18   Cheese's street name, Marcel Worthy, in the blue; and then, in

11:42AM  19   the middle here is Sandy, which is Black; and then we got

11:42AM  20   Marcel Worthy's brother, Wheeze; and then Aaron Hicks; and

11:42AM  21   then that's my cousin, Letorrance Travis; and then, that's

11:42AM  22   Sandy's father on the far right.

11:42AM  23   BY MR. LENIHAN:

11:42AM  24   Q.  And Serious Black, is he a rapper?

11:42AM  25   A.  Yes.

| | | |
|---|---|---|
| 11:42AM | 1 | Q.  That's the person right in the middle? |
| 11:42AM | 2 | A.  Yes. |
| 11:42AM | 3 | Q.  And you said the person all the way to the left you see |
| 11:43AM | 4 | in the courtroom today? |
| 11:43AM | 5 | A.  Yes. |
| 11:43AM | 6 | Q.  Can you identify that person? |
| 11:43AM | 7 | A.  Yes.  Brown shirt, beard.  I can't tell the color; |
| 11:43AM | 8 | burgundy or brown. |
| 11:43AM | 9 | MR. LENIHAN:  The witness has identified the |
| 11:43AM | 10 | defendant, Your Honor. |
| 11:43AM | 11 | BY MR. LENIHAN: |
| 11:43AM | 12 | Q.  And were -- these individuals that you identified in the |
| 11:43AM | 13 | picture, what neighborhood were they from? |
| 11:43AM | 14 | A.  I can't say Brell, but everyone else is, like, Schuele, |
| 11:43AM | 15 | but I can't say Brell.  Brell was, like, a different area. |
| 11:43AM | 16 | Q.  So, everyone else from the Schuele area? |
| 11:43AM | 17 | A.  Yes, I can say. |
| 11:43AM | 18 | Q.  Were these the Schuele Boys? |
| 11:43AM | 19 | A.  Yes. |
| 11:43AM | 20 | Q.  You mentioned the person, Cheese.  Did you know Cheese? |
| 11:43AM | 21 | A.  Yes. |
| 11:43AM | 22 | Q.  Was Cheese involved in drug dealing? |
| 11:43AM | 23 | A.  Yes. |
| 11:43AM | 24 | Q.  How about Sandy Jones? |
| 11:44AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 11:44AM | 1 | Q.  How about Cheese's brother, Wheeze? |
| 11:44AM | 2 | A.  No, I can't say that about Wheeze. |
| 11:44AM | 3 | Q.  How about Aaron Hicks? |
| 11:44AM | 4 | A.  Yes. |
| 11:44AM | 5 | Q.  Letorrance Travis? |
| 11:44AM | 6 | A.  Yes. |
| 11:44AM | 7 | Q.  Sandy Jones' father? |
| 11:44AM | 8 | A.  Not that I know of. |
| 11:44AM | 9 | Q.  And how about Arrington? |
| 11:44AM | 10 | A.  I would say yes. |
| 11:44AM | 11 | Q.  All right.  Now, as far as your own drug dealing, did you |
| 11:44AM | 12 | get caught by the police while you were dealing drugs? |
| 11:44AM | 13 | A.  Yes. |
| 11:44AM | 14 | Q.  And as part of getting caught with the police, can you |
| 11:44AM | 15 | tell the jury what happened to you? |
| 11:44AM | 16 | A.  I got caught and I went to jail and I had to serve some |
| 11:45AM | 17 | time. |
| 11:45AM | 18 | Q.  Did you get caught multiple times? |
| 11:45AM | 19 | A.  Yes. |
| 11:45AM | 20 | Q.  When was the first time you got caught and had to go to |
| 11:45AM | 21 | jail? |
| 11:45AM | 22 | A.  My very first time I went to jail was 2001.  I did six |
| 11:45AM | 23 | months, five years probation, then I got out for a little |
| 11:45AM | 24 | bit.  I violated it, and I did four more months, and then I |
| 11:45AM | 25 | was on probation.  And then, at the ending of 2003, the |

| | | |
|---|---|---|
| 11:45AM | 1 | second time I was incarcerated.  This is ending of 2003, I |
| 11:45AM | 2 | got picked up by the government. |
| 11:45AM | 3 | Q.  You got what?  I'm sorry. |
| 11:45AM | 4 | A.  I got arrested by the government, picked up. |
| 11:45AM | 5 | Q.  Okay.  Were those federal charges? |
| 11:45AM | 6 | A.  Yes. |
| 11:45AM | 7 | Q.  And what sentence did you get? |
| 11:45AM | 8 | A.  Thirty-three months. |
| 11:45AM | 9 | Q.  When were you released on that charge? |
| 11:45AM | 10 | A.  In 2006. |
| 11:46AM | 11 | Q.  What happened after?  Did you get caught again? |
| 11:46AM | 12 | A.  Yes. |
| 11:46AM | 13 | Q.  When was that? |
| 11:46AM | 14 | A.  That was 2014. |
| 11:46AM | 15 | Q.  And can you discuss the circumstances of that case? |
| 11:46AM | 16 | A.  Yes.  I was selling drugs.  Someone was buying from me, |
| 11:46AM | 17 | an informant purchasing, and then taking it back to the |
| 11:46AM | 18 | officers.  It was maybe -- I give it a year probably, if I |
| 11:46AM | 19 | can remember, a yearlong investigation, maybe.  It started in |
| 11:46AM | 20 | 2013.  And in '14, I got picked up -- well, arrested in 2014. |
| 11:46AM | 21 | There was a -- I was getting drugs from Robertson. |
| 11:47AM | 22 | Q.  What was Robertson's nickname? |
| 11:47AM | 23 | A.  Bones. |
| 11:47AM | 24 | Q.  Did you plead guilty to that charge? |
| 11:47AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 11:47AM | 1 | Q.  And what sentence did you receive? |
| 11:47AM | 2 | A.  Forty-one months, I believe. |
| 11:47AM | 3 | Q.  Were you on -- were you sentenced to any supervised |
| 11:47AM | 4 | release after that? |
| 11:47AM | 5 | A.  Yes. |
| 11:47AM | 6 | Q.  Has that been completed? |
| 11:47AM | 7 | A.  Yes. |
| 11:47AM | 8 | Q.  Do you have anything remaining? |
| 11:47AM | 9 | A.  No. |
| 11:47AM | 10 | Q.  So, I'd like to talk to you about, you know, in the |
| 11:47AM | 11 | 2000s.  And so, you were released from federal prison in |
| 11:47AM | 12 | 2006? |
| 11:47AM | 13 | A.  Yes. |
| 11:47AM | 14 | Q.  And when you got out in 2006, did you go back to dealing |
| 11:47AM | 15 | drugs? |
| 11:47AM | 16 | A.  Yes. |
| 11:47AM | 17 | Q.  And can you discuss how you got back into dealing drugs? |
| 11:47AM | 18 | A.  Well, at the time, I couldn't find employment, and I |
| 11:48AM | 19 | resulted back to -- in the streets and selling drugs.  First |
| 11:48AM | 20 | it was crack cocaine, and then I started selling powder, |
| 11:48AM | 21 | cocaine powder. |
| 11:48AM | 22 | Q.  Who were you selling drugs with? |
| 11:48AM | 23 | A.  Back at that time, it used to be me, a friend of mine |
| 11:48AM | 24 | name Byron, and I used to have my cousin, Letorrance Travis, |
| 11:48AM | 25 | with me. |

11:48AM 1  Q.  What area were you selling in?

11:48AM 2  A.  At that time, it was right around Central Park area, my

11:48AM 3  grandmother's area, around Schuele area, Courtland, Delavan

11:48AM 4  and Courtland area.  I would say East Ferry, Cambridge, East

11:49AM 5  Ferry area.

11:49AM 6  Q.  How about the person that I asked you about, Cheese?  Was

11:49AM 7  that person selling drugs with you from 2006 to 2009?

11:49AM 8  A.  No.  Cheese, Marcel Worthy, we -- 2000 I would say -- me

11:49AM 9  and Worthy, in 2010, but we hung together and, you know, he

11:49AM 10  sell drugs, I sell drugs, but we sell to different people,

11:49AM 11  but it was more so 2010 and we were buying drugs from him and

11:49AM 12  selling to different people.  We sold marijuana together, me

11:49AM 13  and Worthy.

11:50AM 14  Q.  I'm sorry?

11:50AM 15  A.  We sold marijuana together, me and Worthy.

11:50AM 16  Q.  When was that?

11:50AM 17  A.  That was 2010.  We was on Courtland.

11:50AM 18  Q.  Whose house was on Courtland?

11:50AM 19  A.  My cousin had a house on Courtland.

11:50AM 20  Q.  What cousin?

11:50AM 21  A.  Letorrance Travis.

11:50AM 22  Q.  You mentioned that you would sell crack cocaine?

11:50AM 23  A.  Yes.

11:50AM 24  Q.  Were you buying it as crack cocaine or were you cooking

11:50AM 25  it?

| | | |
|---|---|---|
| 11:50AM | 1 | A.  I was cooking it. |
| 11:50AM | 2 | Q.  Where was that occurring? |
| 11:50AM | 3 | A.  I'm sorry? |
| 11:50AM | 4 | Q.  Where was that happening at? |
| 11:50AM | 5 | A.  Cooking on Courtland before, cooking on Wohlers, but |
| 11:50AM | 6 | cooking on Courtland before -- |
| 11:50AM | 7 | MR. ARRINGTON:  Excuse me, Judge.  I apologize for |
| 11:50AM | 8 | the interruption.  Can we excuse a juror, please?  I need |
| 11:51AM | 9 | stand-by counsel to approach the bench. |
| 11:51AM | 10 | THE COURT:  All right.  Ladies and gentlemen, would |
| 11:51AM | 11 | you step outside, please? |
| 11:51AM | 12 | (The jury left the room at 11:51 a.m.) |
| 11:52AM | 13 | (The jury entered the room at 11:53 a.m.) |
| 11:53AM | 14 | THE COURT:  All right.  Mr. Lenihan, you may |
| 11:53AM | 15 | continue. |
| 11:53AM | 16 | MR. LENIHAN:  Thank you, Your Honor. |
| 11:53AM | 17 | BY MR. LENIHAN: |
| 11:53AM | 18 | Q.  You mentioned you would cook cocaine into crack cocaine? |
| 11:53AM | 19 | A.  Yes. |
| 11:54AM | 20 | Q.  And you mentioned that you would do that over on |
| 11:54AM | 21 | Courtland? |
| 11:54AM | 22 | A.  Yes. |
| 11:54AM | 23 | Q.  Who would you do that with? |
| 11:54AM | 24 | A.  It would be me, Letorrance Travis, my cousin, |
| 11:54AM | 25 | Shawntorrian Travis, Hicks, Worthy.  At the time, there |

11:54AM   1   was -- and people will come over and, you know, OP or Brell

11:54AM   2   or Arrington, they'd stop by the house and --

11:54AM   3        MR. ARRINGTON:  I object, Your Honor.  Can we get a

11:54AM   4   timeframe on this?

11:54AM   5        THE COURT:  What time are we talking about?

11:54AM   6        THE WITNESS:  Two thousand eleven.

11:54AM   7        THE COURT:  Okay.

11:54AM   8   BY MR. LENIHAN:

11:54AM   9   Q.  You mentioned that you would also cook cocaine into crack

11:54AM   10  cocaine over on Wohlers Street?

11:54AM   11  A.  Yes.

11:55AM   12  Q.  Who was there when that was happening?

11:55AM   13  A.  At that time, it was me, Brell, and my cousin, Letorrance

11:55AM   14  Travis.

11:55AM   15       THE COURT:  Sir, what's your understanding of crack

11:55AM   16  cocaine versus cocaine?  What -- can you tell us?

11:55AM   17       THE WITNESS:  Cocaine powder is what -- I would cook

11:55AM   18  that into crack cocaine form.  I would take the powder, and it

11:55AM   19  would need to be crunched down.  I would crunch it down, and

11:55AM   20  then I would take that and baking soda and put it in a pot

11:55AM   21  with water and cook it, you know, into -- it's a process that,

11:55AM   22  you got to cook it with hot water, and then take it out, and

11:55AM   23  let it cool off until it gets hard, and you can let it cool

11:55AM   24  off or add cold water to it.

