1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

2

UNITED STATES OF AMERICA,    )

3                                 ) Case No. 1:15-CR-00033-3
                                )               (RJA)(HBS)

4                Plaintiff,   )
                                )

5 vs.                       ) September, 2022
                                ) 9:29 a.m.

6 RODERICK ARRINGTON,        )
                                )

7               Defendant.   )

8

**TRANSCRIPT OF CONTINUATION OF**
**JURY TRIAL TESTIMONY OF JEROME GRANT**

9

**BEFORE THE HONORABLE RICHARD J. ARCARA**
**SENIOR UNITED STATES DISTRICT JUDGE**

10

11 <u>APPEARANCES:</u>

12 For the Plaintiff:   TRINI E. ROSS, ESQ.
                         UNITED STATES ATTORNEY

13                          BY:  JEREMIAH LENIHAN, ESQ.
                         ASSISTANT UNITED STATES ATTORNEY

14                          138 Delaware Avenue
                         Buffalo, NY 14202

15                          U.S. DEPARTMENT OF JUSTICE

16                          ORGANIZED CRIME SECTION
                         BY:  JULIE ANN FINOCCHIARO, ESQ.

17                          1301 New York Avenue, NW
                         Suite 7th Floor

18                          Washington, DC 20530

19 For the Defendant:   RODERICK ARRINGTON, PRO SE

20 Stand-by counsel:    MARK A. FOTI, ESQ.
                         16 W. Main Street, Suite 100

21                          Rochester, NY 14614

22 Court Reporter:      MEGAN E. PELKA, RPR
                         Robert H. Jackson US Courthouse

23                          2 Niagara Square
                         Buffalo, NY 14202

24                          (716) 229-0880

25

| | | |
|---|---|---|
| 09:29AM | 1 | (The jury entered the room at 9:29 a.m.) |
| 09:30AM | 2 | THE COURT:  All right, ladies and gentlemen.  We will |
| 09:30AM | 3 | continue.  All right.  Mr. Grant, put him on the stand, |
| 09:30AM | 4 | please. |
| 09:30AM | 5 | MR. LENIHAN:  Yes. |
| 09:31AM | 6 | THE COURT:  Mr. Grant, I remind you you are still |
| 09:31AM | 7 | under oath, sir. |
| 09:31AM | 8 | THE WITNESS:  Yeah. |
| 09:31AM | 9 | THE COURT:  Okay.  Mr. Arrington. |
| 09:31AM | 10 | |
| 09:31AM | 11 | CROSS-EXAMINATION |
| 09:31AM | 12 | |
| 09:31AM | 13 | BY THE DEFENDANT: |
| 09:31AM | 14 | Q.  Is it true when you was housed at Allegany County Jail, |
| 09:31AM | 15 | is it true that the federal agents was coming to the jail to |
| 09:32AM | 16 | get you to transfer you to the federal building to testify |
| 09:32AM | 17 | before the Grand Jury? |
| 09:32AM | 18 | A.  Yeah.  They came and picked me up one time. |
| 09:32AM | 19 | Q.  Is it true during the drive, the one and a half hour |
| 09:32AM | 20 | drive from Allegany County Jail, is it true that the agents |
| 09:32AM | 21 | would buy you stuff on the way to the courthouse and tell you |
| 09:32AM | 22 | how much or what to say when you get to the Grand Jury room, |
| 09:32AM | 23 | you testify in front of the Grand Jury? |
| 09:32AM | 24 | A.  I don't remember that. |
| 09:32AM | 25 | Q.  So, you testimony here in front of the jury is that the |

| | | |
|---|---|---|
| 09:32AM | 1 | drive from Allegany County Jail to the federal court |
| 09:33AM | 2 | building, that agents never once told you what they want you |
| 09:33AM | 3 | to say to the Grand Jury or how they profess they dislikes |
| 09:33AM | 4 | for Mr. Hicks and how they wanted this case to stick to |
| 09:33AM | 5 | Mr. Hicks? |
| 09:33AM | 6 | A.  I didn't say -- I said I didn't remember. |
| 09:33AM | 7 | Q.  You say you don't remember? |
| 09:33AM | 8 | A.  Yeah. |
| 09:33AM | 9 | Q.  Okay.  If I show you a letter, would that refresh your |
| 09:33AM | 10 | recollection of the events that took place? |
| 09:33AM | 11 | A.  Possibly. |
| 09:33AM | 12 |         THE DEFENDANT:  Your Honor, can I show the witness |
| 09:34AM | 13 | Government Exhibit 3506UU? |
| 09:34AM | 14 | BY THE DEFENDANT: |
| 09:34AM | 15 | Q.  Do you remember that letter you wrote to Aaron Hicks? |
| 09:35AM | 16 | A.  Yeah. |
| 09:35AM | 17 | Q.  That's your handwriting.  That's the way that you sent it |
| 09:35AM | 18 | to Aaron Hicks, right; same condition beside being copied? |
| 09:35AM | 19 | A.  Yeah, because I can't read some of these things that's on |
| 09:35AM | 20 | here, but it looks -- it's definitely my handwriting. |
| 09:35AM | 21 | Q.  And these was questions you sent to Aaron Hicks for his |
| 09:35AM | 22 | lawyer to ask you -- these questions so you can help Aaron |
| 09:35AM | 23 | Hicks out in this case, correct? |
| 09:35AM | 24 | A.  If that's what you say this is for.  Let me see. |
| 09:35AM | 25 | Q.  Can you read at the top what it say at the top? |

