1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

2

UNITED STATES OF AMERICA,          )
3                                             ) Case No. 1:15-CR-00033-3
                                           )               (RJA)(HBS)
4                     Plaintiff,          )
                                           )
5    vs.                                   ) September 14th, 2022
                                           ) 10:06 a.m.
6    RODERICK ARRINGTON,                   )
                                           )
7                     Defendant.          )

8

**TRANSCRIPT OF EVIDENTIARY HEARING**
**BEFORE THE HONORABLE RICHARD J. ARCARA**
9
**SENIOR UNITED STATES DISTRICT JUDGE**

10

<u>APPEARANCES:</u>

11

For the Plaintiff:   TRINI E. ROSS, ESQ.
12                       UNITED STATES ATTORNEY
                        BY:  JEREMIAH LENIHAN, ESQ.
13                       ASSISTANT UNITED STATES ATTORNEY
                        138 Delaware Avenue
14                       Buffalo, NY 14202

15   For the Defendant:   RODERICK ARRINGTON, PRO SE

16   Stand-by counsel:    MARK A. FOTI, ESQ.
                         16 W. Main Street, Suite 100
17                        Rochester, NY 14614

18   Court Reporter:      MEGAN E. PELKA, RPR
                         Robert H. Jackson US Courthouse
19                        2 Niagara Square
                         Buffalo, NY 14202
20                        (716) 364-6449

21   Other appearances:   WILLIAM POWERS
                         Director of Information Technology

22

23

24

25

10:06AM    1    (The witness was sworn at 10:06 a.m.)

10:06AM    2         THE CLERK:  Please state your name and spell it for

10:06AM    3    the record.

10:06AM    4         THE WITNESS:  William Scott, S-C-O-T-T.

10:06AM    5         THE COURT:  All right.  Mr. Lenihan?

10:06AM    6         MR. LENIHAN:  Thank you, Your Honor.

10:06AM    7

10:06AM    8                    DIRECT EXAMINATION

10:06AM    9

10:06AM   10    BY MR. LENIHAN:

10:06AM   11    Q.  Mr. Scott, how are you doing this morning?

10:06AM   12    A.  Very well, sir.

10:06AM   13    Q.  What do you do for a living?

10:06AM   14    A.  Currently, I'm a court security officer the federal

10:06AM   15    courthouse here in Buffalo.

10:07AM   16    Q.  How long have you been a court security officer?

10:07AM   17    A.  A little over eight years now.

10:07AM   18    Q.  Prior to being a court security officer, what was your

10:07AM   19    experience?

10:07AM   20    A.  I was a deputy sheriff in Genesee County for 37 years.

10:07AM   21    Q.  And, as being a court security officer, can you just

10:07AM   22    generally describe what your duties entail?

10:07AM   23    A.  We maintain security for the building both inside and

10:07AM   24    outside.  Inside courtrooms, we maintain certain equipment as

10:07AM   25    well.  At the front doors, particularly, there's a

SCOTT -- BY MR. LENIHAN -- 09/14/2022

2

10:07AM   1   magnetometer station and x-ray station and we monitor all

10:07AM   2   entering persons into the building for security purposes as

10:07AM   3   well as there's a back entrance for deliveries that we

10:07AM   4   maintain also.

10:07AM   5   Q.   When court is in session, and a district court judge is

10:07AM   6   on the bench or a magistrate court is on the bench, in your

10:07AM   7   experience, are court security officers present?

10:07AM   8   A.   Yes.

10:07AM   9   Q.   Why are court security officers present?

10:07AM   10   A.   To maintain decorum in courtroom, provide security as

10:08AM   11   needed for the judge and all participants within courtroom.

10:08AM   12   Q.   Within your eight years, have you participated in being a

10:08AM   13   court security officer in courtrooms?

10:08AM   14   A.   Yes.

10:08AM   15   Q.   For both hearings and trials?

10:08AM   16   A.   Yes.

10:08AM   17   Q.   Have you been assigned to be the court security officer

10:08AM   18   for this trial here?

10:08AM   19   A.   Yes.

10:08AM   20   Q.   How long have you been in this courtroom for this trial

10:08AM   21   with US v. Roderick Arrington?

10:08AM   22   A.   Since the beginning of the trial and for other

10:08AM   23   proceedings prior to it.

10:08AM   24   Q.   You remember that jury selection happened approximately a

10:08AM   25   week ago?

SCOTT -- BY MR. LENIHAN -- 09/14/2022

3

| | | |
|---|---|---|
| 10:08AM | 1 | A.  Yes. |
| 10:08AM | 2 | Q.  And have you been here every day from jury selection up |
| 10:08AM | 3 | until today? |
| 10:08AM | 4 | A.  I have. |
| 10:08AM | 5 | Q.  As part of being a court security officer, do you have |
| 10:08AM | 6 | the opportunity to -- yeah.  Your job is to protect the |
| 10:08AM | 7 | security of the courtroom? |
| 10:08AM | 8 | A.  Yes. |
| 10:08AM | 9 | Q.  And what does that include? |
| 10:09AM | 10 | A.  I lock and unlock the doors.  I'm the first person in |
| 10:09AM | 11 | this courtroom in the morning and usually the last one out. |
| 10:09AM | 12 | Upon entering in the morning, I sweep the whole courtroom, |
| 10:09AM | 13 | making sure that it's safe, no one left anything behind or |
| 10:09AM | 14 | nothing in the courtroom that shouldn't be here.  I unlock |
| 10:09AM | 15 | the doors, greet people as they come in, seat them if they |
| 10:09AM | 16 | need to be seated somewhere in particular, and I take care of |
| 10:09AM | 17 | the jury during the trial. |
| 10:09AM | 18 | Q.  Yesterday, were you here when a woman by the name of |
| 10:09AM | 19 | Jessica Kazukiewicz was testifying? |
| 10:09AM | 20 | A.  I was. |
| 10:09AM | 21 | Q.  And what do you remember about her testimony -- strike |
| 10:09AM | 22 | that. |
| 10:09AM | 23 | At a certain point, do you remember that Judge Arcara had |
| 10:09AM | 24 | asked to take a break for Ms. Kazukiewicz to read her Grand |
| 10:09AM | 25 | Jury testimony? |

10:09AM    1    A.   Yes.

10:09AM    2    Q.   Once that happened, can you discuss what observations you

10:09AM    3    made?

10:09AM    4    A.   I came up from the back of the courtroom to escort the

10:10AM    5    jury out during that break.  The Judge had already had

10:10AM    6    excused himself from the bench.  I came back out from the

10:10AM    7    jury room, and stood here for a few moments.  I witnessed

10:10AM    8    that the two deputy marshals had escorted Mr. Arrington to

10:10AM    9    the back room, at which point, the -- Ms. Kazukiewicz was

10:10AM   10    still up here on the witness stand reviewing that statement.

10:10AM   11    I took the opportunity to go out the back exit to go wash my

10:10AM   12    hands.

10:10AM   13         Upon my re-entering about 30, 45 seconds later, I was

10:10AM   14    approached by you at the glass doors in the back of the

10:10AM   15    courtroom that an incident had occurred or was occurring in

10:10AM   16    courtroom.  I entered courtroom.  I'm not sure if it was you

10:10AM   17    or your co-counsel advised me that there was some slight

10:10AM   18    interaction between the witness, who was still on the stand

10:10AM   19    here, and some party members in the back of the courtroom.

10:10AM   20         I came up and made the decision that perhaps, with what I

10:11AM   21    had learned, the interaction being some staring back and forth

10:11AM   22    I was told, because of that, I wanted to, again, maintain the

10:11AM   23    decorum in the courtroom.  I made the decision to remove the

10:11AM   24    witness from the stand because, at that point in time, I had

10:11AM   25    noticed that she had already taken the papers that she was

SCOTT -- BY MR. LENIHAN -- 09/14/2022                          5

10:11AM   1   reviewing and set them off to the side, clueing into me that

10:11AM   2   she was done.  So, I escorted her down from the witness stand

10:11AM   3   out to the back of the courtroom to the glass doors where I

10:11AM   4   handed her off to the agent who was in charge of bringing the

10:11AM   5   witnesses in and out.  She, in turn, took custody of her, and

10:11AM   6   put her in one of the attorney/client rooms outside.

10:11AM   7   Q.  And that was an FBI agent you handed the --

10:11AM   8   Ms. Kazukiewicz off to?

10:11AM   9   A.  Correct.

10:11AM  10   Q.  What observations did you make after you handed off

10:11AM  11   Ms. Kazukiewicz to an FBI agent?

10:11AM  12   A.  I came back into courtroom, again, to maintain the

10:11AM  13   decorum, make sure nothing else was going to happen between

10:12AM  14   anybody else.  There were very few people in the courtroom.

10:12AM  15   The attorneys were in here, a few family of members

10:12AM  16   Mr. Arrington's, a few other agents, I believe, sitting off

10:12AM  17   to the side, and everything had calmed down to that point.

10:12AM  18   Q.  Did you see Ms. Kazukiewicz being escorted into a [sic]

10:12AM  19   attorney/client conference room outside the courtroom?

10:12AM  20   A.  I did not.

10:12AM  21   Q.  Did you have any interaction with Ms. Kazukiewicz after

10:12AM  22   that?

10:12AM  23   A.  No.

10:12AM  24   Q.  Was Ms. Kazukiewicz called back to the witness stand?

10:12AM  25   A.  She was.

