IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,           )
       Plaintiff                    )
                          )
v.                                   )
                          )   Case No. 1:15-cr-00033-RJA-HBS
AARON HICKS,                         )
       Defendant                    )
_____   )

## DEFENDANT'S MOTION FOR RELIEF UNDER RULE 60(b) and RULE 59(a)

Now comes the Defendant, Aaron Hicks, pro se, and hereby moves this Honorable Court for relief from judgment in this matter under Rule 60(b) and/or Rule 59(a). In support of this motion, the Defendant states the following:

### I. BACKGROUND

The Defendant went to trial on Count 1, Racketeering Conspiracy in violation of 18 USC §§ 1961(3), 1961(5), 1962(c) and 1962(d); Count 2, Narcotics Conspiracy to possess with the intent to distribute, and to distribute 5 kg or more of cocaine, cocaine base, and marijuana, in violation of 21 USC §§846, 841(a)(1), 841(b)(1)(C) and 841(b)(1)(D), and Count 3, possession of firearms in furtherance of a crime of violence and a drug trafficking crime, in violation of 18 USC §924(c)(1)(A)(i).

At the conclusion of the trial, the jury rendered its verdict as follows: Count 1 - unable to render an unanimous verdict; Count 2 - an unanimous guilty verdict as to marijuana only; and Count 3 - an unanimous not guilty verdict. See Docket No. 258.

Subsequently, the Government retried the Defendant as to Count 1, the RICO conspiracy charge. At the retrial, the Government relied on substantially the same evidence that it had presented during the first trial. The only new evidence at the second trial was the testimony of a government witness, Jerome Grant.

During the second trial, the Government relied heavily on the alleged evidence of the cocaine conspiracy that the Defendant was previously acquitted of and the Government relied heavily on the testimony of Jerome Grant. At the conclusion of the second trial, the jury returned a guilty verdict as to the RICO conspiracy charge.

Since the conclusion of the second trial, new evidence and information has been discovered that raises numerous constitutional concerns regarding the judgments entered against the Defendant. That new evidence includes 1) evidence of juror bias and/or misconduct in both trials; 2) judicial bias and/or misconduct in at least the second trial; and 3) prosecutorial misconduct, including knowingly presenting false testimony and withholding material evidence.

## II. FACTS AND INFORMATION DISCOVERED SINCE THE SECOND TRIAL

### A. Juror and Judicial Issues

Since the conclusion of the second trial, the Defendant hired a private investigator, Paul H. Lawrence, LPI, of Empire Investigations, which is located at 733 Delaware Road, Buffalo, New York. Through Mr. Lawrence's investigation, the Defenadnt has learned about numerous improprieties during the criminal trials.

Charlene G. Barbary was a juror on the Defendant's federal criminal jury. Ms. Barbary was the only African-American juror, all other jurors were white except for one juror who was Puerto Rican. (Exhibit 1 - Affidavit of Charlene Barbary). During deliberations, Ms. Barbary expressed that she did not believe that the Government had proven its case. (Exhibit 1). Ms. Barbary also observed other jurors openly stereotyping the Defendant based on his race and based on the part of Buffalo that he was from. (Exhibit 1). Some of the jurors appeared unhappy with Ms. Barbary's not guilty vote and those jurors repeatedly asked Ms. Barbary if there was anything else that she needed to see to assist in her decision. (Exhibit 1). A white female juror, believed to be the jury foreperson, was visibly more upset than the other jurors regarding Ms. Barbary's not

guilty vote. (Exhibit 1). That juror (foreperson) went out to speak to the judge. (Exhibit 1). This upset Ms. Barbary and she left the deliberation room crying. (Exhibit 1). Subseqently, the Judge had Ms. Barbary brought into his chambers alone, and the judge began discussing the case with Ms. Barbary. (Exhibit 1). Ms. Barbary felt that this meeting with the judge was "peculiar". (Exhibit 1). During the meeting with the trial judge, Ms. Barbary became uncomfortable. (Exhibit 1). Ms. Barbary was uncomfortable, in part, because the trial judge informed her that he had explained to the Defendant that if the Defendant did not accept a plea, that the Defendant would lose at trial, and that upon losing trial, the Court would sentence the Defendant to the maximum sentence. (Exhibit 1). Ms. Barbary believed that the maximum sentence was 25-30 years to life. (Exhibit 1). Ms. Barbary was confused as to why the trial judge provided her with this information. (Exhibit 1). Ms. Barbary believed that the judge should have addressed all of the jurors, rather than only her. (Exhibit 1). At this point, Ms. Barbary felt immense pressure to change her not guilty vote to a guilty vote. (Exhibit 1). Ms. Barbary felt that both the other jurors and the trial judge were pressuring her to change her vote to guilty. (Exhibit 1). Ms. Barbary regretted her decision and she believed her not guilty vote was the vote she should have made. (Exhibit 1).   .