11:55AM   25       THE COURT:  What's the purpose of doing that?

| | | |
|---|---|---|
| 11:55AM | 1 | THE WITNESS:  Cooking it into crack cocaine? |
| 11:55AM | 2 | THE COURT:  Yes. |
| 11:55AM | 3 | THE WITNESS:  For different people's drug of choice. |
| 11:56AM | 4 | Some people might want cocaine and some people want crack |
| 11:56AM | 5 | cocaine to smoke. |
| 11:56AM | 6 | THE COURT:  Is there any difference in the effect |
| 11:56AM | 7 | between cocaine and crack cocaine? |
| 11:56AM | 8 | THE WITNESS:  I would say it would give off the same |
| 11:56AM | 9 | high, I believe, usually versus somebody using it for they |
| 11:56AM | 10 | nose and smoking it. |
| 11:56AM | 11 | THE COURT:  All right. |
| 11:56AM | 12 | BY MR. LENIHAN: |
| 11:56AM | 13 | Q.  How would somebody ingest powder cocaine? |
| 11:56AM | 14 | A.  Through their nose. |
| 11:56AM | 15 | Q.  How would somebody ingest crack cocaine? |
| 11:56AM | 16 | A.  Through a pipe. |
| 11:56AM | 17 | Q.  And how would it be through a pipe? |
| 11:56AM | 18 | A.  With a crack pipe, they would use -- it's like some type |
| 11:56AM | 19 | of stringy copper stuff they put inside as, like, a strain, |
| 11:56AM | 20 | and they just put that in there and use a lighter and smoke |
| 11:57AM | 21 | it. |
| 11:57AM | 22 | Q.  You mentioned that -- so, up until 2009, who were you |
| 11:57AM | 23 | primarily dealing drugs with? |
| 11:57AM | 24 | A.  I believe my cousins, Letorrance Travis and Shawntorrian |
| 11:57AM | 25 | Travis. |

| 11:57AM | 1 | Q. Did you -- and what happened after 2009? |
| 11:57AM | 2 | A. What happened in 2009? Let me see. I got incarcerated |
| 11:57AM | 3 | again, I think, for about 30 days to 45 days, and then I came |
| 11:57AM | 4 | home around January, February of 2010. |
| 11:58AM | 5 | Q. In 2010, was there any changes to this drug operation? |
| 11:58AM | 6 | A. In 2010, they was selling marijuana, and then it changed |
| 11:58AM | 7 | from the marijuana into cocaine. |
| 11:58AM | 8 | Q. How did it change? |
| 11:58AM | 9 | A. I would say they was bringing in marijuana and then they |
| 11:58AM | 10 | seen there was more money to be made with cocaine, so they |
| 11:58AM | 11 | started bringing in coke. |
| 11:58AM | 12 | Q. Who was bringing in coke? |
| 11:58AM | 13 | A. My cousin, Letorrance Travis, and Hicks' source of |
| 11:58AM | 14 | supply. |
| 11:58AM | 15 | Q. I'm sorry? |
| 11:58AM | 16 | A. My cousin, Letorrance Travis, and Hicks' source of |
| 11:58AM | 17 | supply. |
| 11:58AM | 18 | Q. So, are you aware that Aaron Hicks had a source of |
| 11:59AM | 19 | supply? |
| 11:59AM | 20 | A. Yes. |
| 11:59AM | 21 | Q. And can you just describe to the jury what a source of |
| 11:59AM | 22 | supply is? |
| 11:59AM | 23 | A. A source of supply, explain this? It's the individual |
| 11:59AM | 24 | bringing in drugs. Like, I'm trying to make an instance. If |
| 11:59AM | 25 | I was a source of supply, you know, I would bring in a lot of |

| | | |
|---|---|---|
| 11:59AM | 1 | weight, a large quantity of it, and I would give it to them |
| 11:59AM | 2 | to sell. |
| 11:59AM | 3 | Q.  During this timeframe, what kind of weight was Aaron |
| 11:59AM | 4 | Hicks getting? |
| 11:59AM | 5 | A.  Large weight.  I would say kilos of cocaine. |
| 11:59AM | 6 | Q.  Kilograms? |
| 11:59AM | 7 | A.  Yes. |
| 11:59AM | 8 | Q.  How much was a kilogram of cocaine selling for in Buffalo |
| 11:59AM | 9 | back then? |
| 11:59AM | 10 | A.  $44,000. |
| 11:59AM | 11 | Q.  Did you have knowledge as to who the source of supply |
| 12:00PM | 12 | was? |
| 12:00PM | 13 | A.  Yes.  I actually seen a guy.  And we all went out to a |
| 12:00PM | 14 | club one night.  It's a kind of dark-skinned guy.  He had a |
| 12:00PM | 15 | fade around the sides and had like dreads; little small, tiny |
| 12:00PM | 16 | dreads at the top of his head. |
| 12:00PM | 17 | Q.  Do you know where he was from? |
| 12:00PM | 18 | A.  No. |
| 12:00PM | 19 | Q.  What -- how did you know this was Aaron Hicks' source of |
| 12:00PM | 20 | supply? |
| 12:00PM | 21 | A.  When I bought, like -- I bought, like, I'd say three, |
| 12:00PM | 22 | four pounds of marijuana at the time.  And he was, like, I'm |
| 12:00PM | 23 | waiting on my cousin or whoever the guy was.  He said, I'm |
| 12:00PM | 24 | waiting on, you know, him to grab it, and then he had to go |
| 12:00PM | 25 | meet him and get the marijuana from him to bring it back to |

12:01PM  1    me on Courtland.

12:01PM  2    Q.  How much or how often was Aaron Hicks being supplied with

12:01PM  3    kilograms of cocaine?

12:01PM  4    A.  I would say twice a month.

12:01PM  5    Q.  And had you observed these kilograms of cocaine?

12:01PM  6    A.  Yes.

12:01PM  7    Q.  Where did you observe these kilograms of cocaine?

12:01PM  8    A.  Courtland.

12:01PM  9    Q.  How much -- how many kilograms of cocaine would you

12:01PM  10   observe?

12:01PM  11   A.  Anywhere from five to ten kilograms of cocaine.

12:01PM  12   Q.  And were you receiving some of that?

12:01PM  13   A.  Yes.  I sold some.  Yes.

12:01PM  14   Q.  And discuss how you would then sell some of those

12:01PM  15   kilograms of cocaine?

12:01PM  16   A.  I would call the people that I knew that wanted to buy

12:01PM  17   some and they would pull up.  And when they pull up, I'd go

12:02PM  18   inside and get it and take it back outside to them, sell it

12:02PM  19   to them, and bring the money back in the house.

12:02PM  20   Q.  How much of weight were you selling on a regular basis?

12:02PM  21   A.  Half a key up to a kilogram of cocaine.

12:02PM  22   Q.  And where were your customers?

12:02PM  23   A.  Where was my customers?

12:02PM  24   Q.  Yes.

12:02PM  25   A.  You mean waiting to buy it or just --

12:02PM   1   Q.  Again, what area were you selling?

12:02PM   2   A.  Oh, there was different areas.  Some was from my

12:02PM   3   neighborhood, Central Park neighborhood; some was from East

12:02PM   4   Ferry, Cambridge area; some was people from downtown, William

12:02PM   5   Street area.

12:02PM   6   Q.  And did you have any knowledge as to where these

12:02PM   7   kilograms of cocaine were coming from?

12:03PM   8   A.  Yes.

12:03PM   9   Q.  Where was that?

12:03PM  10   A.  Again, coming from the state or from the person?

12:03PM  11   Q.  State.

12:03PM  12   A.  No.  I'm not going to say that.  At the time, no, I don't

12:03PM  13   know what state they were coming from.

12:03PM  14   Q.  Was there any problems that occurred with the source of

12:03PM  15   supply, to your knowledge?

12:03PM  16   A.  Yes.  Hicks' cousin -- we was all at the house one day,

12:03PM  17   and Hicks was -- you know, we was all out there talking, and

12:03PM  18   he was talking about how he ran off with about a hundred-

12:03PM  19   something thousand dollars of money, and that they had to

12:03PM  20   repay the connect back, or the source of supply.  They had to

12:03PM  21   pay him back the money that they ran off with.  And, yeah,

12:03PM  22   once they paid him back off, the money from selling all the

12:04PM  23   marijuana, then that's when they switched up and were

12:04PM  24   bringing cocaine.

12:04PM  25   Q.  When you were observing kilograms of cocaine inside

| | | |
|---|---|---|
| 12:04PM | 1 | Courtland, who else was present? |
| 12:04PM | 2 | A.  It was me, Shawntorrian Travis, my cousin, Letorrance |
| 12:04PM | 3 | Travis, Marcel Worthy, it was Aaron Hicks, Brell, OP, Jimmy |
| 12:04PM | 4 | Robbs was there, and Arrington didn't come into the picture |
| 12:05PM | 5 | until later. |
| 12:05PM | 6 | Q.  You mentioned the name OP.  Who is OP? |
| 12:05PM | 7 | A.  He not in one of the pictures.  I don't know his whole |
| 12:05PM | 8 | real name.  Omar. |
| 12:05PM | 9 | Q.  Is he a Schuele Boy? |
| 12:05PM | 10 | A.  Yes. |
| 12:05PM | 11 | Q.  And you mentioned the name Jimmy Robbs? |
| 12:05PM | 12 | A.  Yes. |
| 12:05PM | 13 | Q.  Can you -- are you familiar with Jimmy Robbs? |
| 12:05PM | 14 | A.  Yes. |
| 12:05PM | 15 | Q.  Is he a Schuele Boy? |
| 12:05PM | 16 | A.  Yes. |
| 12:05PM | 17 | Q.  Was there any time -- in addition to the kilograms that |
| 12:05PM | 18 | you were observing on Courtland, did you see any money? |
| 12:05PM | 19 | A.  Yes. |
| 12:05PM | 20 | Q.  Can you discuss what observations you made? |
| 12:05PM | 21 | A.  I would say a million-plus. |
| 12:05PM | 22 | Q.  A million dollars in Courtland? |
| 12:05PM | 23 | A.  Yes. |
| 12:05PM | 24 | Q.  Who was present -- or strike that. |
| 12:05PM | 25 | The Courtland house, did the operation continue to run |

| | | |
|---|---|---|
| 12:06PM | 1 | out of the Courtland house? |
| 12:06PM | 2 | A.  Not for long.  Not that long. |
| 12:06PM | 3 | Q.  Why not? |
| 12:06PM | 4 | A.  They was moving it to a different location. |
| 12:06PM | 5 | Q.  What location was that? |
| 12:06PM | 6 | A.  It went from there to having stuff on Wohlers and on |
| 12:06PM | 7 | Forman Street. |
| 12:06PM | 8 | Q.  Do you know why it stopped over on Courtland? |
| 12:06PM | 9 | A.  It was there too long.  You don't want to be in one spot |
| 12:06PM | 10 | for too long, you know, police watching, things like that, |
| 12:06PM | 11 | so -- |
| 12:06PM | 12 | MR. ARRINGTON:  Objection, Your Honor.  I need |
| 12:06PM | 13 | timeframes. |
| 12:06PM | 14 | THE COURT:  What timeframe are you talking about, |
| 12:06PM | 15 | sir? |
| 12:06PM | 16 | THE WITNESS:  That they stopped -- the operation |
| 12:06PM | 17 | stopped on Courtland? |
| 12:06PM | 18 | THE COURT:  Pardon me? |
| 12:06PM | 19 | THE WITNESS:  The timeframe of when it stopped on |
| 12:06PM | 20 | Courtland? |
| 12:06PM | 21 | THE COURT:  Yes, best you can recall. |
| 12:07PM | 22 | THE WITNESS:  In the -- I would say in mid to the |
| 12:07PM | 23 | ending of the summertime. |
| 12:07PM | 24 | MR. ARRINGTON:  What year? |
| 12:07PM | 25 | THE COURT:  What year was that? |

| | | |
|---|---|---|
| 12:07PM | 1 | THE WITNESS:  In 2011. |
| 12:07PM | 2 | THE COURT:  Okay. |
| 12:07PM | 3 | BY MR. LENIHAN: |
| 12:07PM | 4 | Q.  Now, Aaron Hicks, what was his role in this drug |
| 12:07PM | 5 | organization? |
| 12:07PM | 6 | A.  Hicks was, you know, money.  The money -- and on his |
| 12:07PM | 7 | behalf and then putting money back together and, you know, so |
| 12:07PM | 8 | they could put him and my other cousin, Letorrance Travis, |
| 12:07PM | 9 | they put the money and combined it together. |
| 12:08PM | 10 | Q.  And what was Letorrance Travis's role? |
| 12:08PM | 11 | A.  Travis's role was selling the drugs and managing the |
| 12:08PM | 12 | money. |
| 12:08PM | 13 | Q.  How about Marcel Worthy? |
| 12:08PM | 14 | A.  Worthy, at first, was selling drugs and then he got too |
| 12:08PM | 15 | hot.  And what I mean by saying he got too hot is, he was, |
| 12:08PM | 16 | you know, he got into some trouble and they felt he was being |
| 12:08PM | 17 | watched by police.  So, they just told him to lay low, and he |
| 12:08PM | 18 | didn't have to sell the drugs.  They just give him a cut. |
| 12:08PM | 19 | Q.  Was there any time that you got too hot? |
| 12:08PM | 20 | A.  Yes. |
| 12:08PM | 21 | Q.  Can you discuss that? |
| 12:08PM | 22 | A.  Yes.  I got into an altercation with detectives on |
| 12:08PM | 23 | Courtland Avenue.  They thought I got caught with something |
| 12:09PM | 24 | that I didn't get caught in and they figured that I was being |
| 12:09PM | 25 | watched or working with officials. |

12:09PM 1  Q.  What did that do to your ability to sell drugs with this

12:09PM 2  group?

12:09PM 3  A.  They so much don't trust me, didn't want to supply me.

12:09PM 4  Q.  Why would that be?

12:09PM 5  A.  Because they thought I was working with the police.

12:09PM 6  Q.  In 2011, was Roderick Arrington involved in this drug

12:09PM 7  conspiracy?

12:09PM 8  A.  Yes.

12:09PM 9  Q.  Was there a time where, in 2011, that this operation was

12:10PM 10  disrupted by the -- by law enforcement?

12:10PM 11  A.  Yes.

12:10PM 12  Q.  Can you describe the circumstances of that?

12:10PM 13  A.  Yes.  My cousin, Letorrance Travis, was picked up on

12:10PM 14  Forman Street and they went inside the house.  I believe it

12:10PM 15  was four and a half, five kilograms they recovered, and then

12:10PM 16  they recovered the rest of the kilograms out of a van that

12:10PM 17  was parked in the garage.

12:10PM 18  Q.  And was your cousin arrested?

12:10PM 19  A.  Yes.

12:10PM 20  Q.  Do you know what agency arrested him?

12:10PM 21  A.  It was DEA, FBI.

12:10PM 22  Q.  Do you know how many kilograms were seized?

12:10PM 23  A.  In all?  I would say about 15, about 15 kilograms from my

12:11PM 24  knowledge, if I can remember that far back.

12:11PM 25  Q.  Was your cousin arrested?

12:11PM  1    A.  Yes.  He was arrested.

12:11PM  2    Q.  Do you know who he was arrested with?

12:11PM  3    A.  Not at the time, until we went to court for him.  He was

12:11PM  4    arrested with, I think, it was one male was Caucasian and the

12:11PM  5    other one was a Mexican guy.

12:11PM  6    Q.  The Mexican guy, do you know where he came from?

12:11PM  7    A.  No.

12:11PM  8    Q.  Have you ever seen that person before?

12:11PM  9    A.  No.

12:11PM  10   Q.  Do you know his name?

12:11PM  11   A.  No.

12:11PM  12   Q.  Do you know Aaron Hicks's source of supply's name?

12:11PM  13   A.  No.

12:11PM  14   Q.  Do you know if any money was seized by the DEA?

12:12PM  15   A.  Yes.  It was seized on Crossman, in a basement washing

12:12PM  16   machine I believe it was, close to 200,000 currency.

12:12PM  17   Q.  Did you have knowledge as to where the kilograms of

12:12PM  18   cocaine that were seized by the DEA, where those kilograms of

12:12PM  19   cocaine came from?

12:12PM  20   A.  Not at that time.  It came from the source of supply, but

12:12PM  21   not actually where it was, you know, traveled or driven from.