| | | |
|---|---|---|
| 09:35AM | 1 | THE COURT:  Don't read the document.  Just look at |
| 09:35AM | 2 | it. |
| 09:35AM | 3 | THE WITNESS:  Yeah.  I can see what it say a little |
| 09:36AM | 4 | bit.  It's a bad copy. |
| 09:36AM | 5 | THE COURT:  Just read it to yourself. |
| 09:36AM | 6 | THE WITNESS:  Yeah. |
| 09:36AM | 7 | BY THE DEFENDANT: |
| 09:36AM | 8 | Q.  And it says, questions from my lawyer to ask Grant at |
| 09:36AM | 9 | trial, correct? |
| 09:36AM | 10 | A.  Yeah.  That's what it look like it say. |
| 09:36AM | 11 | Q.  And this letter was to assist Aaron Hicks through his |
| 09:36AM | 12 | first proceeding, not the government, correct? |
| 09:36AM | 13 | A.  Yeah.  It looks that way. |
| 09:36AM | 14 | Q.  Okay.  And do you remember also stating that you have the |
| 09:36AM | 15 | ace in the hole for Aaron Hicks to win, and you stated that |
| 09:36AM | 16 | you do your best and you do your best very good.  Can you |
| 09:36AM | 17 | explain to the jury what that mean? |
| 09:36AM | 18 | A.  I don't even remember saying that. |
| 09:37AM | 19 | THE DEFENDANT:  Your Honor, can I admit Exhibit |
| 09:37AM | 20 | 3506VV to refresh the witness recollection? |
| 09:37AM | 21 | THE COURT:  Look at it.  Does that refresh your |
| 09:37AM | 22 | recollection, sir? |
| 09:37AM | 23 | THE DEFENDANT:  No.  It's another letter, Your Honor, |
| 09:37AM | 24 | 3506VV. |
| 09:37AM | 25 | THE COURT:  All right.  Show it to him. |

GRANT -- BY THE DEFENDANT -- 09/20/2022

4

09:37AM  1   BY THE DEFENDANT:

09:37AM  2   Q.  Is that the letter you sent to Aaron Hicks?  Besides it

09:38AM  3   being copied, is this the same letter you sent to Aaron Hicks

09:38AM  4   that day?

09:38AM  5   A.  I don't know when I sent it, but I see my name on the

09:38AM  6   envelope.  It looks like my handwriting.

09:38AM  7   Q.  It's your handwriting, correct?

09:38AM  8   A.  It looks like it.

09:38AM  9   Q.  So, when you stated that you do what you do the best, and

09:38AM  10  you do it very good, can you explain to the jurors what that

09:38AM  11  mean when you sent this letter to Aaron Hicks?

09:38AM  12  A.  To be honest, I don't even really remember exactly what

09:38AM  13  my thought process was during that time.  So, I really

09:38AM  14  wouldn't be able to explain it to them because I don't

09:38AM  15  remember my thought process.

09:38AM  16  Q.  If you read the letter, it might refresh your

09:38AM  17  recollection.  Just take a minute.  Let me know when you

09:38AM  18  finished reading it.

09:38AM  19  A.  I don't think it is, though, because I'm looking at it.

09:38AM  20  I was reading it.  Yeah.  Yeah.  I can't say it do refresh my

09:39AM  21  recollection.  It's my handwriting.  I don't necessarily

09:39AM  22  remember.

09:39AM  23  Q.  So, when you state in the letter that you will make sure

09:39AM  24  Hicks diddy bop out that motherfucker.  Can you explain to

09:39AM  25  the jury what that mean?

09:39AM  1  A.  Again, I don't really have no recollection.  I don't

09:39AM  2  really remember too much about this letter.  So, if I explain

09:39AM  3  anything, I would be inaccurate.

09:39AM  4  Q.  So, is it true that any letters you wrote Aaron Hicks,

09:39AM  5  you remember none of them?  You authored them, you wrote

09:39AM  6  them, you sent them to this individual stating these things,

09:39AM  7  but you don't have no recollection of what these letters

09:39AM  8  mean?

09:39AM  9  A.  No.  That's not true that I don't remember any of them.

09:39AM  10  I might remember some of them, but I don't remember all of

09:39AM  11  them.

09:39AM  12  Q.  You also stated that you don't know how shit going to end

09:40AM  13  for other niggas, but you great.  What do that mean?

09:40AM  14  A.  Again, I don't know.

09:40AM  15  Q.  You don't know what that means --

09:40AM  16  A.  I don't necessarily remember writing this letter, but

09:40AM  17  it's my handwriting.  I do know that.

09:40AM  18          THE DEFENDANT:  Your Honor, would I be able to admit

09:40AM  19  those letters inside evidence?

09:40AM  20          MR. LENIHAN:  Objection.

09:40AM  21          THE COURT:  Sustained.

09:40AM  22  BY THE DEFENDANT:

09:40AM  23  Q.  Do you remember you also stated that you have some

09:40AM  24  very -- you are trying to broker a deal with some information

09:40AM  25  you have, and you wanted to clear your probation and be

| | | |
|---|---|---|
| 09:40AM | 1 | released on bail, and you stated that one good deed deserves |
| 09:40AM | 2 | another good deed.  And the day you get this information, you |
| 09:40AM | 3 | want to be released that same day.  Do you remember that |
| 09:40AM | 4 | letter?  Remember -- will you explain to the jury what that |
| 09:41AM | 5 | mean? |
| 09:41AM | 6 | A.  I don't remember it. |
| 09:41AM | 7 | THE DEFENDANT:  Your Honor, can I admit -- show the |
| 09:41AM | 8 | defendant Exhibit 3506R to refresh his recollection? |
| 09:41AM | 9 | THE COURT:  He says it doesn't refresh his |
| 09:41AM | 10 | recollection. |
| 09:41AM | 11 | THE DEFENDANT:  No, it's another letter Your Honor. |
| 09:41AM | 12 | THE COURT:  Mr. Lenihan, do you have any objection? |
| 09:41AM | 13 | MR. LENIHAN:  Not for refreshing recollection. |
| 09:42AM | 14 | THE WITNESS:  Yeah, this definitely my handwriting |
| 09:42AM | 15 | but, again, this was so long ago. |
| 09:42AM | 16 | BY THE DEFENDANT: |
| 09:42AM | 17 | Q.  So, you remember that letter you wrote to the United |
| 09:42AM | 18 | States Attorney's Office to the prosecutor that was on the |
| 09:42AM | 19 | case? |
| 09:42AM | 20 | A.  I don't remember the letter but, again, it's my |
| 09:42AM | 21 | handwriting.  I do -- this is my handwriting and I do |
| 09:42AM | 22 | remember being housed in Rochester when I first got arrested, |
| 09:42AM | 23 | but -- |
| 09:42AM | 24 | Q.  And you wrote that letter to AUSA Burgasser, correct? |
| 09:42AM | 25 | A.  Yes.  That's who it's addressed to. |

09:42AM    1   Q.  And you stated that you have some information involving a

09:42AM    2   murder, and you want to be released the same day you give

09:43AM    3   this information, correct?  That's what it states in the

09:43AM    4   letter, correct?