SCOTT -- BY MR. LENIHAN -- 09/14/2022

6

10:12AM    1   Q.  Were you part of bringing her back to the witness stand?

10:12AM    2   A.  No.

10:12AM    3   Q.  Were you in the courtroom when she was brought to the

10:12AM    4   witness stand?

10:12AM    5   A.  I was.  I held the door open for her, the swinging doors,

10:12AM    6   and that was my interaction.

10:12AM    7   Q.  And just so -- for purpose of record, if you can describe

10:12AM    8   where the person would enter and exit courtroom and where

10:12AM    9   those attorney/client doors are in relation to the entrance

10:13AM   10   and exit?

10:13AM   11   A.  Entering the courtroom for anyone other than judicial

10:13AM   12   personnel are through the back doors.  There's a set of

10:13AM   13   wooden doors and outer glass doors.  That's the only way for

10:13AM   14   the public and attorneys to enter courtroom.  Outside,

10:13AM   15   there's a long hallway that services two courtrooms, a couple

10:13AM   16   of restrooms, and three attorney/client rooms.  There are

10:13AM   17   three of them outside in the long hallway.

10:13AM   18   Q.  With your interactions with Ms. Kazukiewicz, did you

10:13AM   19   witness anything inappropriate?

10:13AM   20   A.  No.

10:13AM   21            MR. LENIHAN:  No further questions, Your Honor.

10:13AM   22            THE COURT:  All right.  Mr. Arrington?

          23

          24

          25

SCOTT -- BY THE DEFENDANT -- 09/14/2022                    7

1                           CROSS-EXAMINATION

2

3       BY THE DEFENDANT:

10:13AM    4       Q.   How are you doing, Mr. Scott?

10:13AM    5       A.   Good.

10:13AM    6       Q.   I never had an issue with you, and I'm not saying you did

10:13AM    7       anything wrong, sir, but you was here when the Judge recessed

10:13AM    8       for ten minutes, correct, for her to refresh her

10:13AM    9       recollection?

10:13AM   10       A.   Regarding this incident, yes.

10:14AM   11       Q.   Yes.  Okay.  From your experience, when a judge recess

10:14AM   12       for ten minutes and leave a witness on the stand to refresh

10:14AM   13       they recollection, do the prosecution -- supposed to escort

10:14AM   14       that witness off the stand before the judge come back during

10:14AM   15       cross-examining?  Do the prosecutor -- supposed to escort her

10:14AM   16       to be taken out to a conference room or anything since your

10:14AM   17       whole time you've been working in this courthouse?

10:14AM   18       A.   No.

10:14AM   19       Q.   You ever see that happen before?

10:14AM   20       A.   Not normally.  No.

10:14AM   21       Q.   Okay.  And if the judge wanted to excuse that witness

10:14AM   22       before he recessed, he would have had that witness excused,

10:14AM   23       correct?

10:14AM   24       A.   Correct.

10:14AM   25       Q.   Okay.  So, when you left courtroom for a couple seconds,

10:14AM    1    you never witnessed this interaction with the witness and one

10:14AM    2    of my family members, correct?

10:15AM    3    A.   I did not.

10:15AM    4    Q.   Okay.  So, when you came back, the government approached

10:15AM    5    you and said an interaction happened, correct?

10:15AM    6    A.   That's correct.

10:15AM    7    Q.   So, they asked for her to be escorted off the witness

10:15AM    8    stand, correct?  They asked -- the government asked you to

10:15AM    9    escort her back to a room off the witness stand?

10:15AM   10    A.   No.

10:15AM   11    Q.   You just --

10:15AM   12    A.   I made that decision.

10:15AM   13    Q.   Okay.  You made that decision?

10:15AM   14    A.   Yes.

10:15AM   15    Q.   Okay.  So, when you escorted her off the witness stand,

10:15AM   16    when you made that decision, you handed her off to an FBI

10:15AM   17    agent that handles witnesses, correct?

10:15AM   18    A.   Yes.

10:15AM   19    Q.   Okay.  So, when you left, you don't know what took place

10:15AM   20    or what room -- you said they took her into a room.  The FBI

10:15AM   21    agents took her to a room?

10:15AM   22    A.   Correct.

10:15AM   23    Q.   Outside of here?

10:15AM   24    A.   Correct.

10:15AM   25    Q.   Is there cameras out there that will show her going in

10:15AM  1  this room by herself and nobody going in there with her?

10:15AM  2  A.  I would need --

10:16AM  3  Q.  Or if somebody did go in there with her, the cameras will

10:16AM  4  show that, correct?

10:16AM  5  A.  Correct.

10:16AM  6  Q.  Okay.  And you never stood out there.  So, you can't say

10:16AM  7  if somebody went in there because you came back into the

10:16AM  8  courtroom, correct?

10:16AM  9  A.  That's correct.

10:16AM  10  Q.  Okay.  So, you don't have no idea if anybody went in

10:16AM  11  there and talked to her or went in that room while she was

10:16AM  12  sitting in the room for, like, what, 40 minutes I would say,

10:16AM  13  the whole time the Judge was in the chambers?

10:16AM  14  A.  No.  It wasn't that long.  It might have been 15, 20

10:16AM  15  minutes at the most.

10:16AM  16  Q.  Because I was in the back for, like, 15 minutes and I

10:16AM  17  came out here and I sat for, like, 20 minutes.  So, if we get

10:16AM  18  those -- if the judge subpoena those cameras, it will show if

10:16AM  19  somebody went in the room and talked to Jessica, correct, or

10:16AM  20  just went in the room, correct?

10:16AM  21  A.  Correct.

10:16AM  22          THE DEFENDANT:  No further questions, Your Honor.

10:16AM  23          MR. LENIHAN:  No redirect.

10:17AM  24          THE COURT:  All right.  Thank you, Mr. Scott.

10:17AM  25  (The witness was excused at 10:17 a.m.)

| | | |
|---|---|---|
| 10:17AM | 1 | THE COURT:  Who is the FBI agent? |
| 10:17AM | 2 | MR. LENIHAN:  I believe it's Husen Ali.  We can have |
| 10:17AM | 3 | her testify. |
| 10:17AM | 4 | THE COURT:  Put her on the stand.  I'll lake a five- |
| 10:17AM | 5 | minute break. |
| 10:17AM | 6 | MR. LENIHAN:  Sure. |
| 10:17AM | 7 | THE COURT:  And Mr. Arrington will be able to cross- |
| 10:17AM | 8 | examine her. |
| 10:17AM | 9 | MR. LENIHAN:  Yes. |
| 10:17AM | 10 | THE CLERK:  All rise. |
| 10:21AM | 11 | (A recess was taken from 10:17 a.m. to 10:21 a.m.) |
| 10:21AM | 12 | THE CLERK:  All rise.  You may be seated. |
| 10:21AM | 13 | THE COURT:  All right.  Mr. Lenihan? |
| 10:25AM | 14 | MR. LENIHAN:  Thank you, Your Honor.  The government |
| 10:25AM | 15 | would call Husen Ali. |
| 10:25AM | 16 | (The witness was sworn at 10:25 a.m.) |
| 10:25AM | 17 | THE CLERK:  Please state your name and spell it for |
| 10:25AM | 18 | the record. |
| 10:25AM | 19 | THE WITNESS:  Husen Ali, H-U-S-E-N, A-L-I. |
| 10:25AM | 20 | |
| 10:25AM | 21 | DIRECT EXAMINATION |
| 10:25AM | 22 | |
| 10:25AM | 23 | BY MR. LENIHAN: |
| 10:25AM | 24 | Q.  Good morning, ma'am. |
| 10:25AM | 25 | A.  Good morning. |

10:25AM   1   Q.  What do you do for a living?

10:25AM   2   A.  I'm a special agent with the FBI.

10:25AM   3   Q.  How long have been a special agent with the FBI?

10:25AM   4   A.  A little over a year and a half now.

10:25AM   5   Q.  And where are you assigned right now?

10:25AM   6   A.  I'm assigned to the Safe Streets Task Force.

10:26AM   7   Q.  What is the Safe Streets Task Force?

10:26AM   8   A.  We investigate gangs, drug trafficking, sex trafficking,

10:26AM   9   and illegally-possessed firearms.

10:26AM  10   Q.  Have you had the opportunity to help in preparation for

10:26AM  11   the trial that we're here today on, United States v. Roderick

10:26AM  12   Arrington?

10:26AM  13   A.  I have.

10:26AM  14   Q.  Have you been at -- in court to help facilitate trial

10:26AM  15   preparation?

10:26AM  16   A.  Yes.

10:26AM  17   Q.  Were you in court yesterday on September 13th, 2022?

10:26AM  18   A.  Yes.

10:26AM  19   Q.  Do you remember a woman by the name of Jessica

10:26AM  20   Kazukiewicz testifying?

10:26AM  21   A.  I do.

10:26AM  22   Q.  Do you remember if there was -- during her testimony, if

10:26AM  23   there had -- it had been decided that a break would be taken

10:26AM  24   by the Court?

10:26AM  25   A.  Yes.

10:26AM   1   Q.  Once the break occurred, can you describe what you

10:26AM   2   observed?

10:26AM   3   A.  She seemed to get upset that someone was staring at her

10:26AM   4   from Mr. Arrington's side of the family, and then the court

10:27AM   5   security officer made a decision to escort her out the room.

10:27AM   6   Q.  Where were you at this point?  Were you in courtroom?