Patricia A. Kessel was a juror in the Defendant's criminal trial. (Exhibit 2 - Affidavit of Patricia Kessel). During deliberations, Ms. Kessel observed numerous other jurors stereotyping the Defendant based on his race and based on the part of Buffalo that he was from. (Exhibit 2). Ms. Kessel also observed numerous jurors that were more concerned with going home than deliberating the case. (Exhibit 2). During the deliberations, Ms. Kessel felt intimidated by numerous jurors an she voiced her concerns to the jury foreperson. (Exhibit 2). Ms. Kessel believed that the foreperson wrote a note to the Court, however, Ms. Kessel did not know what the note said. (Exhibit 2). Ms. Kessel observed that the other jurors appeared to completely disregard the jury

instructions. (Exhibit 2). Ms. Kessel also observed numerous jurors discussing the case before the trial was over. (Exhibit 2).

## B. False Testimony Presented by the Government

Prior to the second trial, the Government disclosed the anticipated testimony of Jerome Grant. That Government stated that Jerome Grant would testify that 1) after Grant was released from prison in 2011, that Grant sold marijuana and cocaine supplied by Defendant and Grant would help Defendant pick up and break down quantities of marijuana; 2) that Defendant had told Grant about Davison's murder and that Defendant told Grant that Defendant "couldn't let it go."; 3) that in 2006, that Grant purchased an ounce or two ounces of marijuana from Defendant (Trial Transcript at pgs 560-61); 4) that according to Grant, Grant was with Defendant and Sandy Jones when they went to retrieve a thirty-three pound parcel of marijuana sent via UPS (Trial Transcript at pgs 573-74); 5) that Grant stated in "2013, 2014" he was with Defendant "a couple of times" when Defendant picked up mailed parcels of marijuana (Trial Transcript at pgs 580-81).

At trial, the government was aware that all of the above statements and testimony by Jerome Grant was false. Prior to trial, the Government turned over to the defense numerous letters written by Jerome Grant to the U.S. Attorney's Office, including Christmas cards sent by Grant to the U.S. Attorney's office. However, the Government did not produce a letter written by Jerome Grant to the U.S. Attorney's office in which Grant stated that the Government had informed him to falsely testify in the Defendant's second trial. The letter was an exhibit in Roderick Arrington's jury trial.

On September 15, 2022, Jerome Grant was question in Mr. Arrington's trial regarding the contents of that letter. The letter was marked as exhibit 3506MM in Mr. Arrington's case. The Defendant learned of this letter when the testimony of Mr. Arrington's trial

was transcribed and placed on the docket. See, United States v. Arrington, Case No. 1:15-Cr-00033-3, Docket No. 972, pages 1 through 77). Specifically, Jerome Grant testified regarding the contents of that letter on pages 58 through 77.

### C. Withheld Evidence by the Prosecution

As stated above, the Government was in possession of a letter authored by Jerome Grant, a key government witness in Defendant's second trial, in which Mr. Grant stated that the Government had instructed him to falsely testify at the Defendant's trial. The Government never disclosed this letter to the Defendant at any time. The letter was marked as Exhibit 3506MM in Roderick Arrington's trial, which was commenced in September 2022, years after the Defendant's second trial.

### III. LEGAL STANDARD – RULE 59(a)

Pursuant to Rule 59(a), a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court", Fed. R. Civ. P. 59(a)(1)(A). However, "[a] motion for a new trial ordinarily should not be . granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice", Snyder v. N.Y.S. Educ. Dep't, 486 F. App'x 176, 177 (2nd Cir. 2012). See also, Song v. Ives Laboratories Inc, 957 F.2d 1041, 1047 (2nd Cir. 1992).

"In order for a district court to grant a new trial on jury compromise grounds, 'the record itself viewed in its entirety must clearly demonstrate the compromise character of the verdict", In re Vivendi Universal, S.A. Securities Litigation, 765 F.Supp.2d 5122 (SDNY 2011)(quoting Maher v. Isthmian Steamship Co., 253 F.2d 414, 415 (2nd Cir. 1958). "[T]he inference of compromise stems from inconsistency between the verdict and the

facts adduced at trial", <u>Ajax Hardware Mfg. Corp. v. Indus. Plants Corp.</u>, 569 F.2d 181,
184 (2nd Cir. 1977). In other words, the record must show that the jury "reach[ed]
agreement by means other than a conscientious examination of the evidence", <u>Maher</u>, 253
F.2d 416-17.


IV. <u>LEGAL STANDARD - RULE 60(b)</u>

Pursuant to Rule 60(b), Fed. R. Civ. P., "the court may relieve a party or its
legal representative from a final judgment, order, or proceeding if one of several
enumerated bases for relief is established", <u>Thai-Lao Lignite (Thailand) Co. v. Gov't
of Lao People's Democratic Republic,</u> 864 F.3d 172, 182 (2nd Cir. 2017). Additionally,
Rule 60(b) provides that a court may relieve a party from a final judgment for reason of
'newly discovered evidence that, with reasonable diligence, could not have been discovered
in time to move for a new trial under Rule 59(b). The Second Circuit has held that the
newly discovered evidence must be 1) of facts that existed at the time of trial or
other dispositive proceeding, 2) the movant must have been justifiably ignorant
of them despite due diligence, 3) the evidence must be admissible and of such
importance that it probably would have changed the outcome, and 4) the evidence must
not be merely cumulative or impeaching. <u>Mirlis v. Greer</u>, 952 F.3d 36, 50 (2nd Cir.
2020). Lastly, Rule 60(b) allows relief based on fraud, misrepresentation, or misconduct
by an opposing party.