12:12PM  22   Q.  How did Letorrance Travis's arrest affect this drug

12:12PM  23   conspiracy after he got arrested?

12:12PM  24   A.  There was no drugs around.

12:13PM  25   Q.  There was what?  I'm sorry.

| | | |
|---|---|---|
| 12:13PM | 1 | A.  There was no drugs around after he got arrested. |
| 12:13PM | 2 | Q.  Did it cause any problems in the group? |
| 12:13PM | 3 | A.  Yeah.  You could say that people broke up kind of, you |
| 12:13PM | 4 | know, some start hanging with each other and they broken up. |
| 12:13PM | 5 | Q.  And so, can you explain that a little bit; like, who |
| 12:13PM | 6 | broke up, and how did that take place? |
| 12:13PM | 7 | A.  When it broke up, it was me and Worthy -- it was me and |
| 12:13PM | 8 | Worthy and my cousin, Shawntorrian Travis, we was still |
| 12:13PM | 9 | hanging.  Hicks kind of was just on his own, doing his own |
| 12:13PM | 10 | thing.  Just -- it wasn't like how it was before that |
| 12:14PM | 11 | happened, you know, everybody going out to the club together |
| 12:14PM | 12 | and things like that, and, you know, almost seeing each other |
| 12:14PM | 13 | every day to not seeing each other. |
| 12:14PM | 14 | Q.  And prior to that, you would see everyone every day? |
| 12:14PM | 15 | A.  Just about, yes, every day. |
| 12:14PM | 16 | Q.  In what area would you see them? |
| 12:14PM | 17 | A.  Either on Courtland or we'd ride around, going out, or |
| 12:14PM | 18 | around my grandmother area over there on Schuele, and maybe a |
| 12:14PM | 19 | party over there. |
| 12:14PM | 20 | Q.  Where did -- Letorrance Travis, where did he fall? |
| 12:14PM | 21 | THE COURT:  Where did he fall? |
| 12:14PM | 22 | MR. LENIHAN:  Sorry for -- I'll rephrase it. |
| 12:14PM | 23 | BY MR. LENIHAN: |
| 12:14PM | 24 | Q.  As part of this breaking up, was there anyone that he |
| 12:15PM | 25 | ended up -- Letorrance Travis ended up with? |

12:15PM  1   A.  Yeah.  It was me, Worthy, and my cousin, Shawntorrian.

12:15PM  2   Q.  How about Aaron Hicks?

12:15PM  3   A.  He still came around, but they wasn't as tight as they

12:15PM  4   was.

12:15PM  5   Q.  Was there anyone that you saw that Aaron Hicks became

12:15PM  6   close to after that?

12:15PM  7   A.  No.  No.

12:15PM  8   Q.  How about Roderick Arrington?

12:15PM  9           MR. ARRINGTON:  Objection, Your Honor.  He's leading

12:15PM  10  this witness.  He just said he had no knowledge.

12:15PM  11          THE COURT:  It's not leading at all.  Overruled.

12:15PM  12          THE WITNESS:  Arrington would be with Jimmy Robbs.

12:15PM  13  It would be him -- the one time we left the club, it was him,

12:16PM  14  Robbs, and Hicks was in the front driver seat.  Hicks was in

12:16PM  15  the truck with Arrington.

12:16PM  16  BY MR. LENIHAN:

12:16PM  17  Q.  Are you familiar with a rap video that was created called

12:16PM  18  "The Front Door"?

12:16PM  19  A.  Yes.

12:16PM  20  Q.  Were you a part of that rap video?

12:16PM  21  A.  Yes.

12:16PM  22  Q.  Can you explain to the jury what "The Front Door" rap

12:16PM  23  video is?

12:16PM  24  A.  The "Front Door" rap video is Sandy explaining, you know,

12:16PM  25  in some of the rap, some of it's violence, some of it's

12:16PM 1    selling drugs; out of that very own house, some drugs been

12:16PM 2    sold.

12:16PM 3             MR. ARRINGTON:  Objection, Your Honor.  He don't know

12:17PM 4    what Sandy Jones rap --

12:17PM 5             THE COURT:  You don't know what he knows.  He can

12:17PM 6    testify to what he knows.  Overruled.  Go ahead, sir.  You may

12:17PM 7    continue.

12:17PM 8    BY MR. LENIHAN:

12:17PM 9    Q.  Were you in the "Front Door" rap video?

12:17PM 10   A.  Yes.

12:17PM 11   Q.  Who is the lead singer of the "Front Door" rap video?

12:17PM 12   A.  Sandy.  Serious Black.

12:17PM 13   Q.  Have you had the opportunity to watch the "Front Door"

12:17PM 14   rap video prior to you testifying here today?

12:17PM 15   A.  Yes.

12:17PM 16   Q.  And does the "Front Door" rap video accurately depict

12:17PM 17   what transpired when this rap video was made?

12:17PM 18   A.  Yes.

12:17PM 19   Q.  Have you had the opportunity to look at the lyrics

12:17PM 20   associated with the rap video?

12:17PM 21   A.  Yes.

12:17PM 22   Q.  And does the -- do the lyrics that are transcribed, do

12:17PM 23   they accurately capture the words that are on video?

12:17PM 24   A.  Yes.

12:17PM 25            MR. LENIHAN:  Your Honor, the government would move

12:17PM  1  to admit Government 23 into evidence as well as show --

12:18PM  2  provide the jury with transcript for an aid.

12:18PM  3        THE COURT:  Ladies and gentlemen -- that will be

12:18PM  4  admitted.

12:18PM  5  (Government Exhibit 23 was received in evidence.)

12:18PM  6        THE COURT:  You are about to view a music video that

12:18PM  7  the government has offered into evidence and the Court has

12:18PM  8  allowed it to be admitted in evidence.  You are not to assume

12:18PM  9  from the video alone that the video depicts the defendant or

12:18PM  10  anyone else engaging in any criminal conduct or being part of

12:18PM  11  any type of criminal association.  You may attribute any or no

12:18PM  12  evidentiary value to the video as you see it based upon what

12:18PM  13  you see in the video in combination of all the other evidence

12:18PM  14  in the case.

12:18PM  15    Likewise, as for the video lyrics, you are not to assume

12:18PM  16  from the lyrics alone that the lyrics describe the defendant

12:19PM  17  or anyone else engaged in criminal conduct or being part of a

12:19PM  18  criminal association.  You may attribute any or no evidentiary

12:19PM  19  value to the lyrics as you see it based upon what you hear in

12:19PM  20  the video in combination with all the other evidence in the

12:19PM  21  case.

12:19PM  22    In addition, let me stress to you that you may not

12:19PM  23  consider the video or its lyrics as truth that the defendant

12:19PM  24  has a criminal propensity or a bad character.  You must

12:19PM  25  consider the video dispassionately.  And even if the material

12:19PM  1   in the video or its lyrics personally are distasteful to you,

12:19PM  2   you must not let your personal opinion affect your

12:19PM  3   consideration of the evidence in the case.

12:19PM  4       Now, the government is going to give you a typed

12:19PM  5   transcript of the government -- the government has prepared a

12:20PM  6   transcript on what they have interpreted as being said in the

12:20PM  7   video.  This interpretation has not been received in evidence.

12:20PM  8   However, the transcript is going to be -- that's given to you

12:20PM  9   in order to aid you in listening to the video.  However, the

12:20PM  10  transcript itself is not evidence.

12:20PM  11      Therefore, when the video is played, I advise you to

12:20PM  12  listen very carefully to the video.  You alone should make

12:20PM  13  your own interpretation of what appears in the video based on

12:20PM  14  what you heard.  If you think you heard something differently

12:20PM  15  than that what appears in the transcript, then what you heard

12:20PM  16  is controlling.  I remind you, ladies and gentlemen, you are

12:20PM  17  the sole judges of the facts.  All right.  Let's proceed from

12:20PM  18  there.

12:20PM  19          MR. LENIHAN:  Thank you, Your Honor.

12:21PM  20          THE COURT:  What is the exhibit number on the video?

12:21PM  21          MR. LENIHAN:  It's Exhibit 23, Your Honor.

12:21PM  22          THE COURT:  And the transcript is what?

12:21PM  23          MR. LENIHAN:  It's 23T.  Permission to publish, Your

12:21PM  24  Honor?

12:21PM  25          THE COURT:  Yes.

| | | |
|---|---|---|
| 12:21PM | 1 | BY MR. LENIHAN: |
| 12:21PM | 2 | Q.  Sir, I'd like to play the video once and we'll go back |
| 12:21PM | 3 | and have you discuss certain things, all right? |
| 12:21PM | 4 | A.  Yes. |
| 12:21PM | 5 | (The recording was played.) |
| 12:24PM | 6 | BY MR. LENIHAN: |
| 12:24PM | 7 | Q.  Did you have the opportunity to watch that video, sir? |
| 12:24PM | 8 | A.  Yes. |
| 12:24PM | 9 | Q.  Did you see yourself in it? |
| 12:24PM | 10 | A.  Yes. |
| 12:24PM | 11 | Q.  A younger Mr. James? |
| 12:24PM | 12 | A.  Yeah. |
| 12:24PM | 13 | Q.  And when -- to the best you remember, when did this |
| 12:25PM | 14 | video -- when was it shot? |
| 12:25PM | 15 | A.  2011. |
| 12:25PM | 16 | Q.  Do you remember what month? |
| 12:25PM | 17 | A.  No, I don't remember the month, but it was summertime. |
| 12:25PM | 18 |         MR. LENIHAN:  If we could play it again, Ms. Fulton? |
| 12:25PM | 19 | (The recording was played.) |
| 12:25PM | 20 |         MR. LENIHAN:  And stop it right there. |
| 12:25PM | 21 | BY MR. LENIHAN: |
| 12:25PM | 22 | Q.  It says G.O.N.E. Ent.  Are you familiar with what that |
| 12:25PM | 23 | means? |
| 12:25PM | 24 | A.  Yeah.  G.O.N.E., me and my cousin kind of -- we didn't |
| 12:25PM | 25 | come up with that phrase for this kind of label, but we -- |

12:25PM   1   I'm familiar with G.O.N.E. Ent, but we, like, talked about

12:25PM   2   how fast we used to sell drugs and, you know, it would be

12:25PM   3   gone.  So, I guess he came up with that name later.

12:26PM   4          MR. LENIHAN:  If we can keep playing, please.

12:26PM   5   (The recording was played.)

12:26PM   6          MR. LENIHAN:  You can stop it right here.

12:26PM   7   BY MR. LENIHAN:

12:26PM   8   Q.  And there is a house to the left here.  Stopping it at 13

12:26PM   9   seconds.  Can you describe where this house is?

12:26PM  10   A.  It's on Schuele between Northland and Delavan.

12:26PM  11          MR. LENIHAN:  Keep playing, please.

12:26PM  12   (The recording was played.)

12:26PM  13          MR. LENIHAN:  Can you stop it?

12:26PM  14   BY MR. LENIHAN:

12:26PM  15   Q.  Now, we just -- the phrase, "never ever use the front

12:26PM  16   door, the trap door built on the side, clientele in the

12:26PM  17   back", what does that mean?

12:26PM  18   A.  Not to use the front door.  They done see too much

12:26PM  19   traffic going in and out, so use the side door.

12:27PM  20   Q.  What does the term "trap door" mean?

12:27PM  21   A.  Trap as in a drug house.

12:27PM  22   Q.  And prior to stopping it, did you see anything associated

12:27PM  23   with drug activity?

12:27PM  24   A.  Yes.

12:27PM  25   Q.  What was that?

12:27PM    1    A.  He was on the way in the house with a bag with money in

12:27PM    2    it, in front.

12:27PM    3          MR. LENIHAN:  If we can go back to 18 seconds quick?

12:27PM    4    BY MR. LENIHAN:

12:27PM    5    Q.  At 18 seconds, can you discuss what this depicts?

12:27PM    6    A.  It's counting money, and we had on the table -- we had a

12:27PM    7    plate on the table with baking soda in it, and we had a pot

12:27PM    8    on the stove that we was showing, like, a way of cooking up

12:28PM    9    cocaine.

12:28PM   10    Q.  Was there real cocaine being cooked at this point?

12:28PM   11    A.  No.

12:28PM   12    Q.  And what was the purpose of having that item over to the

12:28PM   13    left on the table?

12:28PM   14    A.  To show a synthetic weigh-up, and we had it there for

12:28PM   15    display.

12:28PM   16          MR. LENIHAN:  If we can keep playing to 22 seconds.

12:28PM   17    (The recording was played.)

12:28PM   18          MR. LENIHAN:  And if you could just go to 22 seconds.

12:28PM   19    BY MR. LENIHAN:

12:28PM   20    Q.  And there is a picture of an individual?  Do you

12:28PM   21    recognize that individual?

12:28PM   22    A.  Yes.

12:28PM   23    Q.  Who is that?

12:28PM   24    A.  It's Will Pop.

12:28PM   25    Q.  And why is there a picture of him being shown?

12:28PM    1    A.  He was killed.

12:28PM    2    Q.  Where was he killed?

12:28PM    3    A.  City Grill.

12:28PM    4    Q.  Was anyone else killed at the City Grill?

12:29PM    5    A.  Yes.

12:29PM    6    Q.  Who was that?

12:29PM    7    A.  It was Marcel Worthy's girlfriend, Tia.  I believe it was

12:29PM    8    her sister, Tiffany, and couple other individuals I wasn't

12:29PM    9    familiar with, they were shot.  They were shot and killed.

12:29PM   10    Q.  Were you present?

12:29PM   11    A.  Yes.

12:29PM   12    Q.  And we just heard the lyrics, "keep your work close by

12:29PM   13    and you gotta stay strapping".  What does that mean?

12:29PM   14    A.  Keep the work close by, the purpose of --

12:29PM   15         MR. ARRINGTON:  Objection, Your Honor.  He didn't

12:29PM   16    write these rap lyrics.  He don't know what these things mean,

12:29PM   17    Your Honor.

12:29PM   18         THE COURT:  Overruled.  You'll be able to cross-

12:29PM   19    examine him.

12:29PM   20         THE WITNESS:  Keep your work close by, so you can hit

12:29PM   21    a lick, and a lick is a customer, and keep your strap, meaning

12:30PM   22    use a gun.

12:30PM   23         MR. LENIHAN:  You can keep playing.

12:30PM   24    (The recording was played.)