09:43AM    5   A.  I would have to read that just to make sure.  Which one,

09:43AM    6   because there's two letters.

09:43AM    7   Q.  They both the same, the name just redacted out of -- the

09:43AM    8   person you had information on, his name is just redacted, so

09:43AM    9   it's the same letter.

09:43AM   10   A.  What is you asking did I say?

09:43AM   11   Q.  I said that you stated in this letter that you trying to

09:43AM   12   broker a deal with this information you have, and you want to

09:43AM   13   clear your probation, and to be released to bail and one

09:43AM   14   deed -- you stated that one good deed deserves another.  And

09:43AM   15   if you give this information to the AUSA, that you better be

09:43AM   16   released on the same day.  Can you explain it to the jurors?

09:44AM   17   A.  I don't even remember saying anything like -- especially

09:44AM   18   no broker no deal.  I don't even see the broker no deal part

09:44AM   19   in here, so I definitely can't -- my memory is very vague.

09:44AM   20   Q.  Do you remember the letter saying that you want to clear

09:44AM   21   your probation with this information about this murder?  You

09:44AM   22   state in the letter, correct, that you want to clear your

09:44AM   23   probation with this information, and that you want to be

09:44AM   24   released on bail with this information you have about this

09:44AM   25   murder?  Didn't you write that to the AUSA, correct?

09:44AM    1    A.   I apologize that it's been so long, but --

09:44AM    2    Q.   That's what the letter states though, correct?   It states

09:44AM    3    in your letter.

09:44AM    4    A.   I don't see that, and I know that you probably want me to

09:44AM    5    say it, but I can't, because I don't remember.

09:44AM    6    Q.   So, your testimony here --

09:45AM    7    A.   Is I don't remember.

09:45AM    8    Q.   Your memory is vague, but you remember everything on

09:45AM    9    direct that the government asked you, you remember everything

09:45AM   10    verbatim --

09:45AM   11         THE COURT:   You're arguing with the witness.   Hold

09:45AM   12    it.  Mr. Lenihan, do you object to this?

09:45AM   13         MR. LENIHAN:   I don't.   The question hasn't been

09:45AM   14    finished.

09:45AM   15         THE COURT:   You're arguing with the witness.   Ask him

09:45AM   16    a question.

09:45AM   17    BY THE DEFENDANT:

09:45AM   18    Q.   I said that, you remember everything on direct

09:45AM   19    examination, but when it comes to you remembering your

09:45AM   20    letters that you sent to this Court and other defendants that

09:45AM   21    you don't have no recollection.   You don't think it's

09:45AM   22    something wrong with that there, like --

09:45AM   23         MR. LENIHAN:   Objection.

09:45AM   24         THE COURT:   Sustained.

09:45AM   25

| | | |
|---|---|---|
| 09:45AM | 1 | BY THE DEFENDANT: |
| 09:45AM | 2 | Q.  So, you don't have any recollection to these letters that |
| 09:45AM | 3 | you sent to the United States Attorney's Office about these |
| 09:45AM | 4 | murders that you had information on? |
| 09:45AM | 5 | A.  No.  These ones that you shown me, no, I don't.  I said |
| 09:46AM | 6 | it's my handwriting.  I don't remember. |
| 09:46AM | 7 | Q.  Did you write Aaron Hicks' lawyer Fogg a letter telling |
| 09:46AM | 8 | Aaron Hicks' lawyer Fogg for him to call you as a witness for |
| 09:46AM | 9 | the defense? |
| 09:46AM | 10 | A.  I wrote him a letter.  Yes. |
| 09:46AM | 11 | Q.  You remember the letter?  Okay.  And in that letter, you |
| 09:46AM | 12 | was telling Mr. Fogg that you have information about Spencer |
| 09:46AM | 13 | Rogers lying to the Grand Jury, correct? |
| 09:46AM | 14 | A.  I would have to see the letter. |
| 09:46AM | 15 | THE DEFENDANT:  Your Honor, can I show the Defendant |
| 09:46AM | 16 | Exhibit Number 3506QQ to refresh his recollection? |
| 09:47AM | 17 | THE COURT:  All right. |
| 09:47AM | 18 | THE WITNESS:  Okay.  Yes.  This is my handwriting. |
| 09:47AM | 19 | Yes.  Let me see. |
| 09:47AM | 20 | BY THE DEFENDANT: |
| 09:48AM | 21 | Q.  You remember this letter?  Besides being copied, this is |
| 09:48AM | 22 | your letter you addressed to -- |
| 09:48AM | 23 | A.  Yeah. |
| 09:48AM | 24 | Q.  -- Robert Fogg? |
| 09:48AM | 25 | A.  Yeah. |

GRANT -- BY THE DEFENDANT -- 09/20/2022

10

09:48AM   1   Q.  And when you stated that Spencer Rogers is lying when he

09:48AM   2   said he was getting his drugs from Hicks, can you explain to

09:48AM   3   the jury what you mean by that?

09:48AM   4   A.  Explain to the jury what I mean by Spencer is lying?

09:49AM   5   Q.  Spencer is lying.  Like, who did he lie to, and what was

09:49AM   6   the facts that he was lying about?