10:27AM   7   A.  I was in courtroom.

10:27AM   8   Q.  Were you in the front of the courtroom or towards the

10:27AM   9   back of the courtroom?

10:27AM  10   A.  I was sitting in the back of the courtroom.

10:27AM  11   Q.  What happened after you saw the court security officer?

10:27AM  12   A.  I stood up because I knew she was going to be escorted

10:27AM  13   once he made that decision, and I escorted her out of the

10:27AM  14   courtroom.

10:27AM  15   Q.  Did the court security officer bring Ms. Kazukiewicz to

10:27AM  16   you?

10:27AM  17   A.  Yes, he did.

10:27AM  18   Q.  Where did you escort her to?

10:27AM  19   A.  The first set of double doors and then through the glass

10:27AM  20   doors.

10:27AM  21   Q.  And that would be to exit courtroom?

10:27AM  22   A.  Yes.

10:27AM  23   Q.  What happened next?

10:27AM  24   A.  I walked her out.  And, on her left side, there are rooms

10:27AM  25   for -- conference rooms open where witnesses had been staying

10:27AM   1   since the court started, and I put her in one of the rooms.

10:27AM   2   Q.  What did you do prior to putting Ms. Kazukiewicz in the

10:27AM   3   room?

10:27AM   4   A.  I walked her out, opened the door, let her into the room

10:27AM   5   and closed the door.

10:27AM   6   Q.  Was anyone else inside the room?

10:27AM   7   A.  Not when I put her in there, no.

10:28AM   8   Q.  What do you do next?

10:28AM   9   A.  I walked back into courtroom.

10:28AM  10   Q.  At any time, how long was your interaction with

10:28AM  11   Ms. Kazukiewicz at that point?

10:28AM  12   A.  Maybe a minute or so.

10:28AM  13   Q.  At any time, did you talk to her about her testimony?

10:28AM  14   A.  No, I did not.

10:28AM  15   Q.  Did you suggest that she should identify Mr. Arrington at

10:28AM  16   all?

10:28AM  17   A.  No.

10:28AM  18         MR. LENIHAN:  No further questions.

10:28AM  19         THE COURT:  Mr. Arrington?

10:28AM  20

10:28AM  21                        CROSS-EXAMINATION

10:28AM  22

10:28AM  23   BY THE DEFENDANT:

10:28AM  24   Q.  How are you doing, miss?

10:28AM  25   A.  Good.

ALI -- BY THE DEFENDANT -- 09/14/2022

10:28AM   1   Q.  You said you was here the whole time, and you seen the

10:28AM   2   interaction with Jessica and one of my family members?

10:28AM   3   A.  I heard it.  Yes.

10:28AM   4   Q.  What happened?  What took place?

10:28AM   5   A.  She got upset, said that someone from your side of the

10:28AM   6   family was staring at her.

10:28AM   7   Q.  Staring at her?

10:28AM   8   A.  Yes.

10:28AM   9   Q.  Okay.  Was that enough to remove her off the stand?

10:28AM  10   A.  That's not my decision to make.

10:28AM  11   Q.  Okay.  So, once you took her to this room, you took

10:29AM  12   her -- you walked her inside the room, or you just took her

10:29AM  13   to the door, and she just went in the room herself, and you

10:29AM  14   closed the door?

10:29AM  15   A.  I walked her out, opened the door, watched her walk into

10:29AM  16   the room, closed the door, and walked away.

10:29AM  17   Q.  You never went in there not once?

10:29AM  18   A.  No.

10:29AM  19   Q.  Did you stay at the door the whole time and make sure

10:29AM  20   nobody went in the room or you came back in here?

10:29AM  21   A.  I walked back into courtroom.

10:29AM  22   Q.  So, you don't know if somebody else went in the room with

10:29AM  23   her while you was in there, correct?

10:29AM  24   A.  I did not see anyone.

10:29AM  25   Q.  And you never went into the room?

| | | |
|---|---|---|
| 10:29AM | 1 | A.  I did not. |
| 10:29AM | 2 | Q.  Okay.  So, if we get the cameras, the camera is going to |
| 10:29AM | 3 | see that nobody went in that room after you escorted her in |
| 10:29AM | 4 | there and you came here? |
| 10:29AM | 5 | A.  I was not there. |
| 10:29AM | 6 | MR. LENIHAN:  She doesn't know that. |
| 10:29AM | 7 | THE DEFENDANT:  Okay.  No further questions. |
| 10:29AM | 8 | THE COURT:  All right.  Thank you, ma'am. |
| 10:29AM | 9 | (The witness was excused at 10:29 a.m.) |
| 10:29AM | 10 | THE COURT:  All right.  We're trying to get the |
| 10:29AM | 11 | video.  Should have it, I guess, some time in a few -- I don't |
| 10:29AM | 12 | want to say a few minutes, maybe 15, 20 minutes, half hour. |
| 10:30AM | 13 | So, stay in courtroom or stay available.  You can go outside |
| 10:30AM | 14 | if you want.  Just so when it's ready to go, we got to set it |
| 10:30AM | 15 | up in here, and I don't think anybody has seen the video. |
| 10:30AM | 16 | We'll show it for the first time in the courtroom. |
| 10:30AM | 17 | MR. LENIHAN:  Yes.  And there is another special |
| 10:30AM | 18 | agent that could discuss being -- |
| 10:30AM | 19 | THE COURT:  Ma'am, you're excused. |
| 10:30AM | 20 | THE WITNESS:  Oh. |
| 10:30AM | 21 | MR. LENIHAN:  There is another special agent that can |
| 10:30AM | 22 | discuss being with Ms. Kazukiewicz -- |
| 10:30AM | 23 | THE COURT:  There is another special agent? |
| 10:30AM | 24 | MR. LENIHAN:  -- during this 15, 20-minute window. |
| 10:30AM | 25 | THE COURT:  Do you have the person here? |

ALI -- BY THE DEFENDANT -- 09/14/2022

16

| | | |
|---|---|---|
| 10:30AM | 1 | MR. LENIHAN:  The person is here. |
| 10:30AM | 2 | THE COURT:  You ready to put them on the stand? |
| 10:30AM | 3 | MR. LENIHAN:  We can put them on the stand. |
| 10:30AM | 4 | THE COURT:  All right.  Let's do that. |
| 10:30AM | 5 | THE DEFENDANT:  That person went in the room?  He was |
| 10:30AM | 6 | in the room with her? |
| 10:30AM | 7 | MR. LENIHAN:  It's going to be Special Agent Robert |
| 10:30AM | 8 | Colunga. |
| 10:30AM | 9 | THE COURT:  Okay. |
| 10:31AM | 10 | THE DEFENDANT:  I'm sorry for laughing, Your Honor. |
| 10:31AM | 11 | I want to bring something to your attention, too, also. |
| 10:31AM | 12 | THE COURT:  Mr. Arrington, I don't want to have a |
| 10:31AM | 13 | conversation with you.  If you have something to say, let me |
| 10:31AM | 14 | know, and I'll listen. |
| 10:31AM | 15 | (The witness was sworn at 10:31 a.m.) |
| 10:31AM | 16 | THE CLERK:  State your name and spell it for the |
| 10:31AM | 17 | record. |
| 10:31AM | 18 | THE WITNESS:  Robert Colunga, R-O-B-E-R-T, |
| 10:31AM | 19 | C-O-L-U-N-G-A. |
| 10:31AM | 20 | MR. LENIHAN:  Permission to proceed? |
| | 21 | THE COURT:  Yes. |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1                         DIRECT EXAMINATION

2

3      BY MR. LENIHAN:

4      Q.   Good morning, sir.

5      A.   Good morning.

10:31AM   6      Q.   Where do you work?

10:31AM   7      A.   I work for the FBI.

10:31AM   8      Q.   What is your capacity with the FBI?

10:31AM   9      A.   I'm sorry?

10:31AM   10     Q.   What is -- in what capacity?

10:31AM   11     A.   I work on Safe Streets.  I work violent -- gangs, and

10:31AM   12     drugs, and violent crime.

10:31AM   13     Q.   Are you a special agent?

10:31AM   14     A.   Yes, sir.

10:31AM   15     Q.   How long have you been a special agent with the FBI?

10:31AM   16     A.   Since July of 2019.

10:32AM   17     Q.   Prior to July of 2019, did you have any other law

10:32AM   18     enforcement experience?

10:32AM   19     A.   Yes.  I was a police officer with the FBI in the uniform

10:32AM   20     division.

10:32AM   21     Q.   Where was that?

10:32AM   22     A.   Quantico, Virginia.

10:32AM   23     Q.   When did you start that position?

10:32AM   24     A.   Somewhere around June of 2014.

10:32AM   25     Q.   When you were assigned, when you became an FBI agent in

10:32AM 1 2019, what unit -- what field office were you assigned to?

10:32AM 2 A.  Buffalo.

10:32AM 3 Q.  Have you been helping with the trial preparation in the

10:32AM 4 trial of United States v. Roderick Arrington?

10:32AM 5 A.  Yes, sir.

10:32AM 6 Q.  And in that trial preparation, are you helping with,

10:32AM 7 like, getting evidence to the courtroom?

10:32AM 8 A.  Yes.

10:32AM 9 Q.  I want to draw your attention to yesterday, September

10:32AM 10 13th of 2022.  Were you present at the courthouse?

10:32AM 11 A.  Yes, sir.

10:32AM 12 Q.  Were you inside the courtroom during any testimony?