V. <u>JUROR MISCONDUCT DURING DEFENDANT'S TRIALS</u>

The Second Circuit has repeatedly held that "a post-verdict inquiry into allegations
of [jury] misconduct is only required 'when there is clear, strong, substantial and
incontrovertible evidence...that a specific, nonspeculative impropriety has occurred

which could have prejudiced the trial of a defendant", United States v. Baker, 899 F.3d 123, 130 (2nd Cir. 2018)(quoting United States v. Moon, 718, F2d 1210, 1234 (2nd Cir. 1983)). The allegations of jury misconduct must be "concrete allegations of inappropriate conduct that constitute competent and relevant evidence", Id. (quoting U.S. v. Ianniello, 866 F.2d 540, 543 (2nd Cir. 1989).

Here, the evidence is support by both sworn affidavits of two (2) jurors as well as by audio recordings of their conversations with Investigator Lawrence. This evidence is "concrete" and "competent" evidence of the inappropriate jury misconduct including racial bias and stereotyping.

For centuries, courts have been reluctant to peek behind a jury verdict and inquire into the jury's deliberations or a juror's subjective understandings. See, Pena-Rodriguez v. Colorado, 137 S.Ct. 855, 863, 197 L.Ed2d 107 (2017)(discussing Vaise v. Delaval, 99 Eng. Rep. 944 (K.B. 1785). This traditional "no-impeachment rule" provides "substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations", Id at 861. The rule has been codified in Federal Rule of Evidence 606(b). This evidentiary rule generally bars a juror from giving evidence "about any statement made or incident that occurred during the jury's deliberations" about "the effect of anything on that juror's or another juror's vote" or " about "any juror's mental processes concerning the verdict or indictment", Fed. R. Evid. 606(b)(1). It includes only narrow exceptions for evidence about "extraneous prejudicial information", and improper "outside influence" or a "mistake" in "entering the verdict on the verdict form", Fed. R. Evid. 606(b)(2).

Apart from these three rule-based exceptions, the Supreme Court in Pena-Rodriguez added a fourth constitutionally rooted exception. After the verdict in that case, two jurors alleged that another juror had made several biased remarks that the defendant was

guilty of sexual misconduct becaue of his ethnicity. See 137 S.Ct. att 862. To give one example, this juror allegedly said, "I think he did it because he's Mexican and Mexican men take whatever they want", Id. The state courts found this evidence inadmissible under Colorado's non-impeachment rule. Id. The Supreme Court reversed, holding that the Sixth Amendment requires courts to set aside their no-impeachment rules and consider evidence of racial bias when "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant[.]", Id at 869. It reasoned that, unlike other types of juror misconudct, "racial bias implicates historical, constitutional, and institutional concerns", Id at 868. To protect the general interests served by the no-impeachment rule, however, the Court clarified the narrow scope of its holding. The holding did not cover "every offhand comment indicating racial bias or hostility", rather, it required a showing that a juror made a statement "exhibiting overt racial bias" and "tend[ing] to show that racial animus was a significant motivating factor in the juror's vote to convict", Id at 869.

Here, the standard held in Pena-Rodriguez is easily met. Both Ms. Barbary and Ms. Kessel stated that other jurors openly made comments regarding their racial bias and racial stereotypes, and that those jurors believed that the Defendant was guilty based on his race and based on the neighborhood that he was from. Ms. Barbary and Ms. Kessel's affidavits make clear that those jurors made their decisions not based on the facts of the case before them, but instead based on their own racial bias and stereotype holdings. It is also clear from their affidavits that Ms. Barbary and Ms. Kessel were pressured by those jurors that exhibited racial bias to change their non-guilty votes to guilty votes. Importantly, the Second Circuit has suggested that in certain circumstances, allegations of intrajury pressure may rise to the level necessary to impeach the verdict. See, Anderson v. Miller, 346 F.3d 315, 327 (2nd Cir. 2003).

Regarding Rule 59, courts in the Second Circuit have held that a defendant "is obligated to point to something...suggesting racial bias in the jury selection process", <u>Williams v. City of Newburgh</u>, 830 F.Supp. 770, 773 (S.D.N.Y. 1993), and that a defendant must "make some kind of basic, threshold showing of impropriety beyond mere generalized speculation" to demonstrate unfairness of the trial arising from the behavior of the jury. See, <u>Utica Mut. Ins. Co.</u>, 419 F.Supp.3d at 471.