12:30PM   25         MR. LENIHAN:  Okay.  Stop it.

12:30PM    1    BY MR. LENIHAN:

12:30PM    2    Q.   Their lyric was, "Don't be talking on the phone.  It's

12:30PM    3    too hot for all of that.  Yup."  What does that mean?

12:30PM    4    A.   Not to be talking on the phone in case the Feds is

12:30PM    5    listening in and the DEA.

12:30PM    6    Q.   Are you worried about a wiretap investigation?

12:30PM    7    A.   Yes.

12:30PM    8    Q.   And then the person that's depicted right here at 26

12:30PM    9    seconds in the middle, who is that?

12:30PM   10    A.   Grey shirt?

12:30PM   11    Q.   Yes.

12:30PM   12    A.   That's Aaron Hicks.

12:30PM   13    Q.   How about the person in the light blue shirt right next

12:30PM   14    to Hicks?

12:30PM   15    A.   Marcel Worthy.

12:30PM   16         MR. LENIHAN:  We can keep playing, please.

12:30PM   17    (The recording was played.)

12:30PM   18         MR. LENIHAN:  Stop it right there.

12:30PM   19    BY MR. LENIHAN:

12:30PM   20    Q.   Now, there's a bunch of individuals that are depicted

12:30PM   21    here at 30 seconds.  Starting from left to right -- and like

12:31PM   22    the Judge mentioned previously, when you point to or when you

12:31PM   23    pick out a person, can you just point to who they are?  So,

12:31PM   24    starting from the left.

12:31PM   25    A.   Yes.  Red shirt is Black.  Second here, that's Marcel

12:31PM    1    Worthy in the blue.

12:31PM    2            THE COURT:  Hit the screen when you are referring to

12:31PM    3    each individual, okay, so we know for sure who you are talking

12:31PM    4    about.

12:31PM    5            THE WITNESS:  Yes, but I tapped it.  It doesn't show.

12:31PM    6    I touched the person where --the first one in the red is

12:31PM    7    Black.  Second person in the blue shirt on is Worthy.  Third

12:31PM    8    person is Arrington.  The fourth person, I forgot his name.

12:31PM    9    And in the middle, you got Sandy, the rapper.  Next to Sandy

12:32PM   10    is my cousin, Shawntorrian Travis with the red shirt, plaid

12:32PM   11    shorts.  Next to him is me, white T-shirt.  The guy next to

12:32PM   12    me, I forgot his name.  And the other guy right here with the

12:32PM   13    brown, older guy, I forgot his name as well.  And that's

12:32PM   14    Sandy's father, the very last to the right in the blue shirt,

12:32PM   15    collared shirt.

12:32PM   16            MR. LENIHAN:  We can keep playing, please.

12:32PM   17    (The recording was played.)

12:32PM   18            MR. LENIHAN:  We can just back it up to 53 seconds

12:33PM   19    and start at 52?  Right there.

12:33PM   20    (The recording was played.)

12:33PM   21    BY MR. LENIHAN:

12:33PM   22    Q.  So, at 52 seconds, there is a female that's pictured?

12:33PM   23    A.  Yes.

12:33PM   24    Q.  Who is that female?

12:33PM   25    A.  Marcel Worthy's girlfriend, Tia.

| | | |
|---|---|---|
| 12:33PM | 1 | Q. And was she shot and killed at the City Grill incident? |
| 12:33PM | 2 | A. Yes. |
| 12:33PM | 3 | MR. LENIHAN: If we can play it and stop it at 53. |
| 12:33PM | 4 | (The recording was played.) |
| 12:33PM | 5 | BY MR. LENIHAN: |
| 12:33PM | 6 | Q. And then the person to the left, do you recognize who |
| 12:33PM | 7 | that person is? |
| 12:33PM | 8 | A. Yes. Arrington. |
| 12:33PM | 9 | Q. And how about next to him? |
| 12:33PM | 10 | A. Next to him, I forgot his name, the guy in the middle. |
| 12:34PM | 11 | Q. Then the person to the right with the light blue? |
| 12:34PM | 12 | A. That's my cousin, Letorrance Travis. |
| 12:34PM | 13 | Q. Then you mentioned that this was in the Summer of 2011? |
| 12:34PM | 14 | A. Yes. |
| 12:34PM | 15 | Q. During this time, was Mr. Arrington -- did he have -- |
| 12:34PM | 16 | what was his hairstyle like? |
| 12:34PM | 17 | A. Back in 2011? |
| 12:34PM | 18 | Q. Yes. |
| 12:34PM | 19 | A. It was, like, the way it is at the time. |
| 12:34PM | 20 | Q. Okay. With braids? |
| 12:34PM | 21 | A. Yes. |
| 12:34PM | 22 | MR. LENIHAN: We can keep playing. |
| 12:34PM | 23 | (The recording was played.) |
| 12:34PM | 24 | MR. LENIHAN: Stop it right there. If we can go to |
| 12:34PM | 25 | 1:04. |

12:34PM 1    BY MR. LENIHAN:

12:34PM 2    Q.  Now, the line, "Welcome to the game.  Welcome to the

12:35PM 3    grind.  Thirty-six in a brick, sixteen in a pound.  You take

12:35PM 4    it to the trap, you break it all down", what is that in

12:35PM 5    reference to?

12:35PM 6    A.  Thirty-six ounces in a kilogram, sixteen ounces in a

12:35PM 7    pound of marijuana.  Take it to the trap means break it down

12:35PM 8    as in selling smaller quantities instead of selling it as a

12:35PM 9    whole, as a one.

12:35PM 10   Q.  Can you describe to the jury how you would break

12:35PM 11   something down and why you would break something down?

12:35PM 12   A.  Break it down and make more money.  And how I would break

12:35PM 13   it down, if it was a kilogram, I would weigh it up in all

12:35PM 14   ounces, and I might add an additive to it to make more money.

12:36PM 15   And the same additive, you can add baking soda or anything --

12:36PM 16   not anything, but as long as it's compatible with cocaine and

12:36PM 17   added to it to put more weight on it minimum.

12:36PM 18   Q.  And can you describe that?  Why would you add to the

12:36PM 19   cocaine?

12:36PM 20   A.  To make more money.  You can take come of the cocaine out

12:36PM 21   and then put that with whatever you took out.  You can add

12:36PM 22   that with it 'til let's say we got 28 grams of cocaine

12:36PM 23   powder, you could take might be eight grams of that and then

12:36PM 24   replace it with eight grams of either baking soda or a

12:36PM 25   different kind of additive to put the weight back and then

12:37PM   1   you can make more money like that.

12:37PM   2   Q.  Then you would take eight grams of cocaine, add eight

12:37PM   3   grams of another powder?

12:37PM   4   A.  Either eight or five grams or three.

12:37PM   5   Q.  Then you would have anywhere from 12 to 16 grams to

12:37PM   6   resale?

12:37PM   7   A.  Yes.

12:37PM   8   Q.  And that would allow you to what?

12:37PM   9   A.  Allow me to make more money to spend on different things

12:37PM   10  or whatever the case may have been or outfit or bills or --

12:37PM   11  Q.  Is that common in drug dealing, to add powder to a

12:37PM   12  substance?

12:37PM   13  A.  Yes.

12:37PM   14  Q.  If there's individual at table there's a significance of

12:37PM   15  that, a pure at 1 minute and 4 seconds?

12:37PM   16  A.  You say significant?

12:37PM   17  Q.  Strike that.  Who is at the table?

12:38PM   18  A.  It's me, my cousin, Letorrance Travis, got Shawntorrian

12:38PM   19  Travis, got Aaron Hicks, got Marcel Worthy and we got Sandy.

12:38PM   20        MR. LENIHAN:  We can keep playing, please.

12:38PM   21  (The recording was played.)

12:38PM   22        MR. LENIHAN:  Stop it right there.

12:38PM   23  BY MR. LENIHAN:

12:39PM   24  Q.  Was the line -- did you hear the line where it says,

12:39PM   25  "fuck around with me, you are going to come up on a mill"?

| | | |
|---|---|---|
| 12:39PM | 1 | A.  Yes. |
| 12:39PM | 2 | Q.  What did you interpret that to mean? |
| 12:39PM | 3 | A.  He's basically saying, you hang around with me, this |
| 12:39PM | 4 | is -- what is the outcome of it.  You ain't going to be |
| 12:39PM | 5 | making money and coming up on a mill saying you are going to |
| 12:39PM | 6 | make a million. |
| 12:39PM | 7 | MR. LENIHAN:  Can we keep playing? |
| 12:39PM | 8 | (The recording was played.) |
| 12:39PM | 9 | BY MR. LENIHAN: |
| 12:40PM | 10 | Q.  So, the people that we saw here during the video, were |
| 12:40PM | 11 | these individuals that were involved in drug dealing? |
| 12:41PM | 12 | A.  Yes. |
| 12:41PM | 13 | Q.  Including Aaron Hicks? |
| 12:41PM | 14 | A.  Including, yes, Hicks. |
| 12:41PM | 15 | Q.  Letorrance Travis? |
| 12:41PM | 16 | A.  Yes. |
| 12:41PM | 17 | Q.  Marcel Worthy? |
| 12:41PM | 18 | A.  Yes. |
| 12:41PM | 19 | Q.  Roderick Arrington? |
| 12:41PM | 20 | A.  Yes. |
| 12:41PM | 21 | Q.  Are you aware that there was another video that was shot |
| 12:41PM | 22 | at Russell's Steakhouse? |
| 12:41PM | 23 | THE COURT:  All right.  What I think we'll do is take |
| 12:41PM | 24 | a break at this time, ladies and gentlemen, and we'll take our |
| 12:41PM | 25 | luncheon recess and we'll resume at 2 o'clock.  Again, during |

12:41PM   1   the recess, please do not discuss the case with anyone.  Do

12:41PM   2   not discuss it among yourselves.  Enjoy your lunch, folks, and

12:41PM   3   we'll see you back here at 2 o'clock.  Court will be in

12:41PM   4   recess.

12:41PM   5           THE CLERK:  All rise.

12:44PM   6   (A recess was taken from 12:44 to 2:03 p.m.)

02:09PM   7   (The jury entered the room at 2:09 p.m.)

02:11PM   8   (The witness entered the room at 2:11 p.m.)

02:11PM   9           THE COURT:  Sir, you are still under oath.

02:11PM  10           THE WITNESS:  Yes.

02:11PM  11           THE COURT:  Take your mask off.  All right.

02:11PM  12   Mr. Lenihan?

02:11PM  13           MR. LENIHAN:  Thank you, Your Honor.

02:11PM  14   BY MR. LENIHAN:

02:11PM  15   Q.  Mr. James, we left off -- we were watching the "Front

02:11PM  16   Door" video.  You remember that?

02:11PM  17   A.  Yes.

02:11PM  18   Q.  Did that video -- does that depict the life on Schuele

02:11PM  19   Street?

02:11PM  20   A.  I'm taking my time before I answer because I don't want

02:12PM  21   to say all of it, but mostly yes.

02:12PM  22   Q.  Well, what mostly?

02:12PM  23   A.  The house.  It was just the house.  Like, we been there,

02:12PM  24   but not actually hustle out of that house, sold drugs.

02:12PM  25   That's probably the only part about it.

02:12PM   1    Q.   So, the discussion about drug dealing, was that about --

02:13PM   2    was that -- would that accurately describe the life on

02:13PM   3    Schuele Street?

02:13PM   4    A.   Yes.

02:13PM   5    Q.   Now, I want to talk to you about a person by the name of

02:13PM   6    Walter Davison.   Do you know who that is?

02:13PM   7    A.   Walter Davison?

02:13PM   8    Q.   Do you know someone who went by the nickname Matt?

02:13PM   9    A.   Yes.

02:13PM   10   Q.   How did you know Matt?

02:13PM   11   A.   I met Matt through my cousin, Letorrance Travis.

02:13PM   12   Q.   And can you just give the jury an understanding as to who

02:13PM   13   Matt was?

02:13PM   14   A.   Matt was from Cleveland, Ohio.   He was selling marijuana

02:13PM   15   and crack, but most part Matt it was, you know, friendly.   He

02:13PM   16   was a, you know, like peoples' person.   He wouldn't hurt

02:14PM   17   nobody or anything like that to the -- to my knowledge, but

02:14PM   18   Matt used to be on Carl Street and we sold weed out of the

02:14PM   19   house, and sold crack cocaine, and he went out, party with

02:14PM   20   us, and things like that.

02:14PM   21   Q.   Did you get along with Matt?

02:14PM   22   A.   Yes.

02:14PM   23   Q.   Did everyone seem to get along with Matt?

02:14PM   24   A.   Yes.