09:49AM   7   A.  Well, honestly speaking, I can't -- I wasn't there with

09:49AM   8   him when he said exactly what he said, so I can't say exactly

09:49AM   9   everything that he was lying about, but I do know that he did

09:49AM  10   lie about some things.

09:49AM  11   Q.  Can you explain to the jury what he lied about?

09:49AM  12   A.  Mainly that he was selling me drugs.  He -- I think he

09:49AM  13   was saying that he told people -- he told the agents that he

09:49AM  14   was selling me a half a kilo a week or something like that.

09:49AM  15   Q.  And it was a lie?

09:49AM  16   A.  Yeah.

09:49AM  17   Q.  On Thursday, you testified under oath that you was a

09:49AM  18   Schuele Boys gang member, and then you testified in a sworn

09:49AM  19   affidavit that you was not a Schuele Boys gang member.  Can

09:49AM  20   you explain to the jury about how this alleged Schuele Boys

09:50AM  21   gang operated that you said you were involved in, if this

09:50AM  22   gang existed as you say?  Can you explain to the jury about

09:50AM  23   this gang?

09:50AM  24   A.  Used to sell drugs in the Schuele area.

09:50AM  25   Q.  Uh-huh.

09:50AM    1    A.   That's -- what else?

09:50AM    2    Q.   You say you a gang member.  I want you to explain to the

09:50AM    3    jury how was you a gang member and how they operated.

09:50AM    4    A.   Sell drugs in the Delevan Grider area.  What else?

09:50AM    5    Q.   So you explain to the jury that selling drugs in an area

09:50AM    6    makes you automatically a gang member?

09:50AM    7    A.   I wouldn't say selling drugs make you automatically a

09:50AM    8    gang member.

09:50AM    9    Q.   What make you a gang member?  Explain to the jury what

09:50AM   10    make you a gang member.

09:50AM   11    A.   I guess it was various things.  Selling drugs is

09:51AM   12    definitely one of things to add to it, but it doesn't solely

09:51AM   13    make you a gang member in my opinion.

09:51AM   14    Q.   You say -- said you was a Schuele Boys gang member.

09:51AM   15    Explain to the jurors what it took to be -- or for you to be

09:51AM   16    involved in -- a Schuele Boys gang member; your personal

09:51AM   17    knowledge of the things that took place.

09:51AM   18    A.   Pertaining to me?

09:51AM   19    Q.   Pertaining to this gang that you say you was a gang

09:51AM   20    member.  I'm asking you to explain to the jurors your

09:51AM   21    involvement, your personal knowledge of this gang and how

09:51AM   22    they operated.

09:51AM   23    A.   I mean, my personal knowledge is I sold drugs in that

09:51AM   24    area.  I hung around with certain people that I did certain

09:51AM   25    things with people over there and, yeah, as far as I could

09:51AM  1    explain it.  Maybe you could do better.

09:52AM  2    Q.  So, your testimony is that you never witnessed me commit

09:52AM  3    any crimes as a part of this Schuele Boys gang member,

09:52AM  4    correct?

09:52AM  5    A.  With my own two eyes, no.

09:52AM  6    Q.  How do you say my role is about violence when you never

09:52AM  7    seen me commit any crimes?

09:52AM  8    A.  I mean, I've been around for a while, so --

09:52AM  9    Q.  Personal knowledge -- had you ever witness me commit any

09:52AM  10   crime for this alleged Schuele Boys gang?

09:52AM  11   A.  And you saying seen you, right?

09:52AM  12   Q.  Have you ever seen me or have any personal knowledge of

09:52AM  13   me committing any crime for the Schuele Boys gang?

09:52AM  14   A.  What do you mean by personal knowledge?

09:52AM  15   Q.  Things you witnessed, things you seen me doing, or seen

09:52AM  16   me doing, period.

09:53AM  17   A.  Okay.  So, again, you asking have I seen you do anything?

09:53AM  18   Q.  Correct.

09:53AM  19   A.  No.

09:53AM  20   Q.  Who was the leader of this alleged Schuele Boys gang?

09:53AM  21   A.  I would say you were one of them.

09:53AM  22   Q.  I'm one of them?

09:53AM  23   A.  Yeah.

09:53AM  24   Q.  Who do these alleged Schuele Boys members pay their dues

09:53AM  25   or who collect the due payments from these Schuele Boys?

GRANT -- BY THE DEFENDANT -- 09/20/2022

13

| | | |
|---|---|---|
| 09:53AM | 1 | A.  What due payments? |
| 09:53AM | 2 | Q.  You said you were a gang member.  I'm asking you, you say |
| 09:53AM | 3 | you a gang member.  I want to know who do you pay your dues |
| 09:53AM | 4 | to and who collect these dues from you as part of the gang? |
| 09:54AM | 5 | A.  You supposed to pay your dues to somebody? |
| 09:54AM | 6 | Q.  You testified that you was a gang member.  I'm asking |
| 09:54AM | 7 | you, sir. |
| 09:54AM | 8 | A.  It seem like you got the knowledge on it, though, because |
| 09:54AM | 9 | you telling me something that I don't know. |
| 09:54AM | 10 | Q.  Hey, listen.  I'm asking you a question, sir. |
| 09:54AM | 11 | A.  I have no knowledge on that as far as any of that. |
| 09:54AM | 12 | Q.  Okay.  Where do these meetings take place to discuss all |
| 09:54AM | 13 | the gang activity about the Schuele Boys? |
| 09:54AM | 14 | A.  I guess I got to ask you that question. |
| 09:54AM | 15 | THE DEFENDANT:  Your Honor, could you ask him to |
| 09:54AM | 16 | answer the question, Your Honor?  He's asking me questions. |
| 09:54AM | 17 | He's not answering. |
| 09:54AM | 18 | THE COURT:  Do you understand the question, sir? |
| 09:54AM | 19 | THE WITNESS:  I mean, I understand what he's asking |
| 09:54AM | 20 | me, but I don't necessarily know too much about different gang |
| 09:54AM | 21 | meetings or anything like that.  We have different |
| 09:54AM | 22 | conversations with different people, but it's not like |
| 09:54AM | 23 | everybody group up in one house and having a gang meeting. |
| 09:55AM | 24 | So, it seems like he know more about it than me. |
| 09:55AM | 25 | |

09:55AM  1  BY THE DEFENDANT:

09:55AM  2  Q.  You was asked on direct by the government who side you

09:55AM  3  were on when Letorrance Travis got busted in 2011.  Was that

09:55AM  4  in a friendship way or in a gang member way?