10:32AM 13 A.  No, sir.

10:33AM 14 Q.  Why not?

10:33AM 15 A.  It's my understanding I'm supposed to testify later on in

10:33AM 16 this trial, and I was advised not to be inside the courtroom.

10:33AM 17 Q.  Because there was a sequestration order?

10:33AM 18 A.  I believe so, yes.

10:33AM 19 Q.  Did you see any testimony of Jessica Kazukiewicz

10:33AM 20 yesterday?

10:33AM 21 A.  No.

10:33AM 22 Q.  Are you aware that Ms. Kazukiewicz was present at the

10:33AM 23 courthouse to testify yesterday afternoon?

10:33AM 24 A.  Yes.

10:33AM 25 Q.  And where were you -- do you remember there being a

10:33AM  1  recess that the Court had taken in the afternoon?

10:33AM  2  A.  Yes.

10:33AM  3  Q.  And describe what observations you made after the Court

10:33AM  4  took the recess in the -- yeah.  So, where were you when the

10:33AM  5  Court was taking the recess?

10:33AM  6  A.  I was in this hallway right outside these doors.

10:33AM  7  Q.  So, you were outside the courtroom doors?

10:33AM  8  A.  Correct.  Not, like, immediately outside the doors, but

10:33AM  9  further down to the left.

10:33AM  10  Q.  What observations did you make when the Court took the

10:34AM  11  recess?

10:34AM  12  A.  Just people walking around, and saw Jessica, but that's

10:34AM  13  pretty much it.

10:34AM  14  Q.  Where did you see Jessica go?

10:34AM  15  A.  I believe, at one time, she went to the bathroom, and she

10:34AM  16  went into one of the rooms off to the side.  That's it.

10:34AM  17  Q.  Where -- she was in a room?

10:34AM  18  A.  Yes.

10:34AM  19  Q.  Where is the bathroom in relation to where that room is?

10:34AM  20  A.  The bathroom is to the left of that room.

10:34AM  21  Q.  Did you go to the bathroom or in -- where did you go when

10:34AM  22  Ms. Kazukiewicz went to the bathroom?

10:34AM  23  A.  I walked a little bit behind her, or maybe I was in

10:34AM  24  front, I don't remember, but I was walking with her.  And

10:34AM  25  when she went to the bathroom, I stood outside the -- in the

| | | |
|---|---|---|
| 10:34AM | 1 | main hallway where everyone is. |
| 10:34AM | 2 | Q.  What was the point of walking or sort of escorting her to |
| 10:34AM | 3 | the bathroom? |
| 10:34AM | 4 | A.  Just to stay with her and make sure no one would talk to |
| 10:35AM | 5 | her or tamper with her. |
| 10:35AM | 6 | Q.  To protect her as well? |
| 10:35AM | 7 | A.  Correct. |
| 10:35AM | 8 | Q.  After Ms. Kazukiewicz went to the bathroom, what happened |
| 10:35AM | 9 | next?  Did she exit the bathroom at one point? |
| 10:35AM | 10 | A.  I knew she went to the bathroom.  There was one time |
| 10:35AM | 11 | where we sat inside the room.  I believe there were one or |
| 10:35AM | 12 | two recesses.  And then, another time, we sat outside on the |
| 10:35AM | 13 | bench in the main area. |
| 10:35AM | 14 | Q.  Did you have any interaction with Ms. Kazukiewicz |
| 10:35AM | 15 | while -- and, for purpose of the record, can you describe |
| 10:35AM | 16 | what the bench looks like in the hallway? |
| 10:35AM | 17 | A.  I believe it's, like, a brownish color, just like a flat, |
| 10:35AM | 18 | regular bench.  It's right out on the left-hand side in this |
| 10:35AM | 19 | hallway. |
| 10:35AM | 20 | Q.  You mentioned that Ms. Kazukiewicz went to sit down on a |
| 10:35AM | 21 | bench? |
| 10:35AM | 22 | A.  I asked her if she wanted to go back inside the room, and |
| 10:35AM | 23 | she stated that she did not want to go back inside the room, |
| 10:36AM | 24 | that she does not want to be scared -- she does not want to |
| 10:36AM | 25 | go back in the room.  She does not want to be scared anymore. |

| | | |
|---|---|---|
| 10:36AM | 1 | She wants to sit on the bench in front of everyone. |
| 10:36AM | 2 | Q.  Did Ms. Kazukiewicz sit down on the bench? |
| 10:36AM | 3 | A.  I don't remember if she sat on the bench or if she sat on |
| 10:36AM | 4 | her walker next to the bench. |
| 10:36AM | 5 | Q.  Where were you in relation to Ms. Kazukiewicz? |
| 10:36AM | 6 | A.  To her left on the bench. |
| 10:36AM | 7 | Q.  Did you have any conversation with her? |
| 10:36AM | 8 | A.  I think it was small conversation just about the rain. |
| 10:36AM | 9 | It was raining outside.  I remember telling her that I have a |
| 10:36AM | 10 | weather app on my phone. |
| 10:36AM | 11 | Q.  Anything else?  Any other conversation? |
| 10:36AM | 12 | A.  She seemed distraught and upset.  I didn't get into |
| 10:36AM | 13 | specifics with her about it because I want to maintain the |
| 10:36AM | 14 | integrity of the case.  I just told her to breathe, and tell |
| 10:36AM | 15 | the truth, and that's it. |
| 10:36AM | 16 | Q.  Did you ever suggest to her that she should identify |
| 10:36AM | 17 | Roderick Arrington? |
| 10:37AM | 18 | A.  No. |
| 10:37AM | 19 | Q.  Did you ever suggest to her that she should identify |
| 10:37AM | 20 | anyone in courtroom? |
| 10:37AM | 21 | A.  No. |
| 10:37AM | 22 | Q.  How long was, to the best that you can remember, Jessica |
| 10:37AM | 23 | sitting on the bench in the hallway? |
| 10:37AM | 24 | A.  About ten minutes or so. |
| 10:37AM | 25 | Q.  And you were next to her the entire time? |

10:37AM   1   A.   If not the entire time, 95 to 100 percent of the time.

10:37AM   2   Q.   What was the purpose of being next to her the 95 to 100

10:37AM   3   percent of the time?

10:37AM   4   A.   Same as when I escorted her to the bathroom, just to make

10:37AM   5   sure she was with somebody, that she wasn't alone, that she

10:37AM   6   was protected, and that no one would talk to her or tamper

10:37AM   7   with her.

10:37AM   8   Q.   Do you remember a time when she got -- when she was

10:37AM   9   called back to the witness stand?

10:37AM  10   A.   I do.

10:37AM  11   Q.   And can you discuss what you remember about that?

10:37AM  12   A.   I just remember she had got up.  She walked towards the

10:38AM  13   court doors.  I don't remember who was with her, but I did

10:38AM  14   not walk with her.

10:38AM  15   Q.   And you didn't suggest that she should identify the

10:38AM  16   defendant.  Did you see anyone suggest to her that she should

10:38AM  17   identify the defendant?

10:38AM  18   A.   No.

10:38AM  19   Q.   Did you see anyone suggest to her that she should

10:38AM  20   identify anybody as committing a crime?

10:38AM  21   A.   No.

10:38AM  22          MR. LENIHAN:  No further questions.

10:38AM  23          THE COURT:  All right.  Mr. Arrington?

10:38AM  24          THE DEFENDANT:  Yes.

10:38AM  25

| | | |
|---|---|---|
| 10:38AM | 1 | CROSS-EXAMINATION |
| 10:38AM | 2 | |
| 10:38AM | 3 | BY THE DEFENDANT: |
| 10:38AM | 4 | Q.  Mr. Colunga, you testified at one of my hearings, |
| 10:38AM | 5 | correct, involving the illegal search and seizure of my cell |
| 10:39AM | 6 | at the jail I was in, Cattaraugus County, right? |
| 10:39AM | 7 | A.  Yes, sir. |
| 10:39AM | 8 | Q.  And you testified and said that you wasn't investigating |
| 10:39AM | 9 | me for this case, or you wasn't involved in the investigation |
| 10:39AM | 10 | of this case, correct? |
| 10:39AM | 11 | A.  I wasn't investigating in the case, correct. |
| 10:39AM | 12 | Q.  Right.  But you was investigating me for another case, |
| 10:39AM | 13 | correct? |
| 10:39AM | 14 | A.  No, sir.  I was just helping out with the case. |
| 10:39AM | 15 | Q.  When you came and got my DNA? |
| 10:39AM | 16 | A.  Yes. |
| 10:39AM | 17 | Q.  When you filed that warrant application for my DNA for |
| 10:39AM | 18 | the Michael Payne case? |
| 10:39AM | 19 | A.  I don't remember who the person was, but, yes, for the |
| 10:39AM | 20 | DNA. |
| 10:39AM | 21 | Q.  But it states in that warrant application that you was |
| 10:39AM | 22 | the investigating special agent. |
| 10:39AM | 23 | A.  Investigating special agent for the search warrant. |
| 10:39AM | 24 | Q.  For the search warrant.  But you conducted that search, |
| 10:39AM | 25 | came and got my DNA, correct? |

10:39AM  1   A.  Correct.

10:39AM  2   Q.  And Assistant United States Attorney Tripi sent you to

10:39AM  3   come get that DNA, correct?

10:39AM  4   A.  Yes.

10:39AM  5   Q.  For that case, correct?