The affidavits of Ms. Barbary and Ms. Kessel raise concerns that some of the jurors were not truthful during voir dire, and as such, the Court should consider whether a hearing in accordance with <u>McDonough Power Equipment, Inc. v. Greenwood</u>, 464 U.S. 548, 556-557, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) is necessary. In that case, the Supreme Court held that "regardless of whether a juror's answer [in voir dire] is honest or dishonest, it remains within a trial court's option, in determining whether a jury is biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias, or in exceptional circumstances, that the facts are such that bias is to be inferred", <u>Id</u> (Blackma, J. concurring). As such, based on the evidence presented in the juror affidavits, the Court should consider a hearing to determine any inappropriate answers in voir dire as well as to address the jury misconduct during deliberations that demonstrated a clear, concrete showing of racial bias.

VI. <u>JUDICIAL MISCONDUCT REGARDING THE JURY</u>

The Supreme Court has established that due process "requires a 'fair trial in a fair tribunal' before a judge with no actual bias against the defendant or interest in the outcome of his particular case", <u>Bracy v. Gramley</u>, 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997)(quoting <u>Withrow v. Larkin</u>, 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), and citing <u>Aetna Life Ins. Co. v. Lavoie</u>, 475 U.S. 813, 821-22, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), and <u>Turney v. Ohio</u>, 273 U.S. 510, 523, 47 S.Ct. 437,

71 L.Ed.2d 749 (1927). In order to prevail on a claim of judicial bias, a defendant must show that he did not receive a trial "by an unbiased and impartial judge without a direct personal interest in the outcome of the hearing", Ungar v. Sarafite, 376 U.S. 575, 584, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). Attached as Exhibit 3 is a recent article that specifically addresses the racial bias of the trial judge in the Defendant's case and Exhibit 4, which is an affidavit from the Defendant's trial attorney. Those exhibits are also bolstered by the affidavits of Ms. Barbary and Ms. Kessel. Additionally, as discussed below, there are grave concerns of judicial misconduct regarding ex parte communications between Ms. Barbary and the trial judge that were not disclosed during the trial.

## A. EX PARTE COMMUNICATIONS BETWEEN TRIAL JUDGE AND JURY

A substantial claim raised by the Defendant relates to the trial court's private communications with one juror during the jury's deliberations. Communications with the jury may violate the defendants' right to be present at all stages of the proceedings. See Fed. R. Crim. P. 43(a), Rogers v. United States, 422 U.S. 35, 45 L.Ed.2d 1, 95 S.Ct. 2091 (1975)(reversible error to advise jury in response to jury request, without notifying defense counsel, that court would accept verdict of guilty "with extreme mercy of the Court"); United States v. Glick, 463 F.2d 491, 493 (2nd Cir. 1972)(terming right an "unequivocal mandate").

Because an important right is involved, one with constitutional underpinings, Illinois v. Allen, 397 U.S. 337, 338, 25 L.Ed.2d 353, 90 S.Ct. 1057 (1970), private communications with the jury have been said to "create a presumption of prejudice", United States v. Treatman, 524 F.2d 320, 325 (8th Cir. 1975); see United States v. Pfingst, 477 F.2d 177, 198 (2nd Cir. 1973)(Government has burden of persuasion as to harmlessness to defendant of communication).

The Supreme Court has made clear that in a federal prosecution of a criminal defendant, "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is...deemed presumptively prejudicial", Remmer v. United States, 347 U.S. 227, 229, 98 L.Ed. 654, 74 S.Ct. 450 (1954). See, U.S. v. Scisum, 32 F.3d 1479, 1482 (10th Cir. 1994)(applying Remmer presumption to ex parte juror contact with trial judge).

Other courts too, have held that ex parte communications between judge and jury are presumptively prejudicial. See, U.S. v. Taylor, 562 F.2d 1345, 1365  (2nd Cir.); U.S. v. Treatman, 524 F.2d 320, 323 (8th Cir. 1975). See also, U.S. v. United States Gypsum Co, 438 U.S. 422, 460, 98 S.Ct. 2864, 2885, 57 L.Ed.2d 854 (1978)("any ex parte meeting or communication between the judge and the foreman of a jury is pregnant with possibilities for error").

The Supreme Court has recognized that while ex parte communications between a juror and a trial judge may be concerning, "the constitution does not require a new trial every time a juror has been placed in a potentially compromising situation...[because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote", Rushmen v. Spain, 464 U.S. 114, 118, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). However, a judge should avoid a "coercive atmosphere", U.S. v. Akbar, 698 F.2d 378, 380 (9th Cir. 1983). That is what happened here according to the juror affidavits. More concerning is the fact that there is no court record of the meeting between Ms. Barbary and the judge.

The Court in U.S. v. Gay, 522 F.2d 429, 435 (6th Cir. 1975) held that where no record of the contents of the communications exists, prejudice must be assumed. Further, there was no consent by defense counsel or the defendant for any ex parte communications to occur between the trial judge and any juror. There having been no informed consent to the communications, it was error for the court not to reveal the substance of these

communications to counsel for both sides. And it makes no difference that any ex parte communication matter may have been personal, unrelated to the trial or even possibly embarrassing to the juror in its details. Such factors would justify informing counsel at a side bar or in chambers, rather than in open court, but they cannot outweigh a defendant's right to be "present" for all aspects of his trial.