02:14PM   25   Q.   You mentioned that he was selling marijuana as well as

| | | |
|---|---|---|
| 02:14PM | 1 | crack cocaine? |
| 02:14PM | 2 | A.  Mm-hmm. |
| 02:14PM | 3 | Q.  Where was he selling those drugs from? |
| 02:14PM | 4 | A.  On Carl Street. |
| 02:14PM | 5 | Q.  Do you know where he was living on Carl Street? |
| 02:14PM | 6 | A.  I think it was the second house on the left from Carl and |
| 02:14PM | 7 | Delevan. |
| 02:14PM | 8 | Q.  Who was supplying Matt with the drugs? |
| 02:14PM | 9 | A.  Hicks. |
| 02:14PM | 10 | Q.  Do you know if Hicks got along with Matt? |
| 02:14PM | 11 | A.  Yes. |
| 02:14PM | 12 | Q.  Were you -- when you were -- was there times when you |
| 02:15PM | 13 | were with Matt? |
| 02:15PM | 14 | A.  Yes.  There's been times I've been with Matt. |
| 02:15PM | 15 | Q.  Selling drugs? |
| 02:15PM | 16 | A.  I was at the house, yeah, selling drugs.  We all used to |
| 02:15PM | 17 | be outside playing basketball, sit on the porch, in the |
| 02:15PM | 18 | house, drinking, smoking, and we would be selling drugs. |
| 02:15PM | 19 | Q.  Was there -- when Matt was selling drugs, did he, to your |
| 02:15PM | 20 | knowledge, ever get arrested? |
| 02:15PM | 21 | A.  No, not to my knowledge.  He wasn't arrested, but he did |
| 02:15PM | 22 | take a case for Hicks before.  Well, he got arrested for |
| 02:15PM | 23 | that.  He took a charge for someone else for Hicks. |
| 02:15PM | 24 | Q.  What does that mean, taking a charge? |
| 02:15PM | 25 | A.  That's, like, if somebody is in the car with me -- |

| | | |
|---|---|---|
| 02:15PM | 1 | THE DEFENDANT:  Objection, Your Honor.  If -- he |
| 02:15PM | 2 | wouldn't know that. |
| 02:15PM | 3 | THE COURT:  You can cross-examine him on that. |
| 02:15PM | 4 | Overruled.  You will be able to cross-examine him on that. |
| 02:16PM | 5 | THE WITNESS:  If -- say I'm in a car with someone and |
| 02:16PM | 6 | we get pulled over.  They can't charge two people with the |
| 02:16PM | 7 | same thing, which -- they can, but before they do do it, |
| 02:16PM | 8 | somebody own up to it and claim it before they take two of you |
| 02:16PM | 9 | guys. |
| 02:16PM | 10 | BY MR. LENIHAN: |
| 02:16PM | 11 | Q.  When Matt took a case, what did that do for his |
| 02:16PM | 12 | reputation? |
| 02:16PM | 13 | THE COURT:  What do you mean, take a case? |
| 02:16PM | 14 | MR. LENIHAN:  That's the witness's words. |
| 02:16PM | 15 | THE COURT:  Oh.  All right. |
| 02:16PM | 16 | THE DEFENDANT:  That's what I was objecting to, Your |
| 02:16PM | 17 | Honor. |
| 02:16PM | 18 | THE WITNESS:  Boosted up, you know, his |
| 02:16PM | 19 | representation; make a more likeable person, you know, want to |
| 02:16PM | 20 | keep him around. |
| 02:16PM | 21 | BY MR. LENIHAN: |
| 02:16PM | 22 | Q.  Why would that be? |
| 02:16PM | 23 | A.  Because he took the charge and he stood up.  He didn't |
| 02:16PM | 24 | have to take it, but he took it. |
| 02:17PM | 25 | Q.  Did there become a -- was there a day in August of 2012 |

02:17PM  1  did you learn that Matt had been murdered?

02:17PM  2  A.  Yes.

02:17PM  3  Q.  How did you learn Matt had been murdered?

02:17PM  4  A.  A female friend of mines.

02:17PM  5           THE DEFENDANT:  Objection.  Hearsay.  We don't know

02:17PM  6  who this girl is.  Nobody never seen this girl.  She didn't

02:17PM  7  testify.  We don't know if this girl even exists.

02:17PM  8           MR. LENIHAN:  I'm not asking what the girl said.

02:17PM  9  It's not hearsay.

02:17PM  10           THE COURT:  Overruled.  Go ahead.

02:17PM  11  BY MR. LENIHAN:

02:17PM  12  Q.  Did this female provide you with information?

02:17PM  13  A.  Yes.

02:17PM  14  Q.  What did you do with that information?

02:17PM  15  A.  After she provided me the information, we went around

02:17PM  16  over on Grider and I told them, well, it was me, Hicks,

02:18PM  17  Arrington, Robbs, my cousin Letorrance Travis, Shawntorrian

02:18PM  18  Travis, OP was there, and Worthy was there, also.  And I

02:18PM  19  relayed the message to them about what she said when we was

02:18PM  20  on the porch, and I told her that they wanted to come around

02:18PM  21  and talk to her about it, but it was only the police at the

02:18PM  22  scene.

02:18PM  23      So, when I was telling Arrington and Hicks and everybody

02:18PM  24  on the porch what happened and stuff, she got kind of scared

02:18PM  25  like thinking something is going to happen to her.  I said,

02:18PM   1   no.  They're not going to do nothing to you.  Tell them what

02:18PM   2   you told me.

02:18PM   3   Q.  And you relayed the message to Aaron Hicks?

02:18PM   4   A.  It was Hicks on the porch, Robbs, Arrington, OP, my

02:19PM   5   cousin Shawntorrian Travis, Letorrance Travis, and Jimmy

02:19PM   6   Robbs.

02:19PM   7   Q.  And after you relayed the information to them, what

02:19PM   8   happened next?

02:19PM   9   A.  Guy that did the killing, he got killed.

02:19PM  10   Q.  Who was that?

02:19PM  11   A.  Quincy.  I know him by Gottie, street name.  Quincy is

02:19PM  12   his real name.

02:19PM  13   Q.  Did you have any conversation with anybody related to

02:19PM  14   seeking revenge?

02:19PM  15   A.  I believe that was the wake.  We was on Jefferson at the

02:19PM  16   wake and after, you know, the wake, we all went outside.

02:19PM  17   Q.  Whose wake was that?

02:20PM  18   A.  That was Matt's.  And we was outside and they talked

02:20PM  19   about it.  It was, you know, everyone that I said was on the

02:20PM  20   porch; Arrington, Hicks, Robbs, my cousins was there, and

02:20PM  21   they say they was going to catch up with him.

02:20PM  22   Q.  Who said catch up?

02:20PM  23           THE COURT:  Just one second.  Ladies and gentlemen,

02:20PM  24   would you step in the jury room?

02:20PM  25   (The jury left the room at 2:20 p.m.)

| | | |
|---|---|---|
| 02:25PM | 1 | (The witness left the room at 2:20 p.m.) |
| 02:25PM | 2 | (The jury entered the room at 2:25 p.m.) |
| 02:25PM | 3 | (The witness entered the room at 2:25 p.m.) |
| 02:25PM | 4 | THE COURT:  All right.  Mr. Lenihan? |
| 02:25PM | 5 | MR. LENIHAN:  Thank you, Your Honor. |
| 02:25PM | 6 | THE COURT:  Ladies and gentlemen, sorry I keep |
| 02:26PM | 7 | getting you in and out.  It's just, things have to be |
| 02:26PM | 8 | addressed at certain points in a trial and it's not uncommon. |
| 02:26PM | 9 | I appreciate your patience.  Believe me, I'm not doing it to |
| 02:26PM | 10 | have you waiting around.  I'm doing the best I can to avoid |
| 02:26PM | 11 | that as much as possible. |
| 02:26PM | 12 | MR. LENIHAN:  Thank you. |
| 02:26PM | 13 | BY MR. LENIHAN: |
| 02:26PM | 14 | Q.  Now, Mr. James, you were -- testified that you were at |
| 02:26PM | 15 | Matt's wake? |
| 02:26PM | 16 | A.  Yes. |
| 02:26PM | 17 | Q.  And there was a group of individuals that were outside of |
| 02:26PM | 18 | the wake? |
| 02:26PM | 19 | A.  Yes. |
| 02:26PM | 20 | Q.  Who were those individuals? |
| 02:26PM | 21 | A.  Going back, that's me, Letorrance Travis, Shawntorrian |
| 02:26PM | 22 | Travis, Hicks, Robbs, Worthy, OP, Arrington. |
| 02:26PM | 23 | Q.  And what was everyone's demeanor like? |
| 02:27PM | 24 | A.  Everyone was upset. |
| 02:27PM | 25 | Q.  Was there any discussion that was going on? |

| | | |
|---|---|---|
| 02:27PM | 1 | A.  Yes, talk about catching up with Quincy and when they |
| 02:27PM | 2 | catch up with him, they're going to kill him. |
| 02:27PM | 3 | Q.  Who is they? |
| 02:27PM | 4 | A.  That was the -- well, not my cousin, but Hicks, Robbs, |
| 02:27PM | 5 | Worthy, Arrington. |
| 02:27PM | 6 | Q.  Had you heard Mr. Arrington used the term "catching up" |
| 02:27PM | 7 | with you again? |
| 02:27PM | 8 | THE DEFENDANT:  Objection, Your Honor.  He never |
| 02:27PM | 9 | said -- he never put a name on it. |
| 02:27PM | 10 | THE COURT:  Overruled.  You're testifying. |
| 02:27PM | 11 | THE DEFENDANT:  I'm testifying? |
| 02:27PM | 12 | THE COURT:  Yes. |
| 02:27PM | 13 | THE DEFENDANT:  I object.  He said -- he just said |
| 02:28PM | 14 | the word catching up -- |
| 02:28PM | 15 | THE COURT:  You said he never said that to me. |
| 02:28PM | 16 | That's testifying.  You make an objection, fine.  Overruled. |
| 02:28PM | 17 | You may answer, sir, the best you can, the best as you recall. |
| 02:28PM | 18 | THE WITNESS:  Yes.  It was all of individuals there. |
| 02:28PM | 19 | BY MR. LENIHAN: |
| 02:28PM | 20 | Q.  What -- who?  I'm sorry. |
| 02:28PM | 21 | A.  It was all individuals. |
| 02:28PM | 22 | Q.  I'd like to ask you about an incident that happened late |
| 02:28PM | 23 | 2012, early 2013.  Were you the victim of a robbery? |
| 02:28PM | 24 | A.  Yes. |
| 02:28PM | 25 | THE COURT:  Just one second.  I stand corrected.  You |

02:28PM  1  were not testifying, Mr. Arrington.  I stand corrected on

02:28PM  2  that.

02:28PM  3          THE DEFENDANT:  Thank you.

02:28PM  4          THE COURT:  The jury will disregard what I said in

02:29PM  5  that regard.  I misinterpreted what was being said.  All

02:29PM  6  right.  You may go from there, Mr. Lenihan.

02:29PM  7          MR. LENIHAN:  Thank you, Your Honor.

02:29PM  8  BY MR. LENIHAN:

02:29PM  9  Q.  You mentioned you were the victim of a robbery?

02:29PM  10  A.  Yes.

02:29PM  11  Q.  Did you express to anyone that you were a victim?

02:29PM  12  A.  Yeah.  I told my cousin about it, Letorrance Travis.  I

02:29PM  13  also told Arrington.

02:29PM  14  Q.  How did Mr. Arrington respond to you?

02:29PM  15  A.  Him and my cousin was in a front of a house and my cousin

02:29PM  16  was in a car and my cousin pulled up.  Arrington got out.  We

02:29PM  17  talked.  He said he'd do it for family price at $5,000.  He

02:29PM  18  know the person that robbed me, stuff like that, and he said

02:29PM  19  the price he would do it for the family price.

02:30PM  20  Q.  Do what for $5,000?

02:30PM  21  A.  Kill a guy.

02:30PM  22  Q.  Did you pay him the $5,000?

02:30PM  23  A.  No.

02:30PM  24  Q.  What was your reaction?

02:30PM  25  A.  My reaction was, it was normal.  It was, like, I think

02:30PM   1   about it.  Just -- he said a family price and I was like,

02:30PM   2   okay.  Tell him I'll get with him and let him know.

02:30PM   3   Q.  Did you ever get back to him?

02:30PM   4   A.  No.

02:30PM   5   Q.  What was Mr. Arrington's reputation in the Schuele Boys?

02:30PM   6   A.  His reputation, he putting in work.  You would know not

02:31PM   7   to mess with people in a group.

02:31PM   8           THE DEFENDANT:  Objection.

02:31PM   9           THE COURT:  Overruled.

02:31PM  10           THE WITNESS:  You know somebody not to mess with

02:31PM  11   somebody out of the circle or there was consequences to pay.

02:31PM  12   BY MR. LENIHAN:

02:31PM  13   Q.  What does the term putting in work mean?

02:31PM  14   A.  Shooting.  Killing.

02:31PM  15   Q.  When you were around a member of the Schuele Boys, was

02:31PM  16   there any discussion of violence?

02:31PM  17   A.  Yes.

02:31PM  18   Q.  In your experience, if somebody committed murder, did

02:31PM  19   that person keep the firearm they used to commit the murder?

02:32PM  20   A.  No.

02:32PM  21   Q.  Why not?

02:32PM  22   A.  So it don't trace back to him.

02:32PM  23   Q.  You mentioned back in November of 2011 that you sort of

02:32PM  24   you splintered or the groups -- there was a fracture in the

02:32PM  25   group after Letorrance Travis's arrest.

| | | |
|---|---|---|
| 02:32PM | 1 | A.  Yes. |
| 02:32PM | 2 | Q.  Did you know any of the people that were arrested with |
| 02:32PM | 3 | Letorrance Travis? |
| 02:32PM | 4 | A.  No. |
| 02:32PM | 5 | Q.  Are you aware if there was any -- were you familiar with |
| 02:33PM | 6 | people that was -- that were a part of the drug conspiracy? |
| 02:33PM | 7 | A.  Yes. |
| 02:33PM | 8 | Q.  As well as nicknames? |
| 02:33PM | 9 | A.  Yes. |
| 02:33PM | 10 | Q.  I'd like to show you what's been premarked as Government |
| 02:33PM | 11 | Exhibit 25B and 29. |
| 02:33PM | 12 | THE DEFENDANT:  I object to that, Your Honor.  He's |
| 02:33PM | 13 | trying to bring in some ledgers that he don't have any |
| 02:33PM | 14 | knowledge of this.  He's not the author of them.  He didn't |
| 02:33PM | 15 | write those names on there.  He's about to testify to |
| 02:33PM | 16 | something that don't have anything to do with him.  And the |
| 02:33PM | 17 | government is trying to bring that in.  I'm objecting to it. |
| 02:33PM | 18 | I don't understand the relevance, and he's not the one that |
| 02:33PM | 19 | authorize, so he would not be able to tell who names -- he'd |
| 02:33PM | 20 | be guessing who name on these ledgers. |
| 02:34PM | 21 | THE COURT:  Overruled.  Go ahead, Mr. Lenihan. |
| 02:34PM | 22 | MR. LENIHAN:  Thank you, Your Honor.  I'm going to |
| 02:34PM | 23 | approach the witness with what's been premarked Government |
| 02:34PM | 24 | Exhibit 25B and 29. |
| 02:34PM | 25 | |

| | | |
|---|---|---|
| 02:34PM | 1 | BY MR. LENIHAN: |
| 02:34PM | 2 | Q.  On Government Exhibit 25B, do you recognize anyone? |
| 02:34PM | 3 |         THE COURT:  Just a second.  Just a second.  All |
| 02:35PM | 4 | right.  You may continue. |
| 02:35PM | 5 | BY MR. LENIHAN: |
| 02:35PM | 6 | Q.  Do you recognize any name on Government Exhibit 25B? |
| 02:35PM | 7 | A.  Yes. |
| 02:35PM | 8 | Q.  Can you discuss all the names that you recognize? |
| 02:35PM | 9 | A.  Yeah.  Wheezy, Ra and Breeze and Scrunchy. |
| 02:35PM | 10 | Q.  Do you recognize those to be individuals that are part of |
| 02:35PM | 11 | the drug conspiracy? |
| 02:35PM | 12 |         THE COURT:  Do you recognize this document, sir? |
| 02:35PM | 13 |         THE WITNESS:  Yes. |
| 02:35PM | 14 |         THE COURT:  What is it? |
| 02:35PM | 15 |         THE WITNESS:  It was part of the conspiracy, the |
| 02:36PM | 16 | other -- |
| 02:36PM | 17 |         THE COURT:  Have you seen this before during back in |
| 02:36PM | 18 | 2011 or whatever it was?  Where have you seen this before?  A |
| 02:36PM | 19 | better question, do you recognize this as a document that was |
| 02:36PM | 20 | being used during this period of time that the Schuele Boys |
| 02:36PM | 21 | allegedly were involved in some drug activity? |
| 02:36PM | 22 |         THE WITNESS:  Yes. |
| 02:36PM | 23 |         THE COURT:  Okay.  Go ahead. |
| 02:36PM | 24 |         MR. LENIHAN:  And we're going to be -- I'm not going |
| 02:36PM | 25 | to formally enter it at this point.  It's going to be entered |

02:36PM    1    at a later date, but I'm just looking to have the witness

02:36PM    2    identify names.