09:55AM  5  A.  I would say it was in a friendship way.

09:55AM  6  Q.  Okay.  You testified -- this is just something you had

09:55AM  7  agreed to testify to just to get that nine levels reduced off

09:55AM  8  your 20 years you was facing, correct?

09:55AM  9  A.  That's what I said?  You asking me is that what I said?

09:56AM  10  Q.  I said, this is just something you testified -- this is

09:56AM  11  just something you had agreed to with the government to agree

09:56AM  12  about this Schuele Boys gang just to get that nine levels

09:56AM  13  reduced off your 20 years you was facing, correct?

09:56AM  14          MR. LENIHAN:  Objection.

09:56AM  15          THE COURT:  Sustained.

09:56AM  16  BY THE DEFENDANT:

09:56AM  17  Q.  This is purely speculation and pure conspiracy theory,

09:56AM  18  correct?

09:56AM  19          MR. LENIHAN:  Objection.

09:56AM  20          THE COURT:  Sustained.

09:56AM  21  BY THE DEFENDANT:

09:56AM  22  Q.  You have no personal knowledge and everything you heard

09:56AM  23  and testified to came from the government and the word in the

09:56AM  24  streets correct?

09:56AM  25          MR. LENIHAN:  Objection.

09:56AM   1        THE COURT:  Just one second.  Can you answer that,

09:56AM   2   sir.

09:56AM   3        THE WITNESS:  Repeat it just so I can --

09:56AM   4   BY THE DEFENDANT:

09:56AM   5   Q.  I said, you have no personal knowledge, and everything

09:56AM   6   you heard and testified to to the jury came from the

09:56AM   7   government and the word in the streets, correct?

09:57AM   8   A.  No.  That's not true.

09:57AM   9   Q.  You know the only person from the neighborhood I used to

09:57AM  10   be with is Drew or -- I mean, on Central Park on Jewett,

09:57AM  11   correct?

09:57AM  12   A.  You saying only place you used to be in the Schuele was

09:57AM  13   Drew?

09:57AM  14   Q.  I said the only person that you know that I used to be

09:57AM  15   with around that area besides my little brother is Andrew, or

09:57AM  16   I would be in Central Park, correct?

09:57AM  17   A.  No.  That's not correct.

09:57AM  18   Q.  Are you aware that in 2001, I went to Columbus, Ohio to

09:57AM  19   live for four years?

09:57AM  20   A.  I know you went to Columbus, Ohio, but I don't know

09:57AM  21   exactly how long it was.  I know it was during the Bonkers

09:57AM  22   trial.

09:57AM  23   Q.  Okay.  But before I went to Ohio, are you aware of the

09:58AM  24   incident that took place on Federal Street at Barkley's

09:58AM  25   mother house when it got broken into?

GRANT -- BY THE DEFENDANT -- 09/20/2022

09:58AM 1    A.  I remember something like that.  I don't remember exactly

09:58AM 2    everything that happened, but I think, if I'm not mistaken,

09:58AM 3    y'all broke in they house or something like that.

09:58AM 4    Q.  But you do remember that Barkley mom's house got broken

09:58AM 5    into, correct?

09:58AM 6    A.  Yeah.

09:58AM 7    Q.  Okay.  And some things were stolen, and we got caught at

09:58AM 8    this incident.  Do you remember this causing a major problem

09:58AM 9    in that neighborhood with Barkley and his family and Marcel

09:58AM 10   Worthy and Looper and Little Moan and Denil (phonetic)?

09:58AM 11   A.  Yeah.

09:58AM 12   Q.  You remember that caused an issue, correct?

09:58AM 13   A.  Yeah.

09:59AM 14   Q.  Okay.  Okay.  And so, all the names I just named is

09:59AM 15   younger kids in that neighborhood who all went to the school

09:59AM 16   West Hertel along with my sister and brother who are twins,

09:59AM 17   correct?

09:59AM 18   A.  Yeah.

09:59AM 19   Q.  And they all used to hang out together all day every day

09:59AM 20   on Stevens Street at Cheese grandmother house and Denil

09:59AM 21   house, correct?

09:59AM 22   A.  Yeah.

09:59AM 23   Q.  They were, like, about four years younger than me,

09:59AM 24   correct?

09:59AM 25   A.  I guess.

09:59AM   1   Q.   Okay.  So, once me and my brother violated Barkley and

09:59AM   2   his mother house, this caused a serious beef between me, my

09:59AM   3   little brother, and we had beef with -- which is a serious

09:59AM   4   problem with -- Barkley, Cheese, and they friends, which

10:00AM   5   caused issues between us and hate started to develop on both

10:00AM   6   sides, correct?

10:00AM   7   A.   Yeah.

10:00AM   8   Q.   So, after the Barkley burglary, after the burglary of

10:00AM   9   Barkley mom house, my little brother got caught and went to

10:00AM  10   jail and I had got away, correct?

10:00AM  11   A.   I guess I don't really remember exactly who went to jail

10:00AM  12   and who got away.

10:00AM  13   Q.   Okay.  And this is was around the year 2001 after I did

10:00AM  14   my county year for a probation violation in 2000 until April

10:00AM  15   of 2001, correct?

10:00AM  16   A.   I don't know exactly if it was right when you got out of

10:00AM  17   jail or not.  I don't even remember exactly.  It could have

10:00AM  18   been 2001 when you got out of jail, but --

10:00AM  19   Q.   Okay.  So, once I came home in 2001, months later, this

10:00AM  20   happened with Barkley mom's house, correct?