10:39AM  6   A.  Correct.

10:39AM  7   Q.  And that warrant application never said for comparison

10:40AM  8   for acquitted conduct, correct?

10:40AM  9   A.  I'd have to be refreshed with the search warrant

10:40AM  10  application.

10:40AM  11          MR. LENIHAN:  Objection.  Relevance.

10:40AM  12          THE COURT:  Sustained.

10:40AM  13          THE DEFENDANT:  The relevance is he's an experienced

10:40AM  14  special agent and this is a trial going on.  And when a

10:40AM  15  witness --

10:40AM  16          THE COURT:  Has nothing to do with the issue that

10:40AM  17  we're now facing.

10:40AM  18  BY THE DEFENDANT:

10:40AM  19  Q.  From your experience, when a witness is testifying --

10:40AM  20          THE COURT:  I think I sustained the objection.  You

10:40AM  21  want to keep talking, go ahead.

10:40AM  22          THE DEFENDANT:  No, this is for -- I'm rephrasing the

10:40AM  23  question, Your Honor.

10:40AM  24          THE COURT:  All right.  I'm sorry.

10:40AM  25

| | | |
|---|---|---|
| 10:40AM | 1 | BY THE DEFENDANT: |
| 10:40AM | 2 | Q.  From your experience, as a special agent, when a trial is |
| 10:40AM | 3 | going on, and a witness is on the stand, and they testifying, |
| 10:40AM | 4 | in the middle of they testimony, the judge recessed so she |
| 10:40AM | 5 | can refresh her recollection.  As it -- being a special |
| 10:40AM | 6 | agent, or helping the United States Attorneys by you |
| 10:41AM | 7 | assisting getting evidence to bring to courtroom or assisting |
| 10:41AM | 8 | bringing stuff over here, you was not supposed to have any |
| 10:41AM | 9 | contact with the witness, correct? |
| 10:41AM | 10 | A.  That's incorrect.  No one had told me I could not have |
| 10:41AM | 11 | any contact with her. |
| 10:41AM | 12 | Q.  But, from your experience, if the witness is in a |
| 10:41AM | 13 | courtroom testifying against the defendant that you're |
| 10:41AM | 14 | investigating, you should not have any type of contact or any |
| 10:41AM | 15 | conversations with her without anybody being around, correct? |
| 10:41AM | 16 | A.  Pertinent information to -- regarding the case, that |
| 10:41AM | 17 | would be correct.  There was -- |
| 10:41AM | 18 | Q.  But we don't know what that conversation was.  Only you |
| 10:41AM | 19 | and her know the conversation was.  But you wasn't even |
| 10:41AM | 20 | supposed to be talking to her.  She was supposed to be |
| 10:41AM | 21 | secured in a room, but you stalked her to the bathroom, |
| 10:41AM | 22 | waited for her to come out, and say you protecting her when |
| 10:41AM | 23 | we got cameras here.  She don't need your protection, |
| 10:41AM | 24 | correct? |
| 10:41AM | 25 | MR. LENIHAN:  Objection. |

10:41AM    1              THE DEFENDANT:  This is why --

10:41AM    2              THE REPORTER:  Hold on.  He objected.  Don't talk

10:42AM    3    over.

10:42AM    4              THE COURT:  Did you finish the question?

10:42AM    5              THE REPORTER:  Mr. Lenihan objected.

10:42AM    6              THE COURT:  Mr. Lenihan?

10:42AM    7              MR. LENIHAN:  He's testifying.  He's using the phrase

10:42AM    8    stalking.  There's no evidence of any stalking.

10:42AM    9              THE COURT:  You're objecting?

10:42AM   10              MR. LENIHAN:  Yes.

10:42AM   11              THE COURT:  Sustained.

10:42AM   12              THE DEFENDANT:  I can finish, Your Honor?

10:42AM   13              THE COURT:  Yes.

10:42AM   14    BY THE DEFENDANT:

10:42AM   15    Q.  If the court officer escorted Jessica to a room so she

10:42AM   16    could be secured because she's a testifying witness, and

10:43AM   17    she's in the middle of her testimony, you was not supposed to

10:43AM   18    have contact with that witness, correct?

10:43AM   19    A.  That's incorrect.  I was never told I could not have

10:43AM   20    contact with her.

10:43AM   21    Q.  But, you being a special agent, you being experienced,

10:43AM   22    you been doing this for years, you have knowledge to know not

10:43AM   23    to talk to a witness during their testimony at a trial when

10:43AM   24    she's being secured in a room, correct?

10:43AM   25    A.  Contained to pertinent information, that's correct.

10:43AM   1   Q.   Okay.  But nobody know what was said between y'all but

10:43AM   2   you and her, correct?

10:43AM   3   A.   I guess that's true.

10:43AM   4   Q.   Okay.  And you also went by one of my witness's houses --

10:43AM   5   one of my alibi witnesses houses -- a couple days ago

10:43AM   6   involving -- I don't understand.  Like, you say you got a

10:43AM   7   special agent in this case, but you pops up everywhere

10:44AM   8   involving my witnesses or witness testifying.

10:44AM   9       What is -- is you put on this case specifically to

10:44AM  10   investigate me, trying to get evidence during trial, or stop

10:44AM  11   certain evidence from coming into my trial?  Because,

10:44AM  12   yesterday, you was involved in a witness supposedly being

10:44AM  13   secured.  And here it is, you testifying.

10:44AM  14       But before you testify, the AUSA Lenihan lied to the Judge

10:44AM  15   and said nobody had contact with this woman.  And here it is,

10:44AM  16   we have you sitting here saying that you watched her go to the

10:44AM  17   bathroom, and you started a conversation with her.  And you

10:44AM  18   was protecting her.

10:44AM  19       Was -- something happened yesterday, and she was supposed

10:44AM  20   to be secured in a room.  Did you tell her to say certain

10:44AM  21   things or scare her, threaten her, to say certain things?

10:44AM  22   Because you only one that had contact with her when she was

10:45AM  23   supposed to be secured in the room.  Did you tell Ms. Jessica

10:45AM  24   anything when you wasn't supposed to have contact with her?

10:45AM  25   Did you say anything to her about her testimony or she was

10:45AM   1   supposed to be testifying about?  Because she was supposed to

10:45AM   2   be refreshing her recollection and she supposed to be secure.

10:45AM   3   Why was you having conversations with her where she was

10:45AM   4   supposed to be secured in that room?

10:45AM   5   A.  I don't know what question to answer, because you asked

10:45AM   6   me several questions.

10:45AM   7         THE COURT:  Did you have any contact with her,

10:45AM   8   conversation with her, about her testimony, sir?

10:45AM   9         THE WITNESS:  No, sir.

10:45AM  10   BY THE DEFENDANT:

10:45AM  11   Q.  Did you tell her to tell the truth?

10:45AM  12   A.  I told her to speak the truth, and that's it.

10:45AM  13   Q.  Why would you tell her to say -- tell the truth along --

10:45AM  14   what made you tell her to tell the truth?

10:45AM  15   A.  I tell everyone that to maintain the integrity of the

10:46AM  16   case.

10:46AM  17   Q.  In the middle of they testimony during a trial?

10:46AM  18   A.  She was not testifying.

10:46AM  19   Q.  She was -- the Judge left from the bench to refresh her

10:46AM  20   recollection.  She wasn't supposed to have contact with any

10:46AM  21   agents or special agents while her testimony is going on.

10:46AM  22   But you gave her advice?

10:46AM  23   A.  When she came out, I had no idea that she was on recess.

10:46AM  24   That was never conveyed to me by anyone including her.

10:46AM  25         THE DEFENDANT:  You knew what was going on.  Your

10:46AM 1   Honor, no further questions.  This witness is -- he's

10:46AM 2   involved this case.  He been involved in a lot of situations

10:46AM 3   in this case falsifying DNA reports.  This witness was

10:46AM 4   talking to the witness yesterday, and she was in the middle

10:46AM 5   of her testimony, Your Honor, and this witness -- I mean,

10:46AM 6   this special agent had contact with her, Your Honor.

10:47AM 7           THE COURT:  Mr. Lenihan?

10:47AM 8           THE DEFENDANT:  I don't have any more questions for

10:47AM 9   this witness.

10:47AM 10          MR. LENIHAN:  Redirect very briefly.

10:47AM 11

10:47AM 12                  REDIRECT EXAMINATION

10:47AM 13

10:47AM 14  BY MR. LENIHAN:

10:47AM 15  Q.  Special Agent Colunga, as part of helping bring a case to

10:47AM 16  trial, are you helping transport witnesses?

10:47AM 17  A.  That's correct.

10:47AM 18  Q.  Even if a witness -- and are you helping -- do you have

10:47AM 19  contact with witnesses when there are breaks?

10:47AM 20  A.  Yes.

10:47AM 21  Q.  And why do you have contact with witnesses during breaks?

10:47AM 22  A.  One, if they need to go to the bathroom; two, to make

10:47AM 23  sure they're okay; three, to make sure they're not having a

10:47AM 24  nervous breakdown; four, to make sure that no one is talking

10:47AM 25  to them or tampering with them or giving them any information

10:47AM   1   or scaring them.

10:47AM   2   Q.  And it's common for you to have the contact for those

10:47AM   3   reasons that you mentioned?

10:47AM   4   A.  That's correct.

10:47AM   5   Q.  Now, when a witness is testifying, are you allowed to ask

10:47AM   6   the witness about their testimony?