Here, the trial judge discussed the trial and the defendant with a juror during an ex parte communication. That communication was never disclosed to the defendant or to defense counsel. Ms. Barbary stated that she felt pressured by the judge to change her vote to guilty. Under the standard set forth in U.S. v. Remmer, these facts establish that the presumption of prejudice against the Defendant here is easily met.


## VII. PROSECUTORIAL MISCONDUCT

As stated above, the Prosecution withheld a damaging letter written to the U.S. Attorney's office by the government's key witness, Jerome Grant. In that letter, Mr. Grant revealed that the Government instructed him to testify falsely.

Under Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution must disclose "evidence that is both favorable to the accused and 'material either to guilt or to punishment'", U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)(quoting Brady, 373 U.S. at 87). To establish a Brady violation, a petitioner "must show that: (1) the government either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice", U.S. v. Kirk Tang Yuk, 885 F.3d 57, 86 (2nd Cir. 2018). Reversal is required "if there is a 'reasonable probability' that disclosure would have changed the outcome of the case, or where the suppressed evidence 'could reasonably be taken to put the whole case in such a different

light as to undermine confidence in the verdict'", Kirk Tang Yuk, 885 F.3d at 86 (quoting Kyles v. Whitley, 514 U.S. 419, 434-35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

Here, the Government intentionally withheld the letter because of the damaging content to the government. It is undisputed that the government presented the same evidence in the second trial of the Defendant that it presented in the first trial that ended in the jury being unable to agree to a verdict. The only difference between the government's two trial presentations was that it used Mr. Jerome Grant as a key witness in the second trial. It is easily inferred that without the testimony of Mr. Grant, the second trial jury would also have been unable to reach a verdict, or even would have acquitted the Defendant. As such, the letter was material and its non-disclosure violated Brady. More importantly, as discussed below, the letter raises serious concerns of prosecutorial misconduct as the letter stated that the Government instructed Mr. Grant to testify falsely in order to secure a conviction of the Defendant.

## A. FALSE TESTIMONY PRESENTED BY THE GOVERNMENT

The testimony of Mr. Jerome Grant was false and the Government was aware of the same. Mr. Grant's undisclosed letter makes this fact crystal clear and the letter impeaches his entire testimony.

Courts have held that a criminal defendant is denied due process when the prosecution knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected, Giglio v. U.S., 405 U.S. 150 (1972). To establish a denial of due process through the use of perjured testimony, a petitioner must show "that (1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false", Reed v. Quarterman, 504 F.3d 465, 473 (5th Cir. 2007).

The Supreme Court itself has held that a "state may not knowingly use false evidence

including false testimony, to obtain a tainted conviction", <u>Napue v. Illinois</u>, 360 U.S.
264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). It is "fundamentally unfair to the
accused where 'the prosecution knew, or should have known, of perjury", See, <u>Lambert v.
Blackwell</u>, 387 F.3d 210, 242 (3rd Cir. 2004)(quoting <u>U.S. v. Agurs</u>, 427 U.S. 97, 103,
96 S.Ct. 2392, 49 L.Ed.2d 343 (1976).

Here, according to Mr. Grant's letter, the Government intentionally solicited the
false testimony in order to obtain a conviction. This unquestionably violates every
notion of a fundamentally fair trial. The mere fact that the Government withheld this
damaging letter is prima facie evidence that the letter itself was damaging to the
prosecution's case. As the letter was never properly disclosed, the Court, at a minimum,
should hold an in camera viewing of this withheld document to fully ascertain the
impact of the Government's misconduct during the Defendant's second trial. The Defendant
and / or his counsel, should also be allowed to view the letter during any such
proceeding. The Court should find that such egregious misconduct by the government in
knowingly soliciting false testimony warrants relief from the judgment against the
Defendant.

CONCLUSION

For the reasons stated herein as well as for reasons to be argued at any hearing
on this motion, the Defendant respectfully requests that the Court grant relief under
Rule 59 and or Rule 60 from the judgement against the Defendant. In addition, the
Defendant respectfully requests that the Court appoint counsel to assist the Defendant
in any hearing or to supplement the Defendant's pro se motion on this matter.

Respectfully Submitted,

Aaron Hicks #23995-055
FCI McKean
PO Box 8000
Bradford, PA 16701


## CERTIFICATE OF SERVICE

I, Aaron Hicks, hereby certify that I mailed a copy of this document to the U.S. Attorney's Office on August 8th, 2023 using the FCI-McKean prison mail system.

Aaron Hicks

EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

AARON HICKS,

Petitioner,

v.                                    Case No. 1:15-CR-00033(RJA)(RBS)

                                      Civil Action No.