02:36PM    3          THE COURT:  All right.  Overruled.  You may admit it

02:36PM    4    in evidence.

02:36PM    5    (Government Exhibit 25B was received in evidence.)

02:36PM    6

02:36PM    7    BY MR. LENIHAN:

02:36PM    8    Q.  What does Government Exhibit 25B appear to be in our

02:36PM    9    experience?

02:36PM   10    A.  This is drugs and money that's out there that's owed.

02:37PM   11    Q.  You mention the name Ra.  Who do you know that to be?

02:37PM   12    A.  Ra?

02:37PM   13    Q.  Yeah.

02:37PM   14    A.  In the corner.  Rah Rah.

02:37PM   15          THE DEFENDANT:  Objection, Your Honor.  He never seen

02:37PM   16    this before.  He don't even know where it came from, who it

02:37PM   17    is.  He's just going along what the government saying.  It's

02:37PM   18    not fair.  He don't know where this came from, whose it is or

02:37PM   19    who authored it.

02:37PM   20          THE COURT:  What was -- did you see this document

02:37PM   21    during the time that you were selling drugs and the Schuele

02:37PM   22    Boys were selling drugs?

02:37PM   23          THE WITNESS:  Yes, Your Honor.

02:37PM   24          THE COURT:  What period of time were you talking

02:37PM   25    about 2011, '12 when?

02:37PM    1                    THE WITNESS:  2011.

02:37PM    2                    THE COURT:  2011.  You have seen this before?

02:37PM    3                    THE WITNESS:  Yes.

02:37PM    4                    THE COURT:  Where did you see it?

02:37PM    5                    THE WITNESS:  Family members.  My cousin keeping

02:37PM    6    tabs.

02:37PM    7                    THE COURT:  Your cousin?

02:38PM    8                    THE WITNESS:  Letorrance Travis.

02:38PM    9                    THE COURT:  Mr. Travis?  All right.  Go ahead.

02:38PM   10    BY MR. LENIHAN:

02:38PM   11    Q.  How about Government Exhibit 29?  Are there any names

02:38PM   12    that you recognize on Government Exhibit 29?

02:38PM   13    A.  Yes.

02:38PM   14    Q.  What names do you recognize on Government Exhibit 29?

02:38PM   15    A.  Got Ra, Wheeze, OP, Guch, Ant, and Brell.  That's all.

02:38PM   16                    THE DEFENDANT:  Your Honor, I object again.  That's

02:38PM   17    my -- you spell my nickname R-A-H.  He keeps saying R-A.  He's

02:39PM   18    not saying who Ra is.  He's can't say it's me because my name

02:39PM   19    is spelled R-A-H, not R-A.  He's testifying to Ra relating it

02:39PM   20    as me, Your Honor, and he's not the person that wrote this.

02:39PM   21    He don't even know who these people is.  He just testifying.

02:39PM   22    This wasn't even admitted at my first proceeding that I had in

02:39PM   23    this courtroom.  He never testified --

02:39PM   24                    THE COURT:  You can cross-examine him when you are up

02:39PM   25    for cross-examination.  Overruled.  Go ahead.

02:39PM   1   BY MR. LENIHAN:

02:39PM   2   Q.  Mr. James, what does Government 29 appear to be?

02:39PM   3   A.  Same.  Drugs.

02:39PM   4   Q.  Are you familiar with a drug ledger?

02:39PM   5   A.  Yes.

02:39PM   6   Q.  Why would somebody keep a drug ledger as part of being

02:39PM   7   involved in drug dealing?

02:39PM   8   A.  That way you don't lose who owe them money.  Dealing with

02:40PM   9   so many people, you forget.

02:40PM   10  Q.  Now, I want to ask you about -- do you remember pleading

02:40PM   11  guilty in October of 2016?

02:40PM   12  A.  Yes.

02:40PM   13  Q.  Do you remember what your sentencing guidelines range

02:40PM   14  was?

02:40PM   15  A.  It was -- I know it was 41.

02:40PM   16          THE COURT:  Remember pleading guilty to what?

02:40PM   17          MR. LENIHAN:  He testified earlier about the charge.

02:40PM   18          THE COURT:  Can you make a better foundation please?

02:40PM   19          MR. LENIHAN:  I will.

02:40PM   20  BY MR. LENIHAN:

02:40PM   21  Q.  Did you plead guilty before thi court in 2016?

02:40PM   22  A.  Yes.

02:40PM   23  Q.  To what charge?

02:40PM   24  A.  Conspiracy and intent to distribute cocaine, crack.

02:41PM   25  Q.  Do you remember what your guideline range was?

02:41PM 1   A.  Not the actual guideline range.  Sentencing was like, 41

02:41PM 2   to 51 months.

02:41PM 3          MR. LENIHAN:  No further questions, Your Honor.

02:41PM 4          THE DEFENDANT:  Your Honor before, I start

02:41PM 5   questioning with this witness can we excuse the jurors please

02:41PM 6   so we can address this issue?

02:41PM 7          THE COURT:  All right.  Ladies and gentlemen?

02:41PM 8   (The jury left the room at 2:42 p.m.)

03:31PM 9   (The witness entered the room at 3:30 p.m.)

03:31PM 10  (The jury entered the room at 3:31 p.m.)

03:31PM 11         THE COURT:  All right.  Mr. Arrington, you may cross-

03:31PM 12  examine, sir.

03:31PM 13

03:31PM 14                       CROSS-EXAMINATION

03:31PM 15

03:32PM 16  BY THE DEFENDANT:

03:32PM 17  Q.  Your plea agreement and possible sentence.  You pled

03:32PM 18  guilty to Count 1 of an indictment which charges a violation

03:32PM 19  of Title 21, USC, Section 846, conspiracy to possess with

03:32PM 20  intent to distribute and distribution of 500 grams or more of

03:32PM 21  cocaine, correct?

03:32PM 22  A.  Yes.

03:32PM 23  Q.  And that was up under a different indictment, not this

03:32PM 24  indictment, correct?

03:32PM 25  A.  What do you mean not this indictment?

03:32PM   1   Q.   That charge, those charges, was up under a different

03:32PM   2   indictment, not this indictment, correct?

03:32PM   3   A.   2014?

03:32PM   4   Q.   Yes.   But it's not this indictment, right?

03:32PM   5   A.   No.

03:32PM   6   Q.   Okay.   And that conspiracy you was charged with, was it

03:32PM   7   targeted telephone wiretap involved in that case?

03:32PM   8   A.   Yes.

03:32PM   9   Q.   Okay.   Do you know how long Special Agent Vanessa Paris

03:33PM   10   was investigating that case with wiretap surveillance?

03:33PM   11   A.   Not that I can remember right now.   No.

03:33PM   12   Q.   Okay.   In that plea for which the minimum possible

03:33PM   13   sentence is a term of imprisonment of five years and a

03:33PM   14   maximum possible sentence is a term of imprisonment of 40

03:33PM   15   years, correct?

03:33PM   16   A.   Yes.

03:33PM   17   Q.   That's what you was facing, right?

03:33PM   18   A.   Yes.

03:33PM   19   Q.   Okay.   And you had a supervised release condition up to

03:33PM   20   four years and up to life, correct?

03:33PM   21   A.   Yes.

03:33PM   22   Q.   And okay.   And then, in your cooperation agreement, it

03:33PM   23   was conditions that was a part of your supervised release

03:34PM   24   that you had to follow and you could not violate those terms,

03:34PM   25   correct?

03:34PM  1   A.  Violate the terms of?

03:34PM  2   Q.  Up under your cooperation agreement, it states as part of

03:34PM  3   the conditions of supervised release that you are not to

03:34PM  4   violate any terms of those conditions, correct, getting in

03:34PM  5   trouble, committing crimes?  A part of your agreement,

03:34PM  6   cooperation agreement, you was not to commit any crimes,

03:34PM  7   correct?

03:34PM  8   A.  That wasn't part of the agreement.

03:34PM  9   Q.  If I show you a copy of your agreement, would it refresh

03:34PM  10  your recollection?

03:34PM  11  A.  Yeah.

03:34PM  12      THE COURT:  Mr. Foti, what are you going to do now,

03:34PM  13  Mr. Arrington?

03:34PM  14      THE DEFENDANT:  Show him a copy of it.

03:34PM  15      THE COURT:  Mr. Foti, would you bring it over to --

03:34PM  16      MR. FOTI:  Yes.

03:35PM  17      THE COURT:  Is there an exhibit number on that?

03:35PM  18      MR. FOTI:  Government Exhibit 3502B and 3502J.

03:36PM  19      THE WITNESS:  I read it.

03:36PM  20      THE COURT:  You have had a chance to review those two

03:36PM  21  documents, sir?

03:36PM  22      THE WITNESS:  Yeah.  He didn't say what page.

03:36PM  23      THE COURT:  Don't tell me.  You reviewed it?

03:36PM  24      THE WITNESS:  Yes, sir.

03:36PM  25      THE COURT:  All right.  Mr. Arrington?

03:36PM   1   BY THE DEFENDANT:

03:36PM   2   Q.  Do 3502J refresh your recollection?

03:36PM   3   A.  Yeah, it doesn't say that on probation that you are not

03:37PM   4   supposed to get in trouble or anything.  It says up until the

03:37PM   5   date of sentencing.

03:37PM   6   Q.  Just want to -- on 3 -- I mean, 7C of the cooperation

03:37PM   7   agreement, 3502J on page 3 on top of the page?

03:37PM   8   A.  7C?

03:38PM   9   Q.  No, 7C.  Yes.

03:38PM  10   A.  It says it's a condition of this agreement that up

03:38PM  11   through the date of the defendant's sentence the defendant

03:38PM  12   shall commit no further crimes.  It's also condition of this

03:38PM  13   agreement that the defendant must --

03:38PM  14   Q.  You can stop right there.  You read, it, right?

03:38PM  15   A.  Mm-hmm.

03:38PM  16   Q.  So, up under this cooperation agreement, you was not to

03:38PM  17   commit any crimes while cooperating with the government,

03:38PM  18   correct?

03:38PM  19   A.  Up to the date of sentencing.

03:38PM  20   Q.  So, once you sentenced, you can commit crimes again?

03:38PM  21   It's okay to commit crimes again -- cooperate with the

03:38PM  22   government?

03:38PM  23   A.  No.  We talking about what's in the agreement.  That's

03:38PM  24   not in the agreement.

03:38PM  25   Q.  It's a question.  I'm asking you a question now.

03:38PM  1    A.  What is it?

03:38PM  2    Q.  Once you get sentenced and you cooperate with the

03:38PM  3    government, and you finish getting sentenced, once they

03:39PM  4    release you, it's okay to commit crimes again while still

03:39PM  5    cooperating with the government?  It's a yes or no question.

03:39PM  6    A.  Yes or no?  It's not okay to commit a crime.

03:39PM  7    Q.  So, you don't have license to break the law while you're

03:39PM  8    cooperating with the government, right?  You still got to

03:39PM  9    abide by the laws of the land, right?

03:39PM  10   A.  The way -- I would not want to be in any more trouble

03:39PM  11   but --

03:39PM  12   Q.  But that wasn't my question.  My question was, when you

03:39PM  13   cooperated with the government, once they release you or

03:39PM  14   sentence you, and you still up under the agreement with the

03:39PM  15   government, cooperation agreement.  The condition is, you is

03:39PM  16   not to commit any more crimes.  And if you commit a crime,

03:39PM  17   you got the let the government know if any crimes be

03:40PM  18   committed.  You have to inform the government of those

03:40PM  19   crimes, correct?

03:40PM  20   A.  Probation.

03:40PM  21   Q.  Probation?

03:40PM  22   A.  Probation.  That's -- the government say if I get in

03:40PM  23   trouble.

03:40PM  24   Q.  But you are still cooperating.  You are under the

03:40PM  25   cooperation agreement?

03:40PM  1    A.  Yes, I cooperated.

03:40PM  2    Q.  5K1, right?  So, once you in that cooperation agreement,

03:40PM  3    the condition is, you don't commit no crimes while working

03:40PM  4    with the government, correct?

03:40PM  5    A.  I was done already.

03:40PM  6    Q.  It's a yes or no question.

03:40PM  7    A.  When I was sentenced and everything.

03:40PM  8    Q.  So, it was okay to commit crimes while still in

03:40PM  9    agreement?  It's still okay to commit crimes?

03:40PM  10   A.  The agreement says it extends past sentencing, but it

03:40PM  11   says it right here, up through the date of sentencing, the

03:40PM  12   defendant shall not commit --

03:41PM  13         THE COURT:  Read what it says there, sir.  What does

03:41PM  14   it say?

03:41PM  15         THE WITNESS:  It says it's a condition of this

03:41PM  16   agreement that up through the date of defendant's sentencing,

03:41PM  17   the defendant shall commit no further crimes.

03:41PM  18   BY THE DEFENDANT:

03:41PM  19   Q.  So, is it true should the defendant be sentenced prior to

03:41PM  20   completion of the defendant's cooperation with the government

03:41PM  21   the defendant's obligation to comply with the cooperation

03:41PM  22   provisions of this agreement extends past sentencing?