10:01AM  21   A.   I'm not even sure if it was in that same year, to be

10:01AM  22   honest, but it happened.

10:01AM  23   Q.   Okay.  And this caused beef with me, my little brother

10:01AM  24   and them guys, and this is what separated my little brother

10:01AM  25   from these guys, and they wanted us out the neighborhood,

| | | |
|---|---|---|
| 10:01AM | 1 | correct? |
| 10:01AM | 2 |        MR. LENIHAN:  Objection. |
| 10:01AM | 3 |        THE COURT:  Sustained. |
| 10:01AM | 4 |        THE DEFENDANT:  Can I rephrase the question, Your |
| 10:01AM | 5 | Honor? |
| 10:01AM | 6 |        THE COURT:  All right.  Go ahead. |
| 10:01AM | 7 | BY THE DEFENDANT: |
| 10:01AM | 8 | Q.  After this situation with Barkley mom house, I stayed |
| 10:01AM | 9 | away from that neighborhood for a while, correct? |
| 10:01AM | 10 | A.  I can't say if it was because of the Barkley situation. |
| 10:02AM | 11 | Q.  Do you remember when we was in grammar school, you used |
| 10:02AM | 12 | to come to my house on Central Park, correct? |
| 10:02AM | 13 | A.  Yeah. |
| 10:02AM | 14 | Q.  And you do remember me living in Central Park, which is a |
| 10:02AM | 15 | different neighborhood than Schuele Avenue, correct? |
| 10:02AM | 16 | A.  Yeah. |
| 10:02AM | 17 | Q.  So, you can't confirm that to the jury that Central Park |
| 10:02AM | 18 | is my original neighborhood, correct? |
| 10:02AM | 19 | A.  Yeah.  I would say that, like, as far as you living in |
| 10:02AM | 20 | Central Park before you was living in the Schuele area. |
| 10:02AM | 21 | Q.  Okay.  And I also hung around Fillmore and French |
| 10:02AM | 22 | neighborhood as well, correct? |
| 10:02AM | 23 | A.  Yeah. |
| 10:02AM | 24 | Q.  So, after the situation with Cheese and Barkley, I went |
| 10:03AM | 25 | to Columbus, Ohio to live around 2001, correct? |

GRANT -- BY THE DEFENDANT -- 09/20/2022

10:03AM  1   A.  That's not why I remember you going to Columbus, Ohio.

10:03AM  2   Q.  But I went to Columbus, Ohio and lived.  I moved out of

10:03AM  3   Buffalo went to Columbus Ohio, correct?

10:03AM  4   A.  Yeah, but I don't think it was because of the Barkley

10:03AM  5   situation.  I think it was because you -- my memory serves is

10:03AM  6   because you gave a statement on Bonkers about a murder or two

10:03AM  7   murders that he did by you getting rid of the gun and --

10:03AM  8   Q.  That's not what I asked you, Your Honor.  He's just

10:03AM  9   blurting things out that I never even asked him.

10:03AM  10  A.  You asked about Columbus --

10:03AM  11  Q.  I'm asking you --

10:03AM  12          THE REPORTER:  One at a time.

10:03AM  13  BY THE DEFENDANT:

10:03AM  14  Q.  What year.  I asked you what year did I move to Columbus,

10:03AM  15  Ohio?

10:03AM  16          MR. LENIHAN:  Objection, Judge.  He's arguing with

10:03AM  17  the witness.

10:03AM  18          THE COURT:  Sustained.

10:03AM  19          THE WITNESS:  It was after Bonkers did them killings

10:04AM  20  and you gave that statement.  You didn't want to show up for

10:04AM  21  court to testify against him.

10:04AM  22          THE DEFENDANT:  Your Honor, I move to strike his

10:04AM  23  answer because it was unresponsive.  He's blurting things out

10:04AM  24  that I never asked him.

10:04AM  25          MR. LENIHAN:  The defendant asked the witness why he

10:04AM  1   moved to Columbus, Ohio and the witness's personal knowledge

10:04AM  2   was that it was for a different reason, including a murder of

10:04AM  3   Bonkers.

10:04AM  4          THE DEFENDANT:  I didn't have anything to do with

10:04AM  5   that murder.  That wasn't the question I asked him.

10:04AM  6          THE COURT:  You got the answer.  Ask the next

10:04AM  7   question, please.

10:04AM  8          THE DEFENDANT:  This is terrible, man.  This is not

10:04AM  9   fair at all.

10:04AM  10         MR. LENIHAN:  Objection, Judge.

10:04AM  11         THE COURT:  The jury will disregard that last comment

10:04AM  12   by Mr. Arrington.  He is not testifying, folks.  He's there to

10:04AM  13   ask questions.

10:04AM  14         THE DEFENDANT:  And I'm asking questions, Your Honor.

10:05AM  15         THE COURT:  Mr. Arrington, that's it.  Ladies and

10:05AM  16   gentlemen, would you step outside, please?

10:05AM  17   (The jury left the room at 10:05 a.m.)

10:19AM  18   (The jury entered the room at 10:20 a.m.)

10:20AM  19         THE CLERK:  All rise.  You may be seated.

10:21AM  20         THE DEFENDANT:  All right, Mr. Arrington.  You may

10:21AM  21   continue.

10:21AM  22   BY THE DEFENDANT:

10:21AM  23   Q.  So, when the government asked you on direct about me

10:21AM  24   offering to take a hit for you at a club, that's false,

10:21AM  25   correct?

10:21AM     1              MR. LENIHAN:  Objection.  That was I think -- that's

10:21AM     2    a mischaracterization of the testimony.

10:21AM     3              THE COURT:  Sustained.

10:21AM     4    BY THE DEFENDANT:

10:21AM     5    Q.  You only said that because this is what they wanted you

10:21AM     6    to say to complete their story, correct?