10:47AM   7   A.  No.

10:47AM   8   Q.  Did you ask Jessica about her testimony at all?

10:48AM   9   A.  No, I did not.

10:48AM  10   Q.  Is it fair to say that you are a relatively newer special

10:48AM  11   agent?

10:48AM  12   A.  That is correct.

10:48AM  13   Q.  Do you have much say in where you get assigned?

10:48AM  14   A.  No.

10:48AM  15         MR. LENIHAN:  No further questions, Your Honor.

10:48AM  16         THE DEFENDANT:  I have one more question, Your Honor.

10:48AM  17         THE COURT:  All right.

10:48AM  18

10:48AM  19                    RECROSS-EXAMINATION

10:48AM  20

10:48AM  21   BY THE DEFENDANT:

10:48AM  22   Q.  You said it's your job to escort witnesses from out

10:48AM  23   courtroom to the bathroom and stuff like that when they need

10:48AM  24   to use the bathroom?

10:48AM  25   A.  Yes.

10:48AM   1   Q.  Isn't that what we got marshals or officers like Bill --

10:48AM   2   I mean, court -- I mean, Officer Scott that escorted her to

10:48AM   3   the room so she could be safely in the room?  This what we

10:48AM   4   have court officers for.  So, wasn't you supposed to leave

10:48AM   5   that to Scott to escort her or make sure she was safe?  He

10:49AM   6   already did that.  So, why would you intervene?

10:49AM   7   A.  I intervened because she is with me.  I'm making sure

10:49AM   8   that no one tampers with her.  My job is to be with her to

10:49AM   9   make sure she is okay at all times.

10:49AM  10   Q.  The Court Security Guard Scott made sure she was safe

10:49AM  11   already.

10:49AM  12   A.  I don't know what court security or the marshal's job is.

10:49AM  13   All I know is that I'm going to be with her 24/7 to make sure

10:49AM  14   she's okay.

10:49AM  15   Q.  But you gave her advice yesterday to tell the truth,

10:49AM  16   correct?

10:49AM  17   A.  I told her to tell the truth.

10:49AM  18   Q.  Right.  And that's all you told her?

10:49AM  19   A.  We also talked about the weather, and several other

10:49AM  20   things that weren't pertinent to the case.

10:49AM  21   Q.  And the rain and the snow and stuff like that?

10:49AM  22   A.  Rain.  Correct.

10:49AM  23   Q.  Okay.  But you definitely gave her advice to tell the

10:49AM  24   truth?

10:49AM  25   A.  I told her tell the truth and to take deep breaths.

COLUNGA -- BY THE DEFENDANT-- 09/14/2022

| | | |
|---|---|---|
| 10:50AM | 1 | Q.  Okay.  And to say that she seen me, correct, because she |
| 10:50AM | 2 | didn't say that before she left. |
| 10:50AM | 3 | A.  That's incorrect. |
| 10:50AM | 4 | THE DEFENDANT:  No further questions, Your Honor. |
| 10:50AM | 5 | THE COURT:  Thank you, sir.  All right.  As soon as |
| 10:50AM | 6 | the video is ready, we'll show it in court. |
| 10:50AM | 7 | MR. LENIHAN:  Appreciate it. |
| 10:50AM | 8 | THE COURT:  Court will take a recess. |
| 10:50AM | 9 | THE CLERK:  All rise. |
| 11:12AM | 10 | (A recess was taken from 10:50 a.m. to 11:28 a.m.) |
| 11:28AM | 11 | THE CLERK:  All rise.  You may be seated. |
| 11:28AM | 12 | THE COURT:  All right.  I understand that the video |
| 11:28AM | 13 | has been prepared, and I guess there's four cameras out there, |
| 11:28AM | 14 | and three cameras that had some visuals as to the witness |
| 11:28AM | 15 | during that recess.  What's the time that's in the -- what |
| 11:28AM | 16 | time was this yesterday, from what time to what time? |
| 11:28AM | 17 | MR. POWERS:  According to the marshals, it was -- |
| 11:28AM | 18 | THE COURT:  Yeah.  What does it say on there? |
| 11:28AM | 19 | MR. POWERS:  It says 14:29, which is 2:29. |
| 11:29AM | 20 | THE COURT:  To what time? |
| 11:29AM | 21 | MR. POWERS:  To 2:49 is the video that is -- |
| 11:29AM | 22 | THE COURT:  And your name is sir? |
| 11:29AM | 23 | MR. POWERS:  I'm William Powers, Director of IT. |
| 11:29AM | 24 | THE COURT:  You work for the Clerk's Office? |
| 11:29AM | 25 | MR. POWERS:  I do. |

11:29AM    1              THE COURT:  You are the technical person?

11:29AM    2              MR. POWERS:  Yes.

11:29AM    3              THE COURT:  Okay.  I haven't seen -- I don't think

11:29AM    4    anybody has seen this except the tech people, and there were

11:29AM    5    three of them.  They're altogether.  Is that it?

11:29AM    6              MR. POWERS:  According to the Marshal Service,

11:29AM    7    there's four cameras that are all recording at the same time.

11:29AM    8    They've provided us with all four angles, but they're separate

11:29AM    9    files.  They cannot be viewed at the same time.

11:29AM   10              THE COURT:  Okay.  But there's three cameras that

11:29AM   11    actually show the witness during this recess?

11:29AM   12              MR. LENIHAN:  Yes.

11:29AM   13              THE COURT:  Okay.  Let's put it on.  How long is it

11:29AM   14    altogether?

11:29AM   15              MR. POWERS:  Each camera is -- we've got 21 minutes

11:29AM   16    of each camera.

11:29AM   17              THE COURT:  But it's all -- the whole thing is going

11:29AM   18    to be 20 minutes?

11:30AM   19              MR. POWERS:  You'd have to watch all three of them.

11:30AM   20    They're all 21 minutes in length, all three of them.

11:30AM   21              THE COURT:  So, it's going to be altogether --

11:30AM   22              MR. POWERS:  Forty minutes if you watch the whole

11:30AM   23    thing.

11:30AM   24              THE COURT:  It's going to be more than 40.

11:30AM   25              MR. POWERS:  Sixty minutes.

11:30AM   1          THE COURT:  All right.  Let's start playing.

11:30AM   2          MR. LENIHAN:  I don't think we'll have to watch the

11:30AM   3  whole first one, Judge.  This is inside the courtroom.

11:30AM   4          THE COURT:  Pardon me?

11:30AM   5          MR. LENIHAN:  The first video is inside the

11:30AM   6  courtroom.  We'll probably only have to watch three minutes of

11:30AM   7  it.

11:30AM   8          THE COURT:  All right.  And the rest of it -- we're

11:30AM   9  going to play it all.

11:30AM  10          THE DEFENDANT:  Do we have audio?

11:30AM  11          MR. POWERS:  There is no audio.

11:30AM  12          THE COURT:  There's no audio.

11:31AM  13  (The recording was played.)

11:31AM  14          THE COURT:  By the way, we're going to mark this

11:31AM  15  Court Exhibit 1, this video.

11:31AM  16  (Court Exhibit 1 was marked for identification.)

11:31AM  17

11:31AM  18          THE COURT:  I think it's Court Exhibit 1.  That's the

11:32AM  19  witness leaving the courtroom.  This is like, two minutes in

11:32AM  20  the beginning of it?

11:32AM  21          MR. LENIHAN:  Correct.

11:32AM  22          THE COURT:  She's being escorted out by Mr. Scott.

11:32AM  23          MR. LENIHAN:  And, Judge, I think this would -- she

11:32AM  24  doesn't come back into screen.

11:32AM  25          THE COURT:  I'm sorry?

11:32AM   1            MR. LENIHAN:  She doesn't come back into the screen

11:32AM   2   until she comes back on the witness stand when the jury is

11:32AM   3   out.  Our jury comes back.  I think we can go to the next

11:33AM   4   video.

11:33AM   5            THE DEFENDANT:  I want to watch it.

11:33AM   6            MR. LENIHAN:  This is the courtroom video?

11:33AM   7            THE COURT:  Right.

11:33AM   8            MR. LENIHAN:  The witness doesn't come back until

11:33AM   9   later.  We could either fast forward it or go to the next --

11:33AM  10            THE COURT:  Let's fast forward, because there's

11:33AM  11   nothing else going on.

11:33AM  12            MR. POWERS:  Do you have an approximation of when

11:33AM  13   they come back in courtroom?  No?  Okay.

11:33AM  14            THE COURT:  Where are we now, at 14:33?

11:33AM  15            MR. POWERS:  Yes.

11:33AM  16            THE COURT:  And 37 seconds.  All right.  We're at

11:35AM  17   14:35.  I'm not on the bench, and all the parties are at the

11:35AM  18   seats.  The witness is not back in courtroom.  That's on the

11:35AM  19   record.  We're showing -- this is the courtroom.  This is one

11:35AM  20   of the four cameras?

11:35AM  21            MR. POWERS:  Yes.

11:35AM  22            THE COURT:  And the other three cameras are outside?

11:35AM  23            MR. POWERS:  Yes.