UNITED STATES OF AMERICA,

Respondent

_____/

Assigned to: Hon. Richard J. Arcara

Referred to: Hon. Hugh B. Scott

# <u>SUPPORTING AFFIDAVIT</u>

DECLARATION OF CHARLENE A. BARBARY

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1). I, Charlene A. Barbary, do hereby solemnly swear and depose that my date of birth is October 9, 1966 and that I currently reside at _____ venue, Kenmore, New York 14217.

2). I was a member of the Federal Jury on a criminal trial involving Aaron Hicks. My entire experience on this jury is still very clear to me at this time.

3). I was the only African American juror and everyone else was Caucasian with the exception of a female Puerto Rican juror. They seemed to be stereotyping Mr. Hicks based on his skin color and what part of the City of Buffalo he came from.

1

*Charlene G. Barbary*

4). A number of jurors didn't appear to be happy with my not guilty vote and kept asking me if I needed to see anything again to help in my decision. I said no and I felt I had everything I needed to make my decision. I did not feel that the government had proven their case beyond a reasonable doubt.

5). One white female juror, who I think may have been the foreperson, was noticeably more upset than the others regarding my decision and went out to speak with the judge. This made me very upset and I walked out of the jury room on one occasion crying.

6). The judge had me brought into his chambers alone and began to discuss things with me. I did not like going back there by myself. What I found peculiar and what made me uncomfortable was his telling me that he had explained to Mr. Hicks that if he didn't take a plea and went to trial he was going to lose and then he would sentence him to the max, which I believe was 25-30 years to life.

7.) I didn't understand and still don't know how this was relevant to me as a juror. Because he is a judge I wasn't sure what I should do considering he sits in a position of authority. And I also questioned why he wouldn't have brought this up to all of us jurors & not just me. I didn't feel that this was fair to Mr. Hicks.

8.) I changed my vote to guilty because of the immense pressure I felt from both other members of the jury as well as the judge after he brought me into his chambers alone. I truly regret changing my decision and it wasn't what I believed to be true.

9). I have read the following statement consisting of two pages, each of which I have signed. I fully understand this statement and it is true, accurate and complete to the best of my knowledge and belief. I made this statement freely and voluntarily without any threats or rewards, or promises of reward having been made to me in return for it.

I declare under penalty of perjury, that the foregoing is true and correct.


Executed on this _____ day of April 2023


*Charlene A. Barbary*
Charlene A. Barbary

2

06/23/2023

**EXHIBIT 2**

# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

AARON HICKS,

Petitioner,

v.

Case No. 1:15-CR-00033(RJA)(RBS)

Civil Action No._____

UNITED STATES OF AMERICA,

Respondent

/

Assigned to: Hon. Richard J. Arcara

Referred to: Hon. Hugh B. Scott

# SUPPORTING AFFIDAVIT

DECLARATION OF PATRICIA A. KESSEL

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1). I, Patricia A. Kessel, do hereby solemnly swear and depose that my date of birth is July 30, 1975 and that I currently reside at ~~New York 14033.~~ Golden, New York 14033.

2). I was a member of the Federal Jury on a criminal trial involving Aaron Hicks My entire experience on this jury is still very clear to me at this time.

1

06/23/2023

3). Many members of the jury seemed to concerned with going home and not deliberating the matter. They also appeared to me to be stereotyping Mr. Hicks based on his skin color and what part of the City of Buffalo he came from.

4). At the start of deliberations, I felt intimated by a number of the members of the jury. I had voiced my concerns about this to the jury foreperson and I believe that he wrote a note to the court and brought it to them; however, I was not privy to what he wrote.

5). There appeared to be a complete disregard for the jury instructions both at the time of deliberation but also during the trial, where I observed a number of jurors talking about the matter before the trial was over.

6). If the court is willing to have a hearing on this matter, I am willing to provide testimony as to the facts as I have presented them in this affidavit.

7). I have read the following statement consisting of two pages, each of which I have signed. I fully understand this statement and it is true, accurate and complete to the best of my knowledge and belief. I made this statement freely and voluntarily without any threats or rewards, or promises of reward having been made to me in return for it.

I declare under penalty of perjury, that the foregoing is true and correct.


Executed on this 9th day of February 2023.



Patricia A. Kessel

2

**EXHIBIT 3**

TRULINCS 23995055 - HICKS, AARON - Unit: MCK-A-A

------------------------------------------------------------------------------------

FROM: Jackson, Mr
TO: 23995055
SUBJECT: dwight
DATE: 02/24/2022 07:36:08 PM

Intersections + InjusticeUse + Harm ReductionPolitics + LegalizationMedia + CultureDrugs + MoneyAbout FilterAbout The
Influence Foundation

HOMECRIMINAL INJUSTICERACE

Bombshell Paper Names the Federal Judges Guilty of the Most Racist Sentencing

Rory Fleming

August 2, 2021

Subscribe .

It has long been known that people of color get harsher criminal sentences in federal criminal court for the same crimes as
white people. In the federal criminal justice system, the powerful US Sentencing Commission itself has come to this conclusion.