03:41PM  23   A.  Yes.  It says it extends past sentencing.

03:41PM  24   Q.  So, is that telling you it's okay to still commit crimes

03:42PM  25   while in this agreement; because you committed a lot of

03:42PM  1   crimes here, and we need to understand, and the jury need to

03:42PM  2   know, and be able to take your testimony here today as

03:42PM  3   truthful.

03:42PM  4            MR. LENIHAN:  Objection.  He's testifying.

03:42PM  5            THE COURT:  Sustained.  The jury will disregard that

03:42PM  6   last comment.

03:42PM  7   BY THE DEFENDANT:

03:42PM  8   Q.  Okay.  On December 4th, 2017, you were sentenced to serve

03:42PM  9   3 years, 4 months, and 12 days to be followed by 4 years of

03:42PM  10  supervised release, correct?

03:42PM  11  A.  Yes.

03:42PM  12  Q.  A condition imposed includes drug and alcohol testing,

03:42PM  13  treatment and search of conditions, correct?

03:42PM  14  A.  Yes.

03:42PM  15  Q.  Okay.  Okay.  And on May 9th, 2019 you successfully

03:42PM  16  completed the re-entry court program for the Western District

03:43PM  17  of New York and your term of supervised release was reduced

03:43PM  18  [sic] by one year and a new expiration date was December 3rd,

03:43PM  19  2020, correct?

03:43PM  20  A.  Yes.

03:43PM  21  Q.  Okay.  This court signed this order on July 10th, 2019,

03:43PM  22  correct, for your -- for the one year -- to get for you -- to

03:43PM  23  accept the one-year from re-entry, the Court signed that

03:43PM  24  order on July 10, 2019, correct?

03:43PM  25  A.  Yes.  They signed it.

| | | |
|---|---|---|
| 03:43PM | 1 | Q.  And two days later, on July 12th, 2019, this court issued |
| 03:43PM | 2 | an arrest warrant for your arrest, correct? |
| 03:43PM | 3 | A.  Think about it.  I don't know about them putting no |
| 03:44PM | 4 | warrant out.  I had a violation and I was incarcerated. |
| 03:44PM | 5 | Q.  If I show you a copy of that report, would it refresh |
| 03:44PM | 6 | your recollection? |
| 03:44PM | 7 | A.  About a warrant? |
| 03:44PM | 8 | Q.  What you got arrested for two days later, after this |
| 03:44PM | 9 | court give you the year off of probation, you got arrested |
| 03:44PM | 10 | two days later for DWI? |
| 03:44PM | 11 | A.  Mm-hmm. |
| 03:44PM | 12 | Q.  Yes? |
| 03:44PM | 13 | A.  Yes. |
| 03:44PM | 14 | Q.  Two days after, you got arrested for DWI felony? |
| 03:44PM | 15 | A.  Yeah. |
| 03:44PM | 16 | Q.  Okay.  And you had a cooperation agreement in June of |
| 03:44PM | 17 | 2005, case number 05-CR-145.  You was facing a maximum term |
| 03:44PM | 18 | of imprisonment of 30 years back then too, correct? |
| 03:44PM | 19 | A.  If I remember, yes. |
| 03:44PM | 20 | Q.  You remember that? |
| 03:45PM | 21 | A.  Yeah, I remember.  I can't remember how much time it was |
| 03:45PM | 22 | but, yeah, I got in trouble. |
| 03:45PM | 23 | Q.  So, you don't remember being a maximum of 30 years? |
| 03:45PM | 24 | A.  Looking at 30 years prison time. |
| 03:45PM | 25 | Q.  If I show you your plea agreement, would that refresh |

JAMES -- BY THE DEFENDANT-- 09/12/2022

63

03:45PM 1 your recollection?

03:45PM 2 A.  No.  You don't have to show it to me.

03:45PM 3 Q.  So, you agree you was facing 30 years?

03:45PM 4 A.  Yes.

03:45PM 5 Q.  Okay.  On November 11th, 2003, you was also indicted for

03:45PM 6 a state possession of a weapon third degree, am armed felon.

03:45PM 7 You possessed a loaded firearm, a 380 caliber pistol,

03:45PM 8 correct?

03:45PM 9 A.  Yes.

03:45PM 10 Q.  Okay.  So, now, let me fast forward back to August 26,

03:45PM 11 2019.  You was in jail for the DWI, correct?

03:46PM 12 A.  Yes.

03:46PM 13 Q.  And that was for driving while intoxicated and possession

03:46PM 14 of alcohol in a motor vehicle, correct?

03:46PM 15 A.  Yes.

03:46PM 16 Q.  And okay.  So, while you in jail, you write this court a

03:46PM 17 letter because you are a changed man now and you want this

03:46PM 18 court to cut you some slack because you learned your lesson

03:46PM 19 and you are ready to do the right thing.  So, in this letter,

03:46PM 20 you requested to be released, right?

03:46PM 21 A.  Yes.

03:46PM 22 Q.  Okay.  You remember that letter you wrote the Court?

03:46PM 23 A.  Yes.  I can remember something like that.

03:46PM 24 Q.  And you said you was a changed man?

03:46PM 25 A.  Yes.

| | | |
|---|---|---|
| 03:46PM | 1 | Q.  That letter was a lie because soon as you released from |
| 03:46PM | 2 | jail on October 18th, 2021, you was arrested for unlawfully |
| 03:47PM | 3 | fleeing from a police officer in a motor vehicle third |
| 03:47PM | 4 | degree, reckless driver, and aggravated unlicensed operation, |
| 03:47PM | 5 | correct? |
| 03:47PM | 6 | MR. LENIHAN:  Objection. |
| 03:47PM | 7 | THE WITNESS:  No. |
| 03:47PM | 8 | THE COURT:  Sustained. |
| 03:47PM | 9 | BY THE DEFENDANT: |
| 03:47PM | 10 | Q.  So, you didn't get arrested? |
| 03:47PM | 11 | MR. LENIHAN:  Objection. |
| 03:47PM | 12 | THE COURT:  Sustained. |
| 03:47PM | 13 | BY THE DEFENDANT: |
| 03:47PM | 14 | Q.  How about on August 2nd, 2012 at 3:26 p.m., you |
| 03:47PM | 15 | threatened to kill Shaniqua Devost and a juvenile with a gun |
| 03:47PM | 16 | and at one point, almost hitting Ms. Devost and the juvenile |
| 03:47PM | 17 | while threatening to kill them.  Witness 1 and Witness 2 |
| 03:47PM | 18 | signed statements supporting the victim's narrative.  You |
| 03:47PM | 19 | remember that incident? |
| 03:47PM | 20 | MR. LENIHAN:  Objection, Judge.  This isn't what we |
| 03:47PM | 21 | discussed. |
| 03:47PM | 22 | THE COURT:  Sustained. |
| 03:47PM | 23 | BY THE DEFENDANT: |
| 03:48PM | 24 | Q.  Was you charged with this crime on August 2nd, 2022? |
| 03:48PM | 25 | A.  Yes.  I was charged with a crime. |

03:48PM 1  Q.  You was charged with threatening Shaniqua Devost and the

03:48PM 2  juvenile correct?

03:48PM 3          MR. LENIHAN:  Objection.

03:48PM 4          THE COURT:  Sustained.

03:48PM 5  BY THE DEFENDANT:

03:48PM 6  Q.  So, you remember being -- endangering the welfare of a

03:48PM 7  child that day?

03:48PM 8          MR. LENIHAN:  Objection.

03:48PM 9          THE COURT:  Sustained.

03:48PM 10 BY THE DEFENDANT:

03:48PM 11 Q.  Was you just recently -- did you get caught with another

03:48PM 12 weapon recently?

03:48PM 13 A.  No.

03:48PM 14 Q.  You never got caught with a weapon recently?

03:48PM 15 A.  No.

03:48PM 16 Q.  You don't have any knowledge of that?

03:48PM 17 A.  No.

03:48PM 18 Q.  So, you don't know you have a warrant for your arrest

03:49PM 19 right now?

03:49PM 20 A.  I have a warrant for my arrest?

03:49PM 21 Q.  Yes.

03:49PM 22 A.  No.

03:49PM 23 Q.  Do you know about that indictment?

03:49PM 24 A.  No.

03:49PM 25 Q.  You discussed the proceeding?

| | | |
|---|---|---|
| 03:49PM | 1 | A.  No. |
| 03:49PM | 2 | Q.  Do you know about this indictment, you never got caught |
| 03:49PM | 3 | with a gun, and you don't know about a warrant that you have, |
| 03:49PM | 4 | a warrant for your arrest? |
| 03:49PM | 5 | MR. LENIHAN:  Objection. |
| 03:49PM | 6 | THE COURT:  Sustained. |
| 03:49PM | 7 | THE WITNESS:  No. |
| 03:49PM | 8 | BY THE DEFENDANT: |
| 03:49PM | 9 | Q.  Nothing you testified today is true.  The Grand Jury |
| 03:49PM | 10 | testimony says something totally different from the trial |
| 03:49PM | 11 | testimony you gave here today. |
| 03:49PM | 12 | MR. LENIHAN:  Objection. |
| 03:49PM | 13 | THE COURT:  Sustained. |
| 03:49PM | 14 | BY THE DEFENDANT: |
| 03:49PM | 15 | Q.  You testified being a robbery victim in the government's |
| 03:50PM | 16 | direct earlier, correct? |
| 03:50PM | 17 | A.  Yes. |
| 03:50PM | 18 | Q.  You was a robbery victim, correct? |
| 03:50PM | 19 | A.  Yes. |
| 03:50PM | 20 | Q.  And you testified that you was a robbery victim, went to |
| 03:50PM | 21 | go buy some weed, marijuana, from this guy Musa and he robbed |
| 03:50PM | 22 | you for $1,500.  Now, you told the government he robbed you |
| 03:50PM | 23 | for three pounds of marijuana today, correct?  So, it was |
| 03:50PM | 24 | $3,300 of marijuana, which is three pounds -- |
| 03:50PM | 25 | MR. LENIHAN:  Objection. |

03:50PM    1            THE COURT:  Sustained.

03:50PM    2    BY THE DEFENDANT:

03:50PM    3    Q.  So, when the government asked you that you was a robbery

03:50PM    4    victim, you was selling somebody some marijuana; is that

03:50PM    5    true?

03:50PM    6    A.  Yes.  I was going to sell him some marijuana.

03:50PM    7    Q.  So, your testimony today is, you were selling him some

03:51PM    8    marijuana, and he robbed you for three pounds of marijuana.

03:51PM    9    That was your testimony you gave today in front of the jury

03:51PM   10    correct?

03:51PM   11            MR. LENIHAN:  Objection.  He never testified to that.

03:51PM   12            THE COURT:  That will be up to the jury to recall

03:51PM   13    whether what was testified to or not.

03:51PM   14            THE DEFENDANT:  Your Honor, can I get a readback when

03:51PM   15    he was asked this question, Your Honor?

03:51PM   16            THE COURT:  No, you cannot.

03:51PM   17    BY THE DEFENDANT:

03:52PM   18    Q.  So, when the government ask you was you a robbery victim

03:52PM   19    today, you say you was robbed for marijuana, correct?

03:52PM   20    A.  Ask me -- yes.

03:52PM   21    Q.  How much marijuana did you get robbed for?

03:52PM   22    A.  Three pounds.

03:52PM   23    Q.  Three pounds of marijuana you got robbed for?  That

03:52PM   24    testimony totally changed from the Grand Jury transcript

03:52PM   25    testimony that you gave at the Grand Jury, correct?  You

03:52PM   1   stated something totally different at the Grand Jury, right?

03:52PM   2   A.  Can't recall.

03:52PM   3   Q.  If I show you your Grand Jury testimony, would that

03:53PM   4   refresh your recollection?

03:53PM   5   A.  Yes.  Show it to me.

03:53PM   6         THE DEFENDANT:  Your Honor, is it okay for me to show

03:53PM   7   the witness his Grand Jury testimony?

03:53PM   8         THE COURT:  Yes, it is.

03:53PM   9         MR. FOTI:  This is 3502A.

03:54PM  10   BY THE DEFENDANT:

03:54PM  11   Q.  It start on page 18, line 25.  At the bottom, line 25, it

03:55PM  12   starts --

03:55PM  13   A.  It says you were robbed so --

03:55PM  14   Q.  Okay.  That's --

03:55PM  15   A.  What I paid for the actual.

03:55PM  16   Q.  It start again on page 19, from one to three, and just

03:55PM  17   read it to yourself and let me know when you finish.

03:55PM  18   A.  I'm ready.

03:55PM  19   Q.  So, today on direct from the government, he asked you

03:56PM  20   about a robbery, correct?

03:56PM  21   A.  Yes.

03:56PM  22   Q.  And you stated to the government that you was robbed of

03:56PM  23   what?

03:56PM  24   A.  Robbed of three pounds of marijuana.

03:56PM  25   Q.  Three pounds of marijuana, right?

03:56PM   1   A.   Yeah.

03:56PM   2   Q.   Okay.  Your Grand Jury testimony says something totally

03:56PM   3   different, correct?

03:56PM   4   A.   That's what I paid for it.

03:56PM   5   Q.   No, not the answer --

03:56PM   6   A.   It says something different.

03:56PM   7   Q.   The Grand Jury transcript said you say you was robbed,

03:56PM   8   correct?  That was the question.  Your answer was yes.

03:56PM   9   Question.  What was you robbed over?  Your answer was, a guy

03:56PM  10   robbed me for like, $1,500, a guy named Musa.  Did you know

03:56PM  11   this individual?  Not really.  He from Spring Street.

03:56PM  12        There's nowhere in this testimony you said you got robbed

03:56PM  13   for three pounds of marijuana.  So, that was a lie, correct?

03:57PM  14   You sat here and lied to the jurors about you being a robbery

03:57PM  15   victim, and you got robbed for three pounds, $3,300 worth of

03:57PM  16   marijuana, but that wasn't true, correct?

03:57PM  17   A.   No.

03:57PM  18   Q.   You got robbed for $1,500?

03:57PM  19   A.   That's what a paid for three pounds.

03:57PM  20   Q.   But that wasn't the question he asked you.  You

03:57PM  21   specifically told them you got robbed for three pounds of

03:57PM  22   marijuana which was $3,300 worth of?