10:21AM     7    A.  No.

10:21AM     8    Q.  Can you tell the jury when this took place, month, year,

10:21AM     9    when I alleged asked you this question about a hit?  What

10:22AM    10    year and month do you know or do you remember when this took

10:22AM    11    place?

10:22AM    12    A.  I feel like I'm not 100 percent certain, but I think it

10:22AM    13    was 2013.  I don't know what month.

10:22AM    14    Q.  You don't know what month 2013?

10:22AM    15    A.  No.

10:22AM    16    Q.  No?

10:22AM    17    A.  No.

10:22AM    18    Q.  Do you know I was on an ankle monitor, GPS monitoring,

10:22AM    19    '13 to '14 with a curfew at 8 o'clock, I had to be in the

10:22AM    20    house.  You had knowledge of that?

10:22AM    21    A.  Yeah.

10:22AM    22    Q.  You did?

10:22AM    23    A.  Mm-hmm.

10:22AM    24    Q.  But you can't tell the jurors when in 2013 I stated this

10:22AM    25    to you at a bar or a club?

10:22AM    1                    MR. LENIHAN:  Objection.

10:22AM    2                    THE WITNESS:  I wasn't --

10:22AM    3                    MR. LENIHAN:  That's not the testimony.

10:22AM    4                    THE COURT:  Sustained.

10:22AM    5     BY THE DEFENDANT:

10:22AM    6     Q.  But you do have knowledge that I was on an ankle monitor

10:22AM    7     from 2013 to 2014, correct?

10:23AM    8     A.  You saying the whole 2013?

10:23AM    9     Q.  Yes from 2013 to 2014?

10:23AM   10     A.  Whole 2013 to 2014.

10:23AM   11     Q.  That's my question.  Yes.  Do you have any knowledge that

10:23AM   12     I was on an ankle monitor?

10:23AM   13     A.  Sometime in 2013, I think it was on an ankle monitor.  It

10:23AM   14     might have been '14.  I don't remember exactly what year it

10:23AM   15     was.

10:23AM   16                    THE DEFENDANT:  No further questions Your Honor.

10:23AM   17                    MR. LENIHAN:  Briefly, Your Honor.

10:23AM   18

10:23AM   19                         REDIRECT EXAMINATION

10:23AM   20

10:23AM   21     BY MR. LENIHAN:

10:23AM   22     Q.  So, just to clear that up, your direct testimony was that

10:23AM   23     you were asked -- Mr. Arrington asked you or he was talking

10:23AM   24     about taking hits?

10:23AM   25     A.  You talking about -- he asked me about -- I'm assuming he

10:23AM 1  said we was at a club or something like that and you asked me

10:23AM 2  that question.

10:23AM 3  Q.  Yes.  Was it at a club or was it somewhere else?

10:23AM 4  A.  Well one time, he asked me was I all right at a club.

10:24AM 5  When we was venting about taking hits, it was at his mom

10:24AM 6  house on Girard.

10:24AM 7  Q.  And you testified on cross-examination when he asked you

10:24AM 8  if you were all right, your perception was it was framed to

10:24AM 9  commit violence for you?

10:24AM 10  A.  Yeah.

10:24AM 11  Q.  Why was that?

10:24AM 12  A.  Because it was rumored that that's what he do.

10:24AM 13  Q.  You never -- you testified that you didn't see him

10:24AM 14  personally involved in criminal activity?

10:24AM 15  A.  No, besides getting weed from him.

10:24AM 16  Q.  And then did you also buy cocaine from him?

10:24AM 17  A.  Yeah, an eight ball.

10:24AM 18  Q.  Is that illegal?

10:24AM 19  A.  Yeah.

10:24AM 20  Q.  Regarding the mention of the gang, do you remember

10:24AM 21  testifying in open court that there was a gang?

10:24AM 22  A.  I remember saying that.

10:24AM 23  Q.  You wrote that letter to, not me, but Tim Lynch, the

10:25AM 24  letter that we discussed on cross-examination?

10:25AM 25  A.  Yeah.

| | | |
|---|---|---|
| 10:25AM | 1 | Q.  It's a pretty -- what's your opinion of that letter? |
| 10:25AM | 2 | A.  I mean, I was frustrated. |
| 10:25AM | 3 | Q.  Why were you frustrated? |
| 10:25AM | 4 | A.  Because I felt like they was playing with me. |
| 10:25AM | 5 | Q.  Why was that? |
| 10:25AM | 6 | A.  Because I was still in jail. |
| 10:25AM | 7 | Q.  And did -- had you testified at other proceedings? |
| 10:25AM | 8 | A.  Yeah. |
| 10:25AM | 9 | Q.  As the government, do we have the authority to release |
| 10:25AM | 10 | you? |
| 10:25AM | 11 | A.  To my knowledge, no. |
| 10:25AM | 12 | Q.  Who has the authority to release you? |
| 10:25AM | 13 | A.  The Judge. |
| 10:25AM | 14 | Q.  Who ultimately released you? |
| 10:26AM | 15 | A.  Pardon me? |
| 10:26AM | 16 | Q.  Who ultimately released you? |
| 10:26AM | 17 | A.  The Judge. |
| 10:26AM | 18 | Q.  And your cooperation, does it have to be truthful? |
| 10:26AM | 19 | A.  Yeah, to the best of my knowledge. |
| 10:26AM | 20 | Q.  And, to your knowledge, did the Judge take that into |
| 10:26AM | 21 | consideration? |
| 10:26AM | 22 | THE DEFENDANT:  Objection, Your Honor. |
| 10:26AM | 23 | THE COURT:  Sustained. |
| 10:26AM | 24 | BY MR. LENIHAN: |
| 10:26AM | 25 | Q.  When is the first time you and I met? |