11:40AM  24            THE COURT:  Now, we're at 14:40, and the scene is

11:40AM  25   basically the courtroom.  I'm still not in the courtroom, and

| 11:40AM | 1 | just watching the participants waiting to return the witness. |
| 11:49AM | 2 | I notice on the video in 14:49:12, the jury is returning |
| 11:49AM | 3 | to courtroom. |
| 11:49AM | 4 | I notice at 14:49:45, the witness has returned to the |
| 11:49AM | 5 | jury -- to the witness box.  All right.  That ends at 14 |
| 11:50AM | 6 | whatever. |
| 11:50AM | 7 | THE DEFENDANT:  Excuse me, Your Honor, they skipped |
| 11:50AM | 8 | past the first four minutes. |
| 11:50AM | 9 | THE COURT:  I don't want you to say anything, okay? |
| 11:50AM | 10 | We're just going to show the video. |
| 11:50AM | 11 | THE DEFENDANT:  It's crazy. |
| 11:50AM | 12 | THE COURT:  Now, we're going to -- this is the second |
| 11:50AM | 13 | camera. |
| 11:50AM | 14 | MR. POWERS:  This is the second camera. |
| 11:50AM | 15 | THE COURT:  This is outside the courtroom? |
| 11:50AM | 16 | MR. POWERS:  I'll start it from the beginning. |
| 11:50AM | 17 | THE COURT:  And we're at 14:29:47.  This is one of |
| 11:51AM | 18 | three cameras? |
| 11:51AM | 19 | MR. POWERS:  Mm-hmm. |
| 11:51AM | 20 | THE COURT:  Again, one camera has nothing to do with |
| 11:51AM | 21 | the witness.  The other two do? |
| 11:51AM | 22 | MR. POWERS:  Yes. |
| 11:51AM | 23 | THE COURT:  Okay.  On the screen now all it -- |
| 11:51AM | 24 | appears to be a number of gentleman standing in the hallway |
| 11:51AM | 25 | looking out the window or engaging in conversation.  I note at |

11:52AM  1  14:30:25, I believe that was Mr. Scott outside the washroom,

11:52AM  2  the ladies' room.  The bottom of the screen, I note there are,

11:52AM  3  I believe, members of Mr. Arrington's family or friends.  I

11:53AM  4  believe it's at 14:31:35, the witness is being escorted to

11:53AM  5  another room off the lobby.  At 14:33:05, the witness is being

11:55AM  6  brought back into courtroom.

11:55AM  7       MR. LENIHAN:  That was Mr. Foti and his prior

11:55AM  8  assistant.

11:55AM  9       THE COURT:  That's not the witness?

11:55AM  10       MR. LENIHAN:  No.

11:55AM  11       THE COURT:  Oh, okay.  I've never seen this before.

11:55AM  12  I don't think anybody else has.

11:55AM  13       MR. LENIHAN:  No.  I just remember meeting Mr. Foti's

11:55AM  14  assistant yesterday.

11:55AM  15       THE COURT:  Okay.  At 14:37, again, there's a couple

11:59AM  16  of individuals that are standing by the window.  I don't see

11:59AM  17  the witness.  I'm assuming that, during this period of time,

11:59AM  18  that the witness went to the ladies' room consistent with the

11:59AM  19  testimony that I heard in court, and that the witness is

11:59AM  20  either in the ladies' room or she's sitting at the bench.  The

11:59AM  21  bench is up on the wall on the left side of that picture right

11:59AM  22  behind where that American flag is located.

12:02PM  23       I note at 14:40 and one or two seconds, there's -- well,

12:02PM  24  there's two individuals at 14:40:12 standing on the left side

12:02PM  25  of the screen.  I assume that's where the witness is still

| | | |
|---|---|---|
| 12:02PM | 1 | sitting.  That would be, according to the testimony of the FBI |
| 12:02PM | 2 | agent, who escorted her into the lobby or the ladies' room. |
| 12:06PM | 3 | We're at 14:44.  The scene has not changed for the last few |
| 12:06PM | 4 | minutes.  Does this continue for how long?  Do you know? |
| 12:06PM | 5 | We're at -- the scene we're looking at here, we don't know? |
| 12:06PM | 6 | MR. POWERS:  No. |
| 12:06PM | 7 | THE COURT:  How long will this go on for? |
| 12:06PM | 8 | MR. POWERS:  There's another six minutes left in this |
| 12:06PM | 9 | video. |
| 12:06PM | 10 | THE COURT:  Another six minutes?  Okay.  Then we have |
| 12:06PM | 11 | one more video after this one? |
| 12:06PM | 12 | MR. POWERS:  Yes.  I can fast forward to the scene. |
| 12:06PM | 13 | THE COURT:  Does the scene change at all? |
| 12:06PM | 14 | MR. POWERS:  I'm not -- |
| 12:06PM | 15 | THE COURT:  This remains pretty much the same? |
| 12:06PM | 16 | MR. POWERS:  I haven't seen it, so I don't know. |
| 12:06PM | 17 | THE COURT:  Okay.  All right.  Well, we'll run it |
| 12:06PM | 18 | then.  All right.  That ended at what time? |
| 12:12PM | 19 | MR. POWERS:  It's 14:50:13. |
| 12:12PM | 20 | THE COURT:  Thirteen?  Okay.  One more video. |
| 12:12PM | 21 | MR. POWERS:  Mm-hmm. |
| 12:12PM | 22 | THE COURT:  How long is this one? |
| 12:12PM | 23 | MR. POWERS:  Twenty-one minutes.  The same. |
| 12:12PM | 24 | THE COURT:  All right.  I think this should be three |
| 12:12PM | 25 | exhibits.  The first one will be Court Exhibit 1.  The second |

12:12PM  1  will be Court Exhibit 2, and this third one will be Court

12:12PM  2  Exhibit 3.

12:12PM  3  (Court Exhibits 2 and 3 were marked for identification.)

12:12PM  4

12:13PM  5      THE COURT:  This is showing a view of the other end

12:13PM  6  of the lobby outside the courtroom, where the elevators are

12:13PM  7  located, which is in the video.  The second video is at the

12:13PM  8  end of the lobby distances.  This is more or less at the

12:13PM  9  beginning of the lobby as it goes west.  On the left side,

12:13PM  10  there's windows which are showing Buffalo City Court and City

12:13PM  11  Hall of Buffalo.  This is on the ninth floor for the record of

12:13PM  12  the courthouse.

12:13PM  13      And, again, we're showing at 14:30 facing west just a

12:13PM  14  number of individuals standing there by the window in the

12:14PM  15  direction of where my courtroom is located.  Looking at the

12:16PM  16  video now, it looks like just a number of people standing by

12:16PM  17  the window, some with proximity to the courthouse where the

12:16PM  18  bench was, and where the ladies' washroom is.  You cannot see

12:16PM  19  the witness at this point in time from the video.

12:16PM  20      MR. LENIHAN:  She did walk, Your Honor, maybe 40

12:16PM  21  seconds earlier around like 14 -- or around, like, 14:32.

12:16PM  22      THE COURT:  Who took a walk around?

12:16PM  23      MR. LENIHAN:  The witness.  We could see her come

12:16PM  24  into screen.

12:16PM  25      THE COURT:  All right.

| | | |
|---|---|---|
| 12:16PM | 1 | MR. LENIHAN:  Then she went over to the right side of |
| 12:16PM | 2 | this video, which would have been to the witness's left.  And |
| 12:16PM | 3 | then, this is the witness with the walker at 14:33:08. |
| 12:17PM | 4 | THE COURT:  You can see her on the right side of the |
| 12:17PM | 5 | screen.  I can see the walker.  I can see the witness. |
| 12:17PM | 6 | MR. LENIHAN:  She's walking, Your Honor, towards the |
| 12:17PM | 7 | ladies' bathroom.  Your Honor, now at 14:56:12, you see the |
| 12:20PM | 8 | witness coming out of the area of the female bathroom with the |
| 12:20PM | 9 | walker. |
| 12:20PM | 10 | THE COURT:  And that's it? |
| 12:20PM | 11 | THE DEFENDANT:  She was escorted with Colunga the |
| 12:20PM | 12 | whole time.  He was over there with her the whole time, Your |
| 12:20PM | 13 | Honor.  That's what they leaving out.  They filmed -- |
| 12:20PM | 14 | realized -- he -- Colunga was over there with her the whole |
| 12:20PM | 15 | time.  He escorted her over there and was over there the whole |
| 12:20PM | 16 | time off camera. |
| 12:25PM | 17 | THE COURT:  I note that at 14:41:30 and whatever |
| 12:25PM | 18 | there hasn't been anybody in the video, and at 14:41:37 |
| 12:25PM | 19 | someone did appear to be walking toward the elevators.  When |
| 12:28PM | 20 | does this video end at, what time? |
| 12:28PM | 21 | MR. POWERS:  Right now? |
| 12:28PM | 22 | THE COURT:  No, when does it end?  Is it 14:40? |
| 12:28PM | 23 | MR. POWERS:  It ends in five and a half minutes.  So |
| 12:28PM | 24 | it will be 14:50, 14:51. |
| 12:28PM | 25 | THE COURT:  Fifty-one? |