But the numbers obtained and analyzed by researchers usually have shown this on a birds' eye view-level only. That is by
design. The US Judicial Conference has a policy of screening out judges' names from federal databases of cases, claiming that
is concerned about "the potential for judge-specific information taken out of context to be misinterpreted, the administrative
burden of compiling information to satisfy outside requests, and the availability to researchers of the information from individual
courts."

The policy, in other words, protects federal judges despite the fact that they already receive the utmost insulation from populist
anger as well as the democratic process. Thanks to the Constitution, they all receive lifetime tenure.

Six academics have just published a research study in SocArXiv that might go down in history as the single paper that pissed
off the legal profession more than any other.

Its title "The Most Discriminatory Federal Judges Give Black and Hispanic Defendants At Least Double the Sentences of White
Defendants" summarizes the big-picture story succinctly. But it does more than the headline suggests: Thanks to a newly
created database, and the research done here, we now know the names of the judges handing down the most racist sentences
from the federal bench. We know in terms of the disparate sentences these judges give to Black and Latinx defendants,
compared with those they give to white defendants for the same crimes.

A handful of judges are guilty of what can only be described as horrifically racist sentencing. According to the data, the single
worst offender on the federal bench is Senior US District Court Judge C. Darnell Jones, II. Appointed by President George W.
Bush in 2008, he rose up the ranks of the legal profession after starting his career as a public defender in Philadelphia. Despite
that background, Judge Jones's sentences for Black people are 126 percent harsher and for Latinx people, 156 percent harsher
than his sentences for white people.

The mixed crew of academics have hit the accountability nail on the head. This sort of work absolutely needs to be done to
change the system.

Federal defense lawyers practicing in Philly might start seriously considering motions to remove Judge Jones from their clients'
cases. Ethically speaking, Judge Jones could also just resign.

The same goes for the three other federal judges who demonstrated racist sentencing disparities on a similar scale: Judge
Timothy J. Savage, Judge Stanley R. Chesler and Judge Richard J. Arcara.

Each of these three judges was appointed by a Republican president (George W. Bush or Reagan). And like Judge Jones,

TRULINCS 23995055 - HICKS, AARON - Unit: MCK-A-A
--------------------------------------------------------------------------------

perhaps surprisingly for some observers, they all practice in the Northeast. Unsurprisingly they are all white, and two of them are former prosecutors.

Judge Chesler was an assistant district attorney in the Bronx and a federal line prosecutor in New Jersey. Similarly, Judge Arcara was the US Attorney for the Western District of New York, as well the elected district attorney of Erie County, New York in the mid-1980s.

The mixed crew of academics on the project four of the six researchers are in math or computer science fields have hit the accountability nail on the head. This sort of work absolutely needs to be done to change the system.

Our system ensures that few mechanisms, as opposed to simple outcry, are in place for the public to register its disapproval of specific federal judges.

But most human beings are capable of feeling shame. These judges will now likely be asked by people in their personal circles their family and friends, as well as professional peers why they wield bigotry like a weapon when they don their judicial robes.

It's deeply unsatisfactory, but in the absence of needed formal accountability mechanisms, such pressure could be the most likely way for these lifelong appointees to reconsider their careers. Absolutely nothing justifies the gratuitous damage they have inflicted.

Photograph by SalFalko via Flickr/Creative Commons 2.0

-amphtml-auto-lightbox-visited="" style="box-sizing: border-box; margin: 0px; padding: 0px; border: 0px; outline: 0px; font-size: 18px; vertical-align: baseline; background: transparent; max-width: 100%; display: block !important;">" i-amphtml-auto-lihtbox-visited="" style="box-sizing: border-box; margin: 0px; padding: 0px; border: 0px; outline: 0px; font-size: 18px; vertical-align: baseline; background: transparent; max-width: 100%; display: block !important;">" i-amphtml-auto-lightbox-visited="" yle="box-sizing: border-box; margin: 0px; padding: 0px; border: 0px; outline: 0px; font-size: 18px; vertical-align: baseline; background: transparent; max-width: 100%; display: block !important;">

minal injusticerace

Two Years After Oakland's Psychedelic Decrim, What's Been the Impact? »

GOP Senator Behind Marijuana Banking Bill Aims to Restrict Welfare Recipients' Dispensary Spending

ory Fleming

ory is a writer and licensed attorney. Previously, he ran Foglight Strategies, a campaign research services firm for forward-thinking prosecutors, and worked for the Law Enforcement Action Partnership, Harvard Law School Fair Punishment Project and the National Network for Safe Communications at the John Jay College of Criminal Justice. He lives in Philadelphia.

n Francisco Hospital Program Offers Harm Reduction to Patients

bruary 24, 2022

tory After High School Students Strip-Searched for Vapes

bruary 23, 2022

DA Wants to Fund Research Into Marijuana Legalization Models

Exhibit 4

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AARON HICKS, | DECLARATION OF ATTORNEY |
| Petitioner, | ROBERT ROSS FOGG |
| v. | Case No. 1:15-CR-00033(RJA)(RBS) |
| | Civil Action No. 1:23-cv-00166-RJA |
| UNITED STATES OF AMERICA, | |
| Respondent. | Assigned to: Hon. Richard J. Arcara |
| | Referred to: Hon. Hugh B. Scott |