03:57PM  23   A.   Street value.

03:57PM  24   Q.   Money.  Right.  You told the Grand Jury you got robbed

03:57PM  25   for $1,500.  That's not true, correct?  It's a yes or no

03:57PM  1  answer.  You saying two different stories.

03:57PM  2          MR. LENIHAN:  Objection.  He not allowing the

03:57PM  3  witness to answer the question.

03:57PM  4          THE COURT:  You can answer the question, sir.  Are

03:57PM  5  you talking about two different robberies or what?

03:57PM  6          THE WITNESS:  The same robbery.  It was $1,500 I

03:57PM  7  spent in cash for the marijuana, but that was robbery for

03:58PM  8  three pounds.  That's $3,300.

03:58PM  9          THE DEFENDANT:  That wasn't the question.

03:58PM 10          THE COURT:  When he's speaking, you do not ask

03:58PM 11  another question.  Finish your answer, sir.

03:58PM 12          THE WITNESS:  It was -- the money that I spent was

03:58PM 13  $1,500 for the three pounds.  The three pounds had a street

03:58PM 14  value of $3,300.

03:58PM 15          THE DEFENDANT:  But that wasn't the question, Your

03:58PM 16  Honor.  The government asked him --

03:58PM 17          THE COURT:  No speeches, just ask the next question,

03:58PM 18  please.

03:58PM 19  BY THE DEFENDANT:

03:58PM 20  Q.  So, that testimony was false today, correct?

03:58PM 21          MR. LENIHAN:  Objection.

03:58PM 22          THE COURT:  Sustained.

03:58PM 23  BY THE DEFENDANT:

03:59PM 24  Q.  So, where you testified today that you was robbed for

03:59PM 25  marijuana --

03:59PM   1              THE COURT:  All right.  We've gone through that.  Go

03:59PM   2   to the next area.  We have already exhausted that enough.

03:59PM   3              THE DEFENDANT:  He lied, Your Honor.  That's what I'm

03:59PM   4   trying to get out.

03:59PM   5              MR. LENIHAN:  Objection.

03:59PM   6              THE COURT:  You can ask the next question or am I

03:59PM   7   going to stop the cross-examination?

03:59PM   8   BY THE DEFENDANT:

03:59PM   9   Q.  You testified here today after this robbery I offered you

04:00PM  10   my assistance for $5,000 to take care of a person for you for

04:00PM  11   a family price.  That was false, right?

04:00PM  12   A.  No.

04:00PM  13   Q.  So, if Torrance come in here and testify he never heard

04:00PM  14   this, that mean you lied to the Grand Jury, correct?

04:00PM  15              MR. LENIHAN:  Objection.

04:00PM  16              THE COURT:  That is an improper question.

04:00PM  17   BY THE DEFENDANT:

04:00PM  18   Q.  So, if Letorrance Travis come in here tomorrow --

04:00PM  19              THE COURT:  You can't ask a question about what an

04:00PM  20   another witness would testify to.  Mr. Lenihan, are you

04:00PM  21   objecting to this or not?

04:00PM  22              MR. LENIHAN:  I did.  I objected and then he asked

04:00PM  23   the same question previously and I objected.

04:00PM  24              THE COURT:  All right.

04:00PM  25

| | | |
|---|---|---|
| 04:00PM | 1 | BY THE DEFENDANT: |
| 04:00PM | 2 | Q.  Me and you never got along or like each other, correct? |
| 04:00PM | 3 | A.  No.  We spoke, we never really cool, hang, nothing like |
| 04:01PM | 4 | that. |
| 04:01PM | 5 | Q.  Me and you never got along, correct?  We never got along, |
| 04:01PM | 6 | we never chilled, talked, did any business together, correct? |
| 04:01PM | 7 | A.  We don't do no business.  We don't talk.  We don't hang |
| 04:01PM | 8 | with each other. |
| 04:01PM | 9 | Q.  Me and you never dealt any drugs together or had an |
| 04:01PM | 10 | agreement together, right? |
| 04:01PM | 11 | A.  No we never dealt drugs with each other. |
| 04:01PM | 12 | Q.  Okay.  You not charged on this indictment as a |
| 04:01PM | 13 | coconspirator, correct? |
| 04:01PM | 14 | A.  No. |
| 04:01PM | 15 | Q.  You said this girl that you -- your girlfriend yours that |
| 04:02PM | 16 | you met on Carl Street, you said she witnessed Matt murder, |
| 04:02PM | 17 | but did any law enforcement ever get in contact with this |
| 04:02PM | 18 | woman to collaborate your story that you talked to this |
| 04:02PM | 19 | female or she talked to allegedly me and a couple guys? |
| 04:02PM | 20 | MR. LENIHAN:  Objection.  Speculation. |
| 04:02PM | 21 | THE DEFENDANT:  Did any officers to talk -- |
| 04:02PM | 22 | THE COURT:  Do you understand the question, sir? |
| 04:02PM | 23 | THE WITNESS:  Oh, I didn't know I can talk.  I'm |
| 04:02PM | 24 | sorry. |
| 04:02PM | 25 | |

04:02PM  1  BY THE DEFENDANT:

04:02PM  2  Q.  This female friend you said witnessed Matt murder on Carl

04:02PM  3  Street, did any law enforcement or any agents that you told

04:02PM  4  this testimony to, that this girl existed, did anybody go

04:03PM  5  follow up and see if this girl ever existed or did they ever

04:03PM  6  talk to this girl?

04:03PM  7  A.  She had moved at the time, and I told them where she

04:03PM  8  stayed at, and I guess she moved from there, too.  So, no.

04:03PM  9  The answer --

04:03PM  10  Q.  So, this girl don't exist?

04:03PM  11  A.  They never spoke with her.

04:03PM  12  Q.  They never spoke -- they never found this woman you was

04:03PM  13  talking about?

04:03PM  14  A.  No.

04:03PM  15  Q.  Did you witness or did you go over there when you

04:03PM  16  allegedly said that you told us that this girl had

04:03PM  17  information?  Did you go over there?  You know for sure we

04:03PM  18  went over there?

04:03PM  19  A.  To speak with her?

04:03PM  20  Q.  Yes.

04:03PM  21  A.  Yes.

04:03PM  22  Q.  You seen us go over there?

04:03PM  23  A.  I didn't see you guys go over there.  I went over there.

04:03PM  24  Q.  Did you see me over there talking to her?

04:03PM  25  A.  No.  I didn't see you guys go over there.

| | | |
|---|---|---|
| 04:03PM | 1 | Q.  Okay.  So, you don't know if -- |
| 04:03PM | 2 | A.  No.  I spoke with her. |
| 04:03PM | 3 | Q.  But the government never spoke to this girl.  We don't |
| 04:03PM | 4 | even know who this girl is.  What's her name?  What's her |
| 04:03PM | 5 | name? |
| 04:03PM | 6 | A.  Chantel. |
| 04:03PM | 7 | Q.  And the government never found this woman to come in here |
| 04:04PM | 8 | to collaborate what you saying about this meeting taking |
| 04:04PM | 9 | place? |
| 04:04PM | 10 | A.  No.  The government never found her. |
| 04:04PM | 11 | Q.  Did you remember being interviewed by agents and you was |
| 04:04PM | 12 | asked questions and you stated that Tremaine Jacobs a/k/a |
| 04:04PM | 13 | Teeter told you that -- |
| 04:04PM | 14 |         MR. LENIHAN:  Objection.  Hearsay. |
| 04:04PM | 15 |         THE COURT:  Sustained. |
| 04:04PM | 16 | BY THE DEFENDANT: |
| 04:04PM | 17 | Q.  You testified that you was in the drug trade with all |
| 04:04PM | 18 | individuals in 2012 when Matt died, correct? |
| 04:05PM | 19 | A.  Yes. |
| 04:05PM | 20 | Q.  You remember that correct?  Okay.  But that was a lie, |
| 04:05PM | 21 | correct? |
| 04:05PM | 22 | A.  What was a lie about? |
| 04:05PM | 23 | Q.  If I show you your Grand Jury testimony, would that |
| 04:05PM | 24 | refresh your recollection? |
| 04:05PM | 25 | A.  Yeah.  You can show it to me. |

| | | |
|---|---|---|
| 04:06PM | 1 | Q. Page 36, from 1 to 25? |
| 04:07PM | 2 | A. I read it. |
| 04:07PM | 3 | Q. That refresh your recollection? |
| 04:08PM | 4 | A. Mm-hmm. |
| 04:08PM | 5 | Q. So, when Torrance went to jail in 2011, and he got |
| 04:08PM | 6 | popped -- |
| 04:08PM | 7 | THE COURT: Did it refresh your recollection? |
| 04:08PM | 8 | THE WITNESS: Yes. I said yes, Your Honor. I'm |
| 04:08PM | 9 | sorry. |
| 04:08PM | 10 | THE COURT: All right. The question was asked. You |
| 04:08PM | 11 | testified that you were in the drug trade with all the |
| 04:08PM | 12 | individuals in 2012 what Matt died, correct? |
| 04:08PM | 13 | THE WITNESS: In 2011. |
| 04:08PM | 14 | THE COURT: Your answer was? |
| 04:08PM | 15 | THE WITNESS: In 2011. |
| 04:08PM | 16 | THE DEFENDANT: No, it was '12, Your Honor. |
| 04:08PM | 17 | THE COURT: It's what the -- you're not testifying. |
| 04:08PM | 18 | It's the witness. So, that was the question. Do you remember |
| 04:08PM | 19 | that, correct? |
| 04:08PM | 20 | THE WITNESS: Yes. |
| 04:08PM | 21 | THE COURT: Okay. But then he was asking that was a |
| 04:08PM | 22 | lie. |
| 04:10PM | 23 | (The record was read by the reporter.) |
| 04:10PM | 24 | THE COURT: What was your answer? |
| 04:10PM | 25 | THE WITNESS: She said when Matt died right, Your |

| | | |
|---|---|---|
| 04:10PM | 1 | Honor?  We talking about 2012 when Matt passed away. |
| 04:10PM | 2 | THE COURT:  Yes.  All right. |
| 04:10PM | 3 | THE WITNESS:  When my cousin got caught in 2011, |
| 04:10PM | 4 | there was no drugs.  So -- |
| 04:10PM | 5 | THE DEFENDANT:  That wasn't my question. |
| 04:10PM | 6 | THE COURT:  The question was that you were involved |
| 04:10PM | 7 | in drug activity at that time and then Mr. Arrington asked you |
| 04:10PM | 8 | whether that was a lie.  Do you remember that? |
| 04:10PM | 9 | THE WITNESS:  Yes, now that you saying it. |
| 04:10PM | 10 | THE COURT:  Okay.  And you looked at the document. |
| 04:10PM | 11 | That refreshed your memory.  And what's your answer?  Is that |
| 04:10PM | 12 | a lie? |
| 04:10PM | 13 | THE WITNESS:  No. |
| 04:10PM | 14 | THE COURT:  That you were involved in drug activity? |
| 04:10PM | 15 | THE WITNESS:  Yes.  I was involved in drug activity |
| 04:11PM | 16 | Your Honor but in 2012, it slowed up. |
| 04:11PM | 17 | THE COURT:  So, it's the year you're concerned about. |
| 04:11PM | 18 | THE WITNESS:  Yeah.  That's the thing.  Other than |
| 04:11PM | 19 | that, that's the thing. |
| 04:11PM | 20 | THE DEFENDANT:  Your Honor, can I finish the question |
| 04:11PM | 21 | please? |
| 04:11PM | 22 | THE COURT:  Yeah.  Right now, I am -- so it was a lie |
| 04:11PM | 23 | or it's not a lie? |
| 04:11PM | 24 | THE WITNESS:  No.  That's not a lie. |
| 04:11PM | 25 | THE COURT:  All right. |

04:11PM   1   BY THE DEFENDANT:

04:11PM   2   Q.  Question.  Did he give you 62 grams or before or after he

04:11PM   3   was indicted.  Answer.  That was before.

04:11PM   4          THE COURT:  Just a second.

04:11PM   5   Q.  He was indicted.

04:11PM   6          MR. LENIHAN:  I don't know who he is?

04:11PM   7          THE COURT:  Wait a minute.

04:11PM   8          THE DEFENDANT:  Letorrance Travis.

04:12PM   9          THE COURT:  Ask it again.

04:12PM  10   BY THE DEFENDANT:

04:12PM  11   Q.  I stated it was page 36, 1 to 25.  I'm starting from line

04:12PM  12   3.  Question --

04:13PM  13          THE COURT:  Wait a minute, wait a minute.  Ladies and

04:13PM  14   gentlemen, we're going to take a break.  I'm going to send you

04:13PM  15   home.

04:13PM  16      Do not discuss the case with anyone.  Do not discuss it

04:13PM  17   among yourselves.  And I really -- do not discuss this case

04:13PM  18   during the recess with among yourselves.  If anyone talks

04:13PM  19   about this case, I want to know about it from this point

04:13PM  20   forward.  You're not to talk about the case.  Does everyone

04:13PM  21   understand that?  It is critical to this trial that you not

04:13PM  22   talk about this case under any circumstances until the trial

04:13PM  23   is over, and the case is given to you for your deliberation

04:13PM  24   and verdict.

04:13PM  25      Everyone understand that?  I don't want to say this again.

04:13PM  1   I have said this many, many times and it's critical to a fair

04:13PM  2   trial that you not discuss this case among yourselves.  You

04:13PM  3   are reminded not to mingle with the lawyers or the parties.

04:13PM  4   Do not do any research.  Keep an open mind.  Do not form any

04:14PM  5   opinion or judgment until you have heard all the evidence, you

04:14PM  6   have heard the summations, and I charge you on the law and you

04:14PM  7   begin your deliberations.  Okay.  Have a nice evening.  We'll

04:14PM  8   see you tomorrow morning.  What time is tomorrow?

04:14PM  9           THE CLERK:  Nine o'clock tomorrow.

04:14PM  10          THE COURT:  All right, folks.  Enjoy the evening,

04:14PM  11  folks.  See you tomorrow morning.

04:14PM  12  (The jury left the room at 4:15 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1            *     *     *     *     *     *     *

2

3            I certify that the foregoing is a

4      correct transcription of the proceedings

5      recorded by me in this matter.

6

7

8

9                              s/ Megan E. Pelka, RPR

10                             Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25