| | | |
|---|---|---|
| 10:26AM | 1 | A.  Some time this year. |
| 10:26AM | 2 | Q.  Was that prior to you testifying on this stand? |
| 10:26AM | 3 | A.  Yeah. |
| 10:26AM | 4 | Q.  And did -- what was the nature of us meeting? |
| 10:26AM | 5 | A.  You came down to Atlanta and gave me a subpoena. |
| 10:26AM | 6 | Q.  And did I ask you questions? |
| 10:26AM | 7 | A.  I don't remember you asking me no questions that day. |
| 10:26AM | 8 | No.  I don't think so. |
| 10:26AM | 9 | Q.  Prior to you testifying, did I ask you questions? |
| 10:26AM | 10 | A.  No. |
| 10:26AM | 11 | Q.  Did I ever tell you what to say? |
| 10:27AM | 12 | A.  No. |
| 10:27AM | 13 | Q.  Regarding Spencer Rogers, did you ever take a look at his |
| 10:27AM | 14 | Grand Jury material? |
| 10:27AM | 15 | A.  What you mean? |
| 10:27AM | 16 | Q.  Do you know if he testified in front of the Grand Jury or |
| 10:27AM | 17 | not? |
| 10:27AM | 18 | A.  He told me he did, but as far as seeing it, no, I didn't |
| 10:27AM | 19 | see it. |
| 10:27AM | 20 | Q.  You wrote a bunch of letters to Aaron Hicks? |
| 10:27AM | 21 | A.  Yeah. |
| 10:27AM | 22 | Q.  Why were you writing letters to Aaron Hicks? |
| 10:27AM | 23 | A.  Well, various reasons.  One of them was because it was -- |
| 10:27AM | 24 | I was -- it was -- I was having a little problem in the |
| 10:27AM | 25 | counties. |

10:27AM   1   Q.  Can you describe that?

10:27AM   2   A.  People was knowing that I was cooperating and they would,

10:27AM   3   like, say things.  So, I figure, like, if I write him, maybe

10:27AM   4   it will make it a little smoother.  I won't have so many

10:27AM   5   problems.

10:27AM   6           THE DEFENDANT:  Objection, Your Honor.  He said he

10:28AM   7   don't remember the letters he wrote to Aaron Hicks on cross-

10:28AM   8   examination.  Now, he's having recollection on direct.

10:28AM   9           THE COURT:  Overruled.

10:28AM  10   BY MR. LENIHAN:

10:28AM  11   Q.  So, what's the purpose of trying to smooth things over

10:28AM  12   with Aaron Hicks?

10:28AM  13   A.  Just so it would be a little more peaceful for me.

10:28AM  14   Q.  And would you consider Aaron Hicks one of the leaders of

10:28AM  15   the Schuele Boys?

10:28AM  16   A.  Yeah, I would.

10:28AM  17   Q.  You testified on cross-examination that the Schuele Boys

10:28AM  18   were engaged in drug dealing?

10:28AM  19   A.  Yeah.

10:28AM  20   Q.  And you mentioned other things?

10:28AM  21   A.  Yeah.

10:28AM  22   Q.  What other things?

10:28AM  23   A.  Some violence.

10:28AM  24   Q.  What's your understanding as to the incident that the

10:28AM  25   defendant was asking about with Barkley's mother?

10:28AM   1    A.  I think they, like, robbed they house or something like

10:28AM   2    that, maybe thinking it was some drugs there or something,

10:29AM   3    and I don't know what they got, but somebody went to jail

10:29AM   4    behind it.

10:29AM   5    Q.  What's your understanding as to who was committing the

10:29AM   6    violence for the Schuele Boys?

10:29AM   7    A.  It was a few people, but Rah Rah was one of them.

10:29AM   8    Q.  You mentioned that he went to Columbus, Ohio in about

10:29AM   9    2001?

10:29AM  10    A.  Yeah.

10:29AM  11    Q.  What's your understanding as to why he went to Columbus,

10:29AM  12    Ohio?

10:29AM  13    A.  Because Bonkers had killed --

10:29AM  14             THE DEFENDANT:  Objection, Your Honor.

10:29AM  15             THE WITNESS:  -- two people.

10:29AM  16             THE COURT:  Overruled.

10:29AM  17             THE WITNESS:  With his gun and homicide was coming

10:29AM  18    around.  They was -- they end up grabbing Roderick, Rah Rah.

10:29AM  19    He gave them a statement saying that he sold the gun to

10:29AM  20    somebody.  They subpoenaed him in court for Bonkers trial and

10:30AM  21    he went to Columbus because he didn't want to testify.

10:30AM  22             MR. LENIHAN:  No further questions.

10:30AM  23             THE DEFENDANT:  Your Honor, can I?

10:30AM  24             THE COURT:  All right.

10:30AM  25

10:30AM  1                      RECROSS-EXAMINATION

10:30AM  2

10:30AM  3  BY THE DEFENDANT:

10:30AM  4  Q.  You stated that you just testified to the Grand Jury that

10:30AM  5  I gave Bonkers a gun, it was my gun, and I sold this gun?

10:30AM  6  A.  Yeah.  You owned -- I never said you gave Bonkers the

10:30AM  7  gun.  The gun was at Eric and them house.  But when Bonkers

10:30AM  8  took it back to the house, you took it from the house and

10:30AM  9  that's what tied you to the homicide.

10:30AM  10  Q.  Where do you get this information from?

10:30AM  11  A.  You.

10:30AM  12  Q.  What you mean you got the information from me?

10:30AM  13  A.  Yeah.  You told me.

10:30AM  14  Q.  I told you this information?

10:30AM  15  A.  Yeah.

10:30AM  16          THE DEFENDANT:  No further questions, Your Honor.

10:30AM  17          THE COURT:  All right.  The witness is excused.

10:30AM  18  (The witness left the room at 10:30 a.m.)

19

20

21

22

23

24

25

1            *     *     *     *     *     *     *

2

3            I certify that the foregoing is a

4      correct transcription of the proceedings

5      recorded by me in this matter.

6

7

8

9                          s/ Megan E. Pelka, RPR

10                         Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25