| | | |
|---|---|---|
| 12:28PM | 1 | MR. POWERS:  I think at 14:50 it will end. |
| 12:33PM | 2 | THE COURT:  At 14:50:14.  All right.  That concludes |
| 12:34PM | 3 | it.  All right.  That, I think, pretty much concludes this |
| 12:34PM | 4 | hearing.  Thank you, sir.  We're going to have to have those |
| 12:34PM | 5 | three videos as Court Exhibit 1, 2, and 3, as I earlier |
| 12:34PM | 6 | indicated.  All right.  Anything further for today? |
| 12:34PM | 7 | MR. LENIHAN:  No, Your Honor. |
| 12:34PM | 8 | THE DEFENDANT:  You want me to put something in |
| 12:34PM | 9 | writing, Your Honor? |
| 12:34PM | 10 | THE COURT:  No.  I want it right now.  This is it. |
| 12:34PM | 11 | THE DEFENDANT:  Your Honor, the camera speaks for |
| 12:34PM | 12 | itself, Your Honor.  When she got escorted out of here without |
| 12:35PM | 13 | your permission, as a testifying witness that was -- you gave |
| 12:35PM | 14 | her ten minutes to refresh her recollection.  The government |
| 12:35PM | 15 | had her removed to an unsecure location.  And as you can see, |
| 12:35PM | 16 | in Exhibit 3, that when she come out, and she being escorted |
| 12:35PM | 17 | down the hall, you see Special Agent Colunga come from the |
| 12:35PM | 18 | window, goes over to this blind spot, and was over there with |
| 12:35PM | 19 | her talking to her for the whole 20-something minutes off |
| 12:35PM | 20 | camera. |
| 12:35PM | 21 | If you do the readback on her testimony, before she left |
| 12:35PM | 22 | out of here, Your Honor, she was hostile with the government. |
| 12:35PM | 23 | She was refusing to identify me.  She was -- she didn't |
| 12:35PM | 24 | identify me.  And the whole time she's over there talking to |
| 12:36PM | 25 | Special Agent Colunga, she comes in and says -- blurting out |

12:36PM  1   stuff, saying stuff, you know, that I wasn't even questioning

12:36PM  2   her about, and changes her story and starts screaming out that

12:36PM  3   I know what I did.  You know what you did.  And I'm like, what

12:36PM  4   are you talking about?  What's going on?  I'm not even asking

12:36PM  5   you a question.  She start blurting out, you killed him, you

12:36PM  6   know what you did.

12:36PM  7       And I'm moving for a mistrial with prejudice, Your Honor,

12:36PM  8   because whatever Colunga told her to come here and say, she

12:36PM  9   said it, and the jury's heard that, and you can never take

12:36PM  10   that from the jury's minds.  And it's not fair.  It's unfair.

12:36PM  11   And they took it upon they self when they seen a situation

12:36PM  12   going left, and it's going out of -- whatever they thought

12:36PM  13   that she was going to testify to.

12:36PM  14       But as I'm here going to trial, Your Honor, saying I'm

12:36PM  15   innocent, I didn't commit this crime, and for the testimony to

12:37PM  16   go totally different for the government, and she's not

12:37PM  17   cooperating with the government, and she's saying that she

12:37PM  18   never seen me, and she never seen my face, and then come in

12:37PM  19   here and changes her story, Your Honor, because a special

12:37PM  20   agent that's been constantly involved in this case raiding my

12:37PM  21   cell, seizing my materials, my materials coming up missing,

12:37PM  22   he's going by my alibi witness's house trying to get them to

12:37PM  23   tell them what she going to testify to, he's constantly,

12:37PM  24   constantly, reappearing in this case, Your Honor, doing foul

12:37PM  25   things.

12:37PM  1    And when that witness was on the bench during her

12:37PM  2    examination testimony, the government calls her out so the

12:37PM  3    agents can have they way with her, and it's not fair.  And you

12:37PM  4    can never erase what she said out of the jury's minds, Your

12:37PM  5    Honor.

12:38PM  6         During trial, I'm sitting here during trial.  This is a

12:38PM  7    witness that was with the deceased or the person that got

12:38PM  8    killed, Your Honor.  She never identified me, Your Honor.  And

12:38PM  9    the government seen it wasn't going their way, and they took

12:38PM 10    this recess, and without you being on the bench, they took it

12:38PM 11    upon they selves to get her outside to change her story and

12:38PM 12    I'm moving this Court for a mistrial with prejudice, Your

12:38PM 13    Honor.

12:38PM 14         THE COURT:  Mr. Lenihan?

12:38PM 15         MR. LENIHAN:  A couple points, Your Honor.  As the

12:38PM 16    testimony bore out from Court Security Officer Scott, the

12:38PM 17    government didn't make the determination to ask

12:38PM 18    Ms. Kazukiewicz to leave the witness stand.  It was made in

12:38PM 19    the moment for her security to calm down a situation that

12:38PM 20    occurred in this courtroom.  And the video bears that out.

12:38PM 21         The video also corroborates Special Agent Colunga's

12:39PM 22    testimony that he was with her, but he testified credibly that

12:39PM 23    he never told her to say anything, to identify the defendant;

12:39PM 24    that all he told to her was to calm down a little bit and just

12:39PM 25    tell the truth.  The witness herself corroborates all of this.

12:39PM    1    The defendant asked the witness, did the government tell you

12:39PM    2    anything, and her answer was, why would they tell me?  They

12:39PM    3    didn't tell me anything.  Her testimony was that no one from

12:39PM    4    the government told her what to say and to identify the

12:39PM    5    defendant.  The defendant choose to cross-examine her, and she

12:39PM    6    testified as to how she testified.

12:39PM    7      There's -- we never asked for an in-court identification.

12:39PM    8    We had briefed this issue.  The Court had precluded the in-

12:39PM    9    court identification at the first trial due to that Facebook

12:39PM   10    photograph that was shown to her prior to her Grand Jury

12:39PM   11    testimony.

12:39PM   12      So, when we made our representation over the weekend as to

12:40PM   13    seeking her identification evidence, it was purely for the

12:40PM   14    photo arrays; the two photo arrays where she said, on the one,

12:40PM   15    she'd have to see Mr. Arrington in person, and on the other,

12:40PM   16    she said she was 45 percent sure, but would have to see him in

12:40PM   17    person.

12:40PM   18      And Mr. Arrington started asking her about what would

12:40PM   19    happen if she saw him in person and the answer was something

12:40PM   20    that he really didn't like.  There's no evidence of misconduct

12:40PM   21    whatsoever, pure speculation, pure conspiracy theory.  We'd

12:40PM   22    ask the Court to deny the defendant's application.

12:40PM   23          THE DEFENDANT:  Your Honor, can I say something?

12:40PM   24          THE COURT:  Yes.

12:40PM   25          THE DEFENDANT:  The video speak for itself, Your

12:40PM  1  Honor.  Colunga didn't have no right to be telling her what

12:40PM  2  to -- testimony or giving her advice of what her testimony

12:40PM  3  should say.  He's an experienced special agent.  He know the

12:40PM  4  rules of this courtroom and what he should and should not do.

12:40PM  5      Your Honor, he specifically came in here -- first and

12:41PM  6  foremost, AUSA Lenihan lied to you when you asked him about

12:41PM  7  her being secured in this room.  He said nobody had access to

12:41PM  8  her.  She was in the room the whole time.  Once he found out

12:41PM  9  the cameras was coming about, his story totally changed, Your

12:41PM 10  Honor.

12:41PM 11          MR. LENIHAN:  Judge, I mean, on that point, I have to

12:41PM 12  rely on --

12:41PM 13          THE DEFENDANT:  I was still -- not finished.  I

12:41PM 14  wasn't finished talking.  I gave you your piece, give me my

12:41PM 15  piece, please.

12:41PM 16      When the Judge asked you, you told the Judge that she was

12:41PM 17  in a secure place.  Nobody had access to her.  Nobody went in

12:41PM 18  the room with her.  Once you found out that cameras was

12:41PM 19  involved and the Judge was getting his camera in, your

12:41PM 20  testimony changed twice.  First you said the female special

12:41PM 21  agent, and then, oh, one more.

12:41PM 22      Colunga had direct contact with this lady in the corner

12:41PM 23  off the camera in a blind spot sitting there with her for 20

12:42PM 24  minutes talking to her, giving her advice on what to testify

12:42PM 25  to.  We couldn't hear what they were saying, but what -- her

46

12:42PM   1   actions when she came back in here tells the story of what

12:42PM   2   took place.  And it was definitely misconduct being committed,

12:42PM   3   Your Honor.  So, I'm asking this Court --

12:42PM   4          MR. LENIHAN:  Judge, on that point, I wasn't present.

12:42PM   5   I have to rely on what's told to me.  I was relying on the

12:42PM   6   fact that there was no contact.  It was a fact-finding mission

12:42PM   7   this morning.  As we developed more facts and we talked to

12:42PM   8   more people, we learned that Special Agent Colunga did, in

12:42PM   9   fact, escort her to the bathroom.  And then, as Special Agent

12:42PM  10   Colunga sat down on the bench, when I made that

12:42PM  11   representation, I didn't know that it was evolving this

12:42PM  12   morning.  I'm doing the best I can to give the Court the

12:42PM  13   information as to what I knew at the time.

12:42PM  14          THE DEFENDANT:  Your Honor, he knew it was special --

12:42PM  15          THE COURT:  All right.  No, no.  No more talking.

12:42PM  16   I've heard enough.  I've seen the evidence.  I'll render a

12:42PM  17   decision tomorrow morning at 10 o'clock.  All right.  We'll

12:43PM  18   recess for the day.

12:43PM  19   (Proceedings concluded at 12:43 p.m.)

         20

         21

         22

         23

         24

         25

1                  *     *     *     *     *     *     *

2

3              I certify that the foregoing is a

4         correct transcription of the proceedings

5         recorded by me in this matter.

6

7

8

9                              s/ Megan E. Pelka, RPR

10                             Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25