### SUPPORTING AFFIDAVIT

STATE OF NEW YORK )
COUNTY OF ERIE ) :ss.
CITY OF BUFFALO )

I, ROBERT ROSS FOGG, ESQ., pursuant to 28 U.S.C. §1746, hereby depose and declare as follows:

1.    I am a United States citizen who is over the age of 18 and a resident of the State of New York. I am an attorney at law duly licensed to practice in the State of New York and admitted to practice before the United States District Court for the Western District of New York, with a solo-practice located at 69 Delaware Avenue, Suite 600, Buffalo, New York 14202; Phone number: (716) 853-3644; and Email:

2.    On February 23, 2015, Mr. Aaron Hicks (hereinafter referred to as "Hicks") was arrested and eventually charged in a three-count superseding indictment with, under Count 1, racketeering conspiracy in violation of 18 U.S.C. § 1962(d), under Count 2, narcotics conspiracy (marijuana, cocaine and cocaine base) in violation of 21 U.S.C. § 846, and under Count 3, possession of firearms in furtherance of a crime of violence and a drug trafficking crime in violation of 18 U.S.C. §§ 924(c) and 2.

3.    I, as retained counsel, represented Hicks during his first criminal jury trial on the above-entitled action brought by the United States of America, the verdict of which was rendered

1

on October 13, 2017. During jury deliberations, a loud verbal and physical altercation between jurors broke out, which required the intercession of Court Officers. The jury found Hicks guilty of engaging in a marijuana conspiracy but acquitted him of conspiring to traffic cocaine or cocaine base, and a firearm possession charge. The jury was unable to reach a verdict on the RICO conspiracy count and the District Court declared a mistrial.

4.      At the Court's pronouncement of mistrial, the government declared their intention and decision to retry Hicks on Count 1 of the superseding indictment charging a RICO conspiracy and requested a trial date, to which the Court granted and scheduled. Accordingly, Hicks advised the Court of his inability to pay counsel for a retrial. In addition, I advised the Court of my refusal to represent Hicks *pro bono*. I further advised the Court that I was not a CJA panel member and did not desire to be so. Notwithstanding, concerned with delays caused by new substitute counsel's need for time to become familiar with the case, the Court *sua sponte* designated me CJA Appointment against my wishes. I had not gone through a CJA interview process, nor had I completed and submitted a CJA application. I was never trained with regard to the CJA policies, procedures, support tools, reporting of time, billable hours or services, nor the availability and procurement of professional services, etc.

5.      Consequently, I, as CJA appointed counsel, represented Hicks during his criminal retrial on the above-entitled action brought by the United States of America, the verdict of which was rendered on May 2, 2018. At the retrial, the government presented substantially the same evidence that it had presented during the first trial. During jury deliberations, one of the jurors, who was crying distraughtly, requested to be removed as a juror due to racial animosity amongst jurors in the deliberation room. The jury found Hicks guilty of a RICO Conspiracy.

2

6.      After trial, the exact date unknown, Hicks brought to my attention issues of potential juror misconduct. As a solo practitioner of a small criminal defense law office, I was unable to investigate the existence of evidence supporting his claim. In addition, I was not aware that professional investigative services were available through CJA and was unfamiliar with the process of obtaining any needed services. In fact, due to my lack of CJA familiarity and training, to date I have not been paid for my services.

7.      Upon his conviction in the first trial of Conspiracy to Possess with Intent to Distribute, and to Distribute, Marijuana and his conviction in the retrial of a RICO Conspiracy, the District Court sentenced Hicks to 360 months of imprisonment.

8.      Recently, I learned from Hicks' Investigator Paul H. Lawrence, LPI, of Empire Investigations at 733 Delaware Road # 102, Buffalo, N.Y. 14223, that, by way of supporting affidavit(s) and an audio interview from Juror Charlene Barbary, the above stated misconduct could be proven.

9.      If Mr. Aaron Hicks is granted an evidentiary hearing in this matter, I am willing to provide testimony as to the facts stated within my affidavit.

10.     I have read the following statements, stated within this affidavit, I fully understand these statements and they are true, accurate and complete to the best of my knowledge and belief. I made this statement freely and voluntarily without any threats or rewards or promises of reward having been made to me in return for it.

I declare under penalty of perjury, that the foregoing is true and correct.
Executed on this ___22nd___ day of April 2023.

Robert Ross Fogg Attorney at law

3

06/23/2023

Aaron Hicks # 23995-055
Federal Correctional Institution Mckean
P.O. Box 8000
Bradford, PA 16701

15-cr-33

USDC - WDNY
AUG 1 4 2023
BUFFALO


CERTIFIED MAIL

7018 0680 0000 1438 0699

Clerk, U.S. District Court
United States Court House, 2 Niagara Square
Buffalo, NY 14202-